REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| MBIA INSURANCE CORPORATION, | |
| Plaintiff, | Adversary No. 20-50776 (KBO) |
| -against- | |
| LYNN TILTON, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS VIII, LLC, PATRIARCH PARTNERS XIV, LLC, PATRIARCH PARTNERS XV, LLC PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC OCTALUNA, LLC, OCTALUNA II, LLC, ARK II CLO 2001-1, LLC, ARK INVESTMENT PARTNERS II, L.P., LD INVESTMENTS, LLC, ZOHAR HOLDING, LLC, and ZOHAR HOLDINGS, LLC, | **COMPLAINT** |
| Defendants. | |

Plaintiff MBIA Insurance Corporation ("MBIA") through its undersigned

counsel, for its complaint against Defendants Lynn Tilton ("Tilton"), Patriarch Partners, LLC

("Patriarch Partners"), Patriarch Partners VIII, LLC ("Patriarch VIII"), Patriarch Partners XIV,

---

[1]    The Debtors, and, where applicable, the last four digits of each of their respective taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

LLC ("Patriarch XIV"), Patriarch Partners XV, LLC ("Patriarch XV") Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners Management Group, LLC ("PPMG"), Octaluna, LLC ("Octaluna I"), Octaluna II, LLC ("Octaluna II"), ARK II CLO 2001-1, LLC ("ARK"), ARK Investment Partners II, L.P. ("AIP"), LD Investments, LLC ("LDI"), Zohar Holding, LLC ("Zohar Holding") and Zohar Holdings, LLC ("Zohar Holdings," together with Tilton, Patriarch Partners, Patriarch VIII, Patriarch XIV, Patriarch XV, PPAS, PPMG, Octaluna, Octaluna II, ARK, AIP, LDI and Zohar Holding, collectively, the "Defendants"), alleges, on knowledge as to itself and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.     MBIA brings this action to redress Defendants' years-long pattern of fraud, self-dealing, and gross mismanagement pursuant to which they systematically looted the assets of three investment funds.  Defendants flagrantly violated their contractual, fiduciary, and other legal duties to Plaintiff and investors.   As a direct consequence, the funds managed by Defendants failed — causing Plaintiff, the insurer of the notes issued by two of the three funds, to incur more than $1 billion in losses and related damages — and MBIA was wrongfully prevented from recovering on its losses.

2.     Defendant Tilton created and controlled three investment funds (commonly known as "Zohar I", "Zohar II", and "Zohar III") structured as collateralized loan obligations ("CLOs") and referred to, collectively, as the "Zohar CLOs" or the "Zohar Funds."  MBIA provided financial guaranty insurance policies for both Zohar I and Zohar II (together, the "Insured Zohar Funds").  MBIA's insurance policies guaranteed the payments of principal and interest owed by the Insured Zohar Funds to their senior noteholders in the event the Insured Zohar Funds defaulted on their payment obligations on the respective note maturity dates — November 20, 2015 for Zohar I and January 20, 2017 for Zohar II.

3.      Each of the three Zohar CLOs sold notes to investors, who became entitled to principal and interest payments derived from the funds' assets, and used the proceeds to, among other things, make or acquire loans to, and obtain equity interests in, corporate borrowers referred to as the "<u>Portfolio Companies</u>."

4.      Accordingly, the success of the Zohar Funds depended on honest, competent management of their assets that would generate revenue sufficient to repay investors' notes with interest by the applicable maturity dates.

5.      Rather than faithfully perform their contractual, fiduciary, and other legal duties, however, Defendants instead embarked on an egregious campaign of stunning theft and self-dealing that, taken together, deprived the Insured Zohar Funds of funds needed to satisfy their note maturity payment obligations and resulted in the funds' payment defaults.  Defendants' scheme included (without limitation) the following forms of misconduct:

- Using fund assets to acquire controlling equity stakes in Portfolio Companies, of which Defendants then took the benefits to the exclusion of the funds and their investors.

- Refusing at any time to monetize those equity stakes, thereby destroying the funds' ability to repay investor notes in a timely manner.

- Without any legitimate business justification, altering the terms of the funds' loans to Portfolio Companies, including by waiving interest payments without consideration; waiving defaults without consideration; subordinating the funds' liens on collateral without consideration; and extending the Portfolio Companies' principal payment deadlines without consideration, all of which deprived the Insured Zohar Funds of resources to timely repay investors.

- Repeatedly engaging in self-dealing transactions with Portfolio Companies and other self-dealing conduct in order to control and profit from fund assets at the expense of the funds and their investors.

- Embezzling fund assets under the guise of "loans" to, but diverted from, the Portfolio Companies for Defendants' own improper use and benefit.

- Intentionally interfering with and taking for themselves the funds' rights to payments and other rights and interests associated with the equity in certain Portfolio Companies, despite having acknowledged such rights and interests belonging to the funds in presentations to ratings agencies.

- Deliberately manipulating, misrepresenting, and withholding information regarding the performance of fund assets that would have allowed Plaintiff to detect and stop or mitigate Defendants' scheme.

- Engaging in an extended pattern of frivolous and obstructionist litigation designed to frustrate the exercise and vindication of Plaintiff's rights.

6.    Through the foregoing pattern of outrageous and unlawful conduct, Defendants treated equity and control positions in Portfolio Companies acquired by the Funds with fund assets as though they belonged to Tilton — a legal fiction Tilton and Defendants have only recently abandoned — seizing for themselves the benefits of such equity; prolonged their retention and control of those interests and the attendant financial benefits; enriched themselves at the expense of the funds and their investors; and directly and proximately ensured that the funds could not repay investor notes in a timely manner, and defaulted.   The direct and proximate result was almost $1 billion in investor claims against, and losses to, Plaintiff, plus additional, foreseeable damages which Defendants have exacerbated by their continued wrongdoing.

**PARTIES**

7.    Plaintiff MBIA is a stock insurance company organized under the laws of the State of New York, with its principal place of business in Purchase, New York.  MBIA provides financial guaranty insurance on financial transactions such as the Zohar CLOs.  In 2003 and 2005, with respect to Zohar I and Zohar II, respectively, MBIA provided financial insurance guaranteeing, on their respective note maturity dates, the required payments of principal and interest of the Insured Zohar Funds to the holders of certain classes of senior notes issued by

those two CLOs. (MBIA did not provide financial guaranty insurance for the third Zohar CLO, Zohar III, which was created on or about April 6, 2007.)

8.    Defendant Lynn Tilton is a resident of Florida. Tilton is the founder and Chief Executive Officer of Patriarch Partners, and she controls all of the other Defendants. Tilton sponsored the Insured Zohar Funds and structured them to be run and controlled by her through the Defendant entities. For example, Tilton acted as the Collateral Manager for the Insured Zohar Funds through Defendants Patriarch VIII and Patriarch XIV, which were required to manage the Insured Zohar Funds' assets on behalf of and for the benefit of the Insured Zohar Funds, their noteholders and MBIA.

9.    Tilton is the ultimate owner exercising control over a web of affiliated entities organized under Delaware law, including Defendant entities that contracted to perform various investment and asset management services for the Zohar CLOs. Through her affiliated entities, Tilton maintained personal control over the Zohar CLOs and the Portfolio Companies, notwithstanding that the Zohar Funds and MBIA are the actual majority owners of nearly all of the Portfolio Companies. In March 2018, Tilton caused the Zohar Funds to file the above-captioned chapter 11 bankruptcy proceedings jointly administered as Case No. 18-10512 (KBO) (the "Zohar Bankruptcy Cases").

10.    Defendant Patriarch Partners is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is LDI. LDI, a holding company for certain affiliates and subsidiaries of Patriarch Partners, is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is Lynn Tilton. Patriarch Partners carries out business functions on behalf of and for the benefit of Tilton and her Patriarch affiliates.

DOCS_DE:230008.1 53730/001

11.     Defendant Patriarch VIII is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York. Patriarch VIII's sole member is Zohar Holding, a limited liability company whose members are Tilton and a business trust (the "Tilton Trust") for which Tilton serves as the sole trustee and the sole beneficiary of which is Carly Jade Tilton, a resident of Florida. Prior to its voluntary resignation in March 2016, Patriarch VIII was the collateral manager of Zohar I.

12.     Defendant Patriarch XIV is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York. Patriarch XIV's sole member is Zohar Holding, a limited liability company whose members are Tilton and the Tilton Trust.  Prior to its voluntary resignation in March 2016, Patriarch XIV was the collateral manager of Zohar II.

13.     Defendant Patriarch XV is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York. Patriarch XV's sole member is Zohar Holding, a limited liability company whose members are Tilton and the Tilton Trust.  In March 2015, Patriarch XV acquired the Zohar I A-3 notes.  Prior to its voluntary resignation in March 2016, Patriarch XV was the collateral manager of Zohar III.

14.     Defendant PPAS is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is LDI. As set forth above, LDI's sole member is Lynn Tilton.  PPAS was, until June 17, 2016, the administrative agent for the Zohar CLOs under the credit agreements by and among the Zohar CLOs and the respective Portfolio Company borrowers and obligors ("Credit Agreements") that set forth the terms of the loans made to the Portfolio Companies by one or more of the Zohar CLOs.  PPAS was given significant authority with respect to those loans, but exercised that authority for the sole intended benefit of Tilton and to the detriment of the Insured

Zohar Funds, their noteholders and MBIA.  Through her ownership and control of PPAS, and as a result of her misappropriation of the benefits of the Insured Zohar Funds' equity interests in the Portfolio Companies, Tilton and her affiliated entities also managed, directed and controlled the Portfolio Companies.    On June 17, 2106, the Zohar CLOs terminated PPAS as their administrative agent under the Credit Agreements.

15.    Defendant PPMG is a Delaware limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is LDI.  As set forth above, LDI's sole member is Lynn Tilton.  Pursuant to contracts executed and amended at the direction of Defendants, PPMG provided "management and consulting services" to the Portfolio Companies in exchange for a substantial monthly fee.

16.    Defendant Octaluna I is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.  Defendant Tilton is the ultimate owner of and exercises sole and exclusive control over Octaluna I.  Octaluna I is the holder of the subordinate preference shares in Zohar I.

17.    Defendant Octaluna II is a Delaware limited liability company with its principal place of business in New York, New York.  Defendant Tilton is the ultimate owner of and exercises sole and exclusive control over Octaluna II.    Octaluna II is the holder of the subordinate preference shares in Zohar II

18.    Defendant ARK is a Delaware limited liability company with its principal place of business in New York, New York.  Defendant Tilton is the ultimate owner of and exercises sole and exclusive control over ARK.

19.    Defendant AIP is a Delaware limited partnership with its principal place of business in New York, New York.  Defendant Tilton is the ultimate owner of and exercises sole and exclusive control over AIP.

-7-

20.    Defendant LDI is a Delaware limited liability company with its principal place of business in New York, New York.  LDI's sole member is Lynn Tilton.  As set forth above, LDI is the sole member of and holding company for certain of Tilton's affiliates and subsidiaries.

21.    Defendant Zohar Holding is a Delaware limited liability company with its principal place of business in New York, New York.  Zohar Holding's members are Tilton and the Tilton Trust.  Tilton holds 99% of the membership interests in Zohar Holding, and the Tilton Trust holds the remaining 1% of the membership interests in Zohar Holding.  As set forth above, Zohar Holding is the sole member of Patriarch VIII, Patriarch XIV and Patriarch XV.

22.    Alternatively, the sole member of Patriarch VIII, Patriarch XIV and Patriarch XV is Defendant Zohar Holdings, a Florida limited liability company with its principal place of business in Boca Raton, Florida, whose members are Tilton and the Tilton Trust.  Defendants and their agents have on different occasions identified and interchangeably referred to both "Zohar Holding, LLC" and "Zohar Holdings, LLC" as the owner and sole member of Patriarch VIII, Patriarch XIV and Patriarch XV.

## JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), in that this action arises under or arises in title 11 of the United States Code (the "Bankruptcy Code") or is related to the Zohar Bankruptcy Cases.  This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that MBIA and each of the Defendants are citizens of different States, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

24.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A) or, alternatively, is related to these Chapter 11 Cases as set forth in 28 U.S.C. § 157(c).

-8-

25.    Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Local Rule 7008-1, MBIA consents to entry of a final order by this Court with regard to any claim in this action.

26.    Defendants have, through their commencement and prosecution of the Zohar Bankruptcy Cases and other actions described herein, irrevocably submitted and consented to the personal jurisdiction of, and waived any objection to the laying of venue in, this Court.  In addition, this Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

27.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a) because it is related to these Chapter 11 Cases.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the alleged events or omissions giving rise to the dispute occurred in this judicial district, because a substantial part of property that is the subject of the action is situated in this district and because Defendants are subject to personal jurisdiction in this district.

## COMMON ALLEGATIONS

### I.    The Insured Zohar Funds And Governing Transaction Documents

28.    The Zohar I CLO was created on or about November 13, 2003 through the formation of three special purpose entities:  Zohar CDO 2003-1, Ltd. ("Zohar I" or the "Zohar I Issuer"), Zohar CDO 2003-1, Corp. (the "Zohar I Co-Issuer" and, together with the Zohar I Issuer, the "Zohar I Issuers") and Zohar CDO 2003-1, LLC (the "Zohar I Subsidiary").

29.    Similar to Zohar I, the Zohar II CLO was created on or about January 12, 2005 through the formation of three special purpose entities:  Zohar II 2005-1 Limited ("Zohar II" or the "Zohar II Issuer"), Zohar CDO 2005-1, Corp. (the "Zohar II Co-Issuer" and, together with

-9-

the Zohar II Issuer, the "Zohar II Issuers," and together with the Zohar I Issuers, collectively, the

"Issuers") and Zohar CDO 2005-1, LLC (the "Zohar II Subsidiary," and together with the

Zohar I Subsidiary, collectively, the "Zohar Subsidiaries").

30.    On or about November 13, 2003, Zohar I issued $532 million of "Class A" notes

(which are subdivided into Classes A-1, A-2 and A-3), $150 million of "Class B" notes (the

Class A and Class B notes, collectively, the "Zohar I Notes"), and preference shares (together

with the Zohar I Notes, the "Zohar I Securities").  The Zohar I Notes obligated Zohar I to make

periodic interest payments to the noteholders and to redeem the Zohar I Notes in full by paying

on their maturity date all outstanding principal and interest amounts owed.  The maturity date for

the Zohar I Class A notes — when the full principal and all outstanding interest was due to be

repaid — was November 20, 2015 (the "Zohar I Maturity Date").

31.    Zohar II was created on or about January 12, 2005 through a process similar to

Zohar I.  Zohar II issued $1 billion of "Class A" notes (which are subdivided into Classes A-1,

A-2 and A-3) and $200 million of "Class B" notes (collectively, the "Zohar II Notes," and,

together with the Zohar I Notes, the "Zohar Notes"), and preference shares (together with the

Zohar II Notes, the "Zohar II Securities," and together with the Zohar Notes and Zohar I

preference shares, the "Securities").  The Zohar II Notes obligated Zohar II to make periodic

interest payments to the noteholders and to redeem the Zohar II Notes in full by paying on their

maturity date all outstanding principal and interest amounts owed.  The maturity date for the

Zohar II Class A notes — when the full principal and all outstanding interest was due to be

repaid — was January 20, 2017 (the "Zohar II Maturity Date," together with the Zohar I

Maturity Date, collectively, the "Zohar Note Maturity Dates").

32.    The terms of the agreements governing each of the Insured Zohar Funds are set

forth in a series of documents referred to as the "Transaction Documents."  The Transaction

-10-

Documents for each of Zohar I and Zohar II include, among other documents, an indenture, a collateral management agreement, an insurance and indemnity agreement, the financial guaranty insurance policy issued by MBIA and the Zohar Notes themselves.

**A.    The Indentures**

33.    The principal agreements governing the rights and obligations attendant to the Insured Zohar Funds and the Zohar Notes are trust indentures (collectively, the "Indentures"). The parties to the Zohar I Indenture are the Zohar I Issuers, the Zohar I Subsidiary, MBIA, the Class A-1 Note Agent (CDC Financial Products Inc.) and U.S. Bank, N.A., as Trustee.  The parties to the Zohar II Indenture are the Zohar II Issuers, the Zohar II Subsidiary, MBIA, the Class A-1 and Class A-3 Note Agent (IXIS Financial Products Inc.) and U.S. Bank, N.A., as the current Trustee, replacing LaSalle Bank National Association.

34.    The Zohar I Issuer and the Zohar II Issuer are Cayman Islands exempted companies which, along with the Zohar I and Zohar II Subsidiaries, were the nominal owners of the assets held in trust by the Zohar CLOs.  Because the Issuers and Zohar Subsidiaries perform only ministerial functions, the Indentures provided that the Trustee and the Collateral Managers will act as the principal entities responsible for carrying out the day-to-day operations and functions of the Insured Zohar Funds.

35.    The Indentures charged the Trustee with holding the Insured Zohar Funds' property and assets in trust to secure (a) the Zohar Notes; (b) payments of all amounts due on the Zohar Notes in accordance with their terms; (c) other payments made by the Issuers under the Transaction Documents; and (d) compliance by the Issuers and Zohar Subsidiaries with the Transaction Documents.  For the benefit and security of the noteholders, MBIA, the Collateral Managers and the Trustee itself (collectively, among others, the "Secured Parties"), the Issuers

granted to the Trustee a continuing security interest and lien on all of the Issuers' rights, title and

interests in any and all assets and property owned by the Insured Zohar Funds.

**1.    The Collateral**

36.    All property and assets owned by the Insured Zohar Funds — including the loans

made by the Issuers to the Portfolio Companies as well as the equity interests in the Portfolio

Companies that were obtained by Zohar I or Zohar II — are "Collateral" under the Indentures.

Section 1.1 of the Indentures defines Collateral as follows:

> All Money, instruments, accounts, payment intangibles, general
> intangibles, letter-of-credit rights, chattel paper, deposit accounts,
> investment property and other property and rights subject or
> intended to be subject to the lien of this Indenture for the benefit of
> the Secured Parties as of any particular time.

37.    The definition of Collateral includes "property and rights subject or intended to be

subject to the [Trustee's] lien," and, therefore, incorporates all property referenced in the

Indentures' Granting Clauses.  In turn, the Indentures' Granting Clauses set forth an extensive,

but non-exhaustive list of the types of rights, title and interests that are subject to the Trustee's

lien and, thus, also constitute Collateral belonging to the Insured Zohar Funds for the benefit of

the Secured Parties, including MBIA.  Specifically, the Granting Clauses provide as follows:

> The Issuer hereby Grants to the Trustee, for the benefit and
> security of the Secured Parties, a continuing security interest in,
> and lien on, all of its right, title and interest in, to and under, in
> each case, whether now owned or existing, or hereafter acquired or
> arising, all accounts, payment intangibles, general intangibles,
> letter-of-credit rights, chattel paper, electronic chattel paper,
> instruments, deposit accounts, investment property (each, as
> defined by the UCC), and any and all other property of any type or
> nature owned by it (other than Excluded Property ), including but
> not limited to (a) the Collateral Debt Obligations, the Unrestricted
> Collateral Debt Obligations and any Equity Securities and other
> securities or obligations owned or acquired by the Issuer on the
> Closing Date, which the Issuer (or the Collateral Manager on the
> Issuer's behalf) causes to be delivered to the Trustee (directly or
> through a Securities Intermediary or bailee), all payments thereon

-12-

or with respect thereto and all Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and Equity Securities and other securities or obligations owned or acquired from time to time by the Issuer (including, without limitation, Exchanged Securities) that are delivered to the Trustee (directly or through a Securities Intermediary or bailee) after the Closing Date pursuant to the terms hereof and all payments thereon or with respect thereto . . . (d) the Management Agreement, the Collateral Administration Agreement, the Purchase Documents, the Note Purchase Agreements, the Note Subscription Agreements and the Preference Share Subscription Agreements, (e) all Cash and Money delivered to the Trustee (directly or through a Securities Intermediary or bailee) (other than Cash or Money on deposit in the Credit Enhancement Payment Account), (f) the membership interests in the Zohar Subsidiary and (g) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses. . . .

