## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| | |
| MBIA INSURANCE CORPORATION, | Adversary No. 20-50776 (KBO) |
| Plaintiff, | **Related to Adv. Dkt. # 25** |
| -against- | |
| LYNN TILTON,<br>PATRIARCH PARTNERS, LLC,<br>PATRIARCH PARTNERS VIII, LLC,<br>PATRIARCH PARTNERS XIV, LLC,<br>PATRIARCH PARTNERS XV, LLC<br>PATRIARCH PARTNERS AGENCY<br>SERVICES, LLC,<br>PATRIARCH PARTNERS MANAGEMENT<br>GROUP, LLC<br>OCTALUNA, LLC,<br>OCTALUNA II, LLC,<br>ARK II CLO 2001-1, LLC,<br>ARK INVESTMENT PARTNERS II, L.P.,<br>LD INVESTMENTS, LLC,<br>ZOHAR HOLDING, LLC, and<br>ZOHAR HOLDINGS, LLC,<br>Defendants. | |

## PLAINTIFF MBIA INSURANCE CORPORATION'S
## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

[1]    The Debtors, and, where applicable, the last four digits of each of their respective taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ................................ 1

SUMMARY OF ARGUMENT ................................................................................ 1

SUMMARY OF FACTUAL ALLEGATIONS ........................................................... 4

ARGUMENT ...................................................................................................... 13

I.      MBIA'S COMPLAINT IS NOT DUPLICATIVE OF THE DEBTOR
        ZOHAR FUNDS' ADVERSARY PROCEEDING ............................................ 15

II.     THE COMPLAINT STATES A CLAIM FOR BREACH OF
        CONTRACT ........................................................................................... 20

        A.      Count I Provides Fair Notice Of The Grounds On Which It Seeks
                Relief ........................................................................................... 21

        B.      The Management Agreements Do Not Bar Liability For
                Defendants' Alleged Wrongdoing ................................................... 24

        C.      The SEC Decision Does Not Preclude MBIA's Contract Claim ............... 27

        D.      The Complaint Alleges Breaches Of The Management Agreements
                Based On The Patriarch Manager Defendants' Conduct ...................... 31

                1.      The Complaint alleges breaches based on loan amendments ........ 32

                2.      The Complaint alleges breaches based on unauthorized
                        loans ................................................................................. 34

                3.      The Complaint alleges breaches based on failures to
                        monetize Portfolio Company equity, siphoning of fees,
                        diversion of sales proceeds, and self-dealing transactions ............. 35

        E.      Defendants' Contractual Breaches Caused MBIA's Losses ..................... 38

III.    THE COMPLAINT STATES CLAIMS FOR TORTIOUS
        INTERFERENCE ..................................................................................... 40

IV.     THE COMPLAINT STATES CLAIMS FOR FIDUCIARY DUTY AND
        FAITHLESS SERVANT ............................................................................ 44

V.      THE COMPLAINT STATES A CLAIM FOR DECLARATORY
        JUDGMENT ............................................................................................ 47

VI.     THE COMPLAINT STATES A CLAIM FOR CONVERSION ........................... 49

**Page**

VII. THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT ..........51

VIII. THE COMPLAINT STATES A CLAIM FOR MALICIOUS
PROSECUTION ...................................................................................................53

IX. THE COMPLAINT STATES CLAIMS AGAINST ALL DEFENDANTS .........58

X. AMENDMENT, NOT DISMISSAL, IS THE APPROPRIATE REMEDY
FOR ANY PURPORTED PLEADING DEFICIENCIES ....................................60

CONCLUSION...............................................................................................................61

<u>**TABLE OF AUTHORITIES**</u>

**PAGE(S)**

<u>**CASES:**</u>

*Abound Solar Tech. Holdings, LLC v. Great Am. Grp., LLC*
  *(In re Abound Solar Mfg., LLC),*
    547 B.R. 611 (Bankr. D. Del. 2016) ......................................................................55

*Atuahene v. City of Hartford,*
    10 F. App'x 33 (2d Cir. 2001) (summary order) ..................................................41

*Avaya Inc., RP v. Telecom Labs, Inc.,*
    838 F.3d 354 (3d Cir. 2016)..................................................................................20

*Beckerley v. Alorica, Inc.,*
    No. SACV 14-0836-DOC, 2014 WL 4670229 (C.D. Cal. Sept. 17, 2014)......................16, 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................14

*Benihana of Tokyo Inc. v. Benihana Inc.,*
    No. 10-1051-SLR, 2011 WL 3861897 (D. Del. Sept. 1, 2011) .............................15

*Bradkin v. Leverton,*
    257 N.E.2d 643 (N.Y. 1970).................................................................................53

*Brown v. Card Serv. Ctr.,*
    464 F.3d 450 (3d Cir. 2006)..................................................................................13

*Bullmore v. Banc of Am. Sec. LLC,*
    485 F. Supp. 2d 464 (S.D.N.Y. 2007)...................................................................47

*Camofi Master LDC v. Coll. P'ship, Inc.,*
    452 F. Supp. 2d 462 (S.D.N.Y. 2006)...................................................................26

*Carino v. Stefan,*
    376 F.3d 156 (3d Cir. 2004)..................................................................................13

*Charles Schwab & Co. v. Retrophin, Inc.,*
    No. 14-CV-4294, 2015 WL 572949 (S.D.N.Y. Sept. 30, 2015).............................26

*Clark v. McDonald's Corp.,*
    213 F.R.D. 198 (D.N.J. 2003)...............................................................................21

**PAGE(S)**

*Clearmont Prop., LLC v. Eisner,*
   872 N.Y.S.2d 725 (App. Div. 3d Dep't 2009) .................................................................20

*In re Cocolicchio,*
   800 N.Y.S.2d 344 (Table), 2005 WL 689493 (Sup. Ct. N.Y. Cnty. Mar. 8, 2005)................42

*Corp. Claims Mgmt., Inc. v. Shaiper (In re Patriot Nat'l, Inc.),*
   592 B.R. 560 (Bankr. D. Del. 2018) ..........................................................................14

*Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.,*
   887 F. Supp. 2d 459 (E.D.N.Y. 2012) .......................................................................43

*Drennan v. PNC Bank, NA (In re Cmty. Bank of N. Va.),*
   622 F.3d 275, 301-02 (3d Cir. 2010), as amended (Oct. 20, 2010) ........................................55

*EBC I, Inc. v Goldman, Sachs & Co.,*
   832 N.E.2d 26 (N.Y. 2005) .............................................................................. 45-46

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,*
   837 F. Supp. 2d 162 (S.D.N.Y. 2011) .......................................................................52

*Emerald Cap. Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft*
   *(In re FAH Liquidating Corp.),*
   572 B.R. 117 (Bankr. D. Del. 2017) ..........................................................................52

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
   343 F.3d 189 (2d Cir. 2003)...................................................................................38

*Engel v. CBS, Inc.,*
   711 N.E.2d 626 (N.Y. 1999).................................................................................58

*Financial Guaranty Insurance Co. v. Putname Advisory Co., LLC,*
   783 F.3d 395 (2d Cir. 2015)...................................................................................39

*First American Commercial Bancorp, Inc. v. Saatchi & Saatchi Rowland, Inc.,*
   865 N.Y.S.2d 424 (App. Div. 4th Dep't 2008) .......................................................................42

*Fortunato v. City of N.Y.,*
   882 N.Y.S.2d 195 (App. Div. 2d Dep't 2009) .......................................................................57

*Foster v. Churchill,*
   665 N.E.2d 153 (N.Y. 1996).................................................................................43

*Frazier v. Se. Pa. Transp. Auth.,*
   785 F.2d 65 (3d Cir. 1986), *abrogated on other grounds by Leatherman v. Tarrant*
   *Cty. Narcotics Intel. & Coordination Unit,* 507 U.S. 163 (1993)...........................................14

**PAGE(S)**

*Garrett v. Wexford,*
    938 F.3d 69 (3d Cir. 2019), *cert denied*, 140 S. Ct. 1611 (2020) ............................................24

*Graves v. Lowery,*
    117 F.3d 723 (3d Cir. 1997).................................................................................................13

*Grund v. Del Charter Guar. & Tr. Co.,*
    788 F. Supp. 2d 226 (S.D.N.Y. 2011)............................................................................ 46-47

*Gumbs v. Del. Dep't of Labor,*
    C.A. No. 15-00190-RGA, 2015 WL 3793539 (D. Del. June 17, 2015) .................................16

*Hall v. Holman,*
    No. Civ. A. 04-1328 GMS, 2006 WL 2587693 (D. Del. Sept. 8, 2006) ...............................14

*Halperin v. Moreno (In re Green Field Energy Servs., Inc.),*
    585 B.R. 89 (Bankr. D. Del. 2018) ......................................................................................20

*Hamilton Partners, L.P. v. Englard,*
    11 A.3d 1180 (Del. Ch. 2010)..............................................................................................52

*Hansberry v. Lee,*
    311 U.S. 32 (1940)...............................................................................................................28

*Harris v. Coleman,*
    863 F. Supp. 2d 336 (S.D.N.Y. 2012)..................................................................................50

*Hechinger Inv. Co. v. Raytheon Co. (In re Hechinger Inv. Co.),*
    286 B.R. 591 (Bankr. D. Del. 2002) ....................................................................................60

*Hoag v. Chancellor, Inc.,*
    677 N.Y.S2d 531 ( App. Div. 1st Dep't 1998) .....................................................................42

*Huang v. iTV Media, Inc.,*
    13 F. Supp. 3d 246 (E.D.N.Y. 2014) ...................................................................................47

*IDT Corp. v. Morgan Stanley Dean Witter & Co.,*
    907 N.E.2d 268 (N.Y. 2009)................................................................................................53

*Indus. Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn Holding Co.),*
    484 B.R. 25 (Bankr. D. Del. 2012) ......................................................................................55

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)........................................................................................14, 40

**PAGE(S)**

*In re DaVita Inc. S'holder Deriv. Litig.,*
  Civ. A. No. 17-17-152-MPT, 2019 WL 1855445 (D. Del. Apr. 25, 2019) ............................15

*Intershoe , Inc. v. Filanto S.P.A.,*
  97 F. Supp. 2d 471 (S.D.N.Y. 2000)..........................................................................................58

*Japhet v. Francis E. Parker Mem'l Home, Inc.,*
  Civ. A. No. 14-01206,2014 WL 3809173 (D.N.J. July 31, 2014)..........................................41

*JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC),*
  404 B.R. 767 (Bankr. D. Del. 2009) ........................................................................................54

*Johnson v. Fielder,*
  Civ. A. No. 14-1597, 2016 WL 3912022 (D.N.J. July 19, 2016)....................................21, 22

*LaMonica v. Ceva Grp. Plc. (In re CIL Ltd.),*
  582 B.R. 46 (Bankr. S.D.N.Y. 2018)........................................................................................51

*Lavastone Cap. LLC v. Conventry First LLC,47*
  Nos. 12-cv-7139, 14-cv-7967, 2015 WL 1939711 (S.D.N.Y. Apr. 21, 2015) ......................47

*Lawrence v. Fox,*
  20 N.Y. 268 (1859) ..................................................................................................................31

*Lee v. Kylin Mgmt. LLC,*
  17-cv-7249, 2019 WL 917097 (S.D.N.Y. Feb. 25, 2019) ..................................................52, 53

*Lemle v. Lemle,*
  939 N.Y.S.2d 15 (App. Div. 1st Dep't 2012) .....................................................................49-50

*Leonard v. Stemtech Int'l, Inc.,*
  No. 12-86-LPS-CJB, 2012 WL 3655512 (D. Del. Aug. 24, 2012) .........................................16

*Marley v. Donahue,*
  Civ. A. No. 14-6938, 2014 WL 5152618 (D.N.J. Oct. 14, 2014)...........................................21

*Multibank, Inc. v. Access Glob. Cap. LLC,*
  72 N.Y.S. 3d 39 (App. Div. 1st Dep't 2018) ..........................................................................42

*Munno v. Town of Orangetown,*
  391 F. Supp. 2d 263 (S.D.N.Y. 2005)......................................................................................45

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.,*
  571 F.3d 299 (3d Cir. 2009).............................................................................................28, 29

*Obeid v. Mack,*
  No. 14CV6498-LTS-HBP, 2016 WL 1069678 (S.D.N.Y. Mar. 17, 2016) ......................49-50

**PAGE(S)**

*Oddo Asset Management v. Barclays Bank PLC,*
  973 N.E2d 735 (N.Y. 2012)...................................................................................44

*Ostano Commerzanstalt v. Telewide Sys., Inc.,*
  880 F.2d 642 (2d Cir. 1989)..................................................................................20

*Parklane Hosiery Co. v. Shore,*
  439 U.S. 322 (1979)...............................................................................................30

*Pearson v. Sec'y Dep't of Corr.,*
  775 F.3d 598 (3d Cir. 2015)...................................................................................13

*Phillips v. Cnty. of Allegheny,*
  515 F.3d 224 (3d Cir. 2008)........................................................................13, 14, 21

*Point Productions. A.G. v. Sony Music Entertainment, Inc.,*
  215 F. Supp. 2d 336 (S.D.N.Y. 2002)....................................................................39

*Pokoik v. Gittens,*
  567 N.Y.S.2d 49 (App. Div. 1st Dep't 1991) ....................................................49-50

*Port Auth. of N.Y. & N.J. v. Brooklyn Union Gas Co.,*
  119 N.Y.S.3d 191 (App. Div. 2d Dep't 2020)............................................31, 37, 38

*Premier Pork L.L.C. v. Westin, Inc.,*
  Civ. A. No. 07-1661, 2008 WL 724352 (D.N.J. Mar. 17, 2008).............................20

*Reach Music Pul'g., Inc. v. Warner/Chappell Music, Inc.,*
  No. 09 Civ. 5580, 2011 WL 3962515 (S.D.N.Y. Sept. 7, 2011) .......................43-44

*Reda v. Eastman Kodak Co.,*
  659 N.Y.S2d 555 (App. Div. 4th Dep't 1996)........................................................33

*Rosener v. Majestic Mgmt. Inc. (In re OODC, LLC),*
  321 B.R. 128 (Bankr. D. Del. 2005) ..........................................................13, 37, 38

*Saleeby v. Remco Maint., LLC,*
  50 N.Y.S.3d 330 (App. Div. 1st Dep't 2017) .........................................................51

*Schmidt v. Skolas,*
  770 F.3d 241, 248 (3d Cir. 2014)........................................................................54-55

*Silver v. Mendel,*
  894 F.2d 598 (3d Cir. 1990)...................................................................................56

*St. John's Univ., N. Y. v. Bolton,*
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) ...................................................................45

**PAGE(S)**

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ................................................................................ 27-28, 29

*Thyroff v. Nationwide Mut. Ins. Co.,*
    864 N.E.2d 1272 (N.Y. 2007) ...................................................................... 50-51

*Tracinda Corp. v. Daimler Chrysler AG (In re Daimler Chrysler AG Sec. Litig.),*
    200 F. Supp. 2d 439 (D. Del. 2002) .................................................................. 60

*Tradex Eur. SPRL v. Conair Corp.,*
    No. Civ. 1760, 2008 WL 1990464 (S.D.N.Y. May 7, 2008) ................................. 26

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.,*
    136 F. Supp. 2d 253 (S.D.N.Y. 2001) ................................................................ 26

*Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.),*
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ................................................................. 41

*United States v. Calderon,*
    944 F.3d 72 (2d Cir. 2019) ................................................................................ 39

*Varbero v. Belesis,*
    20-CV-2538, 2020 WL 5849516 (S.D.N.Y. Oct. 1, 2020) ............................... 58, 59

*Veleron Holding B.V. v. Morgan Stanley,*
    117 F. Supp. 3d 404 (S.D.N.Y. 2015) ................................................................ 45

*Waite v. Schoenbach,*
    No. 10-CV-3439, 2010 WL 4456955 (S.D.N.Y. Oct. 29, 2010) ........................... 26

*Walton v. Eaton Corp.,*
    563 F.2d 66 (3d Cir. 1977) ................................................................................ 16

*Wells Fargo Bank, N.A. v. ADF Operating Corp.,*
    855 N.Y.S. 68 (App. Div. 1st Dep't 2008) ......................................................... 43

*Winshall v. Viacom Int'l, Inc.,*
    C.A. No.: N15C-06-137 EMD CCLD,
    2019 WL 960213 (Del. Super. Ct. Feb. 25, 2019) ............................................... 58

*Woodards v. Chipotle Mexican Grill, Inc.,*
    No. 14-cv-4181, 2015 WL 3447438 (D. Minn. May 28, 2015) ............................. 16

*Xcell Energy & Coal Co. v. Energy Inv. Grp., LLC,*
    C.A. No. 8652-VCN, 2014 WL 2964076 (Del. Ch. June 30, 2014) ....................... 52

**PAGE(S)**

*Yodlee, Inc. v. Plaid Techs., Inc.,*
    No. 14-1445-LPS, 2016 WL 204372 (D. Del. Jan. 15, 2016) ................................................30

*Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc,*
    C.A. No. 12946-VCS, 2017 WL 5956877 (Del. Ch. Nov. 30, 2017).....................................31

## **STATUTES & OTHER AUTHORITIES:**

Fed. R. Civ. P. 8(a) ..............................................................................................................14

Fed. R. Civ. P. 9(b) ..............................................................................................................57

L.R. 7007-2(b)(i)(E)..............................................................................................................15

*Restatement (Third) of Torts: Liability for Economic Harm* § 25 cmt. e (2019)...........................56

Plaintiff MBIA Insurance Corporation ("MBIA") respectfully submits this brief in opposition (the "Opposition") to *Defendants' Motion To Dismiss The Complaint* (D.I. 24) and opening brief in support thereof (D.I. 25) (the "Brief").[2]  In support of its Opposition, MBIA respectfully states as follows:

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

1.      MBIA commenced this Adversary Proceeding on July 30, 2020, when it filed the Complaint (D.I. 2) and served the accompanying summons (D.I. 3) on Defendants.