38.     In order to preserve and protect the value of the Collateral and the Secured Parties' rights in the Collateral, Sections 7.8(a) and (b) of the Indentures provided that the Issuers will not:

(i) sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(iv) (x) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (y) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof, or (z) take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

(b) None of the Issuer, the Zohar Subsidiary or the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the

Collateral except as expressly permitted by this Indenture and the Management Agreement.

## 2.    The Collateral Managers

39.    The Indentures contemplated that the Collateral of the Insured Zohar Funds will be managed by Collateral Managers. The Indentures provided for the Collateral Managers to perform certain duties of the Issuers and set forth certain rights and obligations with respect to the actions taken by the Collateral Managers on behalf of the Insured Zohar Funds. Section 7.5 of the Indentures, for example, provided that the Collateral Managers shall take actions necessary to secure the rights and remedies of MBIA and the other Secured Parties under the Indenture and, among other things, preserve and defend the Zohar Funds' rights in and title to the Collateral for the benefit of the Secured Parties.

40.    The Indentures, together with the Management Agreements (discussed below), also set forth standards of care governing the Collateral Managers. For example, Section 14.4(f) of the Indentures provided that if the Collateral Managers determine that they or any of their affiliates have a material conflict of interest between the Class A noteholders and any other account or portfolio for which the Collateral Managers or their affiliates act as an investment advisor, the Collateral Managers must, subject to any provisions in the Management Agreements addressing treatment of such conflict, perform their obligations "with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict."

41.    Similarly, Section 12.3(a) of the Indentures required that any sale of Collateral "shall be conducted on an arm's-length basis for fair market value" and in accordance with the Transaction Documents and applicable law, and that any such sales transaction involving the Collateral Managers or their affiliates "shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so Affiliated. . . ."

-14-

**3.     Payments to Noteholder Investors**

42.     The essential function of the Insured Zohar Funds under the Indentures and other

Transaction Documents was to maximize recoveries on the Collateral to facilitate the payment of

amounts that the Insured Zohar Funds owe to the noteholders.  The Indentures expressly required

the Issuers, for example, respectively, to make timely payment of all outstanding principal and

interest owed under the Class A Zohar Notes on the Zohar Note Maturity Dates.  Specifically,

Section 7.1(a) of the Indentures required the Issuers to:

> duly and punctually pay all principal, interest (including Class A
> Additional Interest, Defaulted Interest and interest thereon in
> respect of the Class A Notes), Class A-1 Commitment Fees,
> Class A-2 Commitment Fees, Class A-3 Commitment Fees,
> Class A-1 Additional Amounts, Additional Class A-3 Adjusted
> Amounts, Credit Enhancement Premium and Credit Enhancement
> Liabilities in accordance with the terms of the Notes, this
> Indenture, the Note Purchase Agreements and the Credit
> Enhancement Agreement. Upon the Maturity of the Notes of each
> Class, the Issuer will give notice thereof to each Rating Agency
> (unless otherwise notified thereof pursuant to the terms of this
> Indenture).

43.     The Indentures also set out instructions as to the order in which the various

obligations of the Insured Zohar Funds are to be paid (the "Payment Waterfalls").  Section

11.1(a) of the Indentures contained two Payment Waterfalls, one for distributing interest

proceeds and one for distributing principal proceeds.

44.     Under the interest Payment Waterfall set forth in Section 11.1(a)(i) of the

Indentures, any funds received as payments of interest on the Collateral must be paid (a) first

toward certain administrative expenses; (b) followed by interest on the Class A notes on a pro

rata basis among the Class A sub-classes; (c) followed by repayment of costs incurred by MBIA,

which the Indentures define as "Credit Enhancement Liabilities" (including any claims made

under MBIA's financial guaranty insurance); and (d) then to repayment of principal on the Class

A notes on a pro rata basis among the Class A sub-classes.  Each successive step in the interest

-15-

Payment Waterfall could receive payment only if all amounts owed under the prior steps have been paid in full.

45.     Under the principal Payment Waterfall, set forth in Section 11.1(a)(ii) of the Indentures, principal proceeds must be paid (a) first toward the deposit in the Issuer Principal Collection Account (as defined in the Indenture) in an amount determined by a formula set forth in the Indenture; (b) followed by payment of all Senior Expense Amounts (as defined in the Indenture); and (c) then to repayment of principal on the Class A notes on a pro rata basis among the Class A sub-classes.  The term "Senior Expense Amounts" is defined as those amounts specified for payment in certain sections of the interest Payment Waterfall, specifically, Sections 11.1(a)(i)(A) – 11.1(a)(i)(G) of the Indenture, including Section 11.1(a)(i)(G) which provided for the payment of all accrued and unpaid Credit Enhancement Liabilities.

### 4.      MBIA's Role and Rights as Insurer

46.     The Issuers' contractual obligations to timely pay all outstanding interest and principal owed to the noteholders was the essential bargain to which MBIA agreed in providing financial guaranty insurance pursuant to the Transaction Documents and to which the noteholders agreed in purchasing the Class A notes.  Failure by the Issuers to pay outstanding interest and principal owed under the Class A Zohar Notes on the Zohar Note Maturity Dates would, in addition to causing a breach of the Indentures, constitute an "Event of Default" under the Indentures.  Specifically, Section 5.1 of the Indentures provided that an Event of Default occurs where there is, among other events, a:

> (a) default in the payment of . . . (ii) any interest on any Class A-1 Note . . . (iii) any interest on any Class A-2 Note . . . or (iv) any interest on any Class A-3 Note . . . which default in each case shall continue for a period of three Business Days;
>
> (b) default in the payment of principal of any Note (determined without giving effect to any payments in respect of principal made

with proceeds of drawings under the Credit Enhancement) when the same becomes due and payable, at its Stated Maturity or Redemption Date. . . .

47.    MBIA provided financial guaranty insurance on the Insured Zohar Funds' payments to the Class A noteholders and also was a party to the Indentures. The Indentures refer to MBIA as the "Credit Enhancer" and "Controlling Party" for both Zohar I and Zohar II. The term "Credit Enhancer" refers specifically to MBIA as the issuer of the financial guaranty insurance policies made for the benefit of the holders of the Class A Zohar Notes. MBIA also is deemed the "Controlling Party" so long as the Class A Zohar Notes are outstanding or any amounts remain due and payable to it in its capacity as Credit Enhancer.

48.    As the Credit Enhancer and Controlling Party of the Insured Zohar Funds, MBIA possesses certain exclusive rights and powers under the Indentures. Prior to an Event of Default, for example, the Indentures provided MBIA with broad informational rights relating to the Insured Zohar Funds, the Portfolio Companies and the Collateral. Following an Event of Default, the Indentures empowered MBIA, among additional rights, to direct the Trustee to sell some or all of the Collateral and to remove and replace the Collateral Managers. As such, the term "Controlling Party" refers to these contractual rights and remedies that MBIA enjoys in its role as guarantor and senior secured creditor; the term "Controlling Party" does not mean that MBIA exerts operational control over the Insured Zohar Funds.

49.    A claim under MBIA's financial guaranty insurance policy is itself an Event of Default and also, separately, results in MBIA receiving certain additional rights, including reimbursement prior to principal payments to the Class A notes and subrogation to the rights of the insured Class A noteholders. In that regard, under the Payment Waterfalls, where MBIA has made a payment under its financial guaranty insurance policy, MBIA is entitled to receive reimbursement of its Credit Enhancement Liabilities under the "Senior Expenses" provision.

-17-

Section 16.5 of the Indentures also provided that the Issuers, the Trustee and Class A noteholders agreed, for the benefit of MBIA, that upon making payments of interest or principal on the Class A-1 or Class A-2 Zohar Notes, and without having to take any further action, MBIA becomes fully subrogated to the rights of such noteholders.

50.    The standard of care governing MBIA's actions is set forth in the Indentures. However, unlike the Collateral Managers, for example, MBIA has no obligations or duties under the Indentures to any other person or entity. Specifically, Section 13.2(a) of the Indenture provides as follows:

> [MBIA] shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

51.    MBIA's rights and remedies under the Indentures set forth above are not an exhaustive description of MBIA's rights and remedies in connection with its financial guaranty insurance policies, nor are they exclusive to any other rights and remedies available to MBIA under applicable law. Rather, Section 5.11 of the Indentures expressly provided as follows:

> no right or remedy herein conferred upon . . . the Noteholders or to the Credit Enhancer is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise, and the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

**B.    The Management Agreements**

52.    Under the Transaction Documents, the Collateral Managers are responsible for managing the assets of the Insured Zohar Funds. Until their effective resignation in March 2016,

-18-

Defendants Patriarch VIII and Patriarch XIV (collectively, the "Patriarch Manager Defendants")
acted as the Collateral Managers for Zohar I and Zohar II, respectively, pursuant to the Zohar I
and Zohar II collateral management agreements (the "Management Agreements").  Thus, as a
practical matter, Tilton made and controlled all of the Insured Zohar Funds' investment decisions
and collateral management activities through her control of the Patriarch Manager Defendants.
The Zohar I Management Agreement was entered into between the Zohar I Issuers, the Zohar I
Subsidiary, and Patriarch VIII.  The Zohar II Management Agreement was entered into between
the Zohar II Issuers, the Zohar II Subsidiary and Patriarch XIV.

53.    MBIA is an express third-party beneficiary of both Management Agreements and
has the full power to enforce them as though MBIA was a party thereto.

54.    The Management Agreements set forth the Patriarch Manager Defendants'
obligations and the scope of their authority in carrying out their fiduciary duties on behalf of the
Insured Zohar Funds.

55.    Section 7.12 of the Management Agreements expressly provided for the
assignment of the Management Agreements to the Trustee for the benefit of the Secured Parties
pursuant to the Indentures.  The Patriarch Manager Defendants also expressly acknowledged in
Section 7.12 of the Management Agreements that the Issuers and Zohar Subsidiaries assigned all
of their rights, title and interests in, to and under the Management Agreements to the Trustee for
the benefit of the Secured Parties.  In Section 7.12 of the Management Agreements, the Patriarch
Manager Defendants made the agreements and covenants set forth in Section 14.4 of the
Indenture, including their agreement to perform any provisions of the Indentures applicable to
the Collateral Managers.

56.    The Management Agreements expressly provided that the Patriarch Manager
Defendants were obligated to exercise the powers conferred to them thereunder in accordance

-19-

with and subject to the terms of the Indentures.  The Management Agreements likewise expressly prohibited the Patriarch Manager Defendants from causing the Issuers to exercise any rights or remedies in a manner prohibited by the Indenture.

57.    In addition to requiring that the Patriarch Manager Defendants adhere to the limitations set forth in the Indentures, the Management Agreements also separately and independently prohibited the Patriarch Manager Defendants from taking certain actions with respect to the Collateral and the Insured Zohar Funds.

58.    For example, Section 2.6 of the Management Agreements prohibited the Patriarch Manager Defendants from intentionally taking "any action that [they] know[] would cause an Event of Default under the Indenture."

59.    Section 2.6 of the Management Agreements also provided that the Patriarch Manager Defendants shall not take actions that they know, or should reasonably be expected to know in accordance with prevailing market practices, "would . . . adversely affect the interests of the Holders of the Securities (without, in the case of the Notes, giving effect to [MBIA's financial guaranties], if applicable) in any material respect (other than as contemplated [under the Management Agreements] or under the Indenture[s] . . . )."

60.    Any breach by the Patriarch Manager Defendants of the terms of the Management Agreements or the Indentures or any Event of Default under the Indentures provided grounds for, among other claims and remedies, including damages, the removal of the Patriarch Manager Defendants and the cessation of fees payable to the Patriarch Manager Defendants by the Issuers for the management of the Collateral.

61.    Section 5.3(a) of the Management Agreements provided that the Collateral Managers may be removed for "Cause."  Section 1.1 defined Cause for removal to include, among other events, (a) a willful breach or action knowingly taken in violation of any provision

of the Management Agreements or the Indentures applicable to the Collateral Managers and (b) an Event of Default under the Indenture.

62.      Under Section 5.7 of the Management Agreements, the Collateral Managers were not entitled to compensation after the date of removal and, pursuant to Sections 4.1(d) and 4.1(e) of the Management Agreements, any fees or amounts owed to the Collateral Managers would be subject to the priority of payments set forth in the Indentures' Payment Waterfalls. Where the Collateral Managers have been removed, any fees or amounts payable to them would be subordinated in the Payment Waterfalls to amounts owed by the Insured Zohar Funds to certain other parties.

63.      Section 6.2(c) of the Management Agreements required the Patriarch Manager Defendants to perform their obligations with respect to any material conflict determined to exist between the holders of the Zohar Notes and any other account or portfolio for which the Patriarch Manager Defendants or their affiliates served as an investment advisor "in accordance with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict."

64.      Section 2.4 of the Management Agreements also required the Patriarch Manager Defendants to perform their management duties with "reasonable care and the same degree of skill and attention . . . exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral, and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture."

65.      Section 4.4 of the Management Agreements provided that the Collateral Managers would be liable to any person, including MBIA, for losses, claims, damages, judgments, assessments, interests, costs, fines attorneys' fees and expenses or other liabilities of

-21-

any nature arising out of or in connection with the performance by the Collateral Managers of their duties under the Management Agreements or other Transaction Documents "by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty."

## C.    The Insurance Agreements And Financial Guaranties

66.    As set forth above, MBIA provided financial guaranty insurance for both Zohar I and Zohar II, agreeing to pay principal and interest amounts owed and not paid by the Issuers to senior Class A noteholders as of the payment dates set forth in the financial insurance policies. The financial guaranty insurance provided by MBIA was reflected in the insurance and indemnity agreement between and among MBIA and the Zohar I Issuers, dated as of November 13, 2003 (the "Zohar I Insurance Agreement") and the insurance and indemnity agreement between and among MBIA and the Zohar II Issuers, dated as of January 12, 2005 (the "Zohar II Insurance Agreement," and, together with the Zohar I Insurance Agreement, collectively, the "Insurance Agreements"). The Zohar I Insurance Agreement, dated as of November 13, 2003, was nearly identical to the Zohar II Insurance Agreement, dated as of January 12, 2005. MBIA also issued nearly identical financial guaranty insurance policies (the "Financial Guaranties") for each of the Insured Zohar Funds.

67.    Pursuant to the Insurance Agreement and Financial Guaranty executed in connection with Zohar I, MBIA guaranteed the Issuers' obligations to pay outstanding interest and principal on the Class A-1 and A-2 Zohar Notes ("Zohar I Insured Notes") having a par value of approximately $150 million and $32 million, respectively. Pursuant to the Zohar I Financial Guaranty, the date on which MBIA was required to cover any payments not made by the Zohar I Issuer on principal and interest owed on the Zohar I Insured Notes was November 20, 2015.

-22-

68.     With respect to Zohar II, MBIA guaranteed the Issuers' obligations to pay outstanding interest and principal on the Class A-1, A-2 and A-3 Zohar Notes ("Zohar II Insured Notes," and, together with the Zohar I Insured Notes, collectively, the "Insured Notes") having a par value of approximately $250 million, $550 million and $200 million, respectively.  Pursuant to the Zohar II Financial Guaranty, the date on which MBIA was required to cover any payments not made by the Zohar II Issuers on principal and interest owed on the Zohar II Insured Notes was January 20, 2017.

69.     Similar to the Indentures, the Insurance Agreements imposed clear contractual requirements on the Insured Zohar Funds to meet their obligations to pay the principal and interest amounts owed to Zohar noteholders under the Indentures.  Section 2.04(g) of the Insurance Agreements, for example, expressly required each of the Insured Zohar Funds to "comply with the terms and conditions of, and enforce its rights under, each Transaction Document to which it is a party. . . ."  Sections 2.04(k) and 2.04(n) of the Insurance Agreements likewise expressly required that the Issuers shall pay amounts due under the Transaction Documents, including outstanding principal and interest under the Insured Notes.

70.     In the event that the Issuers failed to pay amounts owed under the Insured Notes on the Zohar Note Maturity Dates in breach of the Insurance Agreements, Events of Default under both the Indentures and Insurance Agreements occur.  Specifically, prior to each of the Zohar Note Maturity Dates, the Trustee was to provide MBIA with notice of the amount owed by Zohar I or Zohar II, as the case may be, to the Class A noteholders on the applicable Note Maturity Date, the amount of funds available to the Trustee to make such payment on behalf of the Issuers and the deficiency amount that MBIA would be required to pay under its Financial Guaranties.  The Trustee thereby would make a claim under the Financial Guaranties for payment, which itself would constitute an Event of Default under the Insurance Agreements and

-23-

the Indentures. The subsequent failure by Zohar I or Zohar II to pay any and all outstanding principal and interest owed on the Insured Notes and MBIA's required payment under its Financial Guaranties constituted an independent Event of Default under the Insurance Agreements and Indentures. Under such circumstances, MBIA had the express authority under the Transaction Documents to cause the removal of the Collateral Managers and to direct the Trustee to liquidate the defaulting Insured Zohar Funds' Collateral in a public or private sale. MBIA also would be entitled to receive reimbursement of its payments under the Financial Guaranties prior to principal payments made to the Class A notes and, separately, be subrogated to the rights of the Insured Noteholders.

### D.    The Zohar Notes And Preference Shares

71.    The Zohar Notes set forth the fundamental terms of the noteholders' investment. Each of the Class A Zohar Notes contain a promise by the Issuers to pay each noteholder the principal face amount of each note on the fixed, maturity date in either November 2015, for Zohar I, or January 2017, for Zohar II. The Issuers also promised in the Zohar Notes to pay interest on the principal face amount of the notes pursuant to the Indentures. Similarly, the Issuers promised to make all applicable payments under the Zohar Notes pursuant to the Payment Waterfalls in the Indentures. The Class A Zohar Notes state that payments thereunder are guaranteed by MBIA's Financial Guaranties, including the payment of all outstanding principal on November 20, 2015 and January 20, 2017 for Zohar I and Zohar II, respectively. Pursuant to the Class A Zohar Notes, the Zohar Notes remain outstanding to the extent that amounts owed on them are paid by MBIA under the Financial Guaranties.

72.    In addition to the Zohar Notes, the Insured Zohar Funds issued Preference Shares, which in each case were acquired by Octaluna I and Octaluna II (together with Octaluna I, the "Octaluna Entities"). The Preference Shares are not common equity, but solely provide

-24-

contractual rights and obligations governed by the Preference Share Paying Agency Agreements. The Octaluna Entities agreed pursuant to the Preference Share Sales Agreements to act as the taxpayers for the Insured Zohar Funds, so that the Funds themselves would have no United States tax liability. Under these agreements and the Indenture, the Octaluna Entities are entitled only to payments of limited dividends, subject to a contractual maximum, and thereafter only to payment following liquidation of the Insured Zohar Funds' Collateral. The Preference Shares do not hold any ownership or reversionary interest in any of the Insured Zohar Funds' non-cash assets and are in all circumstances subordinate in payment to the Secured Creditors.