2.      On August 27, 2020, the Court granted Defendants' motion to extend their time to answer, move, or otherwise respond to the Complaint until October 19, 2020 (D.I. 18). The parties subsequently agreed to extend Defendants' time to respond to the Complaint until October 23, 2020, for MBIA to answer Defendants' motion on or before December 3, 2020, and for Defendants to file a reply brief in support of their motion by January 8, 2021.

3.      On October 23, 2020, Defendants filed their motion and Brief, seeking to dismiss the Complaint.

4.      On December 3, 2020, MBIA filed a notice of voluntary dismissal of claims against defendants Zohar Holdings, LLC on the basis of Defendants' representation that Zohar Holdings, LLC "is not affiliated with or known by any of the other Patriarch Defendants."  Brief at 1 n.2.

## SUMMARY OF ARGUMENT

5.      The Complaint alleges a years-long campaign of theft and self-dealing by Defendants causing injuries to MBIA totaling over $1 billion.  At Lynn Tilton's direction and

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in MBIA's Complaint (D.I. 2).

DOCS_DE:232031.1 53730/001

control, Defendants implemented their scheme through pervasive and wide-ranging misconduct in utter derogation of their contractual, fiduciary, and other legal duties to MBIA. In so doing, Defendants bled the Zohar Funds of assets needed to pay off insured noteholders, resulting in massive losses to MBIA.

6.      Defendants lined their pockets with cash and debt and equity assets belonging to MBIA and the Insured Zohar Funds through their execution of hundreds of conflicted transactions designed to misappropriate assets for their own benefit and to conceal their wrongdoing. Defendants hid and took for themselves Portfolio Company equity interests acquired using Zohar assets. Defendants also entrenched their control over the Portfolio Companies through conflicted governance transactions and abused their controlling positions to siphon fees and divert dividends and distributions from the Portfolio Companies. Enriching themselves, Defendants unlawfully took proceeds from the sales of some Portfolio Companies for themselves, and in other instances obstinately refused to timely monetize Portfolio Company equity and avoid the Zohar note payment defaults as contractually required.

7.      In addition to their misappropriation and theft of Portfolio Company equity, Defendants abused their positions of control at the Insured Zohar Funds and the Portfolio Companies to execute unauthorized and conflicted modifications to the Funds' loan Collateral. Defendants improperly extended the loan principal repayment deadlines such that the Insured Zohar Funds were unable to pay amounts owed to the insured noteholders. Defendants further harmed MBIA by depriving the Insured Zohar Funds of their funds, assets, and rights under the Credit Agreements by altering the terms of the loans to the Portfolio Companies without consideration. Defendants had no legitimate business justification for these amendments and executed them for their own economic benefit and to conceal their other unlawful transactions.

Defendants also made unauthorized loans to the Portfolio Companies and embezzled fictitious "loans" to facilitate the broader scheme of wrongdoing.

8.     As a direct and proximate result of Defendants' bad acts, the Insured Zohar Funds defaulted at maturity.  MBIA paid $150 million to the Zohar I insured noteholders and nearly $800 million to the insured noteholders of Zohar II.  Defendants have since prevented MBIA from recovering amounts owed to it under the Transaction Documents, and engaged in bad faith, obstructionist litigation prosecuted, not to enforce legitimate legal rights or remedies, but rather to frustrate MBIA's ability to obtain recoveries to which MBIA is entitled and to hold Defendants to account for their wrongdoing.

9.     In a desperate, ill-supported attempt to delay the day of reckoning, Defendants seek dismissal of all of MBIA's well-pled claims.  Defendants' 75-page brief is rife with misstatements of fact and mischaracterizations of law.  None of Defendants' arguments support dismissal.  Specifically:

- MBIA's Complaint is not duplicative of the Zohar Debtors' complaint, and the claim-splitting doctrine does not preclude any of MBIA's claims.

- MBIA's breach of contract claim easily satisfies Rule 8's pleading standards, is in no way barred by the terms of the Transaction Documents, and states a claim based on Defendants' various bad acts and omissions.

- The Complaint likewise adequately alleges claims for tortious interference, as Defendants' tortious conduct is neither privileged nor justified as a matter of law, and even if it were, those issues could not be resolved without discovery and factual development.

- MBIA's additional tort causes of action for breach of fiduciary duty, aiding and abetting, faithless servant, and conversion all state valid claims for relief and are not duplicative of MBIA's breach of contract cause of action.

- The Complaint also states a claim for declaratory relief based on MBIA's rights and assets, and adequately alleges Defendants' malicious prosecution of both the SDNY Bankruptcy and the Delaware 225 Action.

- None of the claims should be dismissed against any of Tilton's affiliated Defendants at this early stage of the case, particularly because the Complaint alleges in detail that Tilton has imposed her control over a web of affiliated pass-through entities to facilitate the overall scheme.

- Finally, amendment—not dismissal—is the appropriate remedy for any purported deficiencies in MBIA's pleading (there are none).

10.     In short, Defendants' arguments for dismissal are without merit. Defendants' motion should be denied.

## SUMMARY OF FACTUAL ALLEGATIONS[3]

### The Zohar Funds

11.     The Zohar Funds are three collateral loan obligation funds formed by Tilton between 2003 and 2007.  Compl. ¶ 7, 28-29.  The Zohar Funds issued notes to investors in exchange for cash, which they used to acquire collateral assets that, in turn, were intended to generate cash flow for payments of principal and interest owed by the Zohar Funds' on their investors' notes.  *Id.* ¶¶ 30-31.  The Zohar Funds' Collateral includes loans to and equity interests in the Portfolio Companies.  *Id.* ¶¶ 36-38.

12.     MBIA is the Credit Enhancer that provided Financial Guaranties for the senior noteholders of Zohar I and Zohar II (but not Zohar III).  *Id.* ¶¶ 7, 47.  The Financial Guaranties guaranteed that scheduled interest and principal would be paid to the insured noteholders by MBIA if Zohar I or Zohar II defaulted.  *Id.* ¶¶ 66-68.  MBIA paid approximately $149 million in claims on the Zohar I Policy in November 2015 and approximately $770 million in claims on the Zohar II Policy in January 2017, upon the respective defaults by Zohar I and Zohar II.  *Id.* ¶¶ 147, 169.  As a result of those payments, MBIA became subrogated to the insured noteholders and independently became entitled to reimbursement of its Financial Guaranty

---

[3]   Pursuant to the Rule 7007-2(b)(i)(E) of the Local Rules of The United Stated Bankruptcy Court for the District of Delaware (the "Local Rules"), MBIA hereby sets forth facts relevant to Defendants' motion. A more comprehensive statement of relevant facts and allegations are set forth in the Complaint.

payments (defined as Credit Enhancement Liabilities) prior to the Insured Zohar Funds' distribution of payments to noteholders under the Indentures. *Id.* ¶¶ 147, 169. MBIA also gained the right to direct the liquidation of the Insured Zohar Funds' Collateral, and directed the Trustee to conduct a public auction of the Zohar I Collateral in 2016. *Id.* ¶¶ 159. MBIA was the winning bidder in that auction and now beneficially owns all assets previously held as Collateral by Zohar I. *Id.* ¶¶ 163-64.

13.    Lynn Tilton is the founder and Chief Executive Officer of Patriarch Partners, LLC and a web of numerous other affiliated entities. *Id.* ¶¶ 8-9. Through these affiliated Defendants, Tilton holds various investment positions in the Zohar Funds and occupies various positions of authority relative to the Zohar Funds. *Id.* ¶¶ 8-21. Tilton also appointed herself the sole managing member or board member for almost all of the Portfolio Companies. *Id.* ¶¶ 9, 81. Through these positions, Tilton was for years able to corruptly manage the Zohar Funds for her own self-interest and effectively conceal and prevent her removal. *Id.* The Patriarch Manager Defendants were responsible for managing the Collateral for the benefit of the MBIA and the Funds' Secured Parties from their inception until March 2016, when they resigned and were replaced following Zohar I's note payment default. *Id.* ¶¶ 39-41, 52. PPAS was the Zohar Funds' agent with respect to the loans made by the Zohar Funds to the Portfolio Companies, and PPMG provided the Portfolio Companies purported management consultant services pursuant to agreements executed by Tilton on behalf of both parties. *Id.* ¶¶ 14-15.

14.    Each of the Zohar Funds are governed by a series of Transaction Documents. *Id.* ¶ 32. These contracts include, *inter alia*, a trust Indenture, a Collateral Management Agreement, and—in the case of Zohar I and Zohar II—an Insurance Agreement and a Financial Guaranty issued by MBIA. *Id.* ¶ 32. The Indentures give the Secured Parties, namely the senior noteholders and MBIA (for Zohar I and Zohar II), a continuing security interest in and

- 5 -

lien on the Collateral, intended to ensure that it is not used for any purpose other than for their benefit. *Id.* ¶¶ 35, 37. As set forth above, the Indentures also set forth the order and priority in which the cash proceeds of the Funds would be distributed, including repayment of the noteholders or to reimburse MBIA for claims paid under the Policies. *Id.* ¶¶ 42-45. The Indentures contemplated that prior to the stated maturity, the Collateral would mature or be monetized to generate sufficient proceeds to repay the notes. *Id.* ¶¶ 46, 118-20. The Zohar Funds delegated all of their essential functions, including the selection and management of the Collateral, to the Patriarch Manager Defendants pursuant to the Management Agreements. *Id.* ¶¶ 39-41, 52-65. The Collateral Management Agreements set forth the duties and obligations of the Patriarch Manager Defendants in managing the Collateral for the benefit of the Funds' Secured Parties. *Id.*

**Defendants Caused The Zohar Fund Defaults Through Their Misconduct And Self-Dealing**

15.     After creating the Zohar Funds, Tilton abused her conflicting positions of authority at the Zohar Funds and the Portfolio Companies to pillage assets belonging to the Debtors. *Id.* ¶¶ 2-6, 73-74. The Defendants' conduct caused Zohar I and Zohar II to default. *Id.* ¶¶ 73, 103, 105, 121, 132-33, 145, 167, 192-95.

16.     Defendants attempted to misappropriate the Insured Zohar Funds' equity in the Portfolio Companies, an entire asset category belonging to the Debtors and constituting Collateral for the benefit of the Secured Creditors. *Id.* ¶¶ 75-103. Tilton has on multiple occasions, including to this Court, represented that these equity interests are the most valuable assets of the Zohar Funds. *Id.* ¶¶ 78, 96, 178, 182. Until March 2020, Tilton wrongfully maintained that she owned the Portfolio Company equity notwithstanding the absence of any documents memorializing her purported ownership. *Id.* ¶¶ 172-73, 183. The documentary evidence—stock certificates, LLC agreements and amendments, share transfer agreements, settlement and debt restructuring agreements, and asset purchase agreements—uniformly identify the Zohar Funds,

- 6 -

not Tilton or her affiliates, as the acquirers and owners of the Portfolio Company equity.  *Id.* ¶¶ 75-77, 173.

17.    In the Fall of 2015, on the eve of the Zohar I default and with the termination of the Patriarch Managers in the near future, Defendants purported to transfer to themselves the right to vote or transfer control of the equity of the Portfolio Companies owned by the Zohar Funds. *Id.* ¶¶ 82-89.  These transfers took the form of purportedly irrevocable proxies, amendments to LLC agreements, and amendments to stockholder agreements.  *Id.*  Neither the Zohar Funds nor the noteholders received any consideration in return for their purported forfeiture of critical ownership rights in the Portfolio Companies.  *Id.*

18.    Notwithstanding Defendants' contractual and fiduciary obligations to liquidate the Collateral so that the Zohar Funds could pay their notes when they matured, Defendants refused to monetize it and, in particular, tried to keep the Portfolio Company equity for themselves. *Id.* ¶¶ 94-103.  Defendants' refusal to monetize the equity was clouded by Tilton's self-interest.  *Id.*  Their refusal prolonged Tilton's control of the Portfolio Companies while denying timely payment to the Insured Zohar Funds.  *Id.*  Defendants left the Insured Zohar Funds with nearly no cash on hand when the Zohar I and Zohar II notes matured, despite twelve years in which Tilton could have monetized the Zohar Funds' assets.  *Id.*

19.    Defendants also engaged in extensive misconduct with respect to the loan Collateral. *Id.* ¶¶ 104-44.  Wearing the dual hats of both collateral manager for the Zohar Funds and sole managing member or director of the Portfolio Companies, Tilton sat on both sides of transactions between the Zohar Funds as lenders and Portfolio Companies as borrowers, as a fiduciary for each, unilaterally deciding the terms of the loans serving as Collateral for the benefit of the Secured Creditors.  *Id.* ¶¶ 104-16.  Tilton waived payment defaults by the Portfolio

- 7 -

Companies, amended loans to remove financial covenants that protected the Zohar Funds' investment and rolled unpaid interest into new principal. *Id.*

20.     Tilton also extended the maturity of the Portfolio Company loans beyond the maturity dates for the Zohar Funds' own notes. *Id.* ¶¶ 117-21. The maturity extensions—in most cases executed shortly before Zohar I defaulted in November 2015—made certain that the Zohar Funds would default on their notes because the loans would not be repaid until after the notes came due. *Id.* These extensions were in plain violation of the Zohar Funds' Indentures, which only permitted the funds to acquire loans that matured before the Zohar Funds' notes. *Id.* ¶ 119. At the same time as the maturity extensions in late 2015, Tilton—again, acting on all sides of the transactions and expecting to imminently lose her collateral manager role—caused the Zohar Funds to enter into subordination agreements, so that any debt that the Portfolio Companies owed the Zohar Funds would be junior to obligations that the Portfolio Companies owed to Tilton's affiliate entities. *Id.* ¶ 110-11. This subordination was done without consultation with the Trustee or the Secured Creditors and had no benefit to the Portfolio Companies or to the Zohar Funds, but transferred significant value from the Zohar Funds to Tilton. *Id.* ¶¶ 110-16.

21.     PPAS similarly misused its position as the Zohar Funds' agent to enrich itself and Defendants to the detriment of MBIA and the Zohar Funds. *Id.* ¶¶ 14, 122-32. Shortly before the Patriarch Managers resigned, Tilton caused the maximum amount of loans to be drawn down from the Zohar Funds to PPAS, in effect maxing out the Portfolio Companies' credit cards. *Id.* ¶ 127-32. But, in fact, the Portfolio Companies did not receive or even request these funds. *Id.* Instead, Tilton proceeded to retain these funds at PPAS, and used them to extend loans to the Portfolio Companies as she deemed necessary. *Id.* Any repayments on these loans were again retained at PPAS and never repaid to the Zohar Funds. *Id.* In essence, Tilton set up PPAS as a "shadow" collateral manager, making loans without the consent or even the knowledge of the

- 8 -

Zohar Funds' successor collateral manager, and without ever paying interest or principal back to the Zohar Funds. *Id.*

22.    Over the life of the Zohar Funds, the Patriarch Managers were paid hundreds of millions of dollars in exorbitant collateral management fees which otherwise would have been cash available for the Zohar Funds to pay their note obligations. *Id.* ¶¶ 105, 133, 143, 247. Under the Indentures, the Patriarch Managers' continued tenure as collateral managers and the size of their fees were contingent on whether the loan Collateral held sufficient value to cover the Zohar Funds' notes. *Id.* ¶¶ 134-41. This coverage was measured by a covenant in the Indentures called the "Overcollateralization Ratio," which measured the financial health of each Fund by comparing the value of the Zohar Funds' loan assets to the amount of their debt owed to noteholders. *Id.* To avoid giving up fees and to avoid giving MBIA and the noteholders the power to replace the Patriarch Managers, Defendants deliberately manipulated the Overcollateralization Ratio by treating certain loans as if they were performing, although they should have been steeply discounted because the borrower Portfolio Company had defaulted or gone into bankruptcy, or because the loans were in restructuring. *Id.* ¶¶ 142-44. Through this misconduct, Defendants were able to prolong their control over the Funds and to extract millions of dollars in unearned management fees while impairing the secured creditors' protection. *Id.*

**The Zohar I Default And Involuntary Bankruptcy**

23.    As a result of Defendants' misconduct, including their failure to monetize the assets of Zohar I before its November 2015 note maturity date, Zohar I lacked cash needed to satisfy its note payment obligations when the notes matured. *Id.* ¶ 145. As a result, Zohar I defaulted on its note payment obligations. *Id.* ¶ 146. MBIA paid $149 million under the Zohar I Policy, making whole the senior insured noteholders. *Id.* ¶ 147.