II.     **Defendants' Misconduct Caused Zohar I And Zohar II To Default And Caused MBIA To Make Payment Under Its Financial Guaranties**

73.     As the architect of the Zohar CLOs, Tilton controlled the Insured Zohar Funds and the Collateral from inception to default. Tilton mismanaged and oversaw the decline in performance of the Portfolio Companies and the Zohar CLOs through a period of historically robust merger and acquisition activity. Between 2013 and 2016, however, Defendants engaged in a pattern of misconduct designed and intended to take for themselves the Zohar Funds' and Portfolio Companies' valuable assets while failing to maximize recoveries on the Funds' Collateral and depriving the Zohar CLOs of revenues, including from asset sales, to repay noteholders as required under the Transaction Documents.

74.     Defendants' scheme involved, *inter alia*, (1) using Fund assets to acquire controlling equity interests in Portfolio Companies, effectively seizing those controlling interests and the economic benefits that accompanied them for themselves, and refusing to monetize those interests to enable the Insured Funds to pay their noteholders; (2) using their control of Portfolio Companies and their role as Collateral Manager to modify the Portfolio Companies' loan obligations to the Funds, thereby prolonging the period of Defendants' enrichment from the

-25-

equity interests and Fund fees, (3) extending the Portfolio Companies' payment obligations beyond the Zohar Note Maturity Dates and ensuring the Insured Zohar Funds' payment default in contravention of their legal duties and express contractual obligations; (4) making unauthorized loans and embezzling Fund assets under the guise of fictitious Portfolio Company loans intercepted and misappropriated for Defendants' own unauthorized use; (5) manipulating and concealing information regarding Fund assets to maintain their control over the Funds and the attendant financial benefits; and (6) engaging in additional and numerous self-dealing transactions with Portfolio Companies at the expense of the Funds and their investors.

**A.    Defendants Seize Equity Interests In Portfolio Companies Obtained By The Funds With Fund Assets And Refuse To Monetize The Interests To Satisfy Fund Obligations.**

75.    The Zohar Funds obtained substantial equity interests in the form of preferred or common stock and Limited Liability Company ("LLC") membership interests in many of the various corporate and limited liability Portfolio Companies as consideration for various transactions contemplated by the CLOs' governing documents.  For example, the Insured Zohar Funds acquired equity interests in certain Portfolio Companies in connection with loan financing provided by the Zohar Funds to such Portfolio Companies and in exchange for restructuring existing loans thereto.

76.    Zohar I — and now, MBIA, following the auction of Zohar I's assets described below — and Zohar II are the owners of common and preferred stock certificates in at least 22 Portfolio Companies or their corporate affiliates, including but not limited to the following corporations:  Automated Ductwork Manufacturing Co., Fetco Home Décor, Inc., Felagastyring EHF, Galey & Lord, Inc., Glenoit Universal, Ltd., Hartwell Industries, Inc., Hyperactive Technologies, Inc., IMG Holdings, Inc., Intera Group, Inc., MD Helicopters, Inc., Metalforming Technologies, Inc., FSAR Holdings, Inc., PHC Holding Corp., Spectrum International Holdings,

Textile Holdings, Inc., U.F. Holdings, Inc., UI Acquisition Holding Co., Vorumerkjastyring EHF, Western Forest Products, Inc. W.W. Versat Acquisition Corp. and Xinhua Sports & Entertainment Ltd. The stock certificates are valid securities issued in the name of one or both of the Insured Zohar Funds and declare Zohar I or Zohar II, or both, as the case may be, to be the owner of the identified shares of stock. Similarly, the Insured Zohar Funds own equity interests in corporate Portfolio Companies that are evidenced by stock certificates not presently in their possession — including as result of Defendants' wrongful and bad faith malfeasance — but which equity interests in the Portfolio Companies have been evidenced by, among other things, Defendants' statements to ratings agencies and to MBIA. As represented to the ratings agencies, Zohar II was also the owner of equity in HVEASI Holding BV ("HVEASI") until that company was sold in 2012.

77.      Zohar I and Zohar II likewise are the owners of membership interests in at least approximately 15 limited liability Portfolio Companies for which the Insured Zohar Funds are identified as members in the underlying limited liability company agreements (the "LLC Agreements"), including but not limited to American LaFrance, LLC, Amweld International, LLC, Black Mountain Door Holdings, LLC, Doors Acquisition LLC, Global Automotive Systems, LLC, Iconic American Trucks, Netversant Solutions, LLC, Remco Maintenance, LLC, RM Acquisition, LLC, Scan-Optics, LLC, Silverack, LLC, Snelling Staffing, LLC, White Mountain Tissue, LLC and W. W. Holdings, LLC. The LLC Agreements identify Zohar I or Zohar II, or both, as the case may be, as a party, signatory, and member entitled to membership interests. Similarly, the Insured Zohar Funds own additional equity interests in limited liability Portfolio Companies that are evidenced by limited liability company agreements not presently in their possession — including as result of Defendants' wrongful and bad faith malfeasance — but

-27-

which equity interests in the Portfolio Companies have been evidenced by, among other things, Defendants' statements to ratings agencies and to MBIA.

78.     For almost a decade, at various times, and to varying audiences, Tilton touted the Insured Zohar Funds' ownership of these equity interests as providing significant value that would be available for the Insured Zohar Funds' use to avoid payment defaults to noteholders by Zohar I and Zohar II.  For example, in a February 2007 presentation to prospective investors, Tilton described the Zohar investment strategy and assets as follows:  "the Zohar asset yield is a product of a high yield current coupon combined with added loan accretion, *preferred equity and common equity interests.* The average portfolio asset rating is B2/B; the enhanced quality of the assets reduces the default probability of the portfolio *and renders the added preferred loan and equity returns, in most cases, highly collectable.*"   That February 2007 presentation also projected that the equity interests belonging to Zohar II alone would provide returns in excess of $1.5 billion.  In a July 2009 presentation to Moody's, Tilton represented that each of the Insured Zohar Funds had "ownership" of and would "benefit from valuable equity" in over thirty different Portfolio Companies then "valued at many hundreds of millions."   In their March 13, 2016 appellate filings in New York state court, Tilton and certain Defendants relied on these prior statements to the ratings agencies in arguing that the Zohar Funds' acquisition of equity had been disclosed to Zohar investors:  "The Patriarch Presentation also disclosed to Plaintiffs the then-current equity holdings of Zohar II. The disclosure provides that as of February 2007 — after almost two years of operation — Zohar II held equity interests in 37 of the 43 Portfolio Companies in which it invested, including 19 for which Zohar II owned the majority of the equity interests."   Similarly, in pleadings filed on May 10, 2011 and again on October 13, 2011, on behalf of Patriarch XIV, Tilton stated as follows:  "The Zohar funds make secured loans to, and often *gain majority equity positions in,* middle market companies, typically in the

-28-

manufacturing sector. The companies in which Zohar funds *own a majority equity stake* are called 'portfolio companies.'" Likewise, the Zohar transaction documents described these equity interests as providing "additional value in realizing par recoveries" on the Zohar loans.

### 1.   Defendants Secretly Claim Ownership Of The Equity Interests And Transfer Rights To Themselves

79.    At the very same time that Defendants were making the foregoing representations, they also were actively concealing from MBIA the extent of the Insured Zohar Funds' equity holdings, secretly claiming legal and beneficial ownership of the Funds' equity interests, and absconding with economic and other benefits attendant to such ownership.

80.    Defendants hid from MBIA the equity assets held by the Insured Zohar Funds by regularly misstating and substantially underreporting their Portfolio Company stock and LLC membership interests.  For example, monthly reports provided to MBIA that the Patriarch Manager Defendants were required to review and verify for the accurate disclosure of, among other things, the Insured Zohar Funds' equity assets either completely omitted or substantially underreported the Funds' stock and LLC membership assets.  Similarly, quarterly financial statements provided to MBIA that Tilton certified as compliant with generally accepted accounting principles omitted reference to the Insured Zohar Funds' equity assets notwithstanding the Indentures' express requirement that such disclosures "present[] fairly, in all material respects, the [Insured Zohar Funds'] financial position."

81.    Defendants also wrongfully and secretly acted as the owners of the Funds' equity assets, appropriating to themselves the associated governance and other benefits rightfully belonging to the Insured Zohar Funds.  For example, Defendants caused the Insured Zohar Funds to execute or amend agreements with respect to the organization or governance of the Portfolio Companies and shareholder proxies that purported to transfer, for no consideration, to

-29-

Defendants voting and control rights over the Zohar Funds' equity in the Portfolio Companies. In executing these agreements, amendments, or proxies, Defendants sought to entrench their control over the Portfolio Companies; reap the financial benefits of that control; and prevent the Insured Zohar Funds from monetizing their equity ownership rights and interests in the Portfolio Companies — the very rights and interests that Tilton had previously touted as providing additional value to the Insured Zohar Funds, over and above expected repayments on the loans.

82.    On or about September 21, 2015 — approximately two months prior to Zohar I's default on its note Maturity Date payment obligations, and by which time, Defendants also anticipated the likelihood of Zohar II's January 2017 payment default — the Patriarch Manager Defendants, nominally on behalf of Zohar I and Zohar II, wrongfully and in bad faith executed various purported "irrevocable voting proxies" and shareholder agreements purportedly transferring to Defendants, without consideration, valuable rights belonging to the Insured Zohar Funds as shareholders, including voting rights and the right to veto any attempt by the Funds to exercise their rights, in certain Portfolio Companies.  Specifically, Tilton caused the Zohar Funds to grant to certain Defendants stockholder rights with respect to ███████████████

████████████████████████████████████████████████████████

██████████████████████████.

83.    These irrevocable proxies and shareholder agreements purported to grant to Defendants, without consideration, the right to exercise the Insured Zohar Funds' shareholder voting rights at all stockholder meetings for the Portfolio Companies, to appoint by written consent, elect or remove directors of the Portfolio Companies, to amend company certificate or articles of incorporation and by-laws, and to dissolve corporate affairs for the Portfolio Companies (the "Shareholder Conveyances").  Pursuant to the Shareholder Conveyances, the

-30-

Insured Zohar Funds transferred these rights to Defendants without anything of value in return, and following such transfer could no longer exercise these rights themselves.

84.    Similarly, on or about September 22, 2015, Defendants, purporting to act in their various capacities as Patriarch Manager Defendants on behalf of the Insured Zohar Funds, as members of the Octaluna Entities, as well as the managers and common members of numerous limited liability Portfolio Companies executed amendments to the governance agreements for the limited liability Portfolio Companies in which the Insured Zohar Funds own member interests. Specifically, Defendants executed amendments transferring to Defendants, without consideration, voting and control rights with respect to the LLC agreements for ████.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████.

85.    These amendments purported to transfer from the Insured Zohar Funds to Defendants, without consideration, unfettered control over the management and operation of the limited liability companies, notwithstanding that Defendants were not in fact members of the Portfolio Companies and had no attendant equity rights or interests in the Portfolio Companies. Defendants' unlawful limited liability company agreements and amendments thereto also purported to transfer to themselves any power of the Insured Zohar Funds to take actions as members of the limited liability Portfolio Companies and owners of the equity in those

Companies, including but not limited to, with respect to critical decisions involving management of the limited liability Portfolio Companies and the right of the Insured Zohar Funds to freely transfer their member interests without Defendants' consent (the "LLC Conveyances," and together with the Shareholder Conveyances, collectively, the "Governance Conveyances").

86.    At the time of the Governance Conveyances in September 2015, Defendants were well aware that Zohar I and Zohar II would — absent the monetization of the Insured Zohar Funds' equity interests in the Portfolio Companies that Defendants prevented by executing the Governance Conveyances — default on full payment of the Insured Notes upon their respective Zohar Note Maturity Dates.  Defendants were well aware of these looming defaults because Defendants manufactured them by, among other things, causing the extensions of maturity dates of the underlying loans such that the Insured Zohar Funds could not receive sufficient proceeds prior to the Zohar Note Maturity Dates to pay their respective note payment obligations. Defendants also knew that upon Zohar I's and Zohar II's respective defaults, MBIA would gain the right to remove the Collateral Managers, be required to pay under the Financial Guaranties and, thereafter, be entitled to reimbursement of its Credit Enhancement Liabilities prior to repayment of principal on the Class A notes.

87.    Even after the Patriarch Defendants resigned as Collateral Manager, effective March 2016, Defendants continued to abuse their positions to engage in wrongful actions at the Portfolio Companies which prevented the Insured Zohar Funds from enjoying their full rights, title and interests in the equity assets belonging to them.  In November 2017, as the manager for ███████████████████████████████████████, Tilton executed written consents (the "November 2017 Written Consents") creating new preference "Class A" interests at each of these three Portfolio Companies and granting the Octaluna Entities the exclusive rights to remove or replace Tilton as the manager at those LLCs or to amend those Portfolio

-32-

Companies' governing LLC agreements. Further, pursuant to subscription agreements with the Portfolio Companies, Defendants purportedly contributed approximately $23 million for such rights and interests and also became entitled to receive payment from the Portfolio Companies in an amount five times their contribution amounts prior to any payments to common members of those Portfolio Companies.

88. Neither the Governance Conveyances or the November 2017 Written Consents were transacted on arm's-length terms or disclosed to anyone independent of Tilton. Rather, the transfer of these rights and interests were in each case negotiated and approved solely by Defendants and individuals affiliated with or employed by them. By intentionally interfering with the Insured Zohar Funds' voting rights and management of the Portfolio Companies, Defendants unlawfully obstructed and impeded the Insured Zohar Funds' ability to monetize their equity Collateral, deprived the Insured Zohar Funds of funds sufficient to make their payment obligations on the Insured Notes and prevented the Insured Zohar Funds from making distributions to MBIA as their senior creditor.

89. Defendants' conflicted, bad-faith and self-dealing transactions usurping control over the Insured Zohar Funds' valuable equity ownership rights and interests in the Portfolio Companies interfered with and impaired the value and rights of the security interests conferred to the Insured Zohar Funds' noteholders and MBIA under the Trustees' liens. This violated the terms of the Indentures and applicable law. In particular, Defendants' actions violated Sections 7.8(a) and (b) of the Indentures, which prohibit the Issuers from taking an action that impairs the value or rights in the Collateral of the Insured Zohar Funds.

90. Defendants also diverted to themselves dividends or other distributions made by the Portfolio Companies that rightfully belonged at the time, and belong today, to MBIA and the Insured Zohar Funds, as legal and beneficial owners of equity interests in those Portfolio

-33-

Companies. For example, ███████████████ is believed to have made more than $4.5 million in equity distributions in the form of cash of marketable securities owing and payable to the Insured Zohar Funds between 2006 and 2015, but none of those payments are believed to have ever been received by either Zohar I or Zohar II. ███████████ also distributed more than $1 million that never made it to the Insured Zohar Funds. Defendants are believed to be actively concealing multiple other instances of wrongfully diverted equity distributions or dividends. Defendants' diversion of these dividends or other equity distributions from the Insured Zohar Funds would have, at least, substantially reduced the amounts MBIA was required to pay under its Financial Guaranties.

91.    Defendants — and Tilton in particular — also have exercised for their own benefit other rights belonging to the Insured Zohar Funds. For example, Tilton installed herself as an officer, director or managing member of the Portfolio Companies and filled other management positions at the Portfolio Companies in exchange for substantial fees paid to Tilton and her affiliated entities. Tilton also caused the Portfolio Companies owned by the Zohar Funds to retain her affiliate, PPMG, to provide "management and consulting services" that were "contemplate[d]" to include:  (a) "general executive, professional, and management consulting services," (b) "identification" and "analysis" of "acquisitions and dispositions," (c) "support, negotiation and analysis of financing alternatives," (d) "finance functions," (e) "marketing functions," and (f) "human resource functions." The Portfolio Companies agreed to have PPMG provide services under these "Management Services Agreements" for a term of ten years.

92.    In exchange for these services, Defendants agreed to pay PPMG outsized compensation that would be unavailable under a management consulting agreement negotiated and agreed to on arms-length terms. As "partial consideration" for PPMG's services, Tilton caused each of the Portfolio Companies to agree to pay PPMG a Management Fee ranging from

-34-

$15,000 to $100,000 per month ($180,000 to $1,200,000 per year). Ms. Tilton also caused the Portfolio Companies to agree to a so-called Transaction Fee, purportedly granting PPMG a right to receive cash equal to 5% of the total amount paid upon a qualifying sale of that company. In effect, the Transaction Fee provided Tilton, through PPMG, with the ability to skim 5% from the sale of such Portfolio Company. The Patriarch Managers "consented" to these fees on behalf of the Zohar Funds, and even agreed to an increase of the management fees — despite having PPMG locked in to a lower contractual rate for ten year terms, and after having reduced or waived applicable interest and other payment amounts owed to the Insured Zohar Funds under the Portfolio Company loans — for no consideration on the eve the Patriarch Manager Defendants' resignation. These self-dealing transactions enabled Defendants to double-dip and collect fees for duplicative services provided in their multiple conflicted and, in some cases, overlapping roles and to also ensure the payment of fees to Defendants would continue if, and when, the Patriarch Manager Defendants were ousted as collateral manager following an Event of Default.

93.    As Tilton testified during trial in a Delaware Court of Chancery litigation involving the Zohar Funds, in the months before Zohar I's anticipated payment default in November 2015, Tilton used her control over the Portfolio Companies and PPMG to direct them to execute new Management Services Agreements for certain Portfolio Companies. On or around August 25, 2015, Defendant Tilton caused ███████████████ and many other of the Portfolio Companies to amend their management services agreements with PPMG to provide PPMG with a flat monthly fee of $100,000, significantly increasing the amount of fees previously paid to Tilton by the Portfolio Companies. These agreements between PPMG and the Portfolio Companies are yet another example of Defendants' siphoning of fees from the Portfolio Companies to themselves that otherwise would have been available to be paid to the Insured

-35-

Zohar Funds and, in turn, be applied to outstanding principal and interest the Insured Zohar Funds owed on the Insured Notes. As a result, Defendants' unlawful acts also diverted funds and assets that would have eliminated or, at least, would have substantially reduced the amounts MBIA was required to pay under its Financial Guaranties.

    2.    **Defendants Refuse To Monetize The Equity Interests To Avoid Fund Defaults**

94.    In order to retain and prolong their access to the financial benefits of the Zohar Funds' equity stakes in the Portfolio Companies, Defendants willfully, unjustifiably, and in bad faith refused to monetize those assets when the Zohar loan assets and proceeds received from the Portfolio Companies' loan payments were insufficient to timely pay in full outstanding principal and interest owed on the notes. In fact, while Defendants were in control of the Portfolio Companies for the years leading up to the Zohar Note Maturity Dates, they caused the Portfolio Companies to suspend payments to the Insured Zohar Funds and sought to perpetually preserve the equity value in the Portfolio Companies that, at the time, Tilton was wrongfully claiming to own.