- 9 -

24.    Following Zohar I's default, Defendants commenced an involuntary bankruptcy proceeding against Zohar I in the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy").  *Id.* ¶¶ 148-49.  Zohar I, through its prior independent directors, moved to dismiss the proceeding because the Indenture expressly prohibited any noteholder from filing an involuntary bankruptcy petition and because the petition was filed in bad faith.  *Id.* ¶¶ 149-53.  Tilton's bad faith was evidenced by Tilton's restructuring plan.  *Id.* ¶¶ 150-53.  Tilton's attempted cram-down plan lacked any details for the sale of assets and merely sought three additional years to control the Insured Zohar Funds.  *Id.* ¶ 152.  Tilton did not identify any assets that she would commit to sell, set no schedule or timeframe for monetization of the Collateral, and provided no material terms of any contemplated transactions.  *Id.*

25.    On February 1, 2016, the New York bankruptcy court held an evidentiary hearing on Zohar I's motion to dismiss the Involuntary Petitions.  *Id.* ¶ 153.  Following the conclusion of that hearing, and faced with court oversight of her plan for reorganization, Tilton unilaterally provided notice that the Patriarch Managers would resign effective March 2, 2016.  *Id.* ¶ 153.  Tilton also caused Patriarch XV to withdraw the Involuntary Petitions.  *Id.* ¶ 153.  The bankruptcy court dismissed the Involuntary Petitions, but did not issue a final judgment or terminate the proceeding at that time.  *See* Case Docket, No. 15-23680-RDD (Bankr. S.D.N.Y.).  In fact, the court continued to receive submissions from Defendants and other Zohar stakeholders regarding appropriate fees and the confidential treatment of documents submitted to the court.  *See id.*

## The Zohar II Default And Litigation

26.    Zohar II defaulted when its notes matured in January 2017.  Compl. ¶¶ 167-68.  The Zohar II payment default resulted from the same misconduct by Defendants that had caused the Zohar I default.  *Id.* ¶¶ 73, 103, 105, 121, 132-33, 145, 167, 192-95.  As described

- 10 -

above, Defendants' misconduct included self-dealing loan amendments and Portfolio Company governance transactions, extension of loan maturities beyond the note maturity date, and failure to timely monetize Collateral. Upon the default, MBIA paid $770 million in claims on its Zohar II Financial Guaranty. *Id.* ¶ 169. MBIA as a result is the owner of those notes and is entitled under the Indenture to reimbursement for its Financial Guaranty payment before any funds go through the Zohar II waterfall to Tilton's interests. *Id.*

27.     Following the Insured Zohar Funds' defaults, including after the Patriarch Managers resigned in March 2016, Defendants continued to use their remaining positions at the Zohar Funds to engage in mischief. *Id.* ¶¶ 148-66, 171-83. For example, the Patriarch Managers refused to comply with their continuing contractual obligations under their collateral management agreements to turn over to their successor all books and records of the Zohar Funds. *Id.* ¶¶ 156-58. Defendants' conduct denied MBIA critical information regarding the Zohar Funds' loans and equity interests, as well as up-to-date financial reports for each of the Portfolio Companies. *Id.* Even after the Zohar Funds obtained records demonstrating their record ownership of the Portfolio Company equity, Defendants refused to recognize their beneficial ownership and contested efforts by the Zohar Funds to exercise their rights as equity owners and to replace Tilton as a director at the Portfolio Companies. *Id.* ¶¶ 171-72.

28.     To enforce their rights, the Zohar Funds commenced the Delaware 225 Action, and Defendants unjustifiably filed counterclaims and third-party claims against MBIA in response. *Id.* ¶¶ 172-73. In November 2017, following a six-day trial, the Delaware Court of Chancery entered a judgment that Zohar II and Zohar III are the legal and beneficial owners of the disputed equity. *Id.*

29.     While the Delaware 225 Action was pending, a Securities and Exchange Commission (the "SEC") Administrative Law Judge ("ALJ") issued a decision in a civil

- 11 -

enforcement proceeding commenced by the SEC against Tilton and her various affiliates (the "Enforcement Proceeding"). *See* Trzaskoma Decl. (D.I. 26), Ex. 4 (the "SEC Decision"). Specifically, the SEC alleged that Defendants had violated the antifraud provisions of the Investment Advisers Act of 1940 by providing false and misleading information, and engaging in a deceptive scheme, practice and course of business, relating to the values they reported for these funds' assets. *See id.* at 2, 48. Specifically, the SEC charged Tilton with violations of Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940. *Id.* at 1-2.

30. The SEC's charges related to two categories of allegedly fraudulent statements made by Tilton to the Zohar investors: (1) that non-performing loans were miscategorized as performing in order to pass the Overcollateralization Ratios and allow Defendants to collect collateral management fees and (2) that the Zohar financial statements falsely claimed GAAP compliant accounting when in fact two aspects (the methods for taking impairment of loans and estimating the fair value of loans) were not GAAP compliant. *Id.* at 47-48. The ALJ ruled that the SEC's Division of Enforcement (the "Division") had failed to prove its case for securities fraud regarding both categories of statements. *Id.* at 57. In making that determination, the SEC ALJ did not decide whether Tilton or any of her affiliates in fact had miscategorized any loans or miscalculated the Overcollateralization Ratio. *See id.* at 52 ("assuming *arguendo* that asset categorizations and consequent OC Ratio computations were not in accord with the provisions of the indentures, this disparity was disclosed to the investors").

31. On or about March 11, 2018, Tilton caused the Zohar Funds to commence the Delaware Bankruptcy Cases. Compl. ¶ 178. Significantly, Tilton sought to stay all proceedings in all of these cases—not merely claims brought by Tilton against the Funds, but also causes of action brought by the Debtors as claimants to vindicate their own rights. *Id.* Tilton

- 12 -

commenced the Delaware Bankruptcy Cases as her litigation strategy was faltering and just before her appeal of the Delaware 225 Action was scheduled to be heard by the Delaware Supreme Court. *Id.* ¶¶ 174, 178. MBIA, Defendants, and the Zohar Funds ultimately agreed to a settlement in the Delaware Zohar Bankruptcy Cases, providing for the monetization of the Portfolio Companies. *Id.* ¶¶ 181. Notwithstanding the settlement's fundamental bargain to ensure that MBIA will be Paid in Full, the agreed-upon monetization process has not reimbursed MBIA the amounts it is owed under the Transaction Documents. *Id.* ¶¶ 181-82, 185; *see also* Trzaskoma Decl. (D.I. 26), Ex. 10 (Settlement Agreement).

32. On July 30, 2020, MBIA commenced this action to recover its losses incurred as a result of Defendants' misconduct.

## ARGUMENT

33. "Granting a motion to dismiss is a 'disfavored' practice." *Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 134 (Bankr. D. Del. 2005); *see also Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir. 1997) (dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In deciding a Rule 12(b)(6) motion, the Court must "accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff." *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004). This includes "draw[ing] all reasonable inferences in favor of the non-moving party." *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 604 (3d Cir. 2015) (quoting *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 452 (3d Cir. 2006)). The inquiry is not whether the plaintiff will ultimately prevail in a trial on the merits, but whether the plaintiff should be afforded the opportunity to offer evidence in support of the claim. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

- 13 -

34.     Similarly, Rule 8 imposes "minimal burdens on the plaintiff at the pleading

stage." *Frazier v. Se. Pa. Transp. Auth.*, 785 F.2d 65, 67 (3d Cir. 1986), *abrogated on other*

*grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163

(1993). It requires only "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a). "While a complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007), it must provide a defendant "fair notice of what the claim is and the grounds upon which

it rests." *Phillips*, 515 F.3d at 231(internal quotation marks omitted).    The standard is "one of

plausibility and not probability and simply calls for enough facts to raise a reasonable expectation

that discovery will reveal evidence of the necessary element." *Corp. Claims Mgmt., Inc. v. Shaiper*

*(In re Patriot Nat'l, Inc.)*, 592 B.R. 560, 570 (Bankr. D. Del. 2018) (internal quotation marks

omitted). Thus, for the Court to deny the Defendants' motion to dismiss, it need only find that

MBIA has "nudged [its] claims across the line from conceivable to plausible." *Id.* (internal

quotation marks omitted).

35.     On a motion to dismiss, courts may consider documents "integral to or

explicitly relied upon" in a complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

1426 (3d Cir. 1997) (emphasis omitted). They should not, however, "consider matters extraneous

to the pleadings." *Id.* Notwithstanding these well-established principles, the Defendants' Brief

improperly sets forth an alternative set of "facts" neither alleged in the Complaint nor set forth in

documents integral to the Complaint. *See, e.g.*, Brief ¶¶ 1-4 & n.5, 6-8, 14-24, 29, 32-35, 93, 95,

110, 114. The Court should disregard these "facts." *See Hall v. Holman*, No. Civ. A. 04-1328

GMS, 2006 WL 2587693, at *2 (D. Del. Sept. 8, 2006) (disregarding factual contentions

extraneous to the pleadings and deciding motion to dismiss solely on the basis of the allegations

in the complaint). Assuming *arguendo* that any of these purported "facts" were integral to the

- 14 -

Complaint (they are not), the Court should disregard facts improperly introduced in Defendants'

argumentative "Preliminary Statement" without "supporting references to appendices or record."

*See* Brief ¶¶ 1-41; *see also* L.R. 7007-2(b)(i)(E); *In re DaVita Inc. S'holder Deriv. Litig.*, No. 17-

17-152-MPT, 2019 WL 1855445, at *7-8, 10-11 (D. Del. Apr. 25, 2019) (striking materials

extraneous to the complaint and disregarding discussion of documents that defendants contended

contradicted the allegations in the complaint on the grounds that it constituted improper argument

set forth in background section of brief); *Benihana of Tokyo Inc. v. Benihana Inc.*, No. 10-1051-

SLR, 2011 WL 3861897, at *4 (D. Del. Sept. 1, 2011) (court elected to "use those facts [set forth

in the statement of facts] that are relevant [to the motion to dismiss] and ignore those facts that are

not").

36.     Defendants have not cleared Rule 12(b)(6)'s high bar for dismissal with

respect to any of MBIA's causes of action.  Taking the facts alleged as true, the Complaint

plausibly states claims for relief against all of the Defendants.  Defendants' motion to dismiss

should be denied.

## I.     MBIA'S COMPLAINT IS NOT DUPLICATIVE OF THE DEBTOR ZOHAR FUNDS' ADVERSARY PROCEEDING

37.     In this adversary proceeding, MBIA brings causes of action belonging to it

in its capacity as Credit Enhancer of Zohar I and Zohar II and seeks compensation for the nearly

$1 billion MBIA paid out-of-pocket to the insured noteholders, plus additional damages for other

injuries incurred as a result of Defendants' misconduct.  MBIA's claims and relief sought are

wholly independent of and distinct from claims brought and relief sought by the Zohar Debtors in

a separate suit to which MBIA is not a party. *See Zohar CDO 2003-1, Ltd. v. Patriarch Partners,*

*LLC*, A.P. No. 20-50534 (Bankr. D. Del.).  Defendants' argument that MBIA's Complaint should

- 15 -

be dismissed under the claim-splitting doctrine is contrary to both fact and law. *See* Brief ¶¶ 53-66.

38.     There is no authority that supports application of the claim-splitting doctrine where, as here, two different plaintiffs have brought two different actions seeking different relief, notwithstanding that the two cases may involve similar defendants, transactions, or underlying conduct. It is well-established that the rule against claim-splitting operates to bar a *single plaintiff* from filing multiple *duplicative* pleadings for strategic gain. *See Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (plaintiff, who filed successive suit "indistinguishable from her first" in order to avoid consequences of jury waiver, had her cases consolidated and was denied a jury trial); *see also Leonard v. Stemtech Int'l, Inc.*, No. 12-86-LPS-CJB, 2012 WL 3655512, at *8 (D. Del. Aug. 24, 2012) (doctrine of claim-splitting "applies to bar a plaintiff from filing a new lawsuit after the court in an earlier action denied leave to amend the complaint to add those same claims"). In short, the "rule against claim splitting does not apply to a case such as this one where the later-filed case involves different named plaintiffs with different legal claims than the earlier case[]." *Beckerley v. Alorica, Inc.*, No. SACV 14-0836-DOC, 2014 WL 4670229, at *3 (C.D. Cal. Sept. 17, 2014); *see also Woodards v. Chipotle Mexican Grill, Inc.*, No. 14-cv-4181, 2015 WL 3447438, at *1, 4 (D. Minn. May 28, 2015) (claim-splitting doctrine did not bar plaintiff from bringing suit because he "was not a party to, or in privity with a party to" an "almost identical" previously-filed action). Even where two suits are brought by the same plaintiff, the claim-splitting rule only prohibits "duplicative" suits, not similar causes of action relating to similar subject matter. *See Gumbs v. Del. Dep't of Labor*, No. 15-00190-RGA, 2015 WL 3793539, at *2 (D. Del. June 17, 2015) (two different suits arising from same facts but resting on different legal claims and independent rights to relief permitted to proceed).

39.     Defendants argue that "much"—but admittedly not all—of MBIA's Complaint is indistinguishable from the Debtors' complaint because the two pleadings involve overlapping parties, seek "largely the same or similar relief" and are "largely premised" on similar facts, agreements, and legal theories. Brief ¶ 56. On its face, Defendants' argument is insufficient to trigger the rule against claim-splitting because MBIA is not the Debtors and has its own separate existence, rights, and remedies. That those rights and remedies resemble or even partially overlap with those of others does not implicate the claim-splitting doctrine. *See Beckerley*, 2014 WL 4670229, at *4 (lack of identity of plaintiffs and their legal rights in two similar actions rendered claim-splitting doctrine inapplicable, notwithstanding overlap in parties and facts at issue).

40.     And, in any event, contrary to Defendants' Brief (¶ 57), the Debtors and MBIA do not represent the same interests and are not vindicating the same legal or contractual rights through their respective actions. MBIA is enforcing rights and remedies unique to it as Credit Enhancer under the Transaction Documents and as a party to the SDNY Bankruptcy and Delaware 225 Action. *See* Compl. at Counts I-III, IX-XI. MBIA is also enforcing its unique legal rights as the purchaser of the Zohar I Collateral. *See* Compl. at Counts IV and VIII. In contrast, the Debtor Zohar Funds have brought suit in their own names to enforce independent legal and contractual rights they possess as distinct entities and signatories to the Indentures and Management Agreements. *See* A.P. No. 20-50534, ECF No. 2 (the "Debtors' Complaint").

41.     The relief sought by MBIA here is also different from the relief the Debtors seek in their adversary proceeding. MBIA seeks to recoup nearly $1 billion it paid to the insured noteholders under the Financial Guaranties when Defendants caused the Funds' payment defaults, plus damages incurred by MBIA in satisfaction of those payment obligations. Compl. ¶¶ 194-95 (Count I), 204-06 (Count II), 212-14 (Count III). The Debtors never made similar out-of-pocket payments and, thus, do not and could not seek similar damages as relief for their own breach of

- 17 -

contract and tortious interference causes of action.  Instead, the Debtors "seek rescission of the transactions executed by the Patriarch Managers in breach of the [Management Agreements] and damages in the amount of losses caused by the Patriarch Managers' breaches of the [Management Agreements]. *See* Debtors' Compl. ¶ 207.  The Debtors' allege the following losses, which do *not* apply to MBIA:  (a) the decrease in value of the Funds' debt and equity assets caused by Tilton's and her affiliates' breaches of the Management Agreements, (b) the unearned collateral-management fees and preference-share payments paid by the Funds to the Patriarch Manager Defendants and Octaluna Entities, and (c) reasonable expenses incurred by the Debtors in enforcing their rights.  *See* Debtors' Compl. ¶¶ 194, 196, 201, 206; *see also id.* ¶¶ 214-15 (the Debtors' alleged losses resulting from Defendants' tortious interference are similar to their contract damages).

42.    Defendants misconstrue or outright ignore MBIA's alleged injuries in characterizing the two parties' relief sought as "duplicative" and "materially indistinguishable." Brief ¶ 63.  For example, Defendants omit MBIA's breach of contract and tortious interference causes of action from their count-by-count comparison of the relief sought in MBIA's and the Debtors' respective pleadings.    Brief  ¶ 64 (completely ignoring Counts I-III of MBIA's Complaint).  Defendants also misstate the relief MBIA seeks on its non-contract-based claims.  *Id.* MBIA seeks reimbursement and restitution for losses *MBIA incurred* as a result of Defendants' self-dealing transactions regarding assets *MBIA acquired* in the Zohar I auction—not losses incurred by Debtors in connection with the Debtors' assets.  *See* Compl. ¶¶ 253-54 (Count VIII), 259-60 (Count IX).  And, MBIA seeks declaratory relief confirming *MBIA's* rights with respect to *MBIA's* assets—not declarations regarding the Debtors' rights with respect to the Debtors' assets. *See* Compl. ¶¶ 226 (Count IV).