95.    Defendants' intentional actions were detrimental to the Insured Zohar Funds, their noteholders and MBIA because, if timely monetized, the Insured Zohar Funds' equity interests in the Portfolio Companies would have provided the Insured Zohar Funds with available funds to pay their note repayment obligations and avoid or minimize the amounts MBIA had to pay to the Zohar I and Zohar II noteholders under its Financial Guaranties.

96.    Consistent with both the Transaction Documents and Defendants' representations regarding the Insured Zohar Funds, the equity interests in the Portfolio Companies acquired by the Insured Zohar Funds constitute Collateral owned by the Insured Zohar Funds. That equity provided the Insured Zohar Funds with a source of assets that could have been monetized and

-36-

used to pay amounts owed on the Insured Notes in the event that Portfolio Companies defaulted on, or delayed in honoring, their loan repayment obligations. Significantly, as set forth above, Tilton herself had touted the equity interests in the Portfolio Companies as valuable assets owned by the Zohar Funds that could be used to repay the notes in the event that cash proceeds from the repayment of loans were insufficient to avoid a payment default by the Insured Zohar Funds on the Zohar Note Maturity Dates. The Insured Zohar Funds' equity interests in the Portfolio Companies — whether such interests reflected beneficial ownership of the Portfolio Companies, or (as Tilton has also wrongly contended) only ownership of economic "upside" interests in the Portfolio Companies — and ability to monetize this Collateral became particularly important as the Zohar Note Maturity Dates approached.

97. By October 15, 2015 — just one month before the November 2015 Zohar I Maturity Date — Defendants had extended the Portfolio Company loan principal repayment dates beyond the Zohar Note Maturity Dates such that the Insured Zohar Funds could no longer rely on the repayment of the Portfolio Company loans to fully satisfy their note payment obligations to the holders of the Insured Notes and avoid payment by MBIA under its Financial Guaranties. For example, as of October 2015, Defendants' extensions of the principal repayment dates on the loans made by Zohar I to the Portfolio Companies brought the outstanding principal balance of Zohar I loans due for repayment after November 20, 2015 to approximately $376 million, out of an aggregate principal balance of $484 million for the Zohar I portfolio. Thus, even if 100% of the remaining outstanding Zohar I loan principal had been repaid by the Portfolio Companies, only $108 million would have been available to Zohar I to pay the approximately $436 million owed on the Class A notes, or the $150 million owed on the Zohar I Insured Notes, on the Zohar I Note Maturity Date.

98.    At the same time, the outstanding principal balance of Zohar II loans due for repayment after January 20, 2017 was $864.5 million, whereas the aggregate principal balance of the Zohar II portfolio was approximately $1 billion.    Thus, even if 100% of the remaining outstanding Zohar II loan principal had been repaid by the Portfolio Companies, only $162 million would have been available to Zohar II to pay the approximately $770 million owed on the Class A notes on the Zohar II Note Maturity Date.

99.    As described in greater detail below, Defendants' extensions of the repayment dates for loans made by the Insured Zohar Funds to the Portfolio Companies beyond the Insured Zohar Funds' note maturity dates ensured that, absent monetization of the Funds' equity in the Portfolio Companies, the Insured Zohar Funds would be unable to satisfy their payment obligations to noteholders and inevitably default.    Defendants knew that their wrongful modification of the terms of the Zohar loans and extending the Portfolio Companies' loan repayment obligations beyond the Zohar Note Maturity Dates would reduce the amounts payable to the Insured Zohar Funds and would cause Zohar I and Zohar II to breach the Indentures and lack sufficient funds to satisfy their payment obligations on the Zohar Note Maturity Dates. Defendants, however, took no action to monetize the equity interests in the Portfolio Companies belonging to the Insured Zohar Funds.    Defendants' intentional refusal to monetize the equity owned by the Insured Zohar Funds impeded the Insured Zohar Funds' ability to avoid or reduce the losses incurred by the Insured Zohar Funds and, thus, by MBIA.

100.    In seeking to wrongfully seize the benefits and value of the Portfolio Company equity for themselves, rather than monetizing assets to pay down outstanding amounts owed on the insured notes, Defendants consistently and repeatedly acted for their own intended benefit, and to the detriment of the Insured Zohar Funds, their noteholders and MBIA, in clear violation

-38-

of the Transaction Documents and the standards of care governing Defendants' performance of duties with respect to the Insured Zohar Funds and applicable law.

101.    Outrageously, in one of the few instances where Defendants did make an effort to monetize equity interests in the Portfolio Companies, Tilton took the proceeds from such transactions for herself without providing any to the rightful owner, Zohar II.   Soon after the creation of Zohar II, Defendants represented to multiple parties — including Moody's during presentations for ratings on the Zohar II notes — that HVEASI, an Italian manufacturer of electric motors and generators, power electronics and industrial automation systems, was among the Portfolio Companies in which Zohar II owned equity interests.   Zohar II obtained its equity interests in HVEASI in connection with its funding, acquisition or workout of a loan to that company, similar to the equity interests Zohar II had obtained in other Portfolio Companies.   In 2012, HVEASI was sold for more than $300 million.   Notwithstanding Defendants' prior representations that Zohar II owned 100% of HVEASI, Zohar II did not receive any proceeds from that sale.   Tilton has subsequently acknowledged keeping the entirety of the proceeds of that sale, contending that although Zohar II indeed issued loans to HVEASI, her representations that Zohar II obtained equity in the company at that time were simply mistaken.

102.    Similarly, Defendants previously represented that the Insured Zohar Funds owned 100% of the equity in the Portfolio Company Xpient Solutions, Inc.   When that Portfolio Company was sold in 2014, however, the Insured Zohar Funds did not receive sales proceeds commensurate with their equity holdings.

103.    As a direct and proximate result of Defendants' blatant diversion of Portfolio Company equity interests belonging to the Funds and refusal to monetize those valuable interests for the benefit of Fund investors, the Insured Zohar Funds could not pay investors in full or on time, and defaulted.

**B.    Defendants Unlawfully Alter The Terms Of The Funds' Loans To The Portfolio Companies, Prolonging Their Control Of The Funds And The Portfolio Companies**

104.    As part of their scheme to continue to collect management and other fees while simultaneously seizing and benefitting from control of the Portfolio Companies, Defendants unlawfully modified the terms of the Insured Zohar Funds' loans to the Portfolio Companies without receiving any consideration in return.  Defendants' conflicted loan modifications cannot be justified based on the performance or financial conditions at the Portfolio Companies.  To the contrary, Defendants acted in bad faith to prevent loan defaults that would have resulted in their ouster as Collateral Manager and detection of their ongoing scheme.

105.    Knowing that MBIA bore the liability from the Zohar Funds' non-payment on the Insured Notes, Defendants systematically modified the Portfolio Companies' payment obligations to the Insured Zohar Funds to artificially avoid loan defaults, concealing from MBIA and the Insured Zohar Funds' noteholders the risk of non-payment by the Insured Zohar Funds.  By engaging in this misconduct, Defendants retained their control of the Portfolio Companies, preserved ongoing opportunities for self-dealing.  Similarly, they artificially avoided defaults of the CLOs themselves and continued to manage the collateral for the Insured Funds thereby receiving lucrative fees that further deprived the Insured Zohar Funds of assets that otherwise would have been available to pay the CLOs' obligations on the Insured Notes on the Zohar Note Maturity Dates and, thereby, not trigger MBIA's financial guaranty obligations.

**1.    Waiver Of Interest Payments And Loan Defaults And Subordination Of Insured Zohar Funds' Liens**

106.    The Insured Zohar Funds made or acquired hundreds of loans to the Portfolio Companies.  These loans were Collateral assets belonging to the Insured Zohar Funds and provided them with cash proceeds to be applied toward, among other expenditures, the principal and interest payments owed to the holders of the Insured Notes.  Prior to the maturity of the

-40-

loans and the repayment of the loan principal, the Portfolio Companies were required to make interest payments on the loans pursuant to the terms of the Credit Agreements. Failure by the Portfolio Companies to make these interest payments, or to satisfy certain other requirements or covenants in the Credit Agreements, would constitute a default under the Credit Agreements and would provide the creditors—that is, the Insured Zohar Funds—with additional rights and remedies to secure payment.

107. Contrary to their contractual and legal obligations on behalf of the Insured Zohar Funds, Defendants amended or modified the Credit Agreements in ways that reduced amounts payable to the Insured Zohar Funds and impeded the Insured Zohar Funds' ability to receive payment of amounts owed. Defendants' misconduct included the deferral, waiver and forgiveness of interest and fees owed by the Portfolio Companies on the loans made to them by the Insured Zohar Funds, which significantly reduced the amounts payable to Zohar I and Zohar II and adversely impacted the noteholders and MBIA. Defendants restructured the Zohar loans by executing dozens of amendments to the Credit Agreements for nearly all of the Portfolio Companies that, for example, without any consideration provided to the Insured Zohar Funds, reduced the applicable interest rates on the Portfolio Companies' loans, lowered or eliminated the minimum allowable interests rate for certain Portfolio Companies and converted unpaid fees and outstanding interest on certain loans to principal, increasing the size of the loan commitment from the Insured Zohar Funds to certain Portfolio Companies and delaying the due date for payment of the interest and fees.

108. Defendants' unauthorized and improper amendments to the Credit Agreements increased as it became clearer that Zohar I would not have sufficient assets to pay outstanding principal and interest on the Insured Notes on the November 2015 Zohar I Maturity Date. Rather than take steps to maximize the Insured Zohar Funds' recovery on their assets as required,

Defendants executed amendments to the Credit Agreements that made it less likely that the Portfolio Companies would make timely required payments to the Insured Zohar Funds. Between May and November 2015 alone, Defendants amended loan agreements for at least thirteen different Portfolio Companies, including ██████████████████████ ████████████████ and others, deferring unpaid interest and fees in an amount totaling more than $250 million and restructuring such amounts as new loans to be repaid after the Zohar II Maturity Date. None of the loan amendments provided consideration to the Insured Zohar Funds in exchange for these loan restructurings.

109.    For example, on or around September 1, 2015, Defendants caused the Insured Zohar Funds and borrower ████████████████ to retroactively amend their Credit Agreement, as of March 1, 2015, reducing the applicable interest rate to 5.5% from an applicable rate of 6% that, absent the amendment, would have increased to 8% on April 1, 2016. Defendants also reduced the minimum allowable interest rate for the loan to ████████████ ████ to 0% from 2%. Defendants caused the Insured Zohar Funds and borrower ████ ██████████████ to amend their Credit Agreement again on or around October 1, 2015 to restructure more than $11 million in unpaid interest payments as new loan principal, including over $6 million in new loan commitments from the Insured Zohar Funds. Defendants executed similar amendments on behalf of the Insured Zohar Funds with respect to the Credit Agreement for ████████████████ reducing the applicable interest rate from 4% to 3% and restructuring more than $32 million in unpaid interest and fees to the Insured Zohar Funds into new loan principal in September and November 2015. Defendants' continued deferral of interest and waiver of borrower payment failures served no legitimate purpose, particularly where Defendants were at the same time increasing the Portfolio Companies' payments of fees to themselves to the detriment of the Insured Zohar Funds. Defendants' transactions on behalf of

-42-

the Insured Zohar Funds only further increased the deficiency amounts that MBIA had to pay on the Zohar Note Maturity Dates under its Financial Guaranties.

110.    In addition, Defendants wrongfully impeded the Insured Zohar Funds' ability to exercise their contractual and lawful rights and remedies by eliminating covenants and other restrictions regarding the borrowers' financial condition, waiving borrower payment and covenant defaults under the Credit Agreements and illegitimately subordinating the Insured Zohar Funds' lien positions relative to other lenders to the Portfolio Companies, including lenders affiliated with Defendants. For example, in September and November 2015, Defendants caused the Insured Zohar Funds to agree to amend the Credit Agreements with ███████ ███████████████████████████████████████████████████████████ and other Portfolio Companies and remove provisions requiring those borrowers to maintain minimum cumulative EBITDA, consolidated tangible net worth, interest coverage ratios, minimum liquidity levels and other financial conditions, levels or ratios. These unauthorized amendments and modifications to the Credit Agreements diminished the value of the Insured Zohar Funds' loan assets and avoided borrower defaults that otherwise would have occurred, which defaults, in turn, would have provided the Insured Zohar Funds the ability to exercise additional rights and remedies as lenders with respect to the collateral for those loans.

111.    Similarly, over an eight-month period between May 2015 and January 2016, Defendants caused the Insured Zohar Funds to provide certain investment funds owned by Tilton — namely Defendants ARK and AIP — with senior creditor rights with respect to the collateral assets securing the Insured Zohar Funds' loans to certain Portfolio Companies, thereby subordinating the Insured Zohar Funds' lien positions. These amendments to the Credit Agreements caused the Insured Zohar Funds to forego significant rights without any consideration. For example, Defendants purported to amend the Credit Agreements for ████

-43-

███████████████████████████████████████ to contain the following

(or substantively similar) provision:

> Priority of Liens. Notwithstanding the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a security interest in favor of any Secured Party in any Collateral, and notwithstanding any conflicting terms or conditions which may be contained in any of the Credit Documents, the Liens upon the Collateral of ARK II CLO 2001-1, LTD. ("ARK II") shall have priority over the Liens upon the Collateral of any other Secured Party and such Liens of such other Secured Parties in the Collateral are and shall be, in all respect, subject and subordinate to the Liens of ARK II in the Collateral.

112.    Defendants even prevented the Insured Zohar Funds from exercising their remedies as lenders for borrower defaults by the Portfolio Companies under the Credit Agreements that did occur by issuing blanket waivers for borrower defaults.  On or about November 19, 2015 — the day before Zohar I's Note Maturity Date and note payment default — Defendants executed substantially similar amendments for thirty-one different borrower Portfolio Companies, waiving any and all loan defaults existing as of the date of the amendment and granting Defendant PPAS the exclusive power to waive non-payment borrower defaults. Through these loan modifications Defendants effectively preserved their control over the Insured Zohar Funds' assets following an Event of Default of the Insured Zohar Funds and the removal or resignation of the Patriarch Manager Defendants as Collateral Managers.

113.    Defendants continued to execute amendments to the Credit Agreements nominally on behalf of the Insured Zohar Funds following the Patriarch Manager Defendants' announcement of their resignation as Collateral Managers.  In February 2016, less than a week prior to the March 2, 2016 effective date of the Patriarch Manager Defendants' resignations as Collateral Managers for the Insured Zohar Funds, Defendants amended the Credit Agreement for ██████████████████████ providing for that loan to cease bearing interest. Defendants also

-44-

executed amendments to the Credit Agreements that purportedly authorized Tilton's investment

fund, Defendant ARK, to make revolving credit loans to certain Portfolio Companies, including

█████████████████████████████████████████████

On or about February 10, 2016, Tilton caused at least one Portfolio Company, Transcare, to enter

into a new credit facility with her affiliate ARK and, through PPAS and to the detriment of the

Insured Zohar Funds, caused the Insured Zohar Funds to agree to an intercreditor agreement

granting ARK priority interests in Transcare payments and collateral to which ARK otherwise

would not be entitled.

114.    Defendants not only reduced amounts payable to the Insured Zohar Funds, they

also failed to exercise rights and remedies available to the Insured Zohar Funds upon defaults by

the Portfolio Companies under the Credit Agreements.  For example, Defendants made no efforts

following the Portfolio Companies' failure to timely pay principal and interest, to assert the

Insured Zohar Funds' rights of recourse to the Portfolio Companies' assets under the Credit

Agreements and recoup funds that could have been used to reduce the amounts owed on the

Insured Notes.  Thus, Defendants exacerbated the injury to the Insured Zohar Funds, the

noteholders and MBIA caused by Defendants' failure to maximize the Insured Zohar Funds'

recovery of funds available from the Collateral by consenting to the borrowers' non-performance

of their obligations under the Credit Agreements and forgiveness thereof, completely

undermining the Insured Zohar Funds' rights as lenders.

115.    In violation of the Transaction Documents, Defendants kept certain of their

modifications of the Credit Agreements hidden from the Zohar CLOs Secured Creditors.  The

Indentures expressly required that the Issuers regularly provide, using information provided by

the Collateral Managers, reports to the Insured Zohar Funds' noteholders and MBIA (among

others) containing information regarding the Insured Zohar Funds and their assets ("Note

-45-

Valuation Reports"). For example, with respect to Zohar loans, the Note Valuation Reports are required to contain the last date on which interest payments for each loan were made, the occurrence and date of any loan default and, among other information, payment amounts and types made by the Portfolio Companies in connection with any restructuring of the terms of the loans. In addition, the Zohar II Indenture expressly required that the Zohar II Note Valuation Reports describe "in reasonable detail" any amendment or modification to the loans that result in any change to the applicable loan interest rate, principal payment date or the release of any collateral security under the Credit Agreements. The reduction in payments made to the Insured Zohar Funds resulting from Defendants' deferrals and forgiveness of interest and fees owed by the Portfolio Companies on the loans made to them by the Insured Zohar Funds — whether by Defendants' written amendment to the Credit Agreements, Defendants' "course of conduct," or otherwise — as well as Defendants' waivers of loan defaults and subordination of lien priority, were not accompanied by information required under the Transaction Documents.

116.    Defendants' conflicted and self-interested amendments to the Credit Agreements and modifications of the Zohar loan terms were all inconsistent with Defendants' obligations under the Transaction Documents and applicable law. Defendants' bad faith actions caused the Insured Zohar Funds to lack sufficient cash to make payment on the Insured Notes on the Zohar Note Maturity Dates and prevented the Insured Zohar Funds from taking steps to avoid their payment defaults on the Zohar Note Maturity Dates or, at minimum, from reducing MBIA's payment obligations under the Financial Guaranties.

### 2.    Defendants' Extension Of Loan Principal Repayment Deadlines

117.    In addition to their unauthorized and self-interested modifications to the terms of the Zohar loans described above, Defendants also caused the Insured Zohar Funds' failure to

satisfy their note repayment obligations on the Zohar Note Maturity Dates by extending the Portfolio Companies' loan repayment obligations beyond the Zohar Note Maturity Dates.

118.    As set forth above, the Insured Zohar Funds were "cashflow" transactions that issued notes to investors to which the primary source of repayment were payments of principal and interest on loans to the Portfolio Companies. Thus, it was essential to the structure and purpose of the Zohar transactions that the loans to the Portfolio Companies made or acquired by the Insured Zohar Funds mature and be paid in full prior to the Zohar Note Maturity Dates. Indeed, when Zohar I closed in 2003, the loans in the Zohar I asset portfolio were all scheduled to mature prior to the November 20, 2015 Zohar I Maturity Date. When Zohar II closed in 2005, the loans in the Zohar II asset portfolio likewise were all scheduled to mature prior to the January 20, 2017 Zohar II Maturity Date.

119.    The fact that the loans to the Portfolio Companies were all scheduled to mature prior to the Zohar Note Maturity Dates was not only consistent with the overall framework for the Insured Zohar Funds, but also was required by the Transaction Documents. Section 12.1(a) of the Indentures, for example, required the Insured Zohar Funds to make and acquire loans that matured prior to the Zohar Note Maturity Dates. Specifically, Section 12.1(a)(2) of the Indentures required that loans made or acquired by the Insured Zohar Funds "provide[] for a fixed amount of principal payable in Cash no later than its Stated Maturity." The Indentures define the term "Stated Maturity" "as the fixed date on which the final payment of principal of such security, repurchase obligation or Note, as the case may be, is due and payable." Similarly, Section 12.1(a)(23) required that loans made or acquired by the Insured Zohar Funds "mature[] on or prior to the earlier of (A) the date 7 years after the date of such investment and (B) the Stated Maturity of the Class A notes."