- 18 -

43.    Defendants also misread the Transaction Documents in claiming that "MBIA's losses as insurer are identical to its losses as subrogee to the Insured Zohar Funds' noteholders." *See* Mot. ¶ 65 (citing Zohar I Insurance Agreement § 4.05).  MBIA did become subrogated to the insured noteholders upon its Policy payments as provided in Section 4.05 of the Insurance Agreements (and Section 16.5 of the Indentures).  MBIA's rights to reimbursement of the $1 billion it paid as *insurer*, however, are independent of its rights to receive principal and interest owed to it as subrogated noteholder.  The losses MBIA incurred in the separate capacities of insurer and subrogee are also different, as they are measured by and paid pursuant to different provisions in the Indentures' priority of payment waterfalls. *See* Trzaskoma Decl. (D.I. 26), Ex. 3 (Indenture) § 11.1(a)(i)-(ii).[4]  Defendants' misinterpretation of the Indentures' payment provisions is not academic.  Limiting MBIA to recoveries in its capacity as subrogee, and ignoring its independent right to reimbursement of its Credit Enhancement Liabilities, could drastically reduce the amounts payable to MBIA and, ironically, cause it to receive outstanding interest and principal owed to the Zohar I notes on a pro rata basis with Tilton.[5]

---

[4]    Specifically, MBIA is entitled to reimbursement of its expenses and amounts paid under the Policies as "Credit Enhancement Liabilities," which are included among "Senior Expense Amounts" distributed in accordance with the Indentures' priority of payments. *See* Trzaskoma Decl. (D.I. 26), Ex. 3 (Indenture) at 22 (definition of Credit Enhancement Liabilities); *id.* § 11.1(a)(i)(G) (providing for payment of Credit Enhancement Liabilities following pro rata interest payments on the Class A notes); *id.* at 55 (definition of "Senior Expense Amounts" includes Credit Enhancement Liabilities payable in Section 11.1(a)(i)(G) of the interest waterfall).  Under the Indentures' priority of payment waterfalls, MBIA receives reimbursement of its Credit Enhancement Liabilities separate, and in different priority order, from payments of interest and principal to it as a subrogated noteholder. *See* Trzaskoma Decl. (D.I. 26), Ex. 3 (Indenture) § 11.1(a)(i)(F) (providing for pro rata payment of outstanding interest on the Class A notes); *id.* § 11.1(a)(i)(G) (providing for payment of all Credit Enhancement Liabilities); *id.* § 11.1(a)(ii)(B) (providing for payment of amounts owed to MBIA as insurer as "Senior Expense Amounts"); *id.* § 11.1(a)(ii)(G) (providing for pro rata payment of outstanding principal on the Class A notes).

[5]    *See* Compl. ¶¶ 13, 67 (MBIA insured Class A-1 and A-2 notes, but not the A-3 notes acquired by certain Defendants); *see also* Trzaskoma Decl. (D.I. 26), Ex. 3 (Indenture) § 11.1(a) (Class A notes continue receiving interest and principal distributions on a pro rata basis following a Zohar default and Policy payment).

44.     Ultimately, Defendants' arguments are directed to two issues: (1) the common factual background of this action and the Debtor Zohar Funds' adversary proceeding, and (2) that the Zohar Funds may be required to remit a portion of their recovery to MBIA through operation of law and the Transaction Documents.  The law, however, already provides remedies for both issues — neither of which require dismissal.  The common factual background of the two actions can be addressed through coordinated discovery or outright consolidation.  And, to the extent that some of the damages sought by the Zohar Funds will eventually inure to the benefit of MBIA, the law restricts claimants to a single recovery.  *See, e.g., Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 649 (2d Cir. 1989) (damages principles bar plaintiffs from double recovery on fraud and contract claims).  These principles, not the claim-splitting doctrine, are implicated here.

## II.     THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

45.     "Under New York law, '[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage.'"  *Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*, 585 B.R. 89, 111 (Bankr. D. Del. 2018) (quoting *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (App. Div. 3d Dep't 2009)).[6]  "A claim for a breach of contract is subject to the liberal notice pleading requirements found in Rule 8(a) of the Federal Rules of Civil Procedure."  *Premier Pork L.L.C. v. Westin, Inc.*, No. 07-1661, 2008 WL 724352, at *3 (D.N.J. Mar. 17, 2008).  Accordingly, allegations for a contract claim need not be pleaded

---

[6]   New York law governs MBIA's breach of contract claim.  *See* Trzaskoma Decl. (D.I. 26), Ex. 2 (Management Agreement) § 7.5; Trzaskoma Decl. (D.I. 26), Ex. 3 (Indenture) § 18.9; *see also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 390 (3d Cir. 2016) (contractual New York choice of law clause governed claim).

with particularity and are sufficient if they provide fair notice of the claim and the grounds on which it rests. *See id.*; *Phillips*, 515 F.3d at 232.

46.    MBIA's Complaint easily meets this standard. *See, e.g.*, Compl. ¶¶ 52-65, 188-89 (existence of contract); *id.* ¶¶ 186, 196 (MBIA's performance); *id.* ¶¶ 73-144, 190-91 (the Patriarch Manager Defendants' breaches); *id.* ¶¶ 145-47, 167-70, 192-95 (resulting damages).

## A.    Count I Provides Fair Notice Of The Grounds On Which It Seeks Relief

47.    Defendants contend that Count I of the Complaint is impermissibly vague and should be dismissed or, alternatively, pled again in a more definite statement pursuant to Rule 12(e). Brief ¶¶ 67-77. According to Defendants, Count I does not specify which of the many facts pled elsewhere in the Complaint support the breach of contract cause of action. Brief ¶ 69-72. As a result, Defendants assert, the length of the Complaint and broad language in Count I force Defendants to guess at the facts and circumstances forming the basis of MBIA's breach of contract claim. Brief ¶ 73. Defendants' criticism falls apart, however, upon a cursory review of Count I's allegations and Defendants' own merits-based arguments in response.

48.    In light of Rule 8's liberal pleading standards set forth above, requests to plead a more definite statement under Rule 12(e) are disfavored. *Johnson v. Fielder*, No. 14-1597, 2016 WL 3912022, at *2 (D.N.J. July 19, 2016) (citing *Marley v. Donahue*, No. 14-6938, 2014 WL 5152618, at *1 (D.N.J. Oct. 14, 2014)). A request to replead under Rule 12(e) should only be granted "to address a pleading that 'is so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to [itself].'" *Marley*, 2014 WL 5152618, at *1 (quoting *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 232–33 (D.N.J. 2003)). "Rule 12(e), accordingly, provides a remedy for an 'unintelligible' pleading, but does not serve as a mechanism to correct a pleading merely lack in detail." *Id.* (citation omitted). To satisfy Rule 8 and Rule 12(e), a pleading need only provide "sufficient specificity to enable a defendant to

- 21 -

determine the propriety of interposing in his answer a waivable defense." *Johnson*, 2016 WL 3912022, at *2. The cases Defendants cite do not hold otherwise. *See* Brief ¶¶ 73, 76-77.

49.    The Complaint provides more than adequate notice of and sufficient detail regarding the grounds for MBIA's breach of contract claim. Count I identifies the Patriarch Manager Defendants' relevant duties and obligations under the specific provisions of the Management Agreements at issue and, in the subsequent paragraph, describes six types of conduct undertaken by the Patriarch Manager Defendants in breach of those duties and obligations. Compl. ¶¶ 189-90. The Complaint also identifies the Patriarch Manager Defendants' specific acts and omissions that gave rise to their breaches of the Management Agreements. Compl. ¶ 191. Count I also alleges how the Patriarch Manager Defendants' misconduct directly and proximately caused the Insured Funds' defaults (Compl. ¶ 192) and further explains how MBIA was directly and proximately injured by the Patriarch Manager Defendants' breaches. Compl. ¶¶ 193-95.

50.    These allegations provide Defendants with the information needed to respond to MBIA's breach of contract claim as required by Rule 8. Indeed, they clearly identify the provisions of the Management Agreement that have been breached and how the Patriarch Manager Defendants breached them. Incorporating the Common Allegations of the Complaint by reference into Count I neither obscures the grounds of MBIA's contract claim or prevents Defendants from responding. Indeed, paragraph 191 already provides the alternative relief Defendants seek pursuant to Rule 12(e) by linking the "Common Allegations" to Count I. For the avoidance of doubt, the following side-by-side comparison of paragraph 191's six sub-paragraphs and the various sections and factual allegations of the Complaint incorporated by reference in Count I illustrates how Count I far exceeds Rule 8's minimal notice requirements:

| COUNT I | COMMON ALLEGATIONS |
|---|---|
| **Compl. ¶ 191(a):** Alleging that Patriarch Manager Defendants breached agreements by "executing or amending terms of the Credit Agreements for the sole intended benefit of the Patriarch Manager Defendants or their affiliates | **Compl., Section II.B:** Alleging facts that "Defendants unlawfully alter the terms of the funds' loans to the Portfolio Companies" |
| **Compl. ¶ 191(b):** Alleging that Patriarch Manager Defendants breached agreements by "miscategorizing non-performing 'Category 1' loans as performing 'Category 4' loans and miscalculating the Overcollateralization Ratio" | **Compl., Section II.D:** Alleging facts regarding "Defendants' miscategorization of loans and miscalculation of the Overcollateralization Ratio") |
| **Compl. ¶ 191(c):** Alleging that Patriarch Manager Defendants breached agreements by "funding new loan commitments without MBIA's authorization" | **Compl., Section II.C:** Alleging facts regarding, *inter alia*, "Defendants' unauthorized loans" |
| **Compl. ¶ 191(d):** Alleging that Patriarch Manager Defendants breached agreements by "extending the principal repayment date of the loans . . . beyond the Zohar Note Maturity Dates" | **Compl., Section II.B.2:** Alleging facts regarding "Defendants' extension of loan principal repayment deadlines" |
| **Compl. ¶ 191(e):** Alleging that Patriarch Manager Defendants breached agreements by "refusing to monetize equity interests in the Portfolio Companies owned by the Insured Zohar Funds" <br><br> and <br><br> **Compl. ¶ 191(e):** Alleging that Patriarch Manager Defendants breached agreements by "diverting to themselves proceeds from the Portfolio Companies, including siphoning funds from the Portfolio Companies in the form of management consulting fees" | **Compl., Section II.A.2:** Alleging facts that "Defendants refuse to monetize the equity interests to avoid fund defaults" <br><br> and <br><br> **Compl. ¶¶ 90-93:** Alleging facts that Patriarch Manager Defendants "diverted to themselves dividends or other distributions made by the Portfolio Companies" and consented to non-arm's-length management consulting fees on behalf of the Zohar Funds siphoning fees away from Portfolio Companies |

- 23 -

| COUNT I | COMMON ALLEGATIONS |
|---|---|
| **Compl. ¶ 191(f):** Alleging that Patriarch Manager Defendants breached agreements by "engaging in various conflicted, self-dealing transactions knowingly designed to divert to Defendants control over the Insured Zohar Funds' equity interests in the Portfolio Companies" | **Compl. ¶¶ 82-89:**  Alleging facts regarding "Defendants' conflicted, bad-faith and self-dealing transactions usurping control over the Insured Zohar Funds' valuable equity ownership rights and interests in the Portfolio Companies," including the Patriarch Manager Defendants' bad faith execution of the Governance Conveyances, which "unlawfully obstructed and impeded the Insured Zohar Funds' ability to monetize their equity Collateral" |

51.    Moreover, contrary to their claim of inadequate notice pleading, Defendants' merits-based arguments demonstrate that Defendants are quite capable of determining which of MBIA's alleged facts give rise to the Patriarch Manager Defendants' breaches of the Management Agreement. *See* Brief ¶¶ 78-79, 89, 92, 97, 100, 102-03, 106-08 (summarizing the Complaint's essential grounds for breach in an unsuccessful attempt to refute them).  Accordingly, Defendants' requests for dismissal or, alternatively, a more definite statement on grounds of vagueness should be rejected. *See Garrett v. Wexford*, 938 F.3d 69, 95 (3d Cir. 2019) (district court abused its discretion in dismissing suit on Rule 8 grounds in part because defendants' "brief demonstrates that it was possible to understand and engage with [the plaintiff's] claims on their merits") , *cert denied*, 140 S. Ct. 1611 (2020).

**B.    The Management Agreements Do Not Bar Liability For Defendants' Alleged Wrongdoing**

52.    Defendants contend that Sections 2.2(a) and 4.4 of the Management Agreements preclude all liability for the conduct alleged in the Complaint. Brief ¶¶ 81-85. On the facts alleged here, neither of these provisions exculpate the Patriarch Managers' misconduct.

53.    First, Section 2.2(a) does nothing to limit the Patriarch Managers' liability for breaches of their duties and obligations under the Management Agreements.  That provision states only that the Patriarch Managers are not guaranteeing investors an economic return on the

- 24 -

Collateral.  Trzaskoma Decl. (D.I. 26), Ex. 2 § 2.2(a) ("no duty or obligation of the Collateral Manager described hereunder shall be deemed to imply a guaranty of, and the Collateral Manager does not hereby guarantee, the performance of or economic returns to be realized by such Collateral").  Nowhere does the Complaint allege or imply that the Patriarch Manager Defendants guaranteed MBIA risk-free returns.  Rather, the Complaint alleges that the Patriarch Managers breached their duties and obligations under the Management Agreements and that their breaches directly and proximately caused MBIA's damages.  Compl. ¶¶ 73-144, 145-47, 167-70, 190-97.  Section 2.2 expressly acknowledges that the Patriarch Managers owed contractual duties under the Management Agreements and in no way excuses or limits their liability for any breach thereof.

54.     Second, by its plain terms, Section 4.4 does not exculpate the Patriarch Managers from liability for "fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager."  Compl. ¶¶ 65, 189(e); Trzaskoma Decl. (D.I. 26), Ex. 2 § 4.4.[7]  Accordingly, as made clear in the Complaint, none of the Patriarch Manager Defendants' conduct is subject to Section 4.4's limitation on liability.  E.g., Compl. ¶¶ 1, 5, 65, 76-77, 81-82, 87-88, 90, 94, 99-100, 103-04, 116, 129-30, 133, 143, 190(e), 191.

55.     Defendants contend that the Patriarch Managers' misconduct does not fall within Section 4.4's non-recourse exception because the Complaint does not allege the Patriarch Managers' had a "motive" to, or did in fact, engage in "egregious intentional misbehavior evincing

---

[7]   Defendants concede that the non-recourse provision they rely on contains an exception for fraud, bad faith, willful misconduct and gross negligence, but they incorrectly refer to Section 4.5(a) of the Management Agreements as the source for such exception, rather than Section 4.4.  Brief ¶ 84 (citing Trzaskoma Decl. (D.I. 26), Ex. 2 § 4.5(a)).  Section 4.5(a) provides that the Zohar Funds shall not be required to indemnify or hold harmless the Patriarch Managers for losses or liabilities resulting from their own fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty.  It is Section 4.4 which expressly carves out bad faith, willful misconduct, gross negligence or breach of fiduciary duty from the limitation on liability set forth in that same section.  Id. § 4.4.

extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts." Brief ¶ 84 (citing *Tradex Eur. SPRL v. Conair Corp.*, No. Civ. 1760, 2008 WL 1990464, at \*3 (S.D.N.Y. May 7, 2008)). This argument, however, is beside the point. As set forth above, Section 4.4 expressly provides for liability based on, *inter alia*, bad faith, breach of fiduciary duty, and gross negligence, none of which require "extreme culpability." In arguing otherwise, Defendants fundamentally misconstrue applicable law and ignore the Complaint's factual allegations.

56.    The Complaint alleges that the Patriarch Manager Defendants acted intentionally and in bad faith (or at least with gross negligence) to enrich themselves, Tilton, and their affiliates to the detriment of MBIA. Compl. ¶¶ 1, 5-6, 74, 76-77, 82, 88-89, 94-95, 99-100, 104, 109, 113, 116, 129, 133-34, 143, 179, 190(e), 191. Under well-established New York law, MBIA's allegations are more than sufficient "to support a finding of bad faith, willful misconduct, or gross negligence." *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006); *see also Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 136 F. Supp. 2d 253, 257 (S.D.N.Y. 2001) (question of whether defendants' alleged failures with respect to construction of school gymnasium rose to the level of reckless disregard for the rights of others, and thus constituted "gross negligence," was proper question for jury). Defendants' reliance on the cases cited in their Brief is misplaced because, unlike MBIA's breach of contract claim, those cases involve attempts to set aside contractual provisions limiting damages and liability or fraud claims subject to heightened pleading standards.[8]

---

[8]    *See Tradex*, 2008 WL 1990464, at \*3 (unlike MBIA, which alleges that the Patriarch Managers' conduct falls within the contractual exculpation provision as written, the *Tradex* plaintiffs could not void the contractual limitation on special damages absent egregious misconduct or malice); *see also Charles Schwab & Co. v. Retrophin, Inc.*, No. 14-CV-4294, 2015 WL 5729498, at \*9 (S.D.N.Y. Sept. 30, 2015) (requiring allegations of fraudulent motive to satisfy Rule 9(b)); *Waite v. Schoenbach*, No. 10-CV-3439, 2010 WL 4456955, at \*6 (S.D.N.Y. Oct. 29, 2010) (scienter and allegations of fraudulent

57.     Section 4.4 of the Management Agreements, therefore, does not preclude contract liability as a matter of law.

## C.     The SEC Decision Does Not Preclude MBIA's Contract Claim

58.     Clearly, MBIA is not the SEC.  MBIA was not a party to the SEC Enforcement Proceeding.  In that proceeding, the SEC did not bring the same legal claims that MBIA brings here.  *See supra* ¶¶ 29-30.  The SEC Decision did not determine any issue on which MBIA's breach of contract claim is based, including whether or not Tilton miscategorized any loans or miscalculated the Overcollateralization Ratio.  *Id.*  For these reasons and more, the SEC Decision is not binding on MBIA and has no preclusive effect in this case.