-47-

120.    Notwithstanding the structure and investment strategy underlying the Insured Zohar Funds and the requirements of the Transaction Documents that the Portfolio Companies repay their loans prior to the Zohar Note Maturity Dates, Defendants executed amendments to the Credit Agreements that eliminated the obligations of many of the Portfolio Companies to repay the outstanding principal on their loans prior to the Zohar Note Maturity Dates.  For example, by October 2015—just one month prior to Zohar I's payment default in November 2015—Defendants executed Credit Agreement amendments that extended until April 2019 the maturity dates for loans made by Zohar I and Zohar II to the following Portfolio Companies: ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████.  As of the Zohar Note Maturity Dates, Defendants had amended the Credit Agreements and extended the maturity dates for nearly all of the loans in the Zohar I and Zohar II portfolios — including loans that Defendants had reportedly categorized as "performing" — beyond the Zohar Note Maturity Dates.

121.    Defendants had no legitimate justification for causing the Insured Zohar Funds to extend the date for repayment of the loans made to the Portfolio Companies beyond the Zohar Note Maturity Dates.  Defendants' extensions of the loan principal repayment dates beyond the Zohar Note Maturity Dates not only violated Section 12.1(a) of the Indentures, but these extensions also improperly deprived the Insured Zohar Funds of funds available to make their payment obligations on the Insured Notes.

**C.    Defendants' Unauthorized Loans And Embezzlement Of Fund Assets Under The Guise Of New Loans**

122.    Defendants also defalcated Fund assets under the guise of issuing new loans, some of which were contrary to the terms of the Transaction Documents, and others which simply did not exist.

123.    Although Defendants were contractually and legally obligated to not cause an Event of Default or adversely affect the interests of the noteholders, Defendants, without authorization and contrary to the terms of the Indentures, expended significant funds as new loan commitments.  The funds used to make those unauthorized loans belonged to the Insured Zohar Funds and otherwise would have been available to pay outstanding principal and interest owed on the Insured Notes as of the Zohar Note Maturity Dates.

124.    Sections 9.6, 12.1, 12.3 and 16.1(b) of the Indentures together required that funds belonging to the Insured Zohar Funds be used only to make or acquire loans during the "Reinvestment Period," which expired for Zohar II on or about January 20, 2010 (and prior to that date for Zohar I), or with the express consent of MBIA as Controlling Party.  Defendants acknowledged these restrictions on numerous occasions between 2011 and 2014, where Defendants (in their capacity as Collateral Managers) specifically requested MBIA's authorization, as required by the Indentures, to enable the Insured Zohar Funds to make loans after the Reinvestment Period had closed.  For example, in March and September 2014, Defendants requested that MBIA authorize the commitment of $500,000 and $1 million to Red Shield Acquisition, LLC, to which each request MBIA agreed.

125.    Notwithstanding these contractual requirements, Defendants caused Zohar II to lend, without MBIA's authorization, at least $10 million to Portfolio Companies subsequent to the termination of the Reinvestment Period.  In that regard, in 2015, Zohar II made the following

-49-

three loans to Portfolio Companies outside the Reinvestment Period and without MBIA's consent:

> (a) Loan settled on or about July 30, 2015 in the amount of $4.5 million by Zohar II to █████████████

> (b) Loan settled in July or August 2015 in the amount of $700,000 million by Zohar II to ███████████

> (c) Loan settled on or about September 8, 2015 in the amount of $2 million by Zohar II to an unidentified Portfolio Company;

Zohar II also made a delayed draw term loan to ██████████████ and a term loan to ████████ ██████ for certain unidentified amounts outside the Reinvestment Period without MBIA's consent.

126.    The amount of unauthorized loans made by Zohar II is potentially much larger. For example, as of December 20, 2011, Zohar II held more than $63 million in cash that had not been loaned to the Portfolio Companies during the Zohar II Reinvestment Period. Thus, Defendants should have paid those amounts back to the Zohar II noteholders pursuant to the Payment Waterfalls. Although MBIA expressly directed the Trustee and Defendants that none of those funds should be used to fund new loans, Defendants later drew on those funds belonging to Zohar II, ostensibly to make new loans.

127.    In addition to Defendants' unauthorized commitments described above, on the eve of the Patriarch Manager Defendants' resignations as Collateral Managers in March 2016, Tilton caused PPAS to draw all available amounts under certain of the Credit Agreements, without the knowledge of the corresponding Portfolio Companies and hold them in accounts controlled by PPAS. Those funds, supposedly for loans, were never made available to the Portfolio Companies for their day-to-day operations or returned to the Zohar Funds. Their whereabouts remain unknown, as Tilton has never accounted for them. Tilton later in 2016

caused PPAS to intercept loan payments from the Portfolio Companies to the Insured Zohar Funds, thus depriving Zohar I of funds to be distributed to MBIA as its senior creditor and Zohar II of funds to pay its obligations on the Zohar II Note Maturity Date.

128.    Certain of the Credit Agreements provided for financing to be provided in the form of revolving credit facilities and delayed draw term loans, which Defendants manipulated to maintain a secret slush fund controlled by Tilton and bypass the lending structure contemplated by the Indentures.  The Credit Agreements that provided for financing in the form of a revolving credit facility or delayed draw loan required Portfolio Companies seeking credit to provide, among other things, notice to PPAS of any request to draw funds, which PPAS was required to provide to the Trustee before funds could be released from the Insured Zohar Funds' accounts.    Similarly, the Credit Agreements required that the borrower provide PPAS with advance notice of the amount of and certain instructions regarding its loan repayments, which PPAS was required to report to the Insured Zohar Funds.

129.    Beginning in or around February 2016, and continuing after the Patriarch Manager Defendants' March 2, 2016 resignations as Collateral Managers, Defendants intentionally and fraudulently embezzled tens of millions of dollars in Fund assets by unlawfully circumventing the requirements governing the draw down and repayment of funds obtained under the revolving credit and delayed draw term loan facilities.  Defendants actively concealed their theft.

130.    To fraudulently obtain loan funds from the Trustee, the Patriarch Manager Defendants misrepresented the draw-downs as financings requested by the Portfolio Companies. In fact, the draw-downs far exceeded the Portfolio Companies' operational needs and requests for funding.

131.    Unbeknownst to the Insured Zohar Funds, their successor Collateral Manager, or MBIA, PPAS *never distributed the loan proceeds to the Portfolio Companies.* Similarly, following the Patriarch Manager Defendants' resignations, PPAS stole credit revolver repayments made by the Portfolio Companies, depositing the funds in its own secret accounts and hiding them from the Insured Zohar Funds. The whereabouts of those funds remains unknown, even after the parties' settlement agreement described below and the Bankruptcy Court's March 2019 order approving PPAS's replacement as loan agent and requiring PPAS to transfer all Collateral to its successor.

132.    As a result of the manipulations described herein, PPAS stole at least $45 million, diverting the funds to its own accounts and concealing them from the Insured Zohar Funds, the noteholders, and MBIA. To facilitate its theft, PPAS created a secret set of financial books and records that it failed to disclose to the Insured Zohar Funds, the new Zohar Collateral Manager, MBIA or anyone else. Defendants designed this elaborate system of embezzlement to engage in naked misappropriation of funds, and provide PPAS with the discretion and control over the Zohar Funds' lending activities and assets that Tilton supposedly relinquished when the Patriarch Managers were forced to resign as Collateral Managers for the Zohar CLOs. This knowing, intentional, and criminal misconduct further depleted Zohar II's assets that otherwise would have been available to pay outstanding principal and interest on the Insured Notes.

**D.    Defendants' Miscategorization Of Loans And Miscalculation Of The Overcollateralization Ratio**

133.    Defendants also deprived the Insured Zohar Funds of funds available to satisfy their payment obligations on the notes by wrongfully siphoning away millions of dollars in management fees to which they were otherwise not entitled. Defendants knowingly misrepresented non-performing loans and distressed Portfolio Companies as performing and

-52-

creditworthy and intentionally miscalculated what the Zohar CLOs' governing documents refer to as the Overcollateralization Ratio, a covenant that provided investors and MBIA with protection against the deterioration of the loan collateral owned by the Insured Zohar Funds.

134.    Significantly, the Overcollateralization Ratio served as a trigger for Defendants' removal as collateral managers for the Insured Zohar Funds. In that regard, if Defendants had accurately represented loan performance and properly calculated the Overcollateralization Ratio, MBIA could have reduced or stopped Defendants' collateral management fees from accruing, including by removing Defendants as collateral managers for cause. Absent Defendants' intentional wrongdoing, millions of dollars in Defendants' management fees would have been subordinated to other payment obligations of the Insured Zohar Funds, thereby eliminating or reducing MBIA's ultimate losses.

135.    One of the Patriarch Manager Defendants' essential duties under the Transaction Documents was to monitor the Collateral on an ongoing basis and to identify and report to MBIA, the noteholders and other interested parties whether the loans comprising the Collateral were performing (or likely to perform) or non-performing (or not likely to perform). Specifically, Section 2.2(f) of the Management Agreements required the Patriarch Manager Defendants to:

> (v) monitor from time to time the cash flows generated by the portfolio of [loans] and notify the Trustee when such cash flows materially deviate from the expected cash flows in respect of such portfolio and (vi) determine whether any Collateral Debt Obligation is ... a Category 1, Category 2, Category 3 or Category 4 loan or a Workout Obligation.

136.    The Indentures required the Collateral Manager to designate each Zohar loan as falling within Category 1, 2, 3 or 4 based on (among other things) the performance of the loan, whether the Portfolio Company had defaulted on paying principal or interest on the loan,

-53-

whether there was a significant risk of the loan declining in credit quality or, with the passage of time, defaulting. In practice, however, only two different categories were used by Defendants: "Category 1" (defaulted loans) and "Category 4" (non-defaulted loans). Category 1 represented non-performing loans made to high-credit-risk Portfolio Companies. Category 4 represented performing loans made to low-credit-risk Portfolio Companies.

137.   The Indentures also set forth certain standards the Collateral Manager was required to follow in designating each loan in a particular Category. For example, the Collateral Manager was prohibited from designating a loan as Category 4 if there were "negotiations, at the time of measurement, to restructure (either in or outside of a bankruptcy or reorganization proceeding) the financial obligations" of the relevant Portfolio Company. The Collateral Manager was also prohibited from designating a loan as Category 4 if the Portfolio Company had defaulted on a principal or interest payment, "without regard to any applicable grace period or any waiver of such default . . . but only so long as such default has not been cured."

138.   The Category assigned to each loan was required to be made in writing. Further, Section 10.13 of the Indentures provided that, in the event that any Zohar loan was not performing or subject to an amendment or restructuring of its terms (including an extension of the maturity date or a reduction in interest rate), the Collateral Managers were required to provide such information to the Issuers for inclusion in regularly issued reports provided to MBIA and the noteholders. Thus, where the Defendants deferred loan interest owed or waived defaults by the Portfolio Companies, the Indentures required the Patriarch Manager Defendants to disclose such deferrals or waivers, including by downgrading the Category assigned to the loans subject to such amendments or modifications.

139.   The numerical Categories assigned to each loan were significant because they were used to calculate the Overcollateralization Ratio, a mathematical formula under the

-54-

Indentures measuring the likelihood that the Insured Zohar Funds would have sufficient liquidity to satisfy their payment obligations of outstanding principal and interest on the Insured Notes on the Zohar Note Maturity Dates. A "passing" or "healthy" Overcollateralization Ratio had to exceed specified amounts under the Indentures in excess of 100%, reflecting that there was adequate Collateral available for the Insured Zohar Funds to meet noteholder obligations — or, "overcollateralization." The Indentures provided that an Overcollateralization Ratio below 102% constituted an Event of Default. The Zohar II Indenture also provided that if the "Adjusted Event of Default Overcollateralization Ratio" (which was calculated simply by subtracting 28% from the Overcollateralization Ratio) was greater than 107%, then an Event of Default would occur if the Overcollateralization Ratio was less than 107%.

140.    Failure of the Overcollateralization Ratio triggered a number of consequences under the Indentures that were intended to conserve funds, including diverting or suspending payment of certain fees to the Collateral Manager and other payments to the Octaluna Entities as the holders of Preference Shares of the Insured Zohar Funds.

141.    The Overcollateralization Ratio was calculated, essentially, by totaling the principal balance amounts for loans and other eligible assets held by the Insured Zohar Funds, applying a discount to the balance amounts for the loans designated as Category 1, and dividing that total by the sum of the aggregate principal amount of the outstanding Class A Zohar Notes and the aggregate unfunded amount of all revolving loans. Thus, the decision to categorize a particular loan as Category 4, instead of Category 1, inflated the Overcollateralization Ratio because the principal balance of that loan would not be subject to a discount in calculating the Overcollateralization Ratio.

142.    The Patriarch Manager Defendants consistently and routinely miscategorized non-performing or defaulted loans, or loans subject to a restructuring, as "Category 4" loans,

-55-

regardless of whether, based on all information available to the Patriarch Manager Defendants, it was probable that the Insured Zohar Funds could have collected amounts due on such loans. The Indentures required the Patriarch Manager Defendants to designate as "Category 1" the various loans for which Defendants, among other actions, extended the principal repayment dates, deferred or forgave interest, waived defaults or subordinated the Insured Zohar Funds' lien priority. The Patriarch Manager Defendants' categorization methodology, such as it was, was inconsistent with the requirements of the Indentures and the Management Agreements. Had the Patriarch Manager Defendants' correctly and accurately categorized the Zohar assets in accordance with the Indentures, and made appropriate disclosures pursuant to the Transaction Documents, then the Overcollateralization Ratio calculation would have been lower than 102% (or 107%, as applicable) resulting in an Event of Default for both Zohar I and Zohar II prior to the Zohar Note Maturity Dates and the exercise of remedies available to MBIA.

143.    The Patriarch Manager Defendants disregarded the contractually-mandated standards governing the numerical loan classifications and intentionally manipulated the Insured Zohar Funds' Overcollateralization Ratio to make it appear as though the Insured Zohar Funds were sufficiently collateralized and, artificially, to avoid an Event of Default that would permit MBIA to remove the Patriarch Manager Defendants as Collateral Managers. Maintaining the Patriarch Manager Defendants in their capacity as Collateral Managers for both Zohar I and Zohar II also allowed Defendants to continue to receive payments from the Insured Zohar Funds that otherwise would have been retained by the Funds and used to pay the Insured Notes and to reduce MBIA's payment amounts under its Financial Guaranties.

144.    By misrepresenting the performance of loans and manipulating the Overcollateralization Ratio, Defendants also avoided detection of their fraudulent, self-dealing scheme, and thereby perpetuated their ability to loot the Insured Zohar Funds of assets.

-56-

III.    **The Insured Zohar Funds' Payment Defaults And Defendants' Obstruction Of MBIA's Efforts To Exercise Its Rights And Remedies**

A.      **Zohar I's Note Payment Default**

145.    On November 17, 2015, the Trustee for Zohar I notified MBIA that the amounts of principal and interest due and payable to the holders of the Zohar I Class A-1 and A-2 Notes on November 20, 2015 exceeded the amount of funds available for payment from Zohar I's cash assets in a deficiency amount of $148,951,585.17.  In this notice, on or around November 17, 2015, the Trustee submitted a claim for a payment by MBIA under the Zohar I Financial Guaranty in the amount of $148,951,585.17.

146.    The deficiency with respect to the principal and interest payments due on the Zohar I Insured Notes on November 20, 2015 and the Trustee's claim for payment under the Insurance Agreement and Financial Guaranty each constituted an "Event of Default" under the Insurance Agreement and the Zohar I Indenture.

147.    MBIA fulfilled its obligations and paid the Trustee $148,951,585.17 on November 20, 2015.  Upon that insurance payment, MBIA obtained the right to receive reimbursement prior to principal payments to the Class A notes and became subrogated to the rights of the Zohar I noteholders that received proceeds from MBIA's Financial Guaranty.

B.      **Defendants Filed Involuntary Bankruptcy In Breach Of The Indentures**

148.    On November 22, 2015, just days after Zohar I's Event of Default, and before MBIA could exercise its right under the Zohar I Indenture to remove Patriarch VIII as Collateral Manager for Zohar I, Tilton caused another affiliated entity, Patriarch Partners XV, LLC ("Patriarch XV"), in its capacity as holder of the Zohar I Class A-3 Notes, to file three involuntary Chapter 11 bankruptcy petitions ("Involuntary Petitions") against the Zohar I Issuers and the Zohar I Subsidiary purportedly seeking to confirm a plan for reorganization of Zohar I.

-57-

149.   As the Credit Enhancer and subrogee to the senior Zohar I noteholders, MBIA was the senior creditor to Zohar I and a real-party-in-interest to and litigant in the involuntary bankruptcy proceedings. Tilton caused Patriarch XV to serve MBIA with Patriarch XV's motion to terminate Zohar I's exclusive period to submit a plan of reorganization, discovery and other pleadings and submissions in connection with the Involuntary Petitions. Invoking the automatic stay provisions contained in Title 11 of the United States Bankruptcy Code, Tilton intentionally prevented MBIA from commencing proceedings to remove Patriarch VIII as Collateral Manager for Zohar I.

150.   Patriarch XV's bankruptcy filing on behalf of Tilton and the other Defendants, was expressly prohibited by the Zohar I Indenture, made in bad faith and patently nothing more than a delay tactic seeking to prevent MBIA from exercising its contractual rights and remedies with respect to Zohar I, including MBIA's rights to direct an auction of the Zohar I Collateral under the Zohar I Indenture.

151.   Tilton's filing of the Involuntary Petitions through Patriarch XV breached Section 13.4 of the Indenture, which expressly provides that noteholders "agree not to institute against . . . any [Zohar I Issuer or Zohar I Subsidiary] any bankruptcy . . . proceedings."

152.   In addition, Patriarch XV's proposed plan for reorganization in the bankruptcy proceedings made clear that Tilton in fact had no legitimate intention to monetize the Zohar I Collateral or to ensure that MBIA was compensated for the nearly $150 million it had paid under the Zohar I Financial Guaranty, let alone to avoid Zohar II's payment default or to ensure that MBIA would be compensated for its approximately $770 million anticipated Zohar II Financial Guaranty payment.   Tilton's purported plan for reorganization contained no details for repayment or any schedule for the sale or other monetization of the Zohar I Collateral and

essentially sought three more years to control the Insured Zohar Funds and strip away for Defendants' sole intended benefit any remaining value from the Collateral.

153.    On February 5, 2016, following an evidentiary hearing held on Zohar I's motion challenging Patriarch XV's authority under the Transaction Documents to commence the involuntary bankruptcy proceedings, Tilton provided notice that effective March 2, 2016, the Patriarch Manager Defendants would resign as the Collateral Managers of all three of the Zohar CLOs.  On that same date, Defendants' then-counsel also provided notice that Patriarch XV was withdrawing its bankruptcy petition for Zohar I — confirming all along that filing the Involuntary Petitions had been nothing more than a bad faith delay tactic.