59.     Notwithstanding the fundamental differences in the parties and claims at issue here and the SEC Enforcement Proceeding, Defendants contend that the SEC Decision precludes MBIA from bringing any claim "based on any allegations concerning the [Overcollateralization Ratio]."  Brief ¶ 96.  In an apparent attempt to avoid the rule against precluding a party, such as MBIA, from litigating claims and issues it has not previously litigated, Defendants argue that (1) the SEC's interests in proving its claims in the Enforcement Proceeding were "identical" to MBIA's interests here and (2) there "can be no question" the SEC adequately represented MBIA's interests in the SEC Enforcement Proceeding.  Brief ¶ 95.  Defendants' argument can and should be rejected out of hand.  They fail to demonstrate both that preclusion can be applied in accordance with constitutional due process requirements and that the elements of either claim or issue preclusion have been met.

60.     *First*, constitutional due process bars preclusion of MBIA's claims based on the SEC Decision, under either issue preclusion or claim preclusion.  "It is a principle of general

---

intent required for fraudulent conveyance claims).  Although MBIA's Complaint does not need to show extreme culpability or satisfy the heightened pleading standards applicable to fraud claims, it does in fact allege the detail required to meet even those inapplicable, heightened standards.

application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)); *see also Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009) ("[T]here is generally a bar against applying collateral estoppel to those who were not parties in the prior litigation."). An exception to this principle applies only "in certain limited circumstances," such as class-actions and suits brought by trustees, guardians, and other fiduciaries, where the non-party against whom preclusion is sought was "adequately represented" by a party in the prior litigation that had the "same interests" as the non-party in that litigation. *See Taylor*, 553 U.S. at 894; *see also Nationwide*, 571 F.3d at 312-3 ("adequate representation" exception to rule against nonparty preclusion is "carefully circumscribed" and requires "legal or representative relationship between a party to the prior action and the nonparty against whom estoppel is asserted").

61.    Both the United States Supreme Court and the Third Circuit have rejected attempts to expand the "adequate representation" exception to include circumstances where a party in the first suit is a "virtual representative" of the non-party based on "such an identification of interest between the two [parties] as to represent the same legal right." *Nationwide*, 571 F.3d at 311 (citing *Taylor*, 553 U.S. at 894). For the "adequate representation" exception to apply, the interests of the party and nonparty must be "squarely aligned," and either the party to the earlier action must have understood it was acting in a representative capacity or special procedural protections must have been in place to ensure the due process rights of nonparties who might face issue or claim preclusion. *Nationwide*, 571 F.3d at 313 (non-party preclusion was improper where, *inter alia*, the scope of claims and issues at issue in the two actions were different and, thus, party and non-party's interests were not "entirely aligned"); *see also Taylor*, 553 U.S. at 905 (exception

- 28 -

to rule against nonparty preclusion not warranted because record did not demonstrate that party to first suit "understood himself to be suing on [the later plaintiff's] behalf" or that the court "took special care to protect [the later plaintiff's] interests").

62.     Similar to the plaintiffs in the earlier-filed cases at issue in both *Taylor* and *Nationwide* (and contrary to Defendants' Brief), the SEC here did not have the "same interests" as MBIA or "adequately represent" MBIA's interests in the SEC Enforcement Proceeding.  The mere suggestion is absurd.  MBIA is a private party pursuing contract damages for breach of the Management Agreements.  The SEC sought civil penalties and other sanctions on the grounds that Tilton defrauded Zohar investors in violation of the Investment Advisers Act of 1940.  The parties' common allegations regarding Tilton's miscalculation of the Overcollateralization Ratio are far from the "identity of interests" required to fit the narrow exception to the rule against non-party preclusion.  *See Nationwide*, 571 F.3d at 313.  Indeed, Defendants do not claim privity exists between MBIA and the SEC, and there clearly is none.  Nor is there is any legitimate basis to determine that the SEC represented MBIA or its interests in the Enforcement Proceeding.  Nothing in the Complaint supports a finding that the SEC "understood [it]self to be acting in a representative capacity" or otherwise undertook special procedural protections to ensure MBIA's due process rights.  *Nationwide*, 571 F.3d at 313.  Meanwhile, Defendants' conspiracy theories regarding collusion between the MBIA and SEC should be disregarded as extraneous to the pleadings and, in any event, are unsubstantiated[9] and do not demonstrate that the SEC adequately represented MBIA in the Enforcement Proceeding.  Defendants' preclusion argument can be rejected solely on this ground.

---

[9]     *See* SEC Decision at 47 ("Respondents have claimed that the Division improperly colluded with MBIA by providing MBIA confidential information . . . .  It appears that the Division agreed to share certain documents with MBIA in December 2013, but the exact nature of those documents is unclear.").

63.     *Second*, assuming *arguendo* that Defendants could escape the prohibition against non-party preclusion, they still do not and cannot demonstrate that either claim or issue preclusion should apply here.[10]   Claim preclusion does not apply for many of the same reasons that there is no exception to the rule against non-party preclusion.   MBIA was not a party to the SEC Enforcement Proceeding, was not in privity with the SEC, and had no ability to intervene or bring its own claims in a civil enforcement proceeding brought by the SEC.   Additionally, the claims brought by the SEC in the Enforcement Proceeding relating to Tilton's miscalculation of the Overcollateralization Ratio for violation of the Investment Advisers Act of 1940 are not the same claims for breach of contract brought here by MBIA.   The fact that the SEC's Advisers Act claims and MBIA's claims may arise from similar misconduct is insufficient to trigger claim preclusion.

64.     The elements of issue preclusion also cannot be met here.[11]   It is plain from the face of the SEC Decision that the SEC ALJ never determined whether or not Tilton or any of her affiliates miscategorized loans or miscalculated the Overcollateralization Ratio.   SEC Decision at 51-53.   Indeed, because the SEC brought claims sounding in fraud rather than breach of contract, it was not essential to the SEC Decision for the SEC ALJ to determine that issue.   Rather, the SEC ALJ held that the SEC could not prove that Tilton had misled investors as required to satisfy their burden of proof even if she and her affiliates had in fact breached their contractual obligations.   *Id.* at 52 ("assuming *arguendo* that asset categorizations and consequent OC Ratio computations were

---

[10]   Under claim preclusion, a final judgment bars a subsequent suit involving the same parties based on the same claim or cause of action as the previous suit.   *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).

[11]   Issue preclusion requires satisfaction of the following 4 elements: "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Yodlee, Inc. v. Plaid Techs., Inc.*, No. 14-1445-LPS, 2016 WL 204372, at *3 (D. Del. Jan. 15, 2016).

- 30 -

not in accord with the provisions of the indentures, this disparity was disclosed to the investors"). Indeed, the Delaware Court of Chancery's rejection of Defendants' similar attempt to preclude adjudication of equity ownership issues in the Delaware 225 Action based on the SEC Decision is persuasive here. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc*, C.A. No. 12946-VCS, 2017 WL 5956877, at *36-39 (Del. Ch. Nov. 30, 2017).

65.     At bottom, the SEC Decision has no impact, preclusive or otherwise, on MBIA's breach of contract claim, and Defendants' motion in this regard should be denied.

**D.     The Complaint Alleges Breaches Of The Management Agreements Based On The Patriarch Manager Defendants' Conduct**

66.     Count I of MBIA's Complaint states a claim that the Patriarch Manager Defendants breached multiple provisions of the Management Agreements. *See supra* ¶¶ 49-50. Essentially, the Management Agreements required the Patriarch Manager Defendants to manage the Zohar Collateral in accordance with the Indentures — that is, for the benefit of the Secured Parties, including MBIA. Compl. ¶¶ 37, 39, 55-56, 59, 189(a), 189(c). In that regard, Defendants wrongly contend that the Patriarch Manager Defendants only owed duties under the Management Agreements to the Zohar Funds, and not to MBIA. Brief ¶ 86. As Defendants concede, however, MBIA was an express third-party beneficiary of each of the Management Agreements. *Id.*; Compl. ¶ 53, 188. Thus, the Patriarch Managers' duties run to MBIA under well-settled law. *See Lawrence v. Fox*, 20 N.Y. 268, 271-73 (1859); *Port Auth. of N.Y. & N.J. v. Brooklyn Union Gas Co.*, 119 N.Y.S.3d 191, 194 (App. Div. 2d Dep't 2020). The benefit of the bargain was for the Patriarch Managers to maximize recoveries on the Collateral and timely pay amounts owed to the

Zohar noteholders without causing Zohar note payment defaults that would trigger MBIA's Financial Guaranties.  Compl. ¶¶ 42, 46, 52, 58.[12]

67.      In contravention of their Rule 8 arguments, Defendants capably summarize the following acts allegedly undertaken by the Patriarch Manager Defendants in breach of their contractual duties:  (i) amending the Portfolio Company loans, including by waiving interest and defaults, subordinating the Funds' liens, and extending the loan principal repayment deadlines beyond the Zohar note maturity date; (ii) funding new loans without authorization or consent; (iii) refusing to monetize Portfolio Company equity interests and instead siphoning fees and distributions from those companies for their own benefit; (iv) engaging in self-dealing transactions, entrenching Tilton's control over the Funds' equity interests in the Portfolio Companies; and, as addressed above (v) miscategorizing loan Collateral and miscalculating the Overcollateralization Ratio.  *See* Brief ¶ 78; *see also* Compl. ¶¶ 73-144.

68.      Defendants contend that the Complaint fails to allege a breach of contract on each ground.  Brief ¶¶ 89-108.  Their arguments are unavailing.

### 1.      The Complaint alleges breaches based on loan amendments

69.      The Complaint states a contract claim against the Patriarch Manager Defendants based on their amendments to the credit agreements between the Zohar Funds and the Portfolio Companies that served as the loan Collateral for the benefit of the Secured Parties. Compl. ¶¶ 104-21, 191(a), 191(d).  As alleged in the Complaint, these improper amendments enabled Tilton and the other Defendants to maintain control of the Portfolio Companies, receive

---

[12]   Defendants' recitation of the Management Agreement provisions at issue omits language from Section 2.6 prohibiting the Patriarch Manager Defendants from taking actions that they know, or should reasonably be expected to know in accordance with prevailing market practices, "would . . . adversely affect the interests of the Holders of the Securities (without, in the case of the Notes, giving effect to [MBIA's financial guaranties], if applicable) in any material respect (other than as contemplated [under the Management Agreements] or under the Indenture[s] . . . )."  *See* Brief ¶ 87.

- 32 -

management fees and other economic benefits to which they otherwise would not be entitled, and otherwise conceal Defendants' other misconduct. Compl. ¶¶ 62, 70, 105, 112, 192.

70.    Defendants argue in response that Section 2.2(c) of the Management Agreements authorized the Patriarch Managers to amend the terms of the Zohar Funds' credit agreements and, therefore, none of their loan agreement amendments support the contract claim as a matter of law. Brief ¶ 90-91. However, the Patriarch Manager Defendants' power under Section 2.2(c) was expressly limited by their express obligations to comply with the Indentures. *See* Compl. ¶¶ 56, 189(a); Trzaskoma Decl. (D.I. 26), Ex. 2 § 2.2(c), 2.2(n). The Patriarch Manager Defendants' amendment authority was also circumscribed by their requirements under the Management Agreements and the Indenture to perform their obligations in accordance with their duty of care governing conflicts of interest, to not impair the Collateral, to not adversely affect the interests of the noteholders, and, perhaps most critically, to not take actions that they knew would cause an Event of Default under the Indenture. Compl. ¶¶ 40-41, 58-59, 63, 189(b), 189(d).

71.    Under New York law, when interpreting a contract, each provision must be read to give effect to each other provision. *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (App. Div. 4th Dep't 1996) ("Effect and meaning must be given to every term of the contract . . . , and reasonable effort must be made to harmonize all of its terms."). Thus, the Patriarch Manager Defendants' general authority to amend credit agreements did not eliminate their other express duties and obligations under the Management Agreements and Indenture. The Complaint alleges that the credit agreement amendments were not made in accordance with the Indenture or Defendants' other duties under Management Agreements. Compl. ¶¶ 104-21.

72.    Defendants' reliance on Section 7.7(a) of the Indenture and the SEC Decision is similarly misplaced. Section 7.7(a) acknowledges only that the Patriarch Managers may amend the credit agreements "so long as such amendment . . . does not contravene the

provisions of any Transaction Document or contravene any applicable law or regulation." Trzaskoma Decl. (D.I. 26), Ex. 3 (Indenture) § 7.7(a). The SEC Decision merely quotes Section 7.7(a)'s language from the Indenture and acknowledges the *limited* authority conferred under that provision. *See* SEC Decision at 19-20, 52.

### 2. The Complaint alleges breaches based on unauthorized loans

73. The Complaint states a breach of contract claim against the Patriarch Manager Defendants for causing the Funds to issue millions of unauthorized loans to the Portfolio Companies outside the time period permitted to make new loans absent MBIA's consent. Compl. ¶¶ 122-32.

74. Defendants argue in response that the contract claim should be dismissed because the Complaint does not identify the relevant provisions of the Management Agreements and because Section 2.2(c) of the Management Agreements authorized the Patriarch Managers to make loans without restriction. Brief ¶¶ 98-99. Both of these arguments fail.

75. The Complaint plainly alleges that the Patriarch Manager Defendants were required, and breached their obligation, to exercise their powers under the Management Agreement in accordance with the Indentures. Compl. ¶¶ 56, 189(a), 190(a). The Complaint also alleges that the Indentures restricted the time (to their respective Reinvestment Periods) during which the Zohar Funds could make or acquire loans without MBIA's express consent. Compl. ¶ 124 (citing Sections 9.6, 12.1, 12.3 and 16.1(b) of the Indentures). The Complaint further alleges that Defendants acknowledged these contractual restrictions, including the Patriarch Managers' obligation to seek MBIA's consent to make loans after the Reinvestment Period had closed. Compl. ¶ 124.

76. Additionally, for the reasons set forth above in paragraph 70, Defendants' argument that Section 2.2(c) precludes MBIA's contract claim similarly fails as applied to the

- 34 -

Patriarch Managers' unauthorized loans. *See supra* ¶ 70. Accordingly, the Complaint states a claim that Patriarch Manager Defendants breached the Management Agreements based on these unauthorized loans. Compl. ¶¶ 123-32, 191(c).

### 3. The Complaint alleges breaches based on failures to monetize Portfolio Company equity, siphoning of fees, diversion of sales proceeds, and self-dealing transactions

77.     The Complaint states a contract claim against the Patriarch Manager Defendants for refusing to monetize equity interests in the Portfolio Companies. Compl. ¶¶ 90-102, 191(e). The Patriarch Managers diverted to themselves or other Defendants Portfolio Company equity owned by the Insured Zohar Funds and proceeds received from the Portfolio Companies, including management consulting fees siphoned from the Portfolio Companies. *See id.* The Complaint also alleges that the Patriarch Manager Defendants entrenched their control over the Portfolio Companies through conflicted, self-dealing transactions such as the Governance Conveyances. Compl. ¶¶ 82-89, 191(f).

78.     Defendants first argue in response that the contract claim should be dismissed because the Complaint does not tie their refusal to monetize to any provision in the Management Agreements or allege specific facts regarding hypothetical Portfolio Company sales. Brief ¶¶ 101-02. The Complaint alleges that, pursuant to Sections 2.2 and 2.6 of the Management Agreements, the Patriarch Manager Defendants were required, and breached, their obligations not to, *inter alia,* (a) take actions they knew would cause Events of Default or actions that they knew or should have known would cause the Insured Zohar Funds to fail to pay outstanding amounts owed to the Class A Noteholders on the Zohar Note Maturity Dates or (b) materially and adversely affect the interests of the Class A noteholders (without giving effect to MBIA's Financial Guaranties). Compl. ¶¶ 56, 58-59, 189(b)-(d). Thus, the Complaint plainly identifies the contract provisions breached by the Patriarch Managers' refusal to monetize equity Collateral.

- 35 -

79. The Complaint also plainly alleges facts demonstrating how these provisions were breached. Defendants touted the Portfolio Company equity interests as Fund assets available to be monetized to avoid payment defaults, and their failure to so monetize caused the Zohar Funds' defaults and adversely affected the noteholders' interests in breach of the Patriarch Managers' duties. Compl. ¶¶ 78, 94-96. The Complaint further alleges that, in refusing to monetize the Portfolio Company equity, the Patriarch Manager Defendants acted in their own personal self-interest and violated Sections 2.4 and 6.2 of the Management Agreements, concerning conflicts of interests. Compl. ¶ 100; *see also id.* ¶ 189(d). These allegations plainly satisfy Rule 8, which does not further require MBIA to plead "specific facts" regarding which companies should have been sold, when they should have been sold, for how much, or the allocation of proceeds to each of the Insured Zohar Funds from company sales.