154.    Notwithstanding the Patriarch Manager Defendants' resignation as Collateral Manager, Tilton did not cause any of her various other affiliated entities to resign from their other conflicted positions.  Defendants also continued resisting MBIA's and the Insured Zohar Funds' efforts to obtain information relating to the Collateral and the Insured Zohar Funds. PPAS, for example, did not resign as the purported administrative agent for the Insured Zohar Funds under the Credit Agreements, and, in fact, continued to purport to act as the lenders' agent under the Portfolio Companies Credit Agreements and obstruct the Insured Zohar Funds' and MBIA's efforts to maximize the value of the Insured Zohar Funds' Collateral and maximizing MBIA's realization on that Collateral.

155.    Defendants' continued abuse of their remaining positions of authority and control over the Insured Zohar Funds and the Portfolio Companies following the Patriarch Manager Defendants' resignations further unjustifiably obstructed MBIA's and the Insured Zohar Funds' abilities to exercise their rights to information and delayed or prevented their attempts to mitigate or prevent further losses with respect to the Collateral.

-59-

C.  **Defendants' Obstruction Of Information And The Zohar I Auction**

156.    Following the Patriarch Manager Defendants' resignations, Alvarez & Marsal Zohar Management Services, LLC ("AMZM") was appointed as the new Collateral Manager for the Zohar Funds.  AMZM and its counsel made a series of written requests to Defendants Tilton, PPAS, the Patriarch Manager Defendants, and also the Portfolio Companies, asking each to provide information relating to the Insured Zohar Funds and the Collateral.  Such books and records requests were made pursuant to their express information rights under the Transaction Documents and applicable law.  Nevertheless, Defendants responded by refusing to turn over the requested documents and information and by refusing to provide even an itemized list of the Insured Zohar Funds' Collateral or current audited financial statements for the Portfolio Companies.

157.    Defendants' obstruction forced AMZM to commence litigation in the Court of Chancery of the State of Delaware to vindicate its rights to the Patriarch Manager Defendants' books and records relating to the Insured Zohar Funds (the "Books and Records Action"). Following a trial, the Delaware Court entered a judgment that Defendants breached their obligations under the Management Agreements.  Notably, in rejecting Defendants' attempt to avoid producing documents relating to the Zohar Funds' equity positions in the Portfolio Companies, the court described Defendants' attempt at trial to contest the Zohar Funds' ownership rights as "codswallop."

158.    The Insured Zohar Funds' and MBIA's abilities to obtain information to which they have been and remain entitled and to exercise their rights and remedies with respect to the Insured Zohar Funds also were frustrated by PPAS's involvement with the Insured Zohar Funds. On June 17, 2016, the Insured Zohar Funds, as lenders and principals under the Credit Agreements, terminated PPAS as administrative agent and replaced it with Alvarez & Marsal

-60-

Zohar Agency Services, LLC ("AMZAS").  Notwithstanding its termination, PPAS insisted it was the agent for the Zohar Funds under the Credit Agreements on the grounds that its agency was irrevocable and, in that purported role as agent, refused to cooperate with efforts by the Insured Zohar Funds and MBIA to exercise their rights with respect to the Portfolio Company loans and to preserve and maximize the value of and monetize that Collateral.

159.    In addition to its rights to information regarding the Collateral, one of the rights and remedies available to MBIA under the Indentures is to direct the private or public sale of the Collateral to monetize and recover losses that MBIA incurred in making payments under its Financial Guaranties.  In 2016, after Zohar I defaulted on its payment obligations for the Class A notes — and after the removal of the automatic stay impediment resulting from Tilton's bad faith involuntary bankruptcy filing for Zohar I — MBIA began to take steps to monetize the Zohar I Collateral, including by directing the Trustee to conduct an auction to liquidate the assets of Zohar I.

160.    Just as MBIA gained the right to direct the monetization of the Zohar I Collateral, Tilton took steps to frustrate MBIA's realization of its rights and remedies.  From 2003 through 2016, Tilton claimed as write offs on her personal tax returns tens or hundreds of millions of dollars of tax losses in connection with activity of the Zohar Funds.  In June 2016, however, and in violation of her contractual obligations, Tilton sent notice to the United States Internal Revenue Service that the Zohar Funds thereafter would be taxable entities.  Thus, after having enjoyed the benefit of the Zohar Funds' tax losses for 14 years, Tilton improperly sought to impose potential tax liability on the Insured Zohar Funds once it became clear that MBIA would enforce its rights to direct the liquidation or monetization of the Collateral.

161.    In that regard, on June 27, 2016, pursuant to its express rights as Controlling Party under Section 5.4 of the Indentures, MBIA directed the Trustee to sell and liquidate all of the

-61-

Zohar I Collateral at a public sale. The Trustee notified Defendants of MBIA's direction to liquidate the Collateral on July 11, 2016, and, then, on August 29, 2016, the Trustee provided Defendants with the Notification of Disposition of Collateral Assets. The Notification of Disposition of Collateral Assets identified the various loan and equity interests included in the Collateral being sold, described the terms of the auction, made clear that the Collateral was being offered and sold on an "as is and where is" basis and that bids would only be accepted "for all (but not less than all) of the Collateral."

162.    Notwithstanding MBIA's clear authority to direct the liquidation sale of Zohar I under the Indentures, Tilton caused Octaluna I and Patriarch XV to commence litigation to enjoin the auction (the "Auction Litigation"), then-scheduled for September 15, 2016. After the Auction Litigation was removed to federal court, the court denied Octaluna I's and Patriarch XV's request to enjoin the Zohar I auction and ultimately directed the auction sale to take place on December 21, 2016.

163.    On December 21, 2016, the Trustee and its Liquidation Agent held the Zohar I auction, at which time MBIA was determined to be the highest bidder for the entire portfolio of Zohar I assets. Pursuant to the Zohar I Indenture, MBIA, in its capacity as Controlling Party, provided Octaluna I with notice of the auction results, triggering a 5-day period by which Octaluna I had the right under the Zohar I Indenture to exercise its "last look" right to match the highest bid submitted in the auction and thereby purchase the Zohar I assets. Octaluna I declined to exercise that right, and MBIA thereafter acquired all of the Zohar I assets.

164.    In the three-plus years since submitting the winning bid in the Zohar I auction, MBIA has been unable to effectuate its purchase of the Zohar I Collateral. On January 12, 2017, MBIA, the Trustee, the Zohar I Issuer and the Zohar I Subsidiary executed a purchase agreement (the "Purchase Agreement") pursuant to which MBIA agreed to purchase all right, title and

-62-

interest in the Zohar I Collateral. The parties to the Purchase Agreement agreed that, until such time that the Trustee could effectuate the transfer to MBIA of all right, title and interest in the Zohar I Collateral, MBIA would hold a participation interest in the Zohar I assets pending elevation of MBIA's beneficial ownership rights to that of legal ownership of the Collateral. In that regard, the parties to the Purchase Agreement also executed a "Participation Agreement," dated January 12, 2017, to facilitate the intent of the parties in the Purchase Agreement to elevate MBIA's rights to legal, beneficial and equitable ownership of the Zohar I Collateral.

165.   As of the date of execution of the Purchase Agreement and Participation Agreement, the Zohar I Trustee was not in a position to effectuate the transfer to MBIA of all rights, title and interests in the Zohar I Collateral. One reason MBIA could not effectuate complete transfer of the Zohar I loan assets from the Zohar I Trustee is that certain Credit Agreements executed or acquired by Defendant Patriarch VIII on behalf of the Zohar I Issuer, PPAS, and the Portfolio Companies contained a provision purporting to prevent the Insured Zohar Funds, as lenders, from conveying or assigning any of their rights in the loans absent consent from PPAS, as agent. Although Zohar I removed and replaced PPAS with AMZAS in June 2016 (and although the Court has since approved the appointment of Ankura as the Zohar Funds' new agent, replacing both PPAS and AMZAS), PPAS's continued insistence that it was the agent for the Zohar Funds under the Credit Agreements prevented MBIA from receiving all right, title and interest of the Zohar I Collateral that MBIA purchased in the Zohar I auction.

166.   MBIA also could not effectuate transfer of the Zohar I equity interests in the Portfolio Companies that MBIA purchased in the Zohar I auction. Prior to and continuing into the commencement of the above-captioned Zohar Bankruptcy Cases, MBIA has not been able to complete the transfer of Zohar I's equity Collateral, in part because of Defendants' unjustified and baseless insistence that Octaluna I and Octaluna II were the beneficial owners of the stock

-63-

and LLC membership interests in the Portfolio Companies. Defendants also obstructed and impeded the Trustee's ability to transfer to MBIA the equity assets MBIA purchased in the Zohar I auction because Defendants' Governance Transactions deprived the Insured Zohar Funds of their full right, title and interest in the equity assets belonging to them, including the valuable control and voting rights relating to and arising from the equity interests in the Portfolio Companies.

D.  **Zohar II's Note Payment Default**

167.  On January 20, 2017, as a direct result of Defendants' wrongful acts to deprive Zohar II of the resources needed for it to pay the Zohar II Class A notes on the Zohar II Note Maturity Date, Zohar II defaulted on its payment obligations to the Class A noteholders. On January 10, 2017, the Trustee for Zohar II notified MBIA that the amounts of principal and interest due and payable to the holders of the Zohar II Class A-1 and A-2 Notes on January 20, 2017 exceeded the amount of funds available for payment from Zohar II's cash assets in a deficiency amount of approximately $770 million.

168.  The deficiency with respect to the principal and interest payments due on the Zohar II Insured Notes on January 20, 2017 and the Trustee's claim for payment under the Insurance Agreement and Financial Guaranty each constituted an "Event of Default" under the Zohar II Insurance Agreement and Indenture.

169.  MBIA fulfilled its obligations and paid the Trustee $770 million on January 20, 2017. Upon that insurance payment, MBIA became entitled to receive reimbursement of its payments under the Financial Guaranties prior to principal payments made to the Class A notes and became subrogated to the rights of the Zohar II noteholders that received proceeds from MBIA's Financial Guaranty.

-64-

170.    MBIA was required to undertake substantial and foreseeable efforts to make its payment under the Zohar II Financial Guaranty, efforts which increased and exacerbated MBIA's already significant losses in connection with the Zohar CLOs. Given the significant liquidity required to make that payment, MBIA caused its wholly owned subsidiary MBIA UK (Holdings) Limited to enter into an agreement to sell its subsidiary, MBIA UK Insurance Limited along with $23 million, to Assured Guaranty Corp. in exchange for insured Zohar II Class A Notes with a face value of $347 million (the "Assured UK Transaction"). Additionally, on January 10, 2017, MBIA executed a financing facility ("Zohar II Financing Facility") with, among other parties, affiliates of certain holders of 14% Fixed-to-Floating Rate Surplus Notes of MBIA, pursuant to which MBIA received approximately $328 million that MBIA applied to a portion of the satisfaction of MBIA's Zohar II payment obligations. That is, MBIA relied in part on the net proceeds of the Zohar II Financing Facility to pay its obligations under the Zohar II Financial Guaranty.

**E.    Defendants' Additional Bad Faith Litigation, Obstruction And Inequitable Conduct**

171.    Following the Zohar II Note Payment Default, Defendants continued their bad faith efforts in preventing MBIA and the Insured Zohar Funds from monetizing the Collateral and recovering losses that MBIA incurred in making payments under its Financial Guaranties. On or about January 25, 2017, just five days after Zohar II defaulted on its note payment obligations, Tilton, acting as holder of the Preference Shares, removed the disinterested, independent directors of the Debtors and replaced them with herself as the sole director for each of the Zohar Funds. It was in her capacity as director that Tilton caused the Zohar Funds to commence the above-captioned Zohar Bankruptcy Cases and stay the multiple litigations

-65-

brought by the Zohar Funds challenging Defendants' pre-petition misconduct and seeking to exercise their rights and remedies with respect to the Collateral.

172.    Incredibly, Defendants continued wrongfully to claim beneficial ownership of the Zohar Funds' equity interests in the Portfolio Companies after Zohar II and Zohar III brought suit under Delaware law to exercise their rights as shareholders to name directors at FSAR Holdings, Inc, Glenoit Universal, Ltd. and Universal Holdings Co. (the "Delaware Section 225 Action"). In the Delaware Section 225 Action, Tilton filed meritless and bad faith counterclaims and third-party claims against Zohar II, Zohar III, the Funds' successor Collateral Manager, AMZM, and MBIA all premised on Defendants' baseless claims of beneficial ownership of the Portfolio Company equity. On November 30, 2017, following costly discovery and a six day trial, the Delaware Court of Chancery confirmed that the Zohar CLOs involved in that litigation are the full legal and beneficial owners of the equity at issue. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, C.A. No. 12946-VCS, 2017 WL 5956877, at *9 (Del. Ch. Ct. Nov. 30, 2017).

173.    While the Delaware Chancery Court's November 30, 2017 decision specifically addressed the rights of Zohar II and Zohar III to appoint the directors of three corporate Portfolio Companies (Zohar I was not a party to the Delaware Section 225 Action), the Court's factual and legal determinations applied equally to and conclusively rebutted Tilton's claim of beneficial ownership over numerous other Portfolio Companies. The court issued a well-reasoned 96-page opinion expressly rejecting each of the grounds Defendants asserted in claiming beneficial ownership of equity interests held in the name of the Zohar Funds — arguments that Defendants made not just in connection with the three Portfolio Companies at issue in the Delaware Section 225 Action, but all of the Zohar Portfolio Companies. Among other things, the court held that (a) Tilton's self-dealing purportedly irrevocable proxies were invalid, (b) the documentary evidence uniformly demonstrated the Zohar Funds — not Tilton or her affiliates — as the

-66-

acquirers and owners of the Portfolio Company equity, and (c) the Zohar Funds were entitled to the full powers of controlling shareholders, including to select the management of the Portfolio Companies and to sell or otherwise monetize their Portfolio Company interests. In rejecting what it characterized as Tilton's "revisionist" position, the court found that the encumbrances on Zohar Collateral created by Tilton's voting proxies and Tilton's claims of beneficial ownership of the Portfolio Company equity were in "clear violation" of the plain and unambiguous language of the Indentures and contrary to Tilton's previous express written acknowledgments of the Zohar Funds' ownership of Portfolio Company equity.

174.    The Delaware Court of Chancery's Section 225 Action opinion and judgment eviscerated Tilton's claims to ownership of the Portfolio Companies and Defendants' other positions taken in litigations involving the Zohar Funds. As a result, Defendants took multiple extraordinary steps to prevent the implementation of the Delaware Court of Chancery's opinion and judgment, including by avoiding further litigation in the Court of Chancery, where the outcome of the Delaware Section 225 Action would clearly be repeated. For instance, Defendants sought a stay of the Delaware Court of Chancery's judgment enabling Tilton to remain the sole director of each of the three Portfolio Companies at issue pending appeal. The court granted the stay, expressly relying on "Tilton's representation that she would seek an expedited appeal." Unbeknownst to the court, however, Tilton was already planning to impede any such appeal by commencing bankruptcy proceedings on behalf of the Zohar Funds.

175.    Defendants further sought to avoid the consequences of their imminent overwhelming defeat in Delaware by commencing multiple frivolous state court actions asserting the same rejected ownership claims across the country and transferring any pending Delaware cases to New York. On November 13, 2017, in anticipation of the Delaware court's opinion, and notwithstanding that Tilton was unable to evidence any of her claims of equity ownership at trial

-67-

in the Delaware 225 or Books and Records Actions, Defendants commenced three separate state court actions against the Zohar Funds in Arizona, California and Michigan seeking declarations that Tilton was the beneficial owner of stock and equity membership interests in four Portfolio Companies. A day later, the Zohar Funds commenced the first of two actions in the Delaware Court of Chancery seeking a determination of their ownership and management rights with respect to thirteen Portfolio Companies on grounds similar to those adjudicated in the Delaware Section 225 Action, which actions Defendants sought to remove and transfer to New York federal court on frivolous grounds. At the same time, Defendants reversed their positions in a different action pending against them in New York federal court, asking the New York court to retain jurisdiction over state law claims brought against them and filing an answer with counterclaims against the Zohar Funds and third-party claims against AMZM, MBIA, certain current and former Zohar III noteholders, and U.S. Bank as Trustee.

176.    In early 2018, Defendants suffered multiple fatal blows to their strategy of avoiding the Delaware Court of Chancery. In February 2018, a federal magistrate judge ruled and recommended to the district court judge that one of the two actions filed by the Zohar Funds seeking to confirm their rights of ownership and control over the Portfolio Companies be remanded back to the Delaware Court of Chancery and fee shifting be imposed against Tilton for making the meritless removal. Defendants had previously stipulated that both actions would be treated identically under the court's ruling with respect to remand, making almost certain that the Delaware Court of Chancery would soon vindicate the Zohar Funds' outright ownership of the equity in 13 Portfolio Companies on the same grounds applicable to the Delaware Section 225 Action.

177.    Likewise, in March 2018, courts in Michigan and California granted the Zohar Funds' motions to dismiss Tilton's mirror declaratory actions. Further, briefing on Tilton's

appeal of the Delaware Section 225 Action opinion and judgment was completed with oral argument before the Delaware Supreme Court scheduled for March 21, 2018. Affirmance of the Delaware Section 225 Action judgment would collaterally estop Defendants from asserting their Portfolio Company "ownership" theories.

178.    Running out of options, Tilton caused the Zohar Funds to commence the Zohar Bankruptcy Cases on or about March 11, 2018 — ten days before oral argument was to have been held in Defendants' appeal of the Delaware Section 225 Action. Tilton's surprise gambit was an improper and bad faith attempt to avoid final and enforceable rulings with respect to the Zohar Funds' ownership of and control over the Portfolio Companies and Defendants' pre-petition misconduct in connection with the Zohar CLOs and Portfolio Companies. Indeed, in their First Day Declarations filed in the Zohar Bankruptcy Cases, Tilton and her proposed Chief Restructuring Officer ("CRO") for the Zohar Funds, Marc S. Kirschner, expressly admitted that the Zohar bankruptcy petitions were filed to stop the litigation brought by AMZM on behalf of the Zohar CLOs against Tilton and her affiliates and relitigate in a new forum the findings made by the court in the Delaware Section 225 Action.

179.    Defendants' actions in preparation for Tilton's surprise commencement of the Zohar Bankruptcy Cases further demonstrate Defendants' bad faith and intentional disregard for MBIA's and the Secured Creditors' rights under the Zohar Transaction Documents and applicable law. Prior to commencing the Zohar Bankruptcy Cases, Tilton caused various Portfolio Companies to enter into at least 44 "phantom equity agreements" granting equity value to certain of their employees and officers, including Tilton herself. These phantom equity agreements purported to grant cash payments, measured in terms of the equity value of the Portfolio Company, upon a "Change of Control" at the Portfolio Company, as determined by Tilton, as sole director. Tilton also provided herself the ability under the agreements to

-69-

accelerate the payment and vesting of the phantom equity and to modify, amend, or waive any provisions in the agreements. Tilton's purported grants of phantom equity under these conflicted agreements would negatively impact the value that passes to MBIA upon a Portfolio Company sale by reducing the net sale proceeds that would pass through the Zohar Funds to their Secured Creditors.

180.    Additionally, Defendants diverted millions of dollars of Portfolio Company loan interest payments — payments that they should have paid directly to the Zohar Trustees for the benefit of the Secured Parties — to bank accounts Defendants created for the improper purpose of retaining Tilton's chosen bankruptcy professionals. Defendants were without authority to create these bank accounts or to divert the cash collateral to anyone other than the Zohar Trustees. Tilton also sought without justification to reject the Zohar Funds' collateral management agreements with AMZM, agreements to which MBIA is an express third-party beneficiary, and to modify Defendants' disclosure obligations under the Bankruptcy Rules — a transparent attempt to erect new barriers for MBIA to obtain basic financial information about their Collateral and to shield Tilton's misconduct from judicial review.