80. Defendants' contentions that Section 6.2 of the Management Agreements and their respective duties to each individual Zohar Fund in fact prevented them from timely monetizing the Portfolio Companies are galling and meritless. Brief ¶ 102. Section 6.2 of the Management Agreements did not provide the Patriarch Managers license to engage in conflicted transactions. Rather, as alleged in the Complaint and set forth above, Section 6.2(c) provided a standard of care with respect to Defendants' conflicts, which standard the Patriarch Managers breached in failing to monetize the Portfolio Company equity prior to each of the Note Maturity Dates. Compl. ¶¶ 63, 100.

81. Nor could the Patriarch Managers' duties to Zohar III possibly have excused them from fulfilling their duties to Zohar I or Zohar II. The Management Agreements required the Patriarch Managers avoid payment defaults by the Insured Zohar Funds, including by timely monetizing Portfolio Company equity, and to not take actions that would adversely affect the Insured Zohar Funds' noteholders' interests. The Zohar Funds were not cross-collateralized.

- 36 -

Defendants cite no legal or contractual authority for their position that the Patriarch Managers were permitted to, let alone supposed to, manage the Collateral for the purported benefit of all three of the Zohar Funds collectively. That is contrary to how each of the Zohar Funds were structured. The very notion that Defendants managed the Collateral for Zohar I (or Zohar II, as appropriate) for the benefit of noteholders to a different Fund, each of which had a different note maturity date and was governed by different Transaction Documents, is a stunning admission in and of itself that Defendants breached their contractual obligations and fiduciary duties to each of the respective Insured Zohar Funds. At minimum, whether Defendants' refusal to monetize equity was excused or permitted as they contend raises factual issues surviving this Rule 12(b)(6) motion. *See In re OODC*, 321 B.R. at 141 (question of whether estate paid in excess for company assets presented factual question not appropriately resolved on a motion to dismiss)).

82.    Defendants rehash these same failing arguments with respect to MBIA's claims regarding Defendants' conflicted, self-dealing transactions. Brief ¶ 108. The Complaint, however, plainly alleges that the Patriarch Managers improperly used the Governance Transactions to entrench their control over the Portfolio Companies in breach of Sections 2.2, 2.4 and 2.6 of the Management Agreements. Compl. ¶¶ 56, 58-59, 63, 81, 86-89, 189(b)-(d).

83.    Defendants next argue that the Management Agreements permitted them to siphon management consultant and other fees from the Portfolio Companies. Brief ¶¶ 103-05. The Complaint alleges that the Patriarch Manager Defendants' diversion of funds enriched Defendants and breached the Management Agreements' standards of care governing the Patriarch Managers' conflicts of interests. Compl. ¶¶ 90-93, 191(e). These actions triggered the Insured Zohar Funds' defaults, or reduced amounts payable by the Insured Zohar Funds on their Note Maturity Dates, causing MBIA's injuries. Compl. ¶¶ 1, 73, 86, 90, 95, 103, 192-95. Defendants' contentions that the services and fees payable to PPMG were appropriate and justifiable merely

- 37 -

raise issues of fact that cannot be resolved on a motion to dismiss. *See In re OODC*, 321 B.R. at 141.

84.     Lastly, Defendants argue that they did not in fact divert proceeds payable to the Insured Zohar Funds from the sales of Portfolio Companies HVEASI and Xpient. Brief ¶¶ 106-07. Specifically, Defendants contend that Tilton was the true owner of HVEASI, and that MBIA did not provide sufficient notice to Defendants that Xpient sale proceeds were misallocated. Brief ¶¶ 106-07. Defendants' arguments, however, ignore the well-pled factual allegations that the Insured Zohar Funds were entitled to sale proceeds, and that their diversion injured MBIA. Compl. ¶¶ 76, 101-02. These allegations, at minimum, create an issue of fact to be resolved only following discovery. *See In re OODC*, 321 B.R. at 141.

**E.     Defendants' Contractual Breaches Caused MBIA's Losses**

85.     As Defendants' Brief acknowledges, the Complaint alleges that the Patriarch Managers' various acts and omissions described in the Complaint and above proximately caused the defaults of the Insured Zohar Funds (in further breach of the Management Agreements) resulting in damages to MBIA. Brief ¶ 109 (citing Compl. ¶¶ 95, 192-95); *see also* Compl. ¶¶ 1, 73, 86, 90, 94, 96, 103, 105, 121, 132, 133, 143, 145, 167. These allegations are supported by facts and plead the contractual element of causation as required to state a contract claim. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

86.     Defendants nevertheless contend that the Complaint does not plausibly allege that their contractual breaches caused the Insured Zohar Funds' defaults. Specifically, Defendants argue that, given the Portfolio Companies' distressed condition, it is equally plausible to infer that the 2008 global financial crisis caused the Insured Zohar Funds' defaults. Brief ¶¶ 110, 113, 115. In addition, Defendants argue that the Complaint does not support an inference that any

- 38 -

of the Patriarch Managers' alleged misconduct hastened or caused the Insured Zohar Funds' defaults. Brief ¶¶ 111-12, 114. Neither argument passes muster.

87.    As an initial matter, Defendants misstate the law in asserting that the 2008 global financial crisis somehow imposes "a higher burden" on MBIA in establishing the element of causation. Brief ¶ 113; *see also id.* ¶ 115 (erroneously arguing that MBIA faces a "high bar necessary to plead a strong inference of causation"). None of the cases cited by Defendants support the proposition that a plaintiff asserting contract damages arguably impacted by the 2008 global recession (or any other economic calamity) faces a heightened pleading standard. *See* Brief ¶¶ 110, 113, 115.[13] Defendants' principal case, *Financial Guaranty* is unavailing. In that case, the Second Circuit held that plaintiff need not plead around alternative theories of causation to survive a motion to dismiss, noting that the question of whether the plaintiff's losses were caused by the complained-of conduct versus an intervening event, such as a global recession, "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.* at 404-05.

88.    Similar to the defendant in *Financial Guaranty*, Defendants cannot escape liability at the pleading stage by blaming the Insured Zohar Funds' respective defaults (in 2015 and 2017) on the 2008 global recession. This alternative theory of causation based on the 2008 recession gives rise to multiple issues of fact, requiring further discovery.

---

[13]    For example, in *Financial Guaranty Insurance Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 n.2 (2d Cir. 2015), the court confirmed that a plaintiff need not allege that its injury was caused solely by a defendant's breach for purposes of but-for causation, and then remarked in a footnote the simple truism that proving loss-causation as required on a securities fraud claim could be more difficult where the losses coincided with "a marketwide phenomenon causing comparable losses to other investors." In *United States v. Calderon*, 944 F.3d 72, 96 (2d Cir. 2019), the court held only that foreign banks were not "victims" under the Mandatory Victims Restitution Act because, pursuant to an analysis similar to loss-causation in the securities context, banks in fact happened to suffer loan defaults caused by global financial crisis, as opposed to defendant's fraud. In *Point Productions A.G. v. Sony Music Entertainment, Inc.*, 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002), the court merely confirmed that the contractual "but-for" causation standard applied to the claims at issue, rather than a "substantial factor" causation standard.

- 39 -

89.    Additionally, Defendants' attempt to pin causation on the 2008 recession ignores reality.  Defendants' conduct occurred many years after the effects of the crisis subsided. Compl. ¶¶ 73, 82, 84, 87, 93, 112-13, 120,127, 129.  Defendants also ignore that Tilton represented *in July 2009* that the "valuable equity" in approximately thirty Portfolio Companies was then "valued at many hundreds of millions."  Compl. ¶ 78.  Tilton's own representations to *this Court* similarly refute Defendants' arguments.  She represented in her First Day Declaration (referenced in the Complaint (¶ 178)) that the Portfolio Company equity had, as of *March 2018*, "tremendous value.  In fact, they [Portfolio Companies] are worth **billions** of dollars—far in excess of the amount owed to the Zohar Funds' noteholders."[14]  Thus, the alleged facts support a plausible inference that the Patriarch Managers' breaches — including the failure to monetize the valuable Portfolio Company equity — was a but-for cause of the Insured Zohar Funds' defaults.

## III.    THE COMPLAINT STATES CLAIMS FOR TORTIOUS INTERFERENCE

90.    Count II and Count III of the Complaint state claims against Tilton, Patriarch Partners, PPAS and the Patriarch Manager Defendants for tortious interference with the Indentures and the Insurance Agreements.  *See, e.g.*, Compl. ¶¶ 198-214.  Defendants misappropriated cash belonging to the Zohar Funds, improperly managed the Zohar loan Collateral for their own benefit, and attempted to take for themselves the valuable Portfolio Company equity rightfully belonging to the Insured Zohar Funds.  Through their tortious acts and omissions, Defendants enriched themselves while knowingly depriving the Insured Zohar Funds of assets they needed to make payments to noteholders as required on the Note Maturity Dates.

---

[14]    *See* First Day Decl., Case No. 18-10512 (Bankr. D. Del. Mar. 12, 2018), ECF No. 5.  Moreover, while the Court may take judicial notice of the recession itself, Defendants do not reference any allegations or supporting documents for its descriptions of the Portfolio Companies as "stressed and distressed" companies "hit . .  particularly hard" by the 2008 recession.  The Court should disregard unsupported facts which, in any event, are extraneous to the pleadings and create issues of fact.  Brief ¶ 111; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (extraneous facts should be disregarded).

- 40 -

91.     Defendants contend that Counts II and III are too vague to satisfy Rule 8. Brief ¶¶ 119-20.  The Brief's essential objection is that Counts II and III do not identify tortious acts individually performed by each of the five tortious interference Defendants, and that Counts II and III use similar language in describing Defendants' intentional tortious acts.  Brief ¶¶ 119-20. However, the Complaint does in fact attribute individual tortious acts to particular Defendants. *E.g.*, Compl. ¶ 8-12, 52, 73, 78, 80, 82, 84, 87, 91-94, 101, 113, 127-28, 130-32, 135, 142-43, 154, 156, 159-60, 162, 171-75.  More importantly, the five Defendants intentionally and improperly engaged in a *concerted* scheme at Tilton's direction to cause the Zohar Funds to breach their contractual obligations under the Indentures and Insurance Agreements.  *See, e.g.*, Compl., ¶¶ 1, 5-6, 8-10, 14, 52, 73-74, 88-89, 91, 93-95, 99-100, 104-05, 129, 132-34, 143-44, 149, 155, 160, 179 (allegations regarding Defendants' intentional, concerted scheme); *see also id.* ¶¶ 201-03 (specifying Indenture obligations which Defendants caused the Funds to breach), ¶¶ 210-11 (specifying Insurance Agreement obligations which Defendants caused the Funds to breach). Likewise, Patriarch Partners is the corporate entity through which Tilton and her affiliated Defendants carry out all of their legitimate and intentionally tortious business activities.  Compl. ¶ 10; *see also* Point IX, *infra*.  Thus, it makes sense and is perfectly appropriate to jointly allege facts with respect to these Defendants, and doing so does not constitute improper "group pleading." *See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 93 (Bankr. S.D.N.Y. 2010) (it is appropriate to refer collectively to certain defendants who acted jointly without repeating allegations as to each individual defendant).[15]

---

[15]   The cases cited by Defendants undermine, rather than support, their arguments.  Unlike the Complaint here, the pleading at issue in *Japhet v. Francis E. Parker Mem'l Home, Inc.*, No. 14-01206, 2014 WL 3809173 (D.N.J. July 31, 2014), was "devoid of facts" and employed blatant group pleading where the defendants were merely alleged to have undertaken "certain legal acts -- without more" detail.  *Id.* at *2.  Similarly, in *Atuahene v. City of Hartford*, 10 F. App'x 33 (2d Cir. 2001) (summary order), the

- 41 -

92.    Notwithstanding their purported inability to determine whether any of Defendants' alleged tortious acts "may have been privileged or justified," Defendants further contend that acts or omissions by Tilton, PPAS, and the Patriarch Managers—but not Patriarch Partners, LLC—were privileged because they purportedly undertook them as the Insured Zohar Funds' agents. Brief ¶ 121. Their argument should be rejected on the grounds that it misconstrues applicable law and ignores the Complaint's factual allegations. Defendants cite *First American Commercial Bancorp, Inc. v. Saatchi & Saatchi Rowland, Inc.*, 865 N.Y.S.2d 424 (App. Div. 4th Dep't 2008), for the bright-line principle that an agent cannot be held liable for inducing a principal to breach a contract with a third person. But Defendants ignore the case's express recognition that an agent *can* be held liable for inducing its principal to breach a contract with another if it "does not act in good faith and commits independent torts or predatory acts directed at another for [its own] pecuniary gain." *Id.* at 427-28.[16]

93.    The Complaint plainly alleges bad faith, independently tortious and predatory acts directed by Tilton and Defendants towards others for their own economic benefit. *See, e.g.*, Compl. ¶¶ 80-89 (conversion of the Zohar Funds' voting and equity control rights over the Portfolio Companies); 90-93, 101-02 (diversion and siphoning of distributions, assets, and

---

complaint "provid[ed] no factual basis to distinguish [the defendants'] conduct," and plaintiffs failed to address this issue when offered multiple opportunities to amend. *Id.* at 34.

[16]    *Accord Hoag v. Chancellor, Inc.*, 677 N.Y.S. 2d 531, 534 (App. Div. 1st Dep't 1998) (finding that a plaintiff had sufficiently stated a claim for tortious interference where the defendants "sought to oust [the plaintiffs] and deprive them of benefits, particularly incentive fees, 'with the malicious and improper purpose of seizing those benefits for themselves', since incentive fees, otherwise due, but not paid to plaintiffs, would be distributed to the individual defendants"); *see also Multibank, Inc. v. Access Glob. Capital LLC*, 72 N.Y.S. 3d 39, 42 (App. Div. 1st Dep't 2018) (affirming denial of motion to dismiss, finding tortious interference sufficiently pled where plaintiff contended that "[an affiliate] was not acting in [the company's] best interest when it inserted itself into the three-legged sale transaction and that it realized that doing so could invalidate the insurance policy"); *In re Cocolicchio*, 800 N.Y.S.2d 344 (Table), 2005 WL 689493, at *5 (Sup. Ct. N.Y. Cty. Mar. 8, 2005) ("[Tortious interference with contract] may be stated as against corporate officers or shareholders . . . who are alleged to have interfered with a corporate contract and a third party or parties for their own gain.").

proceeds from sales of Portfolio Companies); 104-21 (improperly conflicted modification of Credit Agreements, including extension of loan principal repayment deadlines); 122-31 (embezzlement of purported loans from Zohar Funds and Portfolio Companies); 133-44 (miscalculation of the Overcollateralization Ratio).

94.     Defendants also wrongly claim that the economic interest doctrine bars MBIA's claims for tortious interference.  Brief ¶¶ 122-25.  As Defendants' Brief concedes, that doctrine only applies where a defendant can demonstrate that it acted to protect its own legal or financial stake in the breaching party's business.  *See* Brief ¶¶ 123 (citing *Foster v. Churchill*, 665 N.E.2d 153, 157 (N.Y. 1996) (economic interest privilege applied where there was lack of evidence that defendant's "actions advanced to serve some personal interest")).  Significantly, third parties alleged to have interfered with a contract to protect their ***personal*** economic interests—as opposed to legitimate business interests in an affiliated contracting party—are not protected by the economic interest doctrine.  *See Wells Fargo Bank, N.A. v. ADF Operating Corp.*, 855 N.Y.S. 68, 69 (App. Div. 1st Dep't 2008) (economic interest privilege did not apply to defendants who sold ownership stake in breaching restaurant business to enrich themselves to business's detriment); *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 484 (E.D.N.Y. 2012) (financial harm to distributors that would result from fulfilling purchase contract with affiliated seller did not justify interference with contract).

95.     MBIA's Complaint makes clear that Defendants caused the Zohar Funds' breaches of the Indentures and Insurance Agreements to protect their own direct ***personal*** economic interests to the detriment of the Insured Zohar Funds and other Secured Parties, and ***not*** to protect or advance the Funds' interests.  *See supra* ¶¶ 18-21, 56; *see also, e.g.*, Compl. ¶¶ 6, 14, 74, 91, 95, 100, 109, 113.  These allegations state a claim for relief.  *See Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc.*, No. 09 Civ. 5580, 2011 WL 3962515, at *6 (S.D.N.Y. Sept. 7,

- 43 -

2011) (Since a motion to dismiss only addresses the sufficiency of the pleading, generally "[i]t is improper for the Court to make a determination at this juncture as to the economic interest defense").

## IV.    THE COMPLAINT STATES CLAIMS FOR FIDUCIARY DUTY AND FAITHLESS SERVANT

96.    Count V and Count VII of the Complaint state claims against Tilton, PPAS, and the Patriarch Manager Defendants for breach of fiduciary duty and faithless servant.  Compl. ¶ 227-35, 246-48.  Defendants abused their positions of trust and control at the Insured Zohar Funds to amend Credit Agreements to benefit themselves at the expense of the Insured Zohar Funds, entrench their control over and ultimately steal the Insured Zohar Funds' equity Collateral, and conceal their wrongdoing from others.  Count VI states a claim against Patriarch Partners, the Octaluna Entities, PPMG, ARK, and AIP for aiding and abetting the breaches of fiduciary duties alleged in Count V.  *See* Compl. ¶¶ 236-45.  Defendants' arguments in response do not justify dismissal.