181.    In reliance on Tilton's commitments to sell the Portfolio Companies and monetize the Collateral, MBIA entered into a settlement agreement (the "Settlement Agreement") by and among the Zohar Funds, Defendants and certain additional Tilton affiliates and the Zohar III Controlling Class. Pursuant to the Settlement Agreement and multiple separate tolling agreements, the parties agreed to stay all pending litigation and toll and extend all filing deadlines with respect to the parties' causes of action. In October 2019, one day after the expiration of the parties' agreed-upon litigation stay, Tilton and Defendants Patriarch VIII, Patriarch XIV, and the Octaluna Entities commenced an adversary proceeding in this Court

against MBIA and other senior Zohar creditors containing a sole cause of action for equitable subordination and captioned as Adversary Proceeding No. 19-50390 (KBO).

182.    Notwithstanding Tilton's sworn statements to the Court and obligations under the Settlement Agreement to work in good faith with the Zohar Funds to sell or refinance the Portfolio Companies, only two Portfolio Companies were sold between March 2018 and March 2020, generating less than $33 million payable towards amounts owed to MBIA.  Indeed, Tilton has failed to jointly work with the Zohar Funds in good faith to monetize all of the Portfolio Companies and instead has impeded and obstructed the Zohar Funds' efforts to monetize the Portfolio Companies, including, without limitation, by unilaterally and indefinitely stopping the sales and marketing of certain Portfolio Companies.  Further exacerbating the harm to MBIA caused by her failure to monetize the Portfolio Companies and work towards achieving amounts due and payable to MBIA as agreed, Tilton also drained the Zohar Funds' bankruptcy estates of assets through frivolous litigation and bad faith delay tactics.

183.    On March 21, 2020, one day after the Bankruptcy Court imposed certain milestones and parameters establishing a timely process for monetization, Tilton resigned her positions as officer and director at nearly all of the Portfolio Companies.  Specifically, on March 21, 2020, Tilton abruptly and without prior notice to MBIA or the Zohar Funds' fiduciaries immediately and effectively resigned her positions as director, manager, and CEO of all but one of the Portfolio Companies and withdrew her prior objections to the Zohar Funds' claims of legal and beneficial ownership of, and voting rights attendant to, the Portfolio Company equity and membership interests that had, as of that date, been in dispute in the parties' pending litigations. Although Tilton subsequently attempted to rescind her resignation with respect to certain of her various positions, the Court confirmed in rulings issued and stated on the record on March 30, 2020 and April 21, 2020 that Tilton's resignations were effective as of March 21, 2020 and that

-71-

the Zohar Funds enjoyed all rights of ownership and control of the previously disputed equity in the Portfolio Companies.

184.    The Portfolio Companies experienced drastic performance declines during Tilton's mismanagement and control, which in turn impaired the Insured Zohar Funds' Collateral and reduced MBIA's and the Secured Parties' recoveries.    Indeed, at least 14 Portfolio Companies ceased or significantly diminished operations between the mere three-year period from 2016 to 2019, and the decline of two in particular highlight the impact of Defendants' misconduct on the Insured Zohar Funds' assets.    As determined by the Honorable Stuart M. Bernstein of the United States Bankruptcy Court for the Southern District of New York, Tilton caused Transcare's collapse and bankruptcy in February 2016 — less than only one month after reporting the loans made to Transcare as low-credit-risk assets of the Insured Zohar Funds — by wasting Transcare's corporate assets and opportunities for survival, saddling the company's employees with large unpaid wage claims, and attempting to fraudulently transfer Transcare's valuable assets to herself.    Specifically, Tilton breached her fiduciary duties of loyalty and good faith to Transcare by rejecting legitimate proposals to purchase the company and rescue its core operating business of transporting disabled passengers for the New York City Transit Authority and other municipalities, only so that Tilton's affiliates could purport to loan funds to Transcare and then "foreclose" on those fake loans and seize for themselves Transcare's profitable business units and remaining assets of value.    Similarly, in October 2019, Tilton forced Portfolio Company Dura Automotive Systems, LLC into bankruptcy under concerning circumstances where Tilton sought to enrich herself at the expense of Dura and the Zohar Funds by acquiring Dura's assets on non-commercial terms for significantly lower amounts than indicative bids offered approximately one year prior.    Notwithstanding Tilton's sworn statements that such company represented a "Crown Jewel" of the Zohar CLOs' portfolio, Dura ultimately was sold

-72-

for amounts insufficient to provide the Zohar Funds any cash recoveries on their debt and equity interests in that company.

185.    As referenced herein, Defendants' self-dealing and mismanagement significantly impaired the Insured Funds' Collateral, and Defendants' refusal to timely monetize the Portfolio Companies harmed MBIA's ability to recover amounts owed to it under the Transaction Documents, the Settlement Agreement and applicable law.    Tilton's abrupt resignation — let alone her attempted rescission thereof — however, did not cure her past misdeeds or remedy her prior bad faith roadblocks to the Zohar Funds' monetization of the Portfolio Companies.    Indeed, the vacuum of leadership at the Portfolio Companies created by her resignation created a new set of governance and management challenges for the Zohar Funds, the repercussions of which are still in flux today and continue to adversely impact the Insured Zohar Funds and MBIA's recoveries.    Tilton's resignation and concessions as to the Zohar Funds' legal and beneficial ownership of equity in the Portfolio Companies does nevertheless further demonstrate Defendants' bad faith in claiming otherwise.

186.    MBIA has at all times performed its obligations under the Transaction Documents, the Settlement Agreement and applicable law.

## CAUSES OF ACTION

### COUNT I
### BREACH OF THE MANAGEMENT AGREEMENTS
#### (Against The Patriarch Manager Defendants)

187.    MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

188.    The Management Agreements are valid and enforceable contracts under which the Patriarch Manager Defendants agreed, for the express benefit of MBIA, to monitor and manage

the Insured Zohar Funds' Collateral in accordance with the terms and standards of care set forth in the Management Agreements and the Indentures as alleged herein.

189.    Among the Patriarch Manager Defendants' other requirements and obligations as Collateral Managers, the Management Agreements provide that the Patriarch Manager Defendants:

(a)    were obligated to exercise the powers conferred to them thereunder "in each case subject to and in accordance with the terms of the Indenture[s]," (Management Agreements § 2.2) and were expressly prohibited from causing the Issuers or the Zohar Subsidiaries "to exercise any . . . rights or remedies in a manner prohibited by the Indenture" (Management Agreements § 2.2(c));

(b)    "shall not intentionally take any action that it knows would cause an Event of Default under the Indenture" (Management Agreements § 2.6);

(c)    "shall not take any action which it knows or should be reasonably expected to know in accordance with prevailing market practices would (i) cause the [Insured Zohar Funds] to violate the terms of the Indenture, (ii) adversely affect the interests of the Holders of the Securities (without, in the case of the Notes, giving effect to the [Financial Guaranties], if applicable) in any material respect (other than as contemplated [under the Management Agreements] or under the Indenture[s] . . .), . . . (iv) violate any United States federal or state law. . . ." (Management Agreements § 2.6);

(d)    perform their obligations with respect to any material conflict determined to exist between the holders of the Zohar Notes and any other account or portfolio for which the Patriarch Manager Defendants or their affiliates serve as an investment advisor "in accordance with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such

conflict" ((Management Agreements § 6.2(c)), and perform their management duties to use "reasonable care and the same degree of skill and attention . . . exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the collateral, and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture" (Management Agreements § 2.4); and

      (e)    shall be liable to any person or entity for any "losses, claims, damages, judgments, assessments, interests, judgments, costs, fines, amounts paid in settlement, attorneys' fees and expenses or other liabilities of any nature whatsoever . . . that arise out of or in connection with the performance by the Collateral Manager[s] . . . of the Collateral Manager[s'] duties under [the Management Agreements] and/or the other Transaction Documents . . . by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty . . . " (Management Agreements § 4.4).

190.    The Patriarch Manager Defendants breached their respective Management Agreements by, among other things:

      (a)    failing to exercise their powers under the Management Agreements subject to and in accordance with the terms of the Indentures, failing to cause the Insured Zohar Funds to exercise rights or remedies and failing to exercise rights and remedies, all in violation of the Indenture;

      (b)    intentionally taking actions that they knew would cause Events of Default under the Indentures for Zohar I and Zohar II as a result of the Insured Zohar Funds' failure to pay outstanding principal and interest owed on the Class A notes on the Zohar Note Maturity Dates;

-75-

(c)    taking actions which they knew, or should have reasonably been expected to know in accordance with prevailing market practices, would (i) cause the Insured Zohar Funds to fail to make principal and interest payments owed to Class A Noteholders on the Zohar Note Maturity Dates, as required by the Indentures, and (ii) materially and adversely affect the interests of the Class A noteholders (without giving effect to MBIA's Financial Guaranties);

(d)    failing to perform their duties and obligations under the Management Agreements, including with respect to their duties of monitoring and managing the Collateral, among others, in the face of known material conflicts of interests, (i) with the care, skill, prudence and diligence that a prudent person or entity would use in resolving such conflict and (ii) with the reasonable care or the skill and attention that the Patriarch Manager Defendants would exercise with respect to comparable assets it would exercise for themselves or for their affiliates or that institutional investment managers of national standing would use in managing similar investments; and

(e)    performing their duties and obligations under the Management Agreements and Indentures in bad faith and with willful misconduct or, at least, gross negligence; and

(f)    causing the Insured Zohar Funds to take actions that impaired the value and rights in the Collateral in violation of Section 7.8 of the Indentures.

191.    The Patriarch Manager Defendants breached their respective Management Agreements by knowingly, in bad faith and with willful misconduct, but at least gross negligence, engaging in, among other things, the following conduct:

(a)    executing or amending terms of the Credit Agreements for the sole intended benefit of the Patriarch Manager Defendants or their affiliates—and in

particular, Defendants Tilton and Patriarch Partners—and to the detriment of the Insured Zohar Funds, the noteholders and MBIA, including by deferring and forgiving loan interest payments and fees and, thus, reducing the amounts payable to the Insured Zohar Funds, and undermining the Zohar Funds' ability to take remedial action to address Portfolio Companies' loan defaults by modifying loan conditions and requirements, waiving defaults themselves and subordinating the Insured Zohar Funds' lien positions;

(b)     miscategorizing non-performing "Category 1" loans as performing "Category 4" loans and miscalculating the Overcollateralization Ratio to ensure the continued wrongful payment of management fees;

(c)     funding new loan commitments without MBIA's authorization;

(d)     extending the principal repayment date of the loans made by the Insured Zohar Funds to the Portfolio Companies beyond the Zohar Note Maturity Dates and in violation of Section 12.1(a)(2) of the Indentures;

(e)     refusing to monetize equity interests in the Portfolio Companies owned by the Insured Zohar Funds and diverting to themselves proceeds from the Portfolio Companies, including siphoning funds from the Portfolio Companies in the form of management consulting fees; and

(f)     engaging in various conflicted, self-dealing transactions knowingly designed to divert to Defendants control over the Insured Zohar Funds' equity interests in the Portfolio Companies in a gross abuse of Defendants' various positions of control over the Insured Zohar Funds, including, among other things, obstructing and impeding Zohar II's ability to monetize its equity interests in the Portfolio Companies to avoid its Note payment default, even after the Patriarch Manager Defendants resigned as Collateral Managers, effective March 2016.

-77-

192.   The Patriarch Manager Defendants' wrongful conduct and contractual breaches directly and proximately caused the Zohar I and Zohar II payment defaults and the Insured Zohar Funds' insurance claims under MBIA's Financial Guaranties. MBIA's payment obligations under the Financial Guaranties were triggered as a direct and proximate result of the Patriarch Manager Defendants breaches, including, by among other things:

(a)    diverting to themselves funds that otherwise would have been available to the Insured Zohar Funds to pay amounts owed on the Class A notes and reduce or avoid MBIA's payment under the Financial Guaranties;

(b)    preventing the Portfolio Companies from making their principal and interest payment obligations on the loans to the Insured Zohar Funds, including by extending the principal repayment date beyond the Zohar Note Maturity Dates, diverting to themselves or their affiliates proceeds from the Portfolio Companies that should have been paid to the Insured Zohar Funds and siphoning off the Portfolio Companies' assets to themselves in the form of, among others, management consulting fees; and

(c)    wrongfully maintaining their positions as Collateral Managers to maximize fees that, upon removal as Collateral Managers or reduction in asset portfolio size, would have been used to eliminate or reduce the deficiencies owed on the Class A notes and paid by MBIA under its Financial Guaranties.

193.   In addition, the Patriarch Manager Defendants' breaches directly and proximately prevented MBIA from exercising its rights and remedies under the Transaction Documents, including, without limitation, MBIA's rights to maximize the value of the Collateral. Thus, MBIA has been unable to avoid or adequately mitigate the harm and damages that it has incurred as a result of the Patriarch Manager Defendants' breaches of contract, including, without

limitation, the Insured Zohar Funds' payment defaults on the Insured Notes, triggering MBIA's payment obligations under MBIA's Financial Guaranties.

194.    On November 20, 2015, MBIA paid approximately $150 million under its Zohar I Financial Guaranty that it otherwise would not have been required to pay if not for the Patriarch Manager Defendants' contractual breaches alleged herein.    On January 20, 2017, MBIA paid approximately $770 million under its Zohar I Financial Guaranty that it otherwise would not have been required to pay if not for the Patriarch Manager Defendants' contractual breaches alleged herein.    MBIA further incurred substantial costs and expenses in connection with its satisfaction of its payment obligations under the Financial Guaranties, including substantial costs and expenses in connection with the Assured UK Transaction and the Zohar II Financing Facility.

195.    MBIA's payments under the Financial Guaranties and the costs and expenses incurred by MBIA as a result of the Zohar I and Zohar II Events of Default and Defendants' wrongdoing are the natural, probable and foreseeable consequences of Defendants' contractual breaches.    Additionally, the costs and expenses incurred by MBIA in satisfying its payment obligations under the Financial Guaranties, including securing the Assured UK Transaction and the Zohar II Financing Facility, were within the contemplation of the parties at the time of the agreement to the Transaction Documents and were foreseeable and commercially reasonable.

196.    MBIA has performed all of its obligations under the Management Agreements and the Indentures.    The parties to the Management Agreements expressly agreed that MBIA has full power to enforce those agreements as if MBIA was a party thereto.

197.    As a result, MBIA has been damaged by the Patriarch Manager Defendants' breaches of contract in an amount to be determined at trial.

## COUNT II
## TORTIOUS INTERFERENCE WITH INDENTURES
### (Against Tilton, Patriarch Partners, PPAS
### And The Patriarch Manager Defendants)

198.     MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

199.     The Indentures constitute valid and enforceable contracts between MBIA, the Issuers, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank National Association, as Trustee. The Indentures were supported by adequate consideration.

200.     Defendants had knowledge of the Indentures and other Transaction Documents setting forth the Issuers' and Zohar Subsidiaries' contractual obligations in connection with the Zohar Funds.

201.     Among other obligations, the Indentures required the Issuers to:

> duly and punctually pay all principal, interest (including Class A Additional Interest, Defaulted Interest and interest thereon in respect of the Class A Notes), Class A-1 Commitment Fees, Class A-2 Commitment Fees, Class A-3 Commitment Fees, Class A-1 Additional Amounts, Additional Class A-3 Adjusted Amounts, Credit Enhancement Premium and Credit Enhancement Liabilities in accordance with the terms of the Notes, this Indenture, the Note Purchase Agreements and the Credit Enhancement Agreement. Upon the Maturity of the Notes of each Class, the Issuer will give notice thereof to each Rating Agency (unless otherwise notified thereof pursuant to the terms of this Indenture).

> Indentures § 7.1(a).

202.     Section 7.8 of the Indentures prohibited the Issuers from taking any actions to impair the Collateral.

203.     Defendants through their affirmative acts and domination and control with respect to the Insured Zohar Funds intentionally, improperly and without privilege induced or caused the Issuers to breach their obligations under Sections 7.1(a) and 7.8 of the Indentures.

-80-

204.    On or around November 20, 2015 and January 20, 2017, which dates MBIA made payments under the Financial Guaranties and incurred additional costs and expenses, MBIA was damaged by Defendants' tortious interference with the Issuers' performance under the Indentures in an amount to be determined at trial.

205.    MBIA's payments under the Financial Guaranties and the costs and expenses incurred by MBIA as a result of Zohar I's and Zohar II's breaches of the Indentures and Defendants' wrongdoing, including the costs and expenses incurred by MBIA in connection with the Assured UK Transaction and the Zohar II Financing Facility, are the natural, proximate and foreseeable result of Defendants' tortious acts.

206.    MBIA also seeks punitive damages in an amount to be determined at trial from Defendants for their intentional interference with the Issuers' performance, and MBIA's rights and remedies, under the Indentures.

### COUNT III
### <u>TORTIOUS INTERFERENCE WITH INSURANCE AGREEMENTS</u>
#### (Against Tilton, Patriarch Partners, PPAS
#### And The Patriarch Manager Defendants)

207.    MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

208.    The Insurance Agreements constitute valid and enforceable contracts between the Issuers and MBIA and were supported by adequate consideration.

209.    Defendants had knowledge of the Indentures, Insurance Agreements and other Transaction Documents, which together set forth the Issuers' contractual obligations in connection with the Insured Zohar Funds.

210.    Among other obligations, the Insurance Agreements required each of the Zohar I and Zohar II Issuers to:

-81-

(a)    "comply with the terms and conditions of, and enforce its rights under, each Transaction Document to which it is a party . . ." (Section 2.04(g));

(b)    "pay its Debts as they become due" (Section 2.04(k); and

(c)    "apply its funds generated under the Indenture towards the payment of amounts due under the Securities and towards the other sums payable by the Issuer under the Transaction Documents and for the other purposes as set forth in the Transaction Documents and fees and expenses incurred in connection with the Transaction and for no other purpose, all as set forth in the Indenture" (Section 2.04(n)).

211.    Defendants through their affirmative acts and domination and control with respect to the Insured Zohar Funds, intentionally, improperly and without privilege induced or caused the Issuers to breach their obligations under Sections 2.04(g), 2.04(k) and 2.04(n) of the Insurance Agreements.

212.    On or around November 20, 2015 and January 20, 2017, which dates MBIA made payments under the Financial Guaranties and incurred additional costs and expenses, MBIA was damaged by Defendants' tortious interference with the Issuers' performance under the Insurance Agreements in an amount to be determined at trial.

213.    MBIA's payments under the Financial Guaranties and the costs and expenses incurred by MBIA as a result of Zohar I's and Zohar II's breaches of the Insurance Agreements and Defendants' wrongdoing, including the costs and expenses incurred by MBIA in connection with the Assured UK Transaction and the Zohar II Financing Facility, are the natural, proximate and foreseeable result of Defendants' tortious acts.

214.    MBIA also seeks punitive damages in an amount to be determined at trial from Defendants for their intentional interference with the Issuers' performance and MBIA's rights and remedies under the Insurance Agreements.