97.    As alleged in the Complaint, Tilton is a registered investment advisor in which the Zohar noteholders reasonably placed their trust and confidence to responsibly manage the Zohar Collateral.  Compl. ¶¶ 8-9, 231, 240.  The Patriarch Manager Defendants likewise provided investment and advisory services to the Insured Zohar Funds, for the benefit of the noteholders who reasonably and completely placed their trust in the Patriarch Managers to manage the Collateral.  Compl. ¶¶ 228, 238.  PPAS was an agent for the Zohar Funds in their capacity as lenders to the Portfolio Companies and in connection with loans that served as the Collateral held for the benefit of the noteholders.  Compl. ¶¶ 14, 239.  Thus, Tilton, the Patriarch Managers, and PPAS were fiduciaries for and faithless servants of the Zohar Funds and noteholders.

98.     MBIA brings fiduciary duty and faithless servant claims in its capacity as a subrogated noteholder of the Zohar Funds. Compl. ¶¶ 232, 235, 246-48. Relying on *Oddo Asset Management v. Barclays Bank PLC*, 973 N.E.2d 735 (N.Y. 2012), Defendants argue that the Zohar noteholders were not owed fiduciary duties. Brief ¶ 136. As the New York Court of Appeals recognized in *Oddo*, however, the determination of the existence of a fiduciary relationship is "necessarily fact specific," and the facts that led to the court's conclusion in *Oddo* are materially different than those alleged in MBIA's Complaint. *See Oddo*, 973 N.E.2d at 740 (quoting *EBC I, Inc. v Goldman, Sachs & Co.*, 832 N.E.2d 26, 30 (N.Y. 2005)). For instance, the *Oddo* court relied on the absence of direct "dealings" and "communications" between the noteholders and the asset manager in *Oddo*. Here, in contrast, as alleged in the Complaint and admitted by Tilton in other pleadings, Defendants regularly interacted and communicated with MBIA and the other Zohar noteholders regarding the Zohar Collateral. *See* Compl. ¶¶ 78, 80; *see also* SEC Decision at 21-22; Equitable Subordination Complaint, *Tilton v. MBIA Inc.*, Case No. 19-50390-KBO (Bankr. D. Del. Nov. 12, 2019), ECF No. 7, ¶¶ 95, 97, 102-03, 119, 136-37.[17]

99.     It would be inappropriate to dismiss MBIA's fiduciary duty and faithless servant claims against Tilton, PPAS, or the Patriarch Managers at the pleading stage. *See St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 166-69 (E.D.N.Y. 2010) (denying motion to dismiss fiduciary duties because "the existence of a fiduciary relationship is determined on a case-by-case basis, and requires a fact-specific inquiry implicating all the circumstances and conduct relevant to understanding the parties' relationship"); *see also Veleron Holding B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 455 (S.D.N.Y. 2015) (issue of fact regarding agent-principal

---

[17]   Courts "may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005).

- 45 -

relationship, "an *inherently fiduciary* arrangement," barred summary judgment notwithstanding contract's express disclaimers of fiduciary duties (emphasis added)); *EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (existence of a fiduciary relationship is necessarily a "fact-specific" inquiry and not properly decided on a motion to dismiss "where the complaining party sets forth allegations that, apart from the terms of the contract, the [parties] created a relationship of higher trust than would arise from the . . . agreement alone").

100.    In addition to alleging facts establishing fiduciary duties owed by Defendants and their agency relationship with the Zohar Funds, the Complaint adequately alleges breaches thereof and faithless conduct.  Defendants' claim that Count V does not meet Rule 8's pleading standards fails for the same reasons that their argument failed with respect to MBIA's tortious interference claims.  *See supra* ¶ 91.  Indeed, the Complaint has adequately alleged actions taken by Defendants, both individually and collectively, in bad faith and in violation of the trust and confidence placed in them by MBIA in its capacity as a subrogated noteholder.  Compl. ¶¶ ¶¶ 80-85, 87, 90, 93, 101-02, 104, 107-20, 129-32, 133, 143 (identifying improper transfers of cash, debt and equity assets and interests from the Funds, for Defendants' own personal benefit and to the detriment of noteholders).  The Complaint has, therefore, placed Defendants on notice of the actions that form the basis of its claims.  Further, because the Complaint states a valid claim for breach of fiduciary duty, the Court should reject Defendants' arguments that the aiding and abetting and faithless servant claims cannot be sustained without a similar and predicate fiduciary duty cause of action.  Brief ¶¶ 144, 148.

101.    Defendants' argument that Counts V-VII of the Complaint are duplicative of Count I should also be rejected.  MBIA's claims for breach of fiduciary duty, aiding and abetting, and faithless servant are distinct from and properly pled alongside MBIA's breach of contract claim.  As an initial matter, Tilton and PPAS were not parties to the Management

- 46 -

Agreements, and MBIA is not asserting breach of contract claims against them. In any event, Counts V, VI, and VII survive as against all named Defendants because "[t]he same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." *Grund v. Del Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 226, 250 (S.D.N.Y. 2011); *see also Lavastone Capital. LLC v. Coventry First LLC*, Nos. 12-cv-7139, 14-cv-7967, 2015 WL 1939711, at *11-12 (S.D.N.Y. Apr. 22, 2015).

102.    For each of MBIA's fiduciary duty and faithless servant claims, the Complaint alleges that Defendants breached a duty extrinsic to the Transaction Documents and that this misconduct and violation of trust resulted in damages to MBIA. *See* Compl. ¶¶ 4, 5, 8-9, 11-14, 39, 154, 158, 165, 229-31, 238-40 (alleging existence, and Defendants' violation, of fiduciary duties); ¶¶ 246-48 (same, regarding faithless servant claim); ¶¶ 8, 10, 15-19, 84-85, 87, 91-93, 111, 113, 140, 162-63, 166, 236-37, 242, 244 (alleging aiding and abetting Defendants' active role in and benefits received from scheme to steal valuable rights and property from the Zohar Funds); ¶¶ 233, 241 (alleging Defendants' fiduciary duties of loyalty). Accordingly, the Complaint adequately alleges these claims in a permissible, non-duplicative fashion along with the contract claims. *See Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 261 (E.D.N.Y. 2014) (whether or not breach of fiduciary duty and contract claims were duplicative presented disputed question of fact); *Lavastone*, 2015 WL 1939711, at *11-12 (breach of fiduciary duty and unjust enrichment claims were not duplicative of contract claims); *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007) (same, regarding aiding and abetting breach of fiduciary claim).

## V.    THE COMPLAINT STATES A CLAIM FOR DECLARATORY JUDGMENT

103.    Count IV seeks declarations that MBIA is the beneficial and equitable owner of all of the Portfolio Company equity issued in the name of Zohar I, without any restrictions

- 47 -

or limitations imposed thereon as a result of Defendants' conflicted self-dealing transactions, including the Governance Conveyances and the November 2017 Written Consents.  Compl. ¶ 226(a)-(d).

104.    Defendants argue that MBIA's declaratory judgment claim should be dismissed on the grounds that it is "partially moot" and that MBIA lacks standing to seek and is not entitled to a declaration that the 2017 Written Consents are invalid.  Dismissal is not warranted on these grounds.

105.    There is no legitimate basis to dismiss Count IV based on the Court's March 30, 2020 order, which declared that the Zohar Funds are the "legal and beneficial owners of the equity or membership interests" in the Portfolio Companies from the date of the Court's Order. *See* Order ¶ 3.  As the Complaint alleges, and Defendants concede (Brief ¶ 150), the Court's March 30 Order only "partially" addresses the parties' dispute regarding ownership of the Portfolio Company equity.  So long as Defendants maintain that Tilton was the legal and beneficial owner of the disputed equity prior to and until the Court's March 30 Order, there exists an actual controversy between the parties on this point.  Compl. ¶ 220.

106.    Additionally, it would be premature to dismiss, as against the Patriarch Entities or with respect to ▮▮▮▮▮▮▮ MBIA's request for a declaration invalidating the 2017 Written Consents given the allegations regarding Defendants' wrongdoing.  In the Zohar I auction, MBIA acquired all of the Zohar I Collateral, including LLC membership interests in ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ which Defendants improperly restricted through their conflicted 2017 Written Consents.  As alleged in the Complaint, Defendants concealed from MBIA and the Insured Zohar Funds the true nature of their equity holdings (Compl. ¶¶ 79-80), and all of the Defendants, including the Patriarch Entities, engaged in self-dealing transactions restricting the Insured Funds' control over the governance of the Portfolio Companies.  Compl. ¶¶ 81-87.  Thus, MBIA has

- 48 -

alleged sufficient facts to adduce evidence of which Defendants executed the 2017 Written Consents in violation of applicable law in support of its request for a declaration of invalidity.

107.    In any event, Defendants do not challenge MBIA's claim for a declaratory judgment with respect to the Governance Conveyances, and, at minimum, that claim should proceed against all Defendants.

## VI.    THE COMPLAINT STATES A CLAIM FOR CONVERSION

108.    Count VIII of the Complaint states a claim against all Defendants for conversion. *See* Compl. ¶¶ 255-60. Defendants improperly and intentionally interfered with cash and equity, including the voting rights and other interests associated with Portfolio Company equity, by diverting Portfolio Company sales proceeds to themselves and executing transactions designed to transfer governance and control over the Portfolio Companies from MBIA and the Zohar Funds to Defendants.

109.    Defendants' notice pleading argument fails here for the same reasons that Rule 8 does not require dismissal of MBIA's other claims. *See supra* ¶¶ 47-51, 91, 100. The Complaint adequately alleges that, for years, Tilton and the other Defendants together embarked on a stunning campaign of theft and self-dealing that wrongfully and unlawfully transferred hundreds of millions of dollars and other rights and equity interests from MBIA and the Zohar Funds to line Defendants' pockets. *E.g.,* Compl. ¶¶ 127-32 (PPAS embezzles loan funds); 104-16, 133, 143-44 (Patriarch Managers conceal and misrepresent Collateral information to improperly receive fees); 101-02 (Tilton diverted proceeds from sales of certain Portfolio Companies); 79-93, 179-80 (Tilton, PPMG, the Patriarch Managers and Octaluna Entities misappropriate and misuse Portfolio Company distributions, fees and control rights acquired using Fund assets). Rule 8 does not require MBIA to reprint these *well-pled factual allegations* (already incorporated by reference into the cause of action) in Count VIII.  Further, the Complaint pleads

- 49 -

specific and identifiable converted funds. *See, e.g.*, Compl. ¶¶ 90, 92-93, 97-98, 101, 108-09, 124-26, 132; *see also Obeid v. Mack*, No. 14CV6498-LTS-HBP, 2016 WL 1069678, at *4 (S.D.N.Y. Mar. 17, 2016); *Lemle v. Lemle*, 939 N.Y.S.2d 15, 18-19 (App. Div. 1st Dep't 2012); *Pokoik v. Gittens*, 567 N.Y.S. 2d 49, 49-50 (App. Div. 1st Dep't 1991).

110.    The Complaint has also stated a claim with respect to Defendants' diversion of Portfolio Company sales proceeds and PPMG management consulting fees. Defendants contend that conversion of fees and sales proceeds does not support MBIA's conversion claim because neither the sale proceeds nor PPMG fees belong to MBIA. Brief ¶ 156. The Brief cites nothing in support of this factual assertion, and its argument improperly assumes the answer to the ultimate issue of fact to be determined—did certain amounts rightfully belong to MBIA at the time they were improperly withheld by Defendants? MBIA is, after all, entitled to directly receive certain Portfolio Company loan payments and equity sales proceeds as the beneficial owner of assets acquired in the Zohar I auction. Compl. ¶¶ 76, 161-66, 250. Separately, MBIA is entitled to receive these payments in its capacity as a subrogated noteholder of the Insured Zohar Funds. Compl. ¶¶ 147, 250. Whether MBIA is entitled to certain amounts in its capacity as the owner of the Zohar I Collateral or subrogated noteholder (or not at all) cannot be resolved on a Rule 12(b)(6) motion.

111.    Count VIII further states a claim for conversion of equity rights and interests. Notwithstanding Defendants' broad claim that "intangible" property is "simply not amenable" to conversion, recent New York case law demonstrates that, in fact, "intangible property may be subject to conversion when represented by a tangible manifestation, such as an electronic or paper record." *Harris v. Coleman*, 863 F. Supp. 2d 336, 345 (S.D.N.Y. 2012) (motion to dismiss conversion claim denied in light of "growing trend" that intangible property may serve as a "proper subject[] of a conversion claim"); *see also Thyroff v. Nationwide Mut. Ins. Co.*, 864

- 50 -

N.E.2d 1272, 1278 (N.Y. 2007) (electronic computer records were subject to a claim of conversion).[18] The converted "equity rights and interests" at issue, including the voting and control rights concomitant with the Portfolio Company equity interests, are embodied in limited liability company agreements, amendments thereto, stock certificates, purported proxy agreements, and other electronic and paper records. *See, e.g.*, Compl. ¶¶ 75-77, 83-85, 87-88, 93, 128-29, 179.

112.    Defendants' contention that MBIA's conversion claim is duplicative of the breach of contract claim fails for the same reasons stated herein with respect to Counts V-VII, IX. *See supra* ¶¶ 101-02, *infra* ¶ 114. The Court should thus deny Defendants' request to dismiss Count VIII.

## VII.    THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT

113.    Count IX of the Complaint states a claim for unjust enrichment against all Defendants. Compl. ¶¶ 255-60. The Complaint alleges unjust enrichment in various forms, such as: lien priority to ARK and AIP under the Portfolio Company credit agreements; unearned fees to the Patriarch Entities; dividends, distributions, and sales proceeds on Portfolio Company equity interests owned by MBIA and the Insured Zohar Funds; Tilton's wrongful ownership and control over equity interests; favorable tax benefits; and other valuable rights in the Portfolio Companies. Compl. ¶ 257.

114.    Defendants do not seek dismissal of this claim under Rule 8. Rather they argue only that MBIA's unjust enrichment claim "is precluded by the existence of contracts

---

[18]    The cases cited by the Defendants are not to the contrary. Brief ¶ 158. For example, in *Saleeby v. Remco Maint., LLC*, 50 N.Y.S.3d 330, 331-32 (App. Div. 1st Dep't 2017) the court did not even consider whether the interests at issue in that case were represented by a tangible manifestation. *See id.* at 570-71. And the decision in *LaMonica v. Ceva Grp. Plc. (In re CIL Ltd.)*, 582 B.R. 46 (Bankr. S.D.N.Y. 2018), supports MBIA's position, not Defendants', as the court in that case recognized a "well-settled" exception where an intangible property right can be united with a tangible object for conversion purposes, such as a stock certificate for the ownership of a share of stock." *See id.* at 113.

governing the subject matter of the claim." Brief ¶ 160.  As an initial matter, MBIA's unjust

enrichment cause of action is not duplicative of Count I.  Count IX is not limited to the Defendants,

misconduct and time periods at issue in MBIA's claim for breach of the Management Agreements.

*See* Compl. ¶¶ 255-60; *see also* Brief ¶ 78.  Additionally, Defendants have not established whether

New York or Delaware law applies to preclude Count IX, or why, in light of the "various written

agreements" purportedly governing the subject matter of the claim, including the Portfolio

Company Credit Agreements, the Insurance Agreements and Financial Guaranties, the Indentures,

and the LLC Agreements.  Brief ¶ 160.[19]  To the extent that Delaware law governs Count IX—

either in whole or in part—Defendants' motion on this point may be denied out of hand.  *See*

*Emerald Cap. Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft*, (*In re FAH*

*Liquidating Corp.)*, 572 B.R. 117, 131 (Bankr. D. Del. 2017) ("It is also well established that a

plaintiff may plead alternative claims for relief even where the pleading contains claims for breach

of contract and unjust enrichment.").  To the extent that New York law governs, Defendants'

argument also fails.

      115.    Defendants cite *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing,*

*Inc.*, 837 F. Supp. 2d 162, 203 (S.D.N.Y. 2011), in favor of precluding Count X while ignoring

the split among New York courts as to when and whether preclusion is appropriate. *See, e.g., Lee*

*v. Kylin Mgmt. LLC*, No. 17-cv-7249, 2019 WL 917097, at *2 (S.D.N.Y. Feb. 25, 2019) (collecting

cases).  In *Lee*, a post-*Ellington* decision, the court thoughtfully addresses this split in New York

---

[19]   Delaware law should govern with respect to allegations regarding Defendants' misappropriation of and wrongful assertion of ownership and interference with equity interests in Delaware Portfolio Companies. *See* Compl. ¶¶ 75-93, 172-78; *see also Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1211, 1213 (Del. Ch. 2010) (applying the internal affairs doctrine, noting that "Delaware courts have a significant and substantial interest in overseeing the conduct of corporate fiduciaries"); *Xcell Energy & Coal Co. v. Energy Inv. Grp., LLC*, No. 8652-VCN, 2014 WL 2964076, at *5 (Del. Ch. June 30, 2014) (Delaware applies the internal affairs doctrine to limited liability companies).  Defendants have not demonstrated which body of law governs their motion to dismiss MBIA's unjust enrichment claim. Nor have they demonstrated that dismissal is appropriate under either Delaware or New York law.

authority and explains why the better-reasoned decisions are those holding that "the mere existence of a written contract governing the same subject matter does not preclude" an unjust enrichment claim on the same subject matter. *Id.* As the court in *Lee* noted, courts that elect *not* to preclude unjust enrichment claims are "more consistent with precedent from the New York Court of Appeals, which recognized an unjust enrichment claim brought against a third party despite a related contract . . . and has not closed the door on such claims since." *Id.* (citing *Bradkin v. Leverton*, 257 N.E.2d 643 (N.Y. 1970); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009)).