-82-

## COUNT IV
## DECLARATORY JUDGMENT
### (Against All Defendants)

215.    MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

216.    The Insured Zohar Funds are the record holders and legal and beneficial owners of valuable equity interests in the Portfolio Companies that are reflected in the form of, among other documents, stock certificates and LLC Agreements.  The Insured Zohar Funds received these interests for good and valuable consideration, generally in connection with extending a loan or in exchange for an agreement to restructure Zohar I's investment in Portfolio Companies.

217.    On January 12, 2017, MBIA purchased, for valid consideration, the equity interests in certain Portfolio Companies that were owned by Zohar I.  MBIA is also subrogated to the rights of the Insured Noteholders and entitled to receive reimbursement of its payments under the Financial Guaranties prior to principal payments made to Fund noteholders.

218.    The stock certificates are valid securities issued in the name of one or more of the Insured Zohar Funds and declare the Insured Zohar Funds to be the owner of the identified shares of stock.

219.    The LLC Agreements list one or both of the Insured Zohar Funds as parties, include the Insured Zohar Funds as a signatories, and list the Insured Zohar Funds as a members entitled to membership interests.

220.    Defendants, however, have asserted in multiple court proceedings that the Insured Funds were — at least until March 21, 2020 — not the legal and beneficial owner of equity in the Portfolio Companies and that such equity was instead actually owned by Defendant Tilton. Defendants have further purported to transfer valuable stockholder and member rights — including voting or control rights, transfer restriction rights and rights to payments as described

-83-

above — in these equity interests to themselves, or to affiliated entities, on the purported grounds that doing so gives effect to the purported "original intent" of the Patriarch Manager Defendants and the Insured Zohar Funds, including pursuant to the Governance Conveyances and November 2017 Written Consents.

221.    Defendants' conflicted, self-dealing transactions wrongfully transferring to Defendants or their affiliates valuable benefits of equity ownership and voting or control rights with respect to the Portfolio Companies that rightfully belong to the Insured Zohar Funds also violated the terms of the Indenture and applicable law because they interfered with and impaired the value and rights in the Trustee's lien under the Indenture, which secures the interests of the noteholders and MBIA in the Collateral — including the equity interests in the Portfolio Companies.  The equity interests in the Portfolio Companies are squarely within the definition of the term "Collateral" and are property subject to the Trustee's lien.

222.    Defendants' wrongful and bad faith transfers of equity ownership rights and interests in the Portfolio Companies interfered with and impaired the security interests conferred to the Insured Zohar Fund noteholders and MBIA under the Trustee's lien because Defendants prevented the Insured Zohar Funds from enjoying their full rights, title and interests in the equity assets belonging to them.

223.    An actual controversy exists between MBIA and Defendants as to the rightful owners of valuable equity interests in certain Portfolio Companies as of and prior to March 21, 2020.

224.    An actual controversy exists between MBIA and Defendants as to whether the Governance Conveyances and November 2017 Written Consents are valid and enforceable.

-84-

225.    An actual controversy exists between MBIA and Defendants as to whether Defendants' conflicted, self-dealing transactions Defendants executed purportedly on behalf of the Insured Zohar Funds violated the Indenture.

226.    MBIA therefore seeks a declaration as to the following:

(a)    that MBIA is the legal, beneficial and equitable owner of the equity interests in the Portfolio Companies that were issued or otherwise created in the name of Zohar I (with the relevant equity interests in the Portfolio Companies to be established at trial);

(b)    that the Governance Conveyances are invalid, void and unenforceable;

(c)    that the November 2017 Written Consents are invalid, void and unenforceable;

(d)    that any other restrictions and limitations imposed on the equity interests by Defendants' execution of conflicted, self-dealing transactions (including any purportedly irrevocable proxies, shareholder agreements and limited liability company agreements or amendments thereto) are invalid, void and unenforceable.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(Against Tilton, PPAS and the Patriarch Manager Defendants)**

227.    MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

228.    Under the Management Agreements, the Patriarch Manager Defendants agreed to provide investment and advisory services to the Insured Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Insured Zohar Funds.

229.    In their capacity as Collateral Managers, the Patriarch Managers held positions of confidence and trust with respect to the Insured Zohar Funds, which the Patriarch Managers knew of and accepted, and in which the Patriarch Managers were obligated to act in good faith and with due regard to the Insured Zohar Funds' interests.

230.    Under the Credit Agreements, PPAS was designated as an agent for the Insured Zohar Funds and, thus, a fiduciary for the Insured Zohar Funds.  As agent, PPAS held a position of confidence and trust with respect to the Insured Zohar Funds, which PPAS knew of and accepted, and in which it was obligated to act in good faith and with due regard to the Issuers' interests.

231.    Tilton is a registered investment advisor and principal of the Patriarch Managers and PPAS.  In such capacities, Tilton held positions of confidence and trust with respect to the Insured Zohar Funds, which Tilton knew of and accepted, and in which Tilton was obligated to act in good faith and with due regard to the Insured Zohar Funds' interests.

232.    On November 20, 2015 and January 20, 2017, MBIA paid claims under its Financial Guaranties to the Class A noteholders for Zohar I and Zohar II.  Upon such payments, MBIA became fully subrogated to the rights and claims of the Class A Noteholders.

233.    Defendants owed fiduciary duties of loyalty, which obligated them to put the interests of the Insured Zohar Funds and their noteholders first and ahead of their own self-interest and the interests of their affiliates.  Defendants also were obligated to refrain from exploiting the relationships for their own personal benefit and for Defendants' benefit. Defendants' also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

234.    Defendants violated their fiduciary duties by wrongfully consenting on behalf of the Insured Zohar Funds to the transfer of cash, debt and equity interests and other assets owned

-86-

by the Insured Zohar Funds to themselves or other Defendants, in brazen acts of self-dealing and exploitation of their positions of power and control with respect to the Insured Zohar Funds, that placed the Defendants' own interests above those of the Insured Zohar Funds, and caused significant economic damages to the Insured Zohar Funds and their noteholders. Defendants likewise violated their fiduciary duties by engaging in acts of self-dealing and exploitation of their control positions at the Portfolio Companies, including, without limitation, Transcare, Dura Automotive, ███████████ and HVEASI as described above. Defendants' breaches of fiduciary duty involved conduct that was willful, intentional, and material, or otherwise grossly negligent in the performance of, or in reckless disregard of, Defendants' obligations.

235.    As a direct and proximate result of such conduct by Defendants, MBIA, in its capacity as subrogee, has suffered substantial damages in an amount to be proven at trial.

**COUNT VI**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Patriarch Partners, the Octaluna Entities, PPMG, ARK and AIP)**

236.    MBIA repeats and realleges paragraphs 1-186, 227-235 set forth above as though fully set forth herein.

237.    At all relevant times, Tilton and Patriarch Partners owned and controlled the Patriarch Manager Defendants, PPAS and all other Defendants, directed their actions, and acted on their behalves.

238.    Under the Management Agreements, the Patriarch Manager Defendants agreed to provide investment and advisory services to the Insured Zohar Funds, were tasked with managing the Zohar Funds' investments, and were designated power to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Insured Zohar Funds. In their capacity as Collateral Managers, the Patriarch Managers held positions of confidence and trust with respect to the Insured Zohar Funds, which the Patriarch

-87-

Managers knew of and accepted, and in which the Patriarch Managers were obligated to act in good faith and with due regard to the Insured Zohar Funds' interests.

239.    Under the Credit Agreements, PPAS was designated as an agent for the Insured Zohar Funds and, thus, a fiduciary for the Insured Zohar Funds.  As agent, PPAS held a position of confidence and trust with respect to the Insured Zohar Funds, which PPAS knew of and accepted, and in which it was obligated to act in good faith and with due regard to the Issuers' interests.

240.    Tilton is a registered investment advisor and principal of the Patriarch Managers and PPAS.  In such capacities, Tilton held positions of confidence and trust with respect to the Insured Zohar Funds, which Tilton knew of and accepted, and in which Tilton were obligated to act in good faith and with due regard to the Insured Zohar Funds' interests.

241.    Defendants owed fiduciary duties of loyalty, which obligated them to put the interests of the Insured Zohar Funds and their noteholders first and ahead of their own self-interest and the interests of their affiliates.  Defendants also were obligated to refrain from exploiting the relationships for their own personal benefit and for Defendants' benefit. Defendants' also owed fiduciary duties prohibiting them from self-dealing and conflicts of interest, and to disclose material facts.

242.    Patriarch Partners and all other Defendants were aware of Tilton's, the Patriarch Manager Defendants' and PPAS's fiduciary duties.

243.    Defendants violated their fiduciary duties by wrongfully consenting on behalf of the Zohar Funds to the transfer of cash, debt and equity interests and other assets owned by the Insured Zohar Funds to themselves or other Defendants, in brazen acts of self-dealing and exploitation of their position of power and control with respect to the Insured Zohar Funds, that placed the Defendants' own interests above those of the Insured Zohar Funds, and caused

-88-

significant economic damages to the Insured Zohar Funds and their noteholders. Defendants breaches of fiduciary duty involved conduct that was willful, intentional, and material, or otherwise grossly negligent in the performance of, or in reckless disregard of, Defendants' obligations.

244.    Patriarch Partners and all other Defendants, through Tilton, induced these violations by exerting control or otherwise causing them to take actions that violated their duties, and provided the personnel and resources that were required to violate these duties.

245.    As a direct and proximate result of such conduct by Defendants, MBIA, in its capacity as subrogee, has suffered substantial damages in an amount to be proven at trial.

**COUNT VII**
**FAITHLESS SERVANT**
**(Against Tilton, Patriarch Manager Defendants and PPAS)**

246.    MBIA repeats and realleges paragraphs 1-186, 227-235 set forth above as though fully set forth herein.

247.    The Insured Zohar Funds have since their inception paid Tilton, the Patriarch Manager Defendants and PPAS hundreds of millions of dollars in fees in exchange for their services as the Funds' fiduciaries and agents.

248.    By reason of their breaches of their fiduciary duties owed to the Zohar Funds, Tilton, the Patriarch Manager Defendants and PPAS are faithless servants and are required to forfeit all money received from the Insured Zohar Funds for the benefit of their noteholders as of the first day that they breached their duties.

**COUNT VIII**
**CONVERSION**
**(Against All Defendants)**

249.    MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

-89-

250.    On January 12, 2017, MBIA purchased, for valid consideration, equity interests in certain Portfolio Companies that were owned by Zohar I and debt memorialized by a series of credit agreements between Zohar I and certain Portfolio Companies. MBIA is also subrogated to the rights of the Insured Noteholders and entitled to receive reimbursement of its payments under the Financial Guaranties prior to principal payments made to Fund noteholders.

251.    Defendants have intentionally interfered with MBIA's and the Insured Zohar Funds' property rights with respect to the Collateral by wrongfully executing agreements, amendments or other ultra vires transactions designed to strip away valuable rights in that property and transfer them to Defendants, thereby exercising dominion and control over such property and depriving MBIA and the Insured Zohar Funds of the use of that property.

252.    Defendants subsequently exacerbated this interference by actively concealing the agreements, amendments or other ultra vires transactions from MBIA, the Insured Zohar Funds and others, including by refusing to hand over documents that would evidence these transactions.

253.    Defendants further intentionally interfered with MBIA's and the Insured Zohar Funds' rights to payments and other equity rights and interests by selling certain Portfolio Companies in which MBIA and the Insured Zohar Funds own equity without paying them due compensation, including without limitation the proceeds of the sale of HVEASI, which Defendants represented to have been owned 100% by Zohar II.

254.    As a direct and proximate result of such conduct by Defendants, MBIA, in its capacities as owner the Zohar I Collateral and subrogee, has suffered substantial damages in an amount to be proven at trial.

## COUNT IX
## UNJUST ENRICHMENT
### (Against All Defendants)

255.    MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

256.    On January 12, 2017, MBIA purchased, for valid consideration, equity interests in certain Portfolio Companies that were owned by Zohar I and debt memorialized by a series of credit agreements between Zohar I and certain Portfolio Companies.  MBIA is also subrogated to the rights of the Insured Noteholders and entitled to receive reimbursement of its payments under the Financial Guaranties prior to principal payments made to Fund noteholders.

257.    As a result of the misconduct set forth above, Defendants have been enriched at MBIA's and the Zohar Funds' expense.  Defendants have been enriched directly by, among other things, (a) the granting to ARK and AIP of priority over the Insured Zohar Funds' liens on the Portfolio Companies, (b) payment of fees to PPMG, PPAS and the Patriarch Manager Defendants to which they were not entitled, (c) misappropriating dividends, distributions, and sales proceeds on equity interests owned by the Zohar Funds (d) Tilton's wrongful assertion of ownership over equity interests owned by MBIA and the Insured Zohar Funds, (e) claiming favorable tax attributes associated with the Zohar Funds' status as pass-through entities for years prior to improperly and with no consideration to the Funds shifting tax liabilities to the Zohar Funds, and (e) otherwise taking for the Octaluna Entities, the Patriarch Manager Defendants and Tilton valuable rights in the Portfolio Companies belonging to or that would otherwise inure to MBIA from the Insured Zohar Funds.

258.    Patriarch Partners, the Patriarch Manager Defendants, the Octaluna Entities, ARK, AIP, LDI, Zohar Holdings and Zohar Holdings, through Tilton, knew of and played an active role in the Defendants' manipulation of the Overcollateralization Ratio, their scheme to

transfer valuable rights in the Portfolio Companies, including voting and control rights, and valuable equity distributions and other benefits away from the Zohar Funds. But for Defendants' wrongful acts, the amounts, rights and interests received by them would have been available for the Insured Zohar Funds to pay amounts due to the Insured Noteholders on the Note Maturity Dates and to compensate MBIA for amounts paid under its Financial Guaranties.

259. The circumstances are such that it would be inequitable and unconscionable to permit Defendants to retain their ill-gotten gains from MBIA and the Zohar Funds. Defendants have an obligation to MBIA to make restitution for their ill-gotten gains. Defendants have failed to make restitution to MBIA for their ill-gotten gains.

260. Restitution should therefore be made by Defendants to MBIA in an amount to be proven at trial.

### COUNT X
### MALICIOUS PROSECUTION
#### (Against Tilton and Patriarch XV)

261. MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

262. Defendants instituted multiple claims and civil proceedings against MBIA without probable cause and with malice. In November 2015, Tilton caused Patriarch XV to commence the Zohar I bankruptcy in express violation of the Zohar I Indenture and with the sole intent to delay or prevent MBIA from exercising its contractual rights and remedies with respect to Zohar I. The Zohar I bankruptcy proceeding was resolved in MBIA's favor when Tilton and Patriarch XV withdrew their objections to the Zohar Funds' and MBIA's motions to dismiss that case following a contested evidentiary hearing. Likewise, in December 2016, Tilton maliciously asserted multiple baseless defenses, counterclaims and third-party claims against MBIA, Zohar II and Zohar III in the Delaware 225 Action disputing their ownership of equity in the three

-92-

Portfolio Companies at issue in that case.   Tilton brought and prosecuted her claims in the Delaware 225 Action to trial and appeal, notwithstanding that she was fully aware and could not legitimately dispute that the Zohar Funds were the true legal and beneficial owners of the disputed equity interests in those and other Portfolio Companies.   In November 2017 the Delaware Court of Chancery resolved the Delaware 225 Action in favor of the Zohar Funds and MBIA, and in March 2020 Tilton conceded that the Zohar Funds are the true and beneficial owners of the Portfolio Company and that she will no longer litigate such equity ownership disputes.

263.   MBIA incurred substantial costs and expenses as a litigant and third-party respondent to Tilton's unsupported and malicious claims in an amount to be determined at trial. MBIA was further harmed by Defendants' interference with and resulting delay in MBIA's exercise of its contractual rights and remedies under the Zohar I Transaction Documents, including its right to remove Patriarch VIII Manager as Collateral Manager.

**COUNT XI**
**ABUSE OF PROCESS**
**(Against Tilton and Patriarch XV)**

264.   MBIA repeats and realleges paragraphs 1-186 set forth above as though fully set forth herein.

265.   Defendants intentionally misused the legal process to coerce MBIA and wrongfully obtain benefits to which Defendants would otherwise not be legally entitled pursuant to such legal process.   On or about November 22, 2015, Tilton caused Patriarch XV to file the Involuntary Petitions in the United States Bankruptcy Court for the District of New York involuntarily forcing Zohar I into chapter 11 in violation of the Indenture.   Defendants knowingly and intentionally filed the Involuntary Petitions to gain the protections of the automatic bankruptcy stay under 11 U.S.C. § 362 and thereby prevent MBIA from removing

-93-

Patriarch VIII as Collateral Manager for Zohar I and stopping Defendants from enjoying fees and other improper benefits gained as a result of Patriarch VIII's status as Collateral Manager. Along with the Involuntary Petitions, Defendants filed and served on MBIA a motion on behalf of Patriarch XV to terminate Zohar I's exclusive period to submit a plan of reorganization.

266.    Defendants' proposed chapter 11 plan for reorganization made clear they had no legitimate intention to repay Zohar I's debts and liabilities.  Rather, the Involuntary Petitions provided the pretext for Defendants to intentionally prevent Patriarch VIII's removal as collateral manager, take discovery of MBIA in connection with their contested motion and leverage in negotiations with MBIA regarding a possible resolution of chapter 11 proceedings.  Those negotiations ultimately did not result in a mutual agreement, and on February 5, 2016 Defendants withdrew their objections to MBIA's and Zohar I's motions to dismiss the Involuntary Petitions. At the same time, Tilton provided notice that the Patriarch Manager Defendants would resign as the Collateral Managers of all three of the Zohar CLOs effective March 2, 2016.

267.    MBIA incurred substantial costs and expenses as a participant in legal proceedings relating to Defendants' abuse of process in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, MBIA demands judgment:

(a)      Damages to be determined at trial;

(b)      Declaring that MBIA is the legal, beneficial and equitable owner of the equity interests in the Portfolio Companies that were issued or otherwise created in the name of Zohar I;

(c)      Declaring that all restrictions and limitations imposed on the equity interests by Defendants' execution of conflicted, self-dealing transactions, including without limitation the Governance Conveyances, the November 2017 Written Consents and any additional purportedly irrevocable proxies, shareholder agreements and limited liability company agreements or amendments thereto, are invalid, void and unenforceable

(d)      Payment to MBIA of all of its attorneys' fees, costs and expenses in connection with these chapter 11 cases and all related adversary proceedings;

(e)      Prejudgment interest at the maximum legal rate; and

(f)      For all such other and further relief as may be just and proper.

DOCS_DE:230008.1 53730/001

Dated:    July 30, 2020
          Wilmington, Delaware

                              **PACHULSKI STANG ZIEHL & JONES, LLP**

                              By: _/s/ Timothy P. Cairns_____
                              Laura Davis Jones (No. 2436)
                              Timothy P. Cairns (No. 4228)
                              919 N. Market Street, 17th Floor
                              P.O. Box 8705
                              Wilmington, DE 19899-87055

                              and

                              **CADWALADER, WICKERSHAM & TAFT LLP**
                              Gregory M. Petrick
                              Ingrid Bagby
                              Michele C. Maman
                              Sean F. O'Shea
                              Michael E. Petrella
                              Joshua P. Arnold
                              200 Liberty Street
                              New York, NY 10281

                              *Attorneys for Plaintiff*
                              *MBIA Insurance Corporation*