116.    More importantly, *Lee* recognizes the sound logic in permitting both contract and unjust enrichment claims to survive as alternative claims for relief. *Id.* at *3. Indeed, preclusion often produces "an unfair result" of immunizing a defendant for receiving ill-gotten gains, notwithstanding the lack of a contract between a plaintiff and recipient of unjustly received funds. *Id.* Preclusion would also "create a perverse incentive for closely held companies that are parties to a contract to transfer the moneys owed on a contract to their principals." *Id.*

117.    This problem identified by *Lee* is precisely the reason why Defendants' request for preclusion should be denied here. It would immunize Tilton and her affiliates from their receipt of ill-gotten gains, including from the contracting Patriarch Manager Defendants, potentially leaving MBIA with no viable remedy. This Court should decline to dismiss Count IX at this early stage, particularly where doing so would produce an unjust result. At minimum, the Court can reassess whether or not any aspects of MBIA's claims are duplicative at summary judgment based on the evidence adduced.

## VIII.    THE COMPLAINT STATES A CLAIM FOR MALICIOUS PROSECUTION

118.    Count X of the Complaint states a claim against Tilton and Patriarch XV for Malicious Prosecution based on (a) Tilton and Patriarch XV Defendants' filing and prosecution

- 53 -

of the SDNY Bankruptcy and (b) Tilton's filing, prosecution, and appeal of counterclaims and third-party claims in the Delaware 225 Action in the Delaware Court of Chancery. Compl. ¶¶ 261-63.

119.    Defendants seek dismissal of this Count on grounds of untimeliness, solely to the extent it is based on the SDNY Bankruptcy, and on the merits in all respects. Brief ¶¶ 162-83. Because the Complaint has adequately alleged facts supporting the claim, and Defendants' response merely gives rise to factual disputes, dismissal here is inappropriate.

120.    Count X is not time-barred. Notwithstanding Defendants' unsupported assertion that the SDNY Bankruptcy was "completely resolved" in February 2016 (Brief ¶ 167), issues of fact remain as to when precisely the SDNY Bankruptcy proceedings terminated and, thus, when MBIA's malicious prosecution claim accrued. Although MBIA's and Zohar I's motions to dismiss the Involuntary Petitions were resolved in MBIA's favor in February 2016, MBIA does not allege—and Defendants do not conclusively demonstrate—when the New York bankruptcy proceedings terminated for purposes of calculating any applicable statute of limitations period. *See JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 404 B.R. 767, 779 (Bankr. D. Del. 2009) (dismissal is improper unless noncompliance with applicable limitations period is clear from the face of the complaint).[20]    Indeed, MBIA is not aware of any order or judgment in the SDNY

---

[20]    Defendants' arguments that certain aspects of MBIA's other claims may be untimely to the extent they rest on conduct occurring outside applicable limitations periods similarly raise issues of fact that cannot be resolved on the face of the Complaint and, therefore, fail. *See* Brief at 52 n.13, 61 n.15. For example, discovery and factual development is required to determine when MBIA discovered Defendants' misconduct, whether Defendants' misconduct occurred outside any applicable limitations period, and whether any time deadlines were tolled, particularly given the Complaint's allegations that Defendants actively concealed from MBIA the Zohar Funds' true assets and Defendants' wrongdoing. Compl. ¶¶ 5, 74, 79-80, 90, 105, 115, 129, 130-32, 144, 252; *see also Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) ("a complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense"); *Drennan v. PNC Bank, NA (In re Cmty. Bank of N. Va.)*, 622 F.3d 275, 301-02 (3d Cir. 2010), as amended (Oct. 20, 2010) ("tolling is not generally amenable to resolution on a Rule 12(b)(6) motion" because it "requires consideration of evidence beyond the pleadings"); *Abound Solar Tech. Holdings, LLC v. Great Am. Grp., LLC (In re Abound Solar Mfg., LLC)*, 547 B.R. 611, 620

Bankruptcy terminating those proceedings as of a particular date, let alone that termination occurred within one year of the parties' agreement to toll all causes of action in connection with the Zohar Funds as of May 21, 2018. *See* Compl. ¶ 181; *see also* Case Docket, No. 15-23680-RDD (Bankr. S.D.N.Y.) (court submission made by counsel for Patriarch XV on March 10, 2017); Compl., Case No. 19-50273-KBO (Bankr. D. Del. July 12, 2019), ECF No. 1 (complaint filed by certain creditors of Zohar I referencing unresolved motion for fees filed in the New York bankruptcy court pursuant to 11 U.S.C. § 303(i)).[21]

121.   Fact issues also preclude dismissal of Count X on the merits. As alleged in the Complaint, Defendants served MBIA with a motion to terminate Zohar I's exclusive period to submit a plan of reorganization, as well as discovery and other pleadings and submissions in the SDNY Bankruptcy proceedings. Compl. ¶ 149. That made sense (both at the time, and now). MBIA was the senior creditor of Zohar I and the real party-in-interest in the SDNY Bankruptcy. Compl. ¶ 149. MBIA also filed submissions supportive of dismissal of the SDNY Bankruptcy and, with the express authorization of the bankruptcy court due its status as a party-in-interest, actively participated in the February 2016 contested evidentiary hearing. Compl. ¶ 149; *see also* No. 15-23680-RDD (Bankr. S.D.N.Y.), ECF No. 31. Thus, Defendants' contention that MBIA was not a party for standing purposes, at most, gives rise to an issue of fact for further discovery.[22] Defendants do not contest MBIA's status as a party to the Delaware 225 Action.

---

(Bankr. D. Del. 2016) (motion to dismiss denied because limitations defense raised "question of fact that has not been developed at this stage of the proceedings"); *Industrial Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn Holding Co.)*, 484 B.R. 25, 44 (Bankr. D. Del. 2012) (statute-of-limitations defense denied where factual development needed to assess grounds for equitable tolling).

[21]   MBIA does not oppose Defendants' motion to dismiss Count XI (Abuse of Process) on grounds of timeliness.

[22]   Defendants' reliance on *Silver v. Mendel*, 894 F.2d 598, 604 (3d Cir. 1990) is misplaced, as that case interpreted standing under a Pennsylvania statute inapposite here.

- 55 -

122.    The Complaint adequately alleges that Defendants commenced the SDNY Bankruptcy and prosecuted and appealed claims in the Delaware 225 Action without probable cause. Compl. ¶¶ 148-53. Defendants wrongly contend that MBIA alleges that Defendants put Zohar I into bankruptcy "to protect the Fund and other stakeholders" (Brief ¶ 172). The Complaint in fact alleges that Defendants commenced the SDNY Bankruptcy by filing the Involuntary Petitions in express violation of the Indentures and with the specific and improper purpose of frustrating MBIA's and the Funds' exercise of contractual and legal remedies. Compl. ¶¶ 149-51. Defendants' contention that they commenced the SDNY Bankruptcy on counsel's advice (Brief ¶ 172) merely raises an issue of fact regarding whether Defendants disclosed all relevant facts to said counsel, including with respect to their bogus, bad faith plan for reorganization and ultimate withdrawal of the Involuntary Petitions. Compl. ¶¶ 152-53; *see also Restatement (Third) of Torts: Liability for Economic Harm* § 25 cmt. e (2019) (party asserting advice of counsel defense bears burden of proof and must show it disclosed all relevant facts to counsel). Tilton's prosecution and appeal of counterclaims and third-party claims in the Delaware 225 Action were similarly baseless and conducted without probable cause and in bad faith. Compl. ¶ 173. The Delaware Court of Chancery confirmed as much when it determined that Tilton's "revisionist" litigation positions were in "clear violation" of the Indentures and Tilton's prior written acknowledgment of the Zohar Funds' ownership of Portfolio Company equity. *Id.* Defendants' self-serving characterizations of their motivations and the court's rulings are not relevant to this 12(b)(6) motion, and certainly do not overcome the Complaint's allegations.

123.    The SDNY Bankruptcy and Delaware 225 Action were terminated in MBIA's favor. Defendants claim that Patriarch's withdrawal of the Involuntary Petitions does not qualify because there was no order finding in MBIA's favor. Brief ¶ 173. Defendants cite no law for this assertion, and ignore the bankruptcy court's March 28, 2016 order dismissing the

- 56 -

Involuntary Petitions—the very relief MBIA sought in its submissions in support of Zohar I's motion to dismiss the Involuntary Petitions, which MBIA litigated in the contested evidentiary hearing. Compl. ¶¶ 152-53; *see also* Order, Case No. 15-23680-RDD (S.D.N.Y. Mar. 28, 2016), ECF No. 53. Similarly, the Delaware Court of Chancery's trial opinion adjudicated Tilton's counterclaim for a declaratory judgment in favor of MBIA when it rejected all of Tilton's stated grounds for equity ownership. Compl. ¶ 173. Defendants' stated facts to the contrary do not provide grounds for dismissal at the pleading stage.

124.    The Complaint adequately alleges that Defendants brought and prosecuted the litigations at issue with malice. It is well-established that malice may be pled "generally." Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"); *Fortunato v. City of N.Y.*, 882 N.Y.S.2d 195, 196 (App. Div. 2d Dep't 2009) (malice can be inferred from lack of probable cause). Defendants' malice in filing and prosecuting the SDNY Bankruptcy may be inferred from allegations regarding Tilton's intent to hinder and delay MBIA's exercise of rights, Defendants' bogus plan for reorganization, and Defendants' prompt reversal and withdrawal from bankruptcy when presented with the possibility of court oversight. Compl. ¶¶ 149-53. Defendants' proposed alternative motivation for commencing the SDNY Bankruptcy (Brief ¶ 174) merely raises a fact issue regarding whether Defendants' actions evidence a legitimate bankruptcy purpose versus malicious intent to hinder MBIA's recoveries. *Cf. Restatement Third of Torts: Liability for Economic Harm* § 24 cmt. d (suit may be brought for improper purpose even when party who initiates it believes suit has legal merit). With respect to the Delaware 225 Action, Tilton's malice may be inferred from allegations that Tilton reversed her positions with respect to ownership of Portfolio Company equity multiple times over the years, was aware her litigation positions were meritless, had taken steps in advance of the litigation to entrench her control over the Portfolio Companies, and intentionally appealed the court's trial

- 57 -

opinion with the intended purpose of staying it through the present Zohar bankruptcy proceedings. Compl. ¶¶ 173-75. These allegations are sufficient to overcome Defendants' motion to dismiss. *See Winshall v. Viacom Int'l, Inc.*, No.: N15C-06-137 EMD CCLD, 2019 WL 960213, at *16 (Del. Super. Ct. Feb. 25, 2019) (malice requires prosecuting litigation with any purpose other than the adjudication of a claim); *Intershoe , Inc. v. Filanto S.P.A.*, 97 F. Supp. 2d 471, 476 (S.D.N.Y. 2000) (same).

125.    Finally, the Complaint adequately alleges special injury resulting from Defendants' bad faith and malicious litigations. In addition to the expenses and costs of litigation incurred in connection with the SDNY Bankruptcy proceedings, MBIA incurred concrete harm in the form of delay, and loss of ability to enforce its contract and legal rights. Compl. ¶¶ 149-50; *see also Engel v. CBS, Inc.*, 711 N.E.2d 626, 631 (N.Y. 1999) (special injury requirement refers to a "concrete harm" in addition to the typical costs and demands of defending a lawsuit).[23] Likewise, as a result of the Delaware 225 Action, MBIA was further delayed from monetizing the Portfolio Companies while Tilton dragged out litigation through trial and appeal. Compl. ¶¶ 173-74, 177-78, 262-63. Once again, Defendants' assertions regarding what injuries MBIA incurred in addition to its litigation costs raise factual issues that cannot be resolved at this stage and do not support dismissal.

## IX.    THE COMPLAINT STATES CLAIMS AGAINST ALL DEFENDANTS

126.    Defendants seek to dismiss claims against Defendants LDI and Zohar Holding—pass-through entities and holding companies for Tilton's web of affiliated LLC

---

[23]    Neither of Defendants' cited authorities refute the Complaint's allegations that Defendants' misuse of a bankruptcy stay caused special damages. *See In re Nicholas*, 457 B.R. 202, 216 (Bankr. E.D.N.Y. 2011) (plaintiff merely alleged "'immense grief, worry, expense, injury health, and wasted time'"); *Wilhelmina Models, Inc. v. Fleischer*, 797 N.Y.S.2d 83, 85 (N.Y. App. Div. 2005) (special damages element inadequately pled where injury was inflicted on party other than plaintiff).

Defendants. *See* Brief ¶¶189-91; Compl. ¶¶ 20-21. According to Defendants, claims against these entities must be dismissed because the Complaint fails to allege an alter ego theory of liability that would permit naming these two entities as Defendants. Brief ¶ 190. Defendants are wrong.

127.    The parties agree that *Varbero v. Belesis*, No. 20-CV-2538, 2020 WL 5849516 (S.D.N.Y. Oct. 1, 2020), the principal case relied on in Defendants' Brief, is instructive. In that case, the court held that one of multiple pass-through limited liability company entities affiliated with and controlled by two individuals was properly named as a defendant on an alter-ego theory of liability. *Id.* at *4-5. Significantly, the court denied a motion to dismiss claims against that pass-through defendant, rejecting the defendants' argument that the complaint must plead "specific details about the corporate formalities observed" by the LLC entity. *Id.* at *5. Allegations that the LLC pass-through entity was "solely owned and controlled" by individuals who likewise controlled the other LLC participants in the scheme were adequate for the court to reasonably infer that the various LLC entities were not operated independently from individual defendants, "but rather served as a vehicle" to further the defendants' wrongful scheme. *Id.*

128.    The similarities between the allegations in *Varbero* and the facts alleged here are striking. Like the individual defendants in *Varbero*, Tilton is alleged to have controlled a web of affiliated LLC entities that she used in an elaborate scheme to enrich herself and conceal the payments, rights, and interests wrongfully taken from others. Compl. ¶¶ 9, 14, 52, 73-74, 82, 84, 87, 91-92, 99-100, 111, 113, 127, 132, 155. Likewise, LDI and Zohar Holding are two LLC pass-through entities solely owned and controlled by Tilton. Compl. ¶¶ 20-21. LDI and Zohar Holding are members of and holding companies for other Tilton-affiliated Defendants. Compl. ¶¶ 10-15, 20-21, 258. These facts plausibly allege that LDI and Zohar Holding were not operated as distinct entities independent from Tilton, and served only as vehicles for the movement of Tilton's and Defendants' assets and ill-gotten gains. "These allegations are adequate to state a

- 59 -

claim for relief on a theory that the corporate veil should be pierced." *Varbero*, 2020 WL 5849516, at *4.

## X.   AMENDMENT, NOT DISMISSAL, IS THE APPROPRIATE REMEDY FOR ANY PURPORTED PLEADING DEFICIENCIES

129.   For the reasons stated above, the Complaint is not deficient, and neither dismissal nor amendment is warranted.   However, if the Court for any reason determines otherwise, the Court should grant MBIA leave to amend the Complaint.   Leave to amend should be freely given unless the amendment would be futile or there is evidence of undue delay, bad faith, or undue prejudice.   *See, e.g.*, *Tracinda Corp. v. Daimler Chrysler AG (In re Daimler Chrysler AG Sec. Litig.)*, 200 F. Supp. 2d 439, 443 (D. Del. 2002) (granting leave to amend); *Hechinger Inv. Co. v. Raytheon Co. (In re Hechinger Inv. Co.)*, 286 B.R. 591, 593-94 (Bankr. D. Del. 2002) (granting leave to amend).   Defendants have made no such showing here.   To the contrary, their Brief largely complains of purported notice pleading deficiencies that Defendants concede could be remedied in an amended pleading.   Brief ¶¶ 67-74, 119-20, 139-41, 155, 189. Accordingly, Defendants' argument that amendment would be futile should be rejected.   Brief ¶ 194.

- 60 -

## CONCLUSION

**WHEREFORE**, MBIA respectfully requests that the Court enter an Order denying

Defendants' motion to dismiss MBIA's Complaint.

Wilmington, Delaware
December 3, 2020

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Timothy P. Cairns*
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:        ljones@pszjlaw.com
                 tcairns@pszjlaw.com

and

CADWALADER, WICKERSHAM & TAFT LLP
Gregory Petrick
Ingrid Bagby
Michele Maman
Sean F. O'Shea
Michael E. Petrella
Joshua P. Arnold
200 Liberty Street
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
Email: gregory.petrick@cwt.com
          ingrid.bagby@cwt.com
          michele.maman@cwt.com
          sean.o'shea@cwt.com
          michael.petrella@cwt.com
          joshua.arnold@cwt.com

*Counsel to Plaintiff MBIA Insurance Corporation*

DOCS_DE:232031.1 53730/001