## EXHIBIT A

Redacted Public Version of Brief [Adv. D.I. 25]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| MBIA INSURANCE CORPORATION, | |
| Plaintiff, | Adversary No. 20-50776 (KBO) |
| -against- | |
| LYNN TILTON;<br>PATRIARCH PARTNERS, LLC;<br>PATRIARCH PARTNERS VIII, LLC;<br>PATRIARCH PARTNERS XIV, LLC;<br>PATRIARCH PARTNERS XV, LLC;<br>PATRIARCH PARTNERS AGENCY<br>SERVICES, LLC;<br>PATRIARCH PARTNERS MANAGEMENT<br>GROUP, LLC;<br>OCTALUNA LLC; OCTALUNA II LLC;<br>ARK II CLO 2001-1, LLC;<br>ARK INVESTMENT PARTNERS II, LP;<br>LD INVESTMENTS, LLC;<br>ZOHAR HOLDING, LLC; and<br>ZOHAR HOLDINGS, LLC, | |
| Defendants. | |

## BRIEF IN SUPPORT OF THE PATRIARCH DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT

---

[1] The "Debtors," and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited ("Zohar III") (9261), Zohar II 2005-1, Limited ("Zohar II") (8297), and Zohar CDO 2003-1, Limited (together with Zohar II and Zohar III, the "Zohar Funds") (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Dated: October 23, 2020

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117 3
npernick@coleschotz.com
preilley@coleschotz.com
ddean@coleschotz.com

– and –

**SHER TREMONTE LLP**
Theresa Trzaskoma (Admitted Pro Hac Vice)
Michael Tremonte (Admitted Pro Hac Vice)
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com

*Counsel to Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners Management Group, LLC, Octaluna, LLC, Octaluna II, LLC, Ark II CLO 2001-1, LLC, Ark Investment Partners II, L.P., LD Investments, LLC, and Zohar Holding, LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

MBIA'S COMPLAINT ..................................................................................... 15

ARGUMENT ................................................................................................... 19

I.  MBIA'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS
    DUPLICATIVE OF THE ZOHAR FUNDS ADVERSARY PROCEEDING ................. 19

    A.  The Parties Represent the Same Interests or Are the Same .................. 20

    B.  The Two Suits Arise from the Same Agreements and Facts ................. 21

    C.  The Claims Are Duplicative ............................................................. 23

    D.  The Relief Sought Is Duplicative ...................................................... 24

II.  MBIA'S CLAIM FOR BREACH OF CONTRACT IS NOT WELL PLEADED ........... 26

    A.  Count I Is Impermissibly Vague ....................................................... 26

    B.  In the Alternative, MBIA Should Be Required to Provide a More Definite
        Statement of Its Breach of Contract Claim ........................................ 28

III.  EVEN IF PLEADED SUFFICIENTLY, THE COMPLAINT STILL DOES
     NOT STATE A CLAIM FOR BREACH OF CONTRACT ................................... 29

    A.  The CMAs Preclude Liability as a Matter of Law ............................... 30

    B.  The Complaint's Allegations Are Insufficient to Plead a Breach of
        the CMAs ..................................................................................... 32

        1.  No Breach Based on Allegations of Amending Credit Agreements
            with the Portfolio Companies ................................................... 33

        2.  No Breach Based on Allegations of Miscategorized Loans or the
            Miscalculation of the OC Ratio ................................................ 34

        3.  No Breach Based on Allegations of Funding New Loan Commitments
            Without MBIA's Authorization .................................................. 36

        4.  No Breach Based on Allegations of Refusing to Monetize Equity
            Interests or "Siphoning" Fees or Assets .................................... 37

i

　　　　5.　　No Breach Based on Allegations of "Conflicted, Self-Dealing
　　　　　　　Transactions ........................................................................... 40

　　C.　　Even If There Had Been a Breach, the Complaint's Allegations Fail to
　　　　　Support an Inference that the Patriarch Managers' Actions Were the
　　　　　Cause of the Zohar Funds' Defaults or Any Other Loss MBIA May Have
　　　　　Suffered ........................................................................................ 41

IV.　　THE TORTIOUS INTERFERENCE CLAIMS ARE DEFICIENT AS A
　　　　MATTER OF LAW ........................................................................... 44

　　A.　　The Tortious Interference Claims Do Not Satisfy Rule 8 .................... 45

　　B.　　The Tortious Interference Claims Cannot Be Sustained Against Ms. Tilton,
　　　　　PPAS, and the Patriarch Managers Because These Defendants Were Acting
　　　　　as Agents of the Zohar Funds ........................................................... 46

　　C.　　Neither Tortious Inference Claim Is Cognizable Under the Economic
　　　　　Interest Doctrine .............................................................................. 47

V.　　THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED ............... 48

　　A.　　Defendants Owed No Fiduciary Duty to MBIA or to the Noteholders ............... 48

　　B.　　The Fiduciary Duty Claim Is Not Cognizable as It Fails to Meet Basic
　　　　　Pleading Requirements ...................................................................... 52

　　C.　　The Breach of Fiduciary Duty Claims Must be Dismissed Because They
　　　　　Are Duplicative of the Contract Claim .............................................. 53

　　D.　　The Aiding and Abetting Claim Must Also Be Dismissed .................... 54

VI.　　THE FAITHLESS SERVANT CLAIM IS NOT VIABLE ............................ 54

VII.　　THE CLAIM FOR DECLARATORY RELIEF FAILS ............................ 56

VIII.　　THE CONVERSION CLAIM IS UNTENABLE ............................................ 58

IX.　　THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED ............ 60

X.　　THE MALICIOUS PROSECUTION CLAIM IS UNSUSTAINABLE .......... 62

　　A.　　MBIA Has No Claim Based on the Zohar I Bankruptcy ...................... 63

　　B.　　MBIA Has No Claim Based on the Delaware 225 Action .................... 67

　　C.　　The Abuse of Process Claim Must Be Dismissed ................................ 70

XI.     THE CLAIMS AGAINST DEFENDANTS LDI AND ZOHAR HOLDING
        MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM ................................... 73

XII.    AMENDMENT OF MBIA'S CLAIMS WOULD BE FUTILE ....................................... 75

CONCLUSION ......................................................................................................................... 75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*34-35th Corp. v. 1-10 Indus. Assocs., LLC*,
    103 A.D.3d 709 (2d Dep't 2013) ........................................................................... 43

*Acosta v. Gaudin*,
    2017 WL 4685548 (W.D. Pa. Oct. 18, 2017) ........................................... 21, 22

*Allen v. Cox*,
    2011 WL 2436705 (S.D.N.Y. June 16, 2011) ................................................. 60

*Alvord & Swift v. Stewart M. Muller Constr. Co.*,
    46 N.Y.2d 276 (1978) ......................................................................................... 44

*Am. Corp. Soc'y v. Valley Forge Ins. Co.*,
    424 F. App'x 86 (3d Cir. 2011) (per curiam) ................................................. 17

*Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*,
    77 F.3d 364 (11th Cir. 1996) ........................................................................... 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 17, 18, 26

*Atuahene v. City of Hartford*,
    10 F. App'x 33 (2d Cir. 2001) ........................................................................ 46

*Austar Int'l Ltd. v. AustarPharma LLC*,
    425 F. Supp. 3d 336 (D.N.J. 2019) ................................................................. 58

*Babbitt v. Koeppel Nissan, Inc.*, No. 18-CV-,
    2020 WL 3183895 (E.D.N.Y. June 15, 2020) ........................................... 55, 56

*Bardwil Indus. Inc. v. Kennedy*,
    2020 WL 2748248 (S.D.N.Y. May 27, 2020) ................................................. 58

*Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n,
    Inc., Local 1889 AFT AFL-CIO*,
    38 N.Y.2d 397 (1975) ....................................................................................... 72

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................. 17, 18, 26

*Berman v. Sugo LLC*,
    580 F. Supp. 2d 191 (S.D.N.Y. 2008) ............................................................. 38

*Binsack v. Lackawanna Cty. Prison*,
   438 F. App'x 158 (3d Cir. 2011) ................................................................... 27

*Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Tr.*,
   117 A.3d 549 (Del. 2015) ............................................................................. 68

*Brightwell v. Lehman*,
   2006 WL 931702 (W.D. Pa. Apr. 10, 2006) ................................................. 39

*BRP Hold Ox, LLC v. Chilian*,
   2018 WL 5734648 (Del. Super. Ct. Oct. 31, 2018) ...................................... 70

*Byron v. Genovese Drug Stores, Inc.*,
   2011 WL 4962499 (E.D.N.Y. Oct. 14, 2011) ................................................ 21

*Calcutti v. SBU, Inc.*,
   224 F. Supp. 2d 691 (S.D.N.Y. 2002) ........................................................... 59

*Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*,
   701 F. Supp. 2d 340 (E.D.N.Y. 2010) ........................................................... 63

*Carbonyx License & Lease LLC v. Carbonyx Inc.*,
   2019 WL 2867022 (S.D.N.Y. July 1, 2019) .................................................. 36

*CARCO GROUP, Inc. v. Maconachy*,
   718 F.3d 72 (2d Cir. 2013) ............................................................................ 55

*Carson v. Tucker*,
   2020 WL 1953655 (E.D. Pa. Apr. 23, 2020) ................................................ 28

*Charles Schwab & Co. v. Retrophin, Inc.*,
   2015 WL 5729498 (S.D.N.Y. Sept. 30, 2015) .............................................. 32

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
   2020 WL 3057796 (S.D.N.Y. June 8, 2020) ................................................. 74

*Comm'r of Dep't of Planning & Nat. Res. v. Century Alumina Co., LLC*,
   2011 WL 6010009 (D.V.I. Nov. 30, 2011) .................................................... 35

*Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*,
   83 F. Supp. 3d 828 (S.D. Iowa 2015) ........................................................... 36

*Coop. Centrale Raiffeisen-Boerenleenbank B.A. v. Atradius Credit Ins. N.V.*,
   149 A.D.3d 416 (1st Dep't 2017) .................................................................. 51

*Crown Wisteria, Inc. v. F.G.F. Enterprises Corp.*,
    168 A.D.2d 238 (1st Dep't 1990) ................................................................ 64

*Cuccia v. Edinburg*,
    1984 WL 548380 (Del. Super. Ct. Jan. 10, 1984) ........................................ 70

*Curiano v. Suozzi*,
    102 A.D.2d 759 (1st Dep't 1984) ................................................................ 71

*D.J. by Next Friend Megahey v. Cty. of Westchester*,
    2020 WL 419382 (S.D.N.Y. Jan. 27, 2020) ................................................ 26

*Davis v. Norwalk Econ. Opportunity Now, Inc.*,
    534 F. App'x 47 (2d Cir. 2013) .................................................................. 22

*De La Cruz v. Caddell Dry Dock & Repair Co.*,
    56 A.D.3d 365 (2008) .................................................................................. 50

*De Los Santos v. Just Wood Furniture, Inc.*,
    2007 WL 9817923 (S.D.N.Y. July 12, 2007) .............................................. 21

*Digene Corp. v. Ventana Med. Sys., Inc.*,
    476 F. Supp. 2d 444 (D. Del. 2007) ............................................................ 28

*Dynamis Therapeutics, Inc. v. Alberto-Culver Int'l Inc.*,
    2010 WL 3834405 (D. Del. Sept. 24, 2010) ................................................ 48

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011) ........................................................ 60

*Engel v. CBS, Inc.*,
    93 N.Y.2d 195 (1999) .................................................................................. 66

*Fabics v. City of New Brunswick*,
    629 F. App'x 196 (3d Cir. 2015) ................................................................ 19

*Falat v. Cty. of Hunterdon*,
    2013 WL 1163751 (D.N.J. Mar. 19, 2013) ............................................ 52, 53

*Fed. Ins. Co. v. Mertz*,
    2015 WL 5769945 (S.D.N.Y. Sept. 29, 2015) ............................................ 55

*Felsen v. Sol Café Mfg. Corp.*,
    24 N.Y.2d 682 (1969) .................................................................................. 44

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)..................................................................... 43

*First Am. Commercial Bancorp, Inc. v. Saatchi & Saatchi Rowland, Inc.*,
    55 A.D.3d 1264 (4th Dep't 2008) ........................................................... 46

*Flemming v. Smith*,
    2014 WL 4829526 (N.D.N.Y. Sept. 29, 2014) ....................................... 20

*Foster v. Churchill*,
    87 N.Y.2d 744 (1996) ............................................................................. 47

*Freeman v. MBL Life Assur. Corp.*,
    60 F. Supp. 2d 259 (S.D.N.Y. 1999)....................................................... 61

*Freshpair.com, Inc. v. Butlein*,
    2017 WL 2968395 (D.N.J. July 11, 2017)............................................... 52

*Fruition, Inc. v. Rhoda Lee, Inc.*,
    1 A.D.3d 124 (1st Dep't 2003) ............................................................... 41

*Greyhound Corp. v. Commercial Cas. Ins. Co.*,
    259 App. Div. 317 (1st Dept. 1940) ....................................................... 44

*Harbor Distrib. Corp. v. GTE Operations Support Inc.*,
    176 F. Supp. 3d 204 (E.D.N.Y. 2016) .................................................... 38

*I.G. Second Generation Partners, L.P. v. Duane Reade*,
    17 A.D.3d 206 (1st Dep't 2005) ............................................................. 71

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009) ............................................................................. 61

*IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*,
    2017 WL 4082886 (Del. Ch. Sept. 7, 2017) .......................................... 53

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)..................................................... 61

*In re AMC Inv'rs, LLC*,
    551 B.R. 148 (D. Del. 2016) ................................................................... 52

*In re Aphton Corp.*,
    423 B.R. 76 (Bankr. D. Del. 2010) ........................................................ 39

*In re CCT Commc'ns, Inc.*,
    464 B.R. 97 (Bankr. S.D.N.Y. 2011) ........................................................... 32

*In re CIL Ltd.*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) ........................................................... 60

*In re Eerie World Entm't, L.L.C.*,
    2006 WL 1288578 (Bankr. S.D.N.Y. Apr. 28, 2006) .................................... 66

*In re Friedman's Inc.*,
    452 B.R. 512 (Bankr. D. Del. 2011) ............................................................ 39

*In re Gupta*,
    38 A.D.3d 445 (2007) ................................................................................. 56

*In re Musicland Holding Corp.*,
    386 B.R. 428 (S.D.N.Y. 2008) .................................................................... 59

*In re Nicholas*,
    457 B.R. 202 (Bankr. E.D.N.Y. 2011) ........................................................ 67

*In re Northshore Mainland Servs., Inc.*,
    537 B.R. 192 (Bankr. D. Del. 2015) ............................................................ 73

*In re Olick*,
    630 F. App'x 140 (3d Cir. 2016) ................................................................. 22

*In re Reveley*,
    148 B.R. 398 (Bankr. S.D.N.Y. 1992) ........................................................ 65

*In re SHC, Inc.*,
    329 B.R. 438 (Bankr. D. Del. 2005) ............................................................ 39

*In re Washington Mut., Inc.*,
    2010 WL 3238903 (Bankr. D. Del. Aug. 13, 2010) ..................................... 63

*In re Waypoint Leasing Holdings Ltd.*,
    607 B.R. 143 (Bankr. S.D.N.Y. 2019) ........................................................ 41

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ......................................................................... 27

*Interior by Mussa, Ltd. v. Town of Huntington*,
    664 N.Y.S.2d 970 (2d Dep't 1997) ............................................................. 59

*Jablonski v. Pan Am. World Airways, Inc.*,
   863 F.2d 289 (3d Cir. 1988)........................................................ 75

*Jackson v. Rohm & Haas Co.*,
   2009 WL 773936 (E.D. Pa. Mar. 19, 2009)................................ 28

*Jacksonville, Inc. v. FPL Grp., Inc.*,
   162 F.3d 1290 (11th Cir. 1998) .................................................. 29

*Japhet v. Francis E. Parker Mem'l Home, Inc.*,
   2014 WL 3809173 (D.N.J. July 31, 2014).............................. 46, 73

*Jayapaul v. Balamurugan*,
   2009 WL 10674911 (Del. Com. Pl. July 9, 2009) ...................... 58

*Kirschner v. Bennett*,
   648 F. Supp. 2d 525 (S.D.N.Y. 2009)......................................... 58

*KnighTek, LLC v. Jive Commc'ns, Inc.*,
   197 A.3d 493 (Del. Super. Ct. 2018) .......................................... 51

*Koret, Inc. v. Christian Dior, S.A.*,
   161 A.D.2d 156 (1990) ................................................................ 44

*Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC*,
   2013 WL 417406 (S.D.N.Y. Feb. 4, 2013)................................. 83

*Krushin v. Kosek*,
   2019 WL 1246963 (M.D. Pa. Feb. 22, 2019) ............................. 29

*La Torella v Hallissey*,
   131 A.D.2d 818 (2d Dep't 1987) ................................................ 71

*Lama Holding Co. v. Smith Barney Inc.*,
   88 N.Y.2d 413 (1996) ................................................................. 44

*Landesbank Baden Wurttemberg v. Goldman, Sachs & Co.*,
   821 F. Supp. 2d 616 (S.D.N.Y. 2011)........................................ 61

*Levy v. Bessemer Tr. Co.*,
   1997 WL 431079 (S.D.N.Y. July 30, 1997) ............................... 36

*Lewis v. Snow*, 01-CV-7785,
   2003 WL 22077457 (S.D.N.Y. Sept. 8, 2003)............................ 71

*Linder v. Innovative Commercial Sys. LLC*,
    41 Misc. 3d 1214(A), 981 N.Y.S.2d 636 (Sup. Ct. 2013) ................................. 55

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004) .................................................................................. 19

*Manchester Equip. Co. v. Panasonic Indus. Co.*,
    141 A.D.2d 616 (2d Dep't 1988) ........................................................................ 34

*Matter of Cohoes Indus. Terminal, Inc.*,
    931 F.2d 222 (2d Cir. 1991) .................................................................................. 73

*Matthews Int'l Corp. v. Lombardi*,
    2020 WL 1309399 (W.D. Pa. Mar. 19, 2020) ................................................... 24

*Mazzola v. Roomster Corp.*,
    849 F. Supp. 2d 395 (S.D.N.Y. 2012) ................................................................. 59

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012) ................................................................... 2

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    950 F. Supp. 2d 568 (S.D.N.Y. 2013) ................................................................... 2

*McKenna v. City of Philadelphia*,
    304 F. App'x 89 (3d Cir. 2008) .......................................................................... 24

*Metropolitan Life Ins. Co. v. Nobel Lowndes Int'l Inc.*,
    84 N.Y.2d 430 (N.Y. Oct. 25, 1994) .................................................................. 30

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
    43 F. Supp. 3d 309 (S.D.N.Y. 2014) ................................................................. 62

*MHS Capital LLC v. Goggin*,
    2018 WL 2149718 (Del. Ch. May 10, 2018) ..................................................... 54

*Midwest Disability Initiative v. JANS Enterprises, Inc.*,
    929 F.3d 603 (8th Cir. 2019) ............................................................................... 35

*Morse v. Lower Merion School Dist.*,
    132 F.3d 902 (3d Cir.1997) ................................................................................. 18

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004) ............................................................... 58

*N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*,
    2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) .................................................... 48

*Nafar v. Hollywood Tanning Sys., Inc.*,
    339 F. App'x 216 (3d Cir. 2009) .................................................... 22

*Nami v. Fauver*,
    82 F.3d 63 (3d Cir. 1996) .................................................... 18

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
    392 F.3d 520 (2d Cir. 2004) .................................................... 41

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008) .................................................... 74

*Nevins v. Bryan*,
    2005 WL 2249520 (Del. Super. Ct. Sept. 8, 2005) .................................................... 70

*New Phone Co. v. City of New York*,
    498 F.3d 127 (2d Cir. 2007) .................................................... 20

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
    19 N.Y.3d 584 (2012) .................................................... 51

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
    809 A.2d 1163 (Del. Ch. 2002) .................................................... 49

*Panish v. Steinberg*,
    32 A.D.3d 383 (2d Dep't 2006) .................................................... 59

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993) .................................................... 19

*Perryman v. Vill. of Saranac Lake*,
    41 A.D.3d 1080 (3d Dep't 2007) .................................................... 65

*Peters Griffin Woodward, Inc. v. WCSC, Inc.*,
    88 A.D.2d 883 (1st Dep't 1982) .................................................... 60

*Pfeiffer v. State Farm Mut. Auto. Ins. Co.*,
    2010 WL 11506689 (Del. Com. Pl. Nov. 30, 2010) .................................................... 69

*Phillips v. County of Alleghany*,
    515 F.3d 224 (3d Cir. 2008) .................................................... 18, 26

*Pilliard v. Sotheby's, Inc.*,
    1997 WL 381795 (S.D.N.Y. July 10, 1997) ................................................................. 60

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    215 F. Supp. 2d 336 (S.D.N.Y. 2002) ........................................................................... 43

*Pozner v. Fox Broad. Co.*,
    59 Misc. 3d 897, 74 N.Y.S.3d 711 (Sup. Ct. 2018) ..................................................... 56

*Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*,
    40 F.3d 1454 (3d Cir. 1994) .......................................................................................... 57

*Related Westpac LLC v. JER Snowmass LLC*,
    2010 WL 2929708 (Del. Ch. July 23, 2010) ................................................................ 54

*Roberts v. Weight Watchers Int'l, Inc.*,
    217 F. Supp. 3d 742 (S.D.N.Y. 2016) ........................................................................... 30

*Rowlands v. Phico Ins. Co.*,
    2000 WL 1092134 (D. Del. July 27, 2000) .................................................................. 68

*Saleeby v. Remco Maint., LLC*,
    148 A.D.3d 570 (2d Dep't 2017) ................................................................................... 60

*Schilt v. Matherson*,
    104 A.D.3d 668 (2d Dep't 2013) ................................................................................... 71

*Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*,
    113 F.3d 405 (3d Cir. 1997) .......................................................................................... 18

*Silver v. Mendel*,
    894 F.2d 598 (3d Cir. 1990) ................................................................................... 64, 65

*Spence v. Schafer*,
    2013 WL 1364025 (W.D. Pa. Mar. 7, 2013) ................................................................ 53

*Spence v. Spence*,
    No. CIV.A. K11C-06035JTV, 2012 WL 1495324 (Del. Super. Ct. Apr. 20, 2012) ....... 67

*Starr Int'l Co. v. Fed. Reserve Bank of New York*,
    906 F. Supp. 2d 202 (S.D.N.Y. 2012) ........................................................................... 41

*Steinberg v. Sherman*,
    2008 WL 2156726 (S.D.N.Y. May 8, 2008) ................................................................ 71

*Stokes v. Lusker*,
    425 F. App'x 18 (2d Cir. 2011) ................................................................ 34

*Stone & Paper Inv'rs, LLC v. Blanch*,
    2020 WL 3496694 (Del. Ch. June 29, 2020) ........................................... 54

*Stone & Paper Inv'rs, LLC v. Blanch*,
    2019 WL 2374005 (Del. Ch. May 31, 2019) ............................................ 57

*Strader v. U.S. Bank*,
    2020 WL 3447776 (W.D. Pa. June 24, 2020) .......................................... 20

*Stroock & Stroock & Lavan v. Beltramini*,
    157 A.D.2d 590 (1st Dep't 1990) ............................................................ 72

*Sun Gold, Corp. v. Stillman*,
    95 A.D.3d 668 (1st Dep't 2012) .............................................................. 60

*Swift v. Pandey*,
    2013 WL 5486851 (D.N.J. July 1, 2013) ..................................... 18, 26, 52

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ................................................................................ 35

*TD Waterhouse Inv'r Servs., Inc. v. Integrated Fund Servs., Inc.*,
    2003 WL 42013 (S.D.N.Y. Jan. 6, 2003) ................................................ 43

*Teller v. Galak*,
    162 A.D.3d 959 (2d Dep't 2018) ....................................................... 63, 64

*Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*,
    2016 WL 368170 (Del. Ch. Jan. 29, 2016) ............................................. 54

*Thomas v. Independence Twp.*,
    463 F.3d 285 (3d Cir. 2006) .................................................................... 28

*Thyroff v. Nationwide Mut. Ins. Co.*,
    8 N.Y.3d 283 (2007) ............................................................................... 60

*Tillio v. H&R Block, Inc.*,
    445 F. App'x 604 (3d Cir. 2011) ............................................................ 26

*TOA Sys., Inc. v. Int'l Bus. Machines Corp.*,
    2019 WL 5693388 (S.D.N.Y. Nov. 4, 2019) .......................................... 31

*Tradex Europe SPRL v. Conair Corp.*,
    2008 WL 1990464 (S.D.N.Y. May 7, 2008) ................................................................. 32

*Trenwick Am. Litig. Tr. v. Billett*,
    931 A.2d 438 (Del. 2007) ........................................................................................ 54

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006) .................................................................................. 54

*Trump on Ocean, LLC v. State*,
    79 A.D.3d 1325 (3d Dep't 2010) .............................................................................. 37

*Trustees of Plumbers Local Union No. 1 Welfare Fund, Additional Sec. Benefit Fund, Vacation*
    *& Holiday Fund, Trade Educ. Fund, 401(k) Sav. Plan v. ENOBRAC Plumbing Inc.*,
    2018 WL 3635049 (E.D.N.Y. Feb. 12, 2018) ............................................................ 24

*U.S. ex rel. Cestra v. Cephalon, Inc.*,
    2014 WL 1087960 (S.D.N.Y. Mar. 19, 2014) ........................................................... 24

*Underground Utilities, Inc. v. Comptroller of City of New York*,
    170 A.D.3d 481 (1st Dep't 2019) ............................................................................. 61

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019) ................................................................................. 42, 43

*Varbero v. Belesis*,
    2020 WL 5849516 (S.D.N.Y. Oct. 1, 2020) ............................................................. 74

*VariBlend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*,
    2019 WL 4805771 (S.D.N.Y. Sept. 30, 2019) .......................................................... 74

*Vorobey v. Cleveland Bros. Equip. Co.*,
    2018 WL 6436717 (M.D. Pa. Dec. 7, 2018) ............................................................. 28

*Wagner v. First Horizon Pharm. Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ............................................................................... 29

*Waite v. Schoenbach*,
    2010 WL 4456955 (S.D.N.Y. Oct. 29, 2010) ........................................................... 32

*Walton v. Eaton Corp.*,
    563 F.2d 66 (3d Cir. 1977) ...................................................................................... 19

*Watson v. Mayo*,
    2008 WL 538442 (S.D.N.Y. Feb. 26, 2008) ............................................................. 20

*White Plains Coat & Apron Co. v. Cintas Corp.*,
    8 N.Y.3d 422 (2007) ................................................................................... 47

*Wilhelmina Models, Inc. v. Fleisher*,
    19 A.D.3d 267 (1st Dep't 2005) ............................................................ 65, 67

*Willoughby v. Zucker, Goldberg & Ackerman, LLC*,
    2014 WL 2711177 (D.N.J. June 16, 2014) ................................................... 18

*Winshall v. Viacom Int'l, Inc.*,
    2019 WL 960213 (Del. Super. Ct. Feb. 25, 2019) ..................................... 68, 69

*Wolff v. Rare Medium, Inc.*,
    171 F. Supp. 2d 354 (S.D.N.Y. 2001) ........................................................ 37

*Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*,
    533 F.3d 634 (8th Cir. 2008) ...................................................................... 35

*Yost v. Anthem Life Ins. Co.*,
    2019 WL 3451507 (M.D. Pa. July 30, 2019) ............................................ 19, 22

*Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*,
    2017 WL 5956877 (Del. Ch. Nov. 30, 2017) ...................................... 62, 68, 69

**Statutes**

11 U.S.C. § 105(a) ............................................................................................... 1

N.Y. CPLR § 215(3) ...................................................................................... 63, 71

**Rules**

Federal Rule of Civil Procedure 8 ....................................................................... *passim*

Federal Rule of Civil Procedure 12(b) ................................................................. 17

Rule 7002 of the Federal Rules of Bankruptcy Procedure .......................................... 17

Rule 7008 of the Federal Rules of Bankruptcy Procedure ..................................... 1, 14

Rule 7012 of the Federal Rules of Bankruptcy Procedure ..................................... 1, 14

xv

**Other Authorities**

Restatement (Second) Conflicts of Laws § 155 ............................................................................ 63

Defendants Lynn Tilton; Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC; Patriarch Partners Agency Services, LLC; Patriarch Partners Management Group, LLC; Octaluna, LLC; Octaluna II, LLC; Ark II CLO 2001-1, LLC; Ark Investment Partners II, L.P.; LD Investments, LLC, and Zohar Holding, LLC (collectively, the "Patriarch Defendants"),[2] by and through their counsel, hereby submit this brief in support of the motion (the "Motion to Dismiss"), filed contemporaneously herewith, pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 7008 and 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, dismissing the Complaint filed on July 30, 2020 (D.I. 2) (the "Complaint")[3] by Plaintiff MBIA Insurance Corporation ("MBIA" or "Plaintiff").[4]

## PRELIMINARY STATEMENT

1.      MBIA, a once-prominent financial insurer that provided guaranty insurance on structured finance securities, has been teetering on the brink of financial ruin for nearly two decades, a consequence of its own catastrophic business decisions. This adversary proceeding is the latest in MBIA's strategy to use litigation against Ms. Tilton and her affiliates as a rescue package for MBIA's own financial recklessness and irrationality. But the Patriarch Defendants are not now and never have been to blame for MBIA's current predicament – MBIA is.

---

[2] The Complaint names an entity called Zohar Holdings, LLC as a further defendant, but this entity is not affiliated with or known by any of the other Patriarch Defendants.

[3] The Patriarch Defendants do not consent to entry of a final order by this Court.

[4] Capitalized terms not defined herein have the meanings ascribed to them in the Complaint. D.I. 2 ("Compl.").

2.      The relationship between Ms. Tilton and MBIA dates back to 2001, when MBIA

insured one of Ms. Tilton's first CLO vehicles, Ark II, CLO 2001-1, Ltd. ("Ark II"). Ark II was

extremely successful and fully paid off its investors well in advance of its maturity date.

3.      Between 1996 and 2002, MBIA and/or its affiliates issued insurance policies

and/or surety bonds with respect to certain senior notes issued by seven collateralized debt

obligation ("CDO") issuers (the "MBIA Funds"). In 2002, MBIA faced an enormous insurance

exposure and expected financial shortfall of up to $297 million with respect to financial guaranty

insurance policies it held covering the senior notes issued by the MBIA Funds. *MBIA Ins. Corp.*

*v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 685 (S.D.N.Y. 2012). By April 2003,

MBIA had determined that its loss reserves could cover only approximately $10 million of the

expected shortfalls of the underperforming MBIA Funds. *MBIA Ins. Corp. v. Patriarch Partners*

*VIII, LLC*, 950 F. Supp. 2d 568, 574 (S.D.N.Y. 2013).

4.       To remediate the troubled MBIA Funds that threatened to cause severe financial

distress to MBIA, and having experienced success with the Ark II deal, MBIA turned to Ms.

Tilton and Patriarch Partners. Neither Ms. Tilton nor Patriarch Partners had any prior

involvement with the MBIA Funds. In April 2003, Patriarch Partners and certain affiliates agreed

to assume the role of manager of the MBIA Funds in order to effectuate a turnaround of the

otherwise failing CDOs and to mitigate any potential losses to MBIA. *MBIA Ins. Corp.*, 950 F.

Supp. at 575. In return, MBIA, pursuant to an Insurance Agreement and Financial Guaranty, was

to provide financial guaranty insurance on the senior classes of notes of a new CLO to be created

and managed by Patriarch, Zohar I. Thus, the Zohar I transaction originated as a Patriarch solution to an MBIA problem.[5]

5.      Zohar I, which had a November 2015 maturity date, issued $532 million in Class A-1, A-2, and A-3 notes, and an additional $20 million in preference shares. The Class A notes were purchased by outside investors and the preference shares were purchased by Octaluna I. By the terms of their agreements, MBIA promised to pay the Zohar I Class A-1 and Class A-2 noteholders the principal and interest due to them in the event that Zohar I defaulted and could not make the payments. MBIA insured $182 million of Zohar I's Class A-1 and A-2 notes.[6]

6.      In 2004, Ms. Tilton and Patriarch began work on a new CLO, Zohar II, which would invest alongside Zohar I and would mature in January 2017. In January 2005, Zohar II issued $1 billion in funded, senior Class A notes – almost twice as much as Zohar I had issued – and $78.2 million in preference shares. Here again, the Class A notes were purchased by outside investors, and the preference shares were purchased by Octaluna II and another affiliate of Ms. Tilton. MBIA insured $1 billion of the Zohar II Class A Notes.

7.      Thus, as of early 2005, MBIA was facing an aggregate exposure to the two Zohar Funds of more than $1.182 billion.

---

[5] *See also In the Matter of MBIA Inc.*, SEC Admin. Proc. File. No. 3-12551 (2007) (alleging that, during this same period, MBIA was engaging in a "fraudulent transaction . . . to mask the true financial impact of a massive loss it suffered"); Bethany Mclean, *The Mystery of the $890 Billion Insurer*, CNN Money (May 16, 2005), https://money.cnn.com/magazines/fortune/fortune_archive/2005/05/16/8260164/index.htm ("MBIA engages in risky practices that endanger not only its own investors but also the global capital markets.").

[6] MBIA entered into a separate insuring agreement with the original holder of $297.5 million in Class A-3 notes. At some point prior to 2015 that policy was commuted and the Class A-3 notes were no longer insured.

8.      In April 2007, Patriarch Partners created another CLO fund, Zohar III, containing collateral overlapping with Zohar I and Zohar II. Zohar III was to mature in April 2019. MBIA did not insure Zohar III.

9.      The collateral of all the Zohar Funds consists primarily of loans to distressed companies, many of them iconic American manufacturing brands which were believed, at the time the loans were made, to have enormous turnaround potential. The Zohar Funds also received certain upside equity interests in the Portfolio Companies, which gave them the opportunity to realize potential cash payments beyond the amount of their secured debt. The Zohar Funds' strategy was for the Portfolio Companies to be revived and sold, or their debt refinanced, in order to repay the Zohar Funds' noteholders at maturity. While not all Portfolio Companies were expected to experience a successful turnaround, those that did would, it was hoped, "carry the day" and generate sufficient value to repay the noteholders at maturity.

10.     As part of the Funds' design and strategy, and as reflected in the Indentures and Collateral Management Agreements, Ms. Tilton (through her Patriarch Entities) had broad discretion to determine or adjust the terms of the Zohar Funds' loans to the Portfolio Companies, with flexibility being key to the Funds' success. Also underpinning this investment strategy was that Ms. Tilton would play an active role in the management, strategic direction, and rebuilding of each of the Portfolio Companies. She served as a board member or manager of all the Companies (in most cases, the sole board member or manager). And for some Portfolio Companies, Ms. Tilton served as CEO and was intimately involved in their day-to-day operations. In addition, Ms. Tilton worked alongside numerous talented Patriarch professionals to provide critical operational, management, consulting, recruiting, legal, and other services to the Portfolio Companies pursuant to their Agreements with Patriarch Partners Management

4

Group LLC ("PPMG"), and administrative agency services to the Funds by PPAS under the Credit Agreements.

11.     This dual control – of both the Zohar Funds and the Portfolio Companies – enabled Ms. Tilton to devise and implement flexible and innovative turnaround solutions, a key to ensuring the success of both the Funds and the Portfolio Companies.

12.     As was disclosed in the Zohar Funds' deal documents, Ms. Tilton and certain of her affiliates have always held significant interests in the Zohar Funds and the Portfolio Companies, including through her affiliates. And since the inception of the Zohar Funds, Ms. Tilton has personally invested *more than $1.1 billion* in the Zohar Funds and the Portfolio Companies, including through preference shares and senior notes in the Zohar Funds, and loans and equity of the Portfolio Companies.

13.     Not only that, the Zohar Funds and the Portfolio Companies owe Ms. Tilton's affiliates *approximately $100 million* in unpaid management, agency, and collateral management fees, unpaid tax distributions, and unpaid expenses.

14.     In view of her substantial investments in and exposure to the Portfolio Companies and the Zohar Funds, Ms. Tilton's overwhelming financial interests have consistently been tethered to the success of the Portfolio Companies and, in turn, the success of the Zohar Funds (*i.e.*, repaying the noteholders in full so that the residual value would then flow to her as owner).

15.     Because the three Zohar Funds invested in many of the same companies, they were interdependent. Zohar III, for example, extended loans to about half of the same portfolio companies as Zohar I and II. This meant that when Ms. Tilton made decisions as collateral manager, she had to consider the interests of all the Funds, not just one of them. This

arrangement was fully disclosed to MBIA, which expressly consented to and expected to benefit from it.

16.    Not long after the Zohar Funds launched, however, the global financial crisis struck, impeding the turnaround of many Portfolio Companies and jeopardizing the possibility that Zohar I would meet its obligations at maturity.

17.    The global crisis also presented an existential threat to MBIA, which had bet big on credit default swaps. In 2004, MBIA was a multi-billion-dollar company and the largest monoline insurer in the United States. By 2009, though, MBIA had suffered catastrophic losses and was forced by regulators to restructure.

18.    It was around this time that MBIA set about trying to generate cash by suing Ms. Tilton. The initial salvo was an April 2009 lawsuit in the Southern District of New York (the "B Notes Case"), in which MBIA accused two Patriarch affiliates of having breached an obligation to transfer certain Class B Notes to the troubled CDOs MBIA had been trying to remediate. The B Note case was without merit, and, after a multi-week bench trial, judgment was ultimately entered in Patriarch's favor.

19.    While that case was pending, MBIA looked for other ways to apply pressure to Ms. Tilton and to extract concessions from her to improve its own individual financial position, to the detriment of the Zohar Funds. Among other things, MBIA entered into a secret deal with the SEC to obtain confidential information about the Portfolio Companies to use in a campaign of sham litigation against Ms. Tilton. At the same time, MBIA encouraged and provoked the SEC to investigate Ms. Tilton and Patriarch. Relying on MBIA's assistance, the SEC ultimately charged that Ms. Tilton, the Patriarch Managers, and Patriarch Partners had allegedly manipulated a particular financial measure in order to increase the collateral management fees

that would be paid to the Patriarch Managers, a theory of motive that made no sense given that, as the ultimate owner of the Zohar Funds, those fees were essentially coming out of her own pocket.

20.     Although the case was the largest ever filed in the SEC's own private administrative court – a forum where the SEC had won at least 97% of the time – all claims were dismissed against Ms. Tilton, the Patriarch Managers, and Patriarch Partners after a fourteen-day evidentiary hearing. In a 57-page decision that ultimately became a final order of the Commission, the Administrative Law Judge flatly rejected the SEC's theories and exonerated Ms. Tilton, the Patriarch Managers, and Patriarch Partners from any wrongdoing.

21.     MBIA has staked a lot on destroying Ms. Tilton and has pursued this course regardless of the consequences to the Zohar Funds or the Portfolio Companies. Even as its strategy began destroying the Zohar Funds' value, MBIA has proved incapable of reversing course. Thus, when the B Notes Case and SEC proceedings had concluded, MBIA opened more litigation fronts, causing a relentless wave of suits against Ms. Tilton and her affiliated Patriarch entities to be filed, including a now-dismissed civil RICO claim filed in the Southern District of New York that falsely accused them of all manner of outrageous wrongdoing (much of which overlapped with the SEC's meritless allegations) and sought over a billion dollars in purported damages.

22.     MBIA's vendetta against Ms. Tilton was difficult to comprehend considering how crucial her efforts were to steer the Portfolio Companies through the financial crisis. MBIA's decisions were also irrational and reckless considering that the Zohar Funds, and in particular Zohar I, would almost certainly default absent restructuring. Indeed, Ms. Tilton had been raising the issue of the Funds' looming maturities since at least 2011, when it became clear that as a

result of the financial crisis, the Zohar Funds would not be able to meet their obligations at their maturity dates.

23.     Between 2011 and 2015, Ms. Tilton repeatedly sought to restructure the Zohar Funds to avoid any default. These proposals included a 2013 restructuring package that involved not only a firm $1.1 billion financing commitment from an outside bank, which would be used to buy out the noteholders, but also cash contributions from Ms. Tilton and MBIA. Although MBIA's contribution under that proposal was only a small fraction of its then over $1 billion exposure on the Zohar I and Zohar II wraps, MBIA inexplicably refused.

24.     In the wake of this failed restructuring effort, Ms. Tilton sought to negotiate an extension of Zohar I's November 2015 maturity date to align it to Zohar II's maturity date; doing so would give the Portfolio Companies more time to execute their turnaround strategies and improve the likelihood that all of the Zohar Funds' noteholders would be repaid in full. For her part, Ms. Tilton was determined to do whatever it took to improve the Funds' chances of success. After MBIA advised Ms. Tilton that Zohar I's A-3 noteholder was the only impediment to an extension, and that MBIA would agree to an extension if the impediment were removed, Ms. Tilton stepped in and, through an affiliate, purchased the A-3 notes on March 26, 2015 for nearly $104 million. Unfortunately, MBIA reneged (again, inexplicably) on its promise to extend Zohar I's maturity date, thus ensuring the fund would default.

25.     On November 17, 2015, Zohar I's Trustee submitted a claim to MBIA for payment of nearly $150 million, which reflected the deficiency with respect to principal and interest payments that were payable on the November 20, 2015 Zohar I maturity date. MBIA made this payment and, as subrogee under the Insurance Agreement, stepped into the shoes of certain Zohar I noteholders. MBIA could have avoided this result had it not unreasonably refused

to extend the maturity date. But, starved for cash, MBIA was determined to find a way to pressure Ms. Tilton into selling the Portfolio Companies, many of which were still reeling from the financial crisis, without regard for whether doing so was in the best interests of either the other Zohar Funds' stakeholders or the Portfolio Companies themselves.

26.     Fearing that MBIA's reckless and short-sighted agenda would ultimately destroy the value of the Portfolio Companies and other Zohar Funds to the detriment of all stakeholders, Patriarch XV, the collateral manager for Zohar I, filed an involuntary bankruptcy petition for Zohar I in the Southern District of New York. The bankruptcy petition was filed in good faith, for the purpose of reorganizing the unquestionably insolvent Zohar I. Rather than work cooperatively with Ms. Tilton, however, MBIA, as controlling party for Zohar I, persisted in its litigious strategy and challenged the bankruptcy filing.

27.     MBIA's vexatious litigation took a terrible toll. Concerned that disputes relating to the Zohar Funds were adversely affecting both the Funds and the Portfolio Companies, Ms. Tilton voluntarily withdrew the Zohar I bankruptcy petition in February 2016. She did this not because the bankruptcy filing had been unwarranted – a reorganization was certainly necessary – but because she believed it was in the best interests of the companies and the Zohar Funds. She also caused the Patriarch Managers to resign as the collateral manager of all three Zohar Funds' (effective upon the appointment of a replacement manager), hoping that such action would help calm the waters with MBIA. Ms. Tilton took these steps even though she had substantial investments in the Zohar Funds and even though, by resigning, she was foregoing tens of millions of dollars in annual collateral management fees. In early March 2016, AMZM – handpicked by MBIA – was appointed replacement collateral manager.

28.     At this point, Ms. Tilton redoubled her and her team's efforts to transform the Portfolio Companies, endeavoring to build and unlock their value for the benefit of all stakeholders. As noted above, in addition to serving as Director/Manager of all of the Portfolio Companies, Ms. Tilton supervised dozens of PPMG and Patriarch employees supporting the Portfolio Companies pursuant to the PPMG Agreements and supporting her in her role as Director/Manager, and she also led a number of Portfolio Companies as their CEO, taking on these roles even though she did not collect a CEO salary (other than beginning in 2017 at MD Helicopters because the U.S. Government required as much).

29.     Rather than her collateral manager resignation mollifying MBIA as hoped, it instead triggered even more animosity and litigation. The new collateral manager, AMZM, completely shirked its mandate to manage the Zohar Funds and instead focused on bringing litigation against Ms. Tilton and various Patriarch entities, including an explosive, yet ultimately frivolous federal RICO suit that was dismissed by the court out of hand. AMZM further refused to pay the Patriarch Managers certain collateral management fees that had been earned during the period prior to their replacement by AMZM, triggering yet another litigation brought by the Zohar Funds' Trustee under the interpleader statute. Perhaps most damaging, however, was AMZM's effort to wrest control of the Portfolio Companies from Ms. Tilton, a move that was directly contrary to the Zohar Funds' entire investment premise and which cast a terrible cloud over the Portfolio Companies, rendering sales or refinancings nearly impossible.

30.     While the parties fought in court, Zohar II matured and defaulted in January 2017, triggering MBIA's insurance obligation with respect to that fund as well. According to MBIA, it paid out just over $779 million in connection with those obligations. Zohar III matured in April 2019.

31.    Unable to monetize the Portfolio Companies as a result of the various Zohar Funds' disputes, in March 2018, Ms. Tilton, then the sole director of the Zohar Funds, directed the Zohar Funds to file voluntary Chapter 11 petitions in this Court in order to lift the cloud created by MBIA's litigation campaign and allow Ms. Tilton to successfully monetize the Zohar Funds' assets for the benefit of all stakeholders. Ms. Tilton hoped that the filings would quiet the incessant litigation between the parties and provide a pathway for the Portfolio Companies to be monetized or their debt refinanced such that the Zohar Funds' noteholders, including MBIA, could be repaid.

32.    The first step in trying to achieve peace was a five-day-long mediation, during which the parties reached the Settlement Agreement, so-ordered by this Court, to fully and finally resolve their dispute over the propriety of the bankruptcy cases and embark on a process to realize the maximum value of the underlying Portfolio Companies. The Settlement Agreement also placed the parties' disputes on hold temporarily so that Ms. Tilton and the other stakeholders could engage in a cooperative process to monetize various Portfolio Companies, as Ms. Tilton had intended with the Chapter 11 filings.

33.    Ms. Tilton worked tirelessly to sell or refinance the Portfolio Companies, a process that had started prior to the Settlement Agreement and continued with re-doubled effort thereafter. From the moment the Settlement Agreement was agreed to (and even before): Ms. Tilton negotiated on the companies' behalf the engagement of blue-chip investment bankers to market the Portfolio Companies; she personally expended millions of dollars of her own money to obtain quality of earnings reports from a highly reputable firm for the key Portfolio Companies; she spent hundreds of hours writing and editing each confidential marketing memorandum; and she personally met with many potential bidders; she coordinated with the

Portfolio Companies and investment bankers to provide voluminous company information for interested bidders in data rooms and throughout the diligence process. This was all accomplished while Ms. Tilton continued to actively manage four of the Portfolio Companies as CEO. Ms. Tilton persisted in these efforts even after the end of the 15-month window provided in the Settlement Agreement, and even when the Debtors refused to extend loan maturity dates while attacking Ms. Tilton in court. Ultimately, Ms. Tilton negotiated and closed two Portfolio Company sales. That more sales were not closed was not due to any lack of effort or desire on the part of Ms. Tilton. Unforeseen market forces and the overhang of the bankruptcy led to a number of disappointing sales processes, as the parties recognized, accepted, and agreed at the time.

34.    When some of the sales processes failed and no final buyer was there to close those transactions, Ms. Tilton persisted in trying to find a path forward for both the Funds' noteholders and the Portfolio Companies. Toward this end, at the encouragement and direction of the Zohar CRO and Independent Director, she raised $1 billion in cash and, using that cash as the centerpiece, in addition to senior secured notes as additional payment in certain proposals and certain Portfolio Companies, themselves, as supplementary compensation in others, she made six fully financed restructuring proposals to achieve complete resolution of these cases through fully documented plans of reorganization. These proposals would have repaid substantially the Zohar Funds' noteholders, including MBIA who would have its principal repaid in full and mitigated the damage or loss, if any, the noteholders may now face. But MBIA rejected Ms. Tilton's proposals, apparently having decided that it would prefer to pursue claims against Ms. Tilton rather than be fully repaid.

35.     Despite Ms. Tilton's herculean monetization efforts, she has faced constant opposition and interference from MBIA, culminating in a disastrous effort to sell Dura, a once highly valuable company that was destroyed by MBIA's irresponsible gamesmanship. Further, upon information and belief, at MBIA's behest, the Zohar Funds refused to extend term loan maturity dates for other companies, an economically irrational decision that meant each company would face the constant risk of foreclosure and bankruptcy while continuing to operate and transact during the monetization process.

36.     On July 30, 2020, MBIA filed this Complaint, once again trying to remedy its self-inflicted wounds by casting Ms. Tilton in the role of villain, and by purporting to assert rights belonging to the Zohar Funds, not to it. But MBIA's central theory of wrongdoing – that Ms. Tilton acted in her own self-interest to the detriment of the Zohar Funds – has always been and remains exactly backwards. At every step of the way for the past two decades, Ms. Tilton has worked tirelessly, alongside many dozens of other dedicated professionals, to make the Portfolio Companies and the Zohar Funds a success. Her decisions to amend credit agreements and modify loan terms rather than declare defaults or foreclose on assets, and her decision to file a bankruptcy petition for Zohar I, were made pursuant to her broad mandate to protect the interests of the Zohar Funds. To the extent MBIA's individual interests may have suffered as a result, that is either simply a function of the overlapping nature of the Funds, to which MBIA expressly consented, or due to MBIA's own wrongful actions.

37.     Nor are MBIA's other theories of Ms. Tilton's acting in her self-interest plausible. MBIA's suggestion that Ms. Tilton's actions were motivated by a desire to earn fees under the CMAs, Credit Agreements, and PPMG Agreements, for example, makes no sense considering that the amount of these fees has always been dwarfed by Ms. Tilton's billion-dollar financial

exposure to the Zohar Funds and the Portfolio Companies. Likewise, the theory that Ms. Tilton

"double dipped" by having her affiliates take fees under both the CMAs and the PPMG

Agreements is contrary to the agreements, which make clear that the services to be provided

were completely distinct. Moreover, Ms. Tilton repeatedly deferred the payment of such fees to

the benefit of the Portfolio Companies. It is also contradicted entirely by the fact that the

replacement collateral managers for the Funds (AMZM and now Ankura) never undertook to

provide the services that PPMG continued to provide even after the Patriarch Managers had

resigned.

38.     As explained in greater detail below, not one of MBIA's claims is sustainable as a

matter of law. As a threshold matter, most of the complaint should be dismissed because it is

duplicative of the Zohar's Funds pending adversary proceeding against the Patriarch

Defendants.[7] MBIA's complaint is primarily against the same defendants, is based on purported

rights the Zohar Funds are already litigating, and seeks largely the same relief the Zohar Funds

are already seeking. MBIA's claims should therefore be dismissed in favor of the Zohar Funds'

proceeding.

39.     In addition, many of MBIA's claims, including the sprawling and convoluted

breach of contract claim, should be dismissed under FRCP 8(a) and FRBP 7008 because MBIA

fails to identify which alleged facts in its rambling narrative, if any, connect to the elements of

the various causes of action. Such poor pleading improperly requires the Patriarch Defendants to

speculate about the exact factual and legal bases underlying MBIA's various theories of liability.

---

[7] *Zohar CDO 2003-1, LTD, et al. v. Patriarch Partners, LLC, et al.*, Adv. Proc. No. 20-50534
(KBO) (D. Del.) (the "Zohar Funds Adversary Proceeding"). Given the overlap of issues
between that case and this, Defendants incorporate by reference the arguments set forth in their
Brief in Support of Defendants' Motion to Dismiss that complaint. *Id.*, D.I. 44.

40.     Further, to the extent MBIA's claims can be gleaned from its convoluted Complaint, it is clear that none of them are sustainable. The tort claims are flawed across the board. In many instances, MBIA is asserting rights that it never had, as either Credit Enhancer or as subrogee to the noteholders. This is true with respect to the breach of fiduciary duty claims – none of the Patriarch Defendants ever owed a fiduciary duty to MBIA. In other instances, MBIA is pursuing claims that are time barred (abuse of process and malicious prosecution) or fundamentally defective (tortious interference).

41.     In short, despite its great length, the Complaint consists entirely of unfounded and legally flawed claims, designed to divert attention from MBIA's own wrongdoing. It should be dismissed in its entirety.

## MBIA'S COMPLAINT

42.     Broadly, MBIA's Complaint alleges that Ms. Tilton and certain of her affiliated entities took various actions, in supposed violation of certain contractual agreements and other obligations, to entrench themselves with the Portfolio Companies in order to extract value from them, to the detriment of MBIA, the Zohar Funds, and the Zohar Funds' noteholders.

43.     In particular, MBIA's Complaint relates to three interrelated contracts: (i) the Indentures; (ii) the Insurance and Indemnity Agreements; and (iii) the Financial Guaranties. Compl. ¶ 32. Pursuant to these agreements, MBIA was the financial guarantor of approximately $1.18 billion in notes. *Id.* ¶¶ 67–68.

44.     The central premise of the Complaint is that the Patriarch Defendants, through various forms of alleged wrongdoing, caused the Zohar Funds to default, thereby triggering MBIA's obligation to pay out on the guaranties for Zohar I and Zohar II. A number of broad categories of grievance – all of them baseless – underpin most of MBIA's claims:

- Certain Patriarch Defendants allegedly used Fund assets to acquire controlling equity interests in Portfolio Companies for their own benefit, refusing to monetize those interests to enable the Insured Funds to pay their noteholders;

- Certain Patriarch Defendants allegedly used their control of Portfolio Companies and their role as Collateral Manager to modify the Portfolio Companies' loan obligations to the Funds, thereby prolonging the period of the Patriarch Defendants' enrichment from the equity interests and Fund fees;

- Certain Patriarch Defendants extended the Portfolio Companies' payment obligations beyond the Zohar Note Maturity Dates, allegedly ensuring the Insured Zohar Funds' payment default in contravention of their legal duties and contractual obligations;

- Certain Patriarch Defendants allegedly embezzled Fund assets under the guise of fictitious Portfolio Company loans that were, according to the Complaint, misappropriated for the Patriarch Defendants' own unauthorized use;

- Certain Patriarch Defendants allegedly manipulated and concealed information regarding Fund assets to maintain their control over the Funds and the attendant financial benefits; and

- Certain Patriarch Defendants allegedly engaged in self-dealing transactions with Portfolio Companies at the expense of the Funds and their investors.

Compl. ¶ 74.

45.     Notwithstanding that the relationships among these highly sophisticated parties were governed by lengthy agreements, the Complaint pleads only a single contract claim. Taking a true scattershot approach, MBIA accuses the Patriarch Managers in Count I of having violated various provisions of the CMAs in a multitude of ways, ultimately leading to Zohar I's and Zohar II's defaults. *See* Compl. ¶¶ 190–92. This contract claim, brought by MBIA as third-party beneficiary, relies principally on provisions of the CMAs obligating the Patriarch Managers to perform their obligations responsibly and with care, and not to engage in any wrongdoing. *See id.* ¶ 189.

46.    Much of the rest of the Complaint consists of a hit parade of commercial tort claims – tortious interference (Counts II and III, Compl. ¶¶ 198–214), breach of fiduciary duty (Counts V and VI, *id.* ¶¶ 227–45), faithless servant (Count VII, *id.* ¶¶ 246–48), conversion (Count VIII, *id.* ¶¶ 249–54) and unjust enrichment (Count IX, *id.* ¶¶ 255–60) – all based on the same allegations underlying the contract claim. Similarly, the Complaint asserts a claim for declaratory relief (Count IV, *id.* ¶¶ 215–26), based on the same set of facts and seeking to invalidate certain actions that Defendants have taken with respect to the Portfolio Companies.

47.    Finally, MBIA adds claims for malicious prosecution (Count X, Compl. ¶¶ 261–63) and abuse of process (Count XI, *id.* ¶¶ 264–67), based on (i) the involuntary bankruptcy petition that Patriarch XV filed in 2015 with respect to Zohar I, and/or (ii) third-party claims that Ms. Tilton filed against MBIA in defense of claims brought against her by the Zohar Funds.

## STANDARD OF REVIEW

48.    Federal Rule of Civil Procedure[8] ("FRCP") 12(b) requires dismissal of a complaint if it fails to state a claim upon which relief can be granted. In evaluating a motion to dismiss, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Am. Corp. Soc'y v. Valley Forge Ins. Co.*, 424 F. App'x 86, 88 (3d Cir. 2011) (per curiam) (unpublished) (same).

49.    To avoid dismissal, a complaint must at least satisfy FRCP 8(a). Under Federal Rule of Civil Procedure 8(a)(2), "a pleading must contain a 'short and plain statement of the

---

[8] The Federal Rules of Civil Procedure are applicable to this Adversary Proceeding through Rule 7002 of the Federal Rules of Bankruptcy Procedure.

claim showing that the pleader is entitled to relief.'" *Swift v. Pandey*, No. 13-CV-650, 2013 WL 5486851, at *4 (D.N.J. July 1, 2013) (quoting *Iqbal*, 556 U.S. at 678). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds'" on which the claim rests." *Phillips v. County of Alleghany*, 515 F.3d 224, 232 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). Moreover, the factual allegations must be sufficient to "raise a [plaintiff's] right to relief above the speculative level," such that it is "plausible on its face." *Twombly*, 550 U.S. at 555; *Willoughby v. Zucker, Goldberg & Ackerman, LLC*, No. 13-CV-7062, 2014 WL 2711177, at *2 (D.N.J. June 16, 2014) (same). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility[.]" *Iqbal*, 556 U.S. at 678.

50.     In *Phillips v. County of Alleghany*, the Third Circuit emphasized the importance of *Twombly*, and the heavier burden it placed on plaintiffs to plead facts to support their claim. 515 F.3d 224 (3d Cir. 2008). "After *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'" *Id*. at 233 (citation omitted). Indeed, the *Phillips* court cautioned that, "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." *Id*. at 232 (citation omitted).

51.     A court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion School Dist*., 132 F.3d 902, 906 (3d Cir.1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co*., 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

18

52.     In evaluating a motion to dismiss, a court can and should consider not only the allegations of the complaint, but also any documents specifically referenced in or attached to the complaint and matters of public record. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993).

## ARGUMENT

## I.    MBIA'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS DUPLICATIVE OF THE ZOHAR FUNDS ADVERSARY PROCEEDING.

53.     As discussed in more detail below, none of MBIA's claims has any merit. But the Court need not even delve into the viability of most claims for the purposes of this motion because much of the Complaint – Counts I, II, IV, V, VI, VII, VIII, IX – is impermissibly duplicative of the Complaint in the Zohar Funds Adversary Proceeding, D.I. 2 (the "Zohar Funds' Complaint" or "Zohar Compl."). *See Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (holding the claim-splitting doctrine prohibits plaintiffs from "maintain[ing] two separate actions involving the same subject matter at the same time in the same court and against the same defendant").

54.     As part of its general power to administer its docket, "a district court may dismiss a duplicative complaint," *Fabics v. City of New Brunswick*, 629 F. App'x 196, 198 (3d Cir. 2015), and is afforded a great deal of latitude and discretion when determining if one lawsuit is duplicative of another, *see Yost v. Anthem Life Ins. Co.*, No. 3:18-CV-1522, 2019 WL 3451507, at *5 (M.D. Pa. July 30, 2019) ("[A] narrow view of a district court's ability to manage its docket is not consistent with more recent Supreme Court and Third Circuit precedent on the issue."). In determining whether a claim is barred by the claim splitting doctrine, the court may rely on a comparison of the pleadings filed in the two actions. *Yost*, 2019 WL 3451507, at *4; *see also*

*Flemming v. Smith*, No. 9:13-CV-816, 2014 WL 4829526, at *6 (N.D.N.Y. Sept. 29, 2014) ("[A] court 'is not required to conduct an exhaustive comparison between the two complaints.'") (quoting *New Phone Co. v. City of New York*, 498 F.3d 127, 129 (2d Cir. 2007)).

55.     The reasons for the rule against splitting claims are obvious: "splitting a cause of action provides a plaintiff with the proverbial two bites at the apple; creates a myriad of possible prejudices to the defendant; creates genuine possibilities of inconsistent results; and imposes an unwarranted burden on courts and jurors." *Watson v. Mayo*, No. 07-CV-54, 2008 WL 538442, at *3 (S.D.N.Y. Feb. 26, 2008); *accord Strader v. U.S. Bank*, No. 2:19-CV-118, 2020 WL 3447776, at *3 (W.D. Pa. June 24, 2020) ("The longstanding rule against improper claim splitting prohibits a plaintiff from prosecuting his case piecemeal and requires that all claims arising out of a single alleged wrong be presented in one action.") (internal citation omitted).

56.     In this case, there is no basis for distinguishing MBIA's claims from those of the Zohar Funds Adversary Proceeding; to the contrary, MBIA's Complaint, filed four months after the Zohar Funds' Complaint as an adversary proceeding in the same bankruptcy proceedings, names the same defendants, is largely premised on the same or similar facts and agreements, asserts largely the same or similar legal theories, and seeks largely the same or similar relief.

       **A.     The Parties Represent the Same Interests or Are the Same.**

57.     It cannot be disputed that the purpose of the Zohar Funds Adversary Proceeding is to collect funds for the benefit of the Funds' creditors, including MBIA, and that Zohar I and II represent MBIA's interests with respect to claims against Ms. Tilton and her Patriarch affiliates arising out of the Indentures and CMAs. It is also clear that much, if not all, of MBIA's lawsuit is an effort to vindicate the Zohar Funds' rights under various agreements. *See, e.g.*, Compl. Count I, ¶¶ 187–97 (seeking to enforce the Patriarch Managers' obligations to the Zohar Funds under the CMAs); *id.* Count IV, ¶¶ 215–26 (seeking to enforce the Zohar Funds' equity interests

in and rights concerning the Portfolio Companies); *id.* Counts VI and VII, ¶¶ 236–48 (seeking to

vindicate certain Patriarch Defendants' alleged fiduciary obligations to the Zohar Funds). This is

sufficient to satisfy the standard for impermissible duplicative litigation as "[t]he parties to the

two actions need not be identical – if the parties to the suits represent the same interests, a district

court may find them to be duplicative." *De Los Santos v. Just Wood Furniture, Inc.*, No. 05-CV-

9369, 2007 WL 9817923, at *3 (S.D.N.Y. July 12, 2007).

58.     There is also a clear overlap in Defendants: eleven defendants here[9] are identical

to those in the Zohar Funds Adversary Proceeding. *Compare* Compl. ¶¶ 8–19 *with* Zohar Compl.

¶¶ 16–27, 30–32, 35–36. And two other defendants – Zohar Holding, LLC, which is the sole

member of certain Patriarch Managers, Compl. ¶¶ 21–22, and LDI, which is the sole member of

certain defendants, *id.* ¶ 20 – are so closely related to the overlapping Patriarch Defendants that

their addition creates no meaningful distinction. *See Acosta v. Gaudin*, No. 2:17-CV-366, 2017

WL 4685548, at *3 (W.D. Pa. Oct. 18, 2017) ("[T]he rules of privity . . . apply to the claim-

splitting analysis."); *Byron v. Genovese Drug Stores, Inc.*, No. 10-CV-3313, 2011 WL 4962499,

at *3 (E.D.N.Y. Oct. 14, 2011) ("As a wholly-owned subsidiary, it cannot be found that these

two entities are so distinct as to warrant duplicative litigation."). This is particularly so since the

additional defendants are not accused of any independent wrongdoing.

**B.     The Two Suits Arise from the Same Agreements and Facts.**

59.     In establishing that litigation is duplicative, "[t]he cases need not be actually

identical to involve the same subject matter. When the difference between the two cases is purely

---

[9]  Ms. Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV,
LLC, Patriarch Partners XV, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners
Management Group, LLC, Octaluna, LLC, Octaluna II, LLC, Ark II CLO 2001-1, LLC, Ark
Investment Partners II, L.P.

semantic and both cases rely on the same operative facts and legal principles, the cases involve the same subject matter." *Acosta*, 2017 WL 4685548, at *3 (internal quotation marks and citation omitted). Thus, "all aspects of the new and prior suits [need not] be identical," *Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 48 (2d Cir. 2013), as the Third Circuit "take[s] a broad view, looking to whether there is an essential similarity of the underlying events giving rise to the various legal claims," *In re Olick*, 630 F. App'x 140, 141 (3d Cir. 2016) (internal citation and quotation marks omitted).

60.    Such is the case here. Both complaints principally arise out of the same universe of agreements, including the Indentures, the CMAs, the Credit Agreements, and the PPMG Management Agreements. *See infra*; *see also Yost*, 2019 WL 3451507, at *4 (dismissing second case as duplicative as plaintiff "[did] not acknowledge the fundamental fact that *Yost I* also alleged Defendant's [insurance] policy violations"). Although MBIA additionally cites to the Insurance Agreements and Financial Guaranties, MBIA asserts only a single claim (for tortious interference) under one of them. Moreover, both actions "arise from the same set of facts and transactions," *Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224 (3d Cir. 2009), such that "the facts alleged in the two complaints are not simply related in time, space and origin. They are nearly identical." *Davis*, 534 F. App'x at 48:

- In August and September of 2015, Ms. Tilton altered the management-services fees that the Portfolio Companies were required to pay PPMG. *Compare* Compl. ¶¶ 91–93, 257, *with* Zohar Compl. ¶¶ 3, 120–27, 377–85.

- In September 2015, the Patriarch Managers, on behalf of the Zohar Funds: (i) executed amendments to the LLC Agreements and (ii) caused the Zohar Funds to exercise their rights as shareholders of the corporate Portfolio Companies to grant irrevocable proxies to other entities controlled by Ms. Tilton. *Compare* Compl. ¶¶ 82–86, *with* Zohar Compl. ¶¶ 3, 103–18.

- In November 2015, Ms. Tilton executed a series of amendments to the credit agreements under which the Zohar Funds loaned to the Portfolio Companies.

*Compare* Compl. ¶¶ 106–16, *with* Zohar Compl. ¶¶ 101–02, 113–19, 166, 237–38.

- In 2016, Ms. Tilton made an election for the Zohar Funds to be taxed as corporations. *Compare* Compl. ¶¶ 160, 257, *with* Zohar Compl. ¶¶ 4, 85, 128–33, 285–352.

- In November 2017, Ms. Tilton executed written consents for ████████ ████████ to create new preference interests. And, on November 13, 2017, Ms. Tilton brought actions seeking declaratory judgments that she was the beneficial owner of these portfolio companies. *Compare* Compl. ¶¶ 87–89, 175–77, 215–26, *with* Zohar Compl. ¶¶ 5, 135–36, 141–42, 163–74, 240–50, 259–70, 353–71.

- On March 10 and 11, 2018, Ms. Tilton caused four Portfolio Companies to enter into "phantom equity" agreements. *Compare* Compl. ¶ 179, *with* Zohar Compl. ¶¶ 6, 143– 47, 353–61, 373–75, 384–85, 406–22, 440–46.

- The SEC alleged that Ms. Tilton manipulated a financial test required under the Indentures. *Compare* Compl. ¶¶ 133–44, *with* Zohar Compl. ¶¶ 88–98, 197–202, 214–16, 222, 278–84.

**C.    The Claims Are Duplicative.**

61.    Apart from the substantial overlap between the parties, the underlying agreements, and the underlying facts, the two actions assert the same or similar causes of action. Indeed, seven of the claims set forth in the MBIA Complaint are exactly the same as claims asserted in the Zohar Funds Adversary Proceeding:

- Breaches of the CMAs. *Compare* Compl. ¶¶ 187–97 (Count I), *with* Zohar Compl. ¶¶ 181–207 (Count IV).

- Tortious interference with the Indentures. *Compare* Compl. ¶¶ 198–206 (Count II), *with* Zohar Compl. ¶¶ 208–16 (Count V).

- Entitlement to declarations establishing: (1) equity ownership of certain Portfolio Companies and (2) that certain Voting/Control Actions were ineffective. *Compare* Compl. ¶¶ 215–26 (Count IV), *with* Zohar Compl. ¶¶ 154–74 (Counts I and II).

- Breaches, as well as aiding and abetting breaches, of fiduciary duty under the CMAs. *Compare* Compl. ¶¶ 227–45 (Counts V and VI), *with* Zohar Compl. ¶¶ 217–32, 447–51 (Counts VI, VII, and XXX).

- The Patriarch Managers are faithless servants. *Compare* Compl. ¶¶ 246–48 (Count VII), *with* Zohar Compl. ¶ 226 (Count VI).

- Conversion of the Zohar Funds' property (and, by extension, MBIA's property). *Compare* Compl. ¶¶ 249–54 (Count VIII), *with* Zohar Compl. ¶¶ 233–39 (Count VIII).

- Defendants were unjustly enriched through supposed bad acts. *Compare* Compl. ¶¶ 255–60 (Count IX), *with* Zohar Compl. ¶¶ 271–84, 347–52, 470–76 (Counts XIII, XIV, XXIV, and XXXIII).

62.    That three of MBIA's claims – tortious interference with Insurance Agreements, malicious prosecution, and abuse of process, *see* Compl. ¶¶ 207–14 (Count III), 261–67 (Counts X and XI) – are new is of no moment because the claims splitting doctrine applies even where two actions "substantially overlap but feature at least one non-overlapping claim." *U.S. ex rel. Cestra v. Cephalon, Inc.*, No. 10-CV-6457, 2014 WL 1087960, at *4 (S.D.N.Y. Mar. 19, 2014). Further, the litigations underlying the malicious prosecution and abuse of process claims all involved the Zohar Funds. *See* Compl. ¶¶ 261–67 (alleging Ms. Tilton caused Patriarch XV to commence the Zohar I bankruptcy and that Zohar II brought the Delaware 225 Action).

**D.    The Relief Sought Is Duplicative.**

63.    Not only are the causes of action duplicative, but the relief sought is materially indistinguishable. That alone is sufficient to warrant dismissal. *See, e.g., Matthews Int'l Corp. v. Lombardi*, No. 2:20-CV-89, 2020 WL 1309399, at *1 (W.D. Pa. Mar. 19, 2020) ("The slight differences in causes of action and intended relief are what the Third Circuit has called purely semantic.") (citing *McKenna v. City of Philadelphia*, 304 F. App'x 89, 92 (3d Cir. 2008) (collecting cases)); *Trustees of Plumbers Local Union No. 1 Welfare Fund, Additional Sec. Benefit Fund, Vacation & Holiday Fund, Trade Educ. Fund, 401(k) Sav. Plan v. ENOBRAC Plumbing Inc.*, No. 17-CV-2846, 2018 WL 3635049, at *18 (E.D.N.Y. Feb. 12, 2018) (finding

action duplicative where there was a "risk that the amounts recovered . . . would be the same

awarded" in the first action).

      64.     In particular, both actions seek the following types of relief:

- Recovery for economic damages to the Zohar Funds and their noteholders allegedly caused by Defendants. *Compare* Compl. ¶¶ 234–35, 243–45, 257–60, 263 (Counts V, VI, IX, and X), *with* Zohar Compl. ¶¶ 207, 216, 232, 277 (Counts IV, V, VII, and XIII).

- Recoupment of (i) collateral management fees, (ii) PPMG fees, and (iii) PPAS fees. *Compare* Compl. ¶¶ 246–48, 257–60 (Counts VII and IX), *with* Zohar Compl. ¶¶ 225–26, 455–61, 464–69 (Counts VI, XXXI, and XXXII).

- Damages for the fair market value of the Zohar I Collateral. *Compare* Compl. ¶¶ 250–54 (Count VIII), *with* Zohar Compl. ¶ 234–39 (Count VIII).

- Declaratory judgment establishing the legal, beneficial and equitable ownership of equity interests in the Portfolio Companies and invalidating the voting, transactions, and encumbrances. *Compare* Compl. ¶ 216–26 (Count IV), *with* Zohar Compl. ¶¶ 155–62, 164–74 (Counts I and II).

      65.     Although MBIA has also asserted a claim for repayment under the Insurance

Agreements, that claim duplicates the request for "significant economic damages to the Insured

Zohar Funds and their noteholders," Compl. ¶¶ 234, 243, because MBIA's losses as insurer are

identical to its losses as subrogee to the Insured Zohar Funds' noteholders. *See* Trzaskoma Decl.

Ex. 1 (Zohar I Insurance Agreement) § 4.05.

      66.     The only potential additional relief sought is for attorneys' fees MBIA

purportedly incurred in litigating the Zohar I 2015 bankruptcy and the Delaware 225 Action. But,

as discussed below, Arg. X and XI, the claims seeking this relief are improper as a matter of law

and should, therefore, be discounted in the Court's claim splitting analysis.

## II.    MBIA'S CLAIM FOR BREACH OF CONTRACT IS NOT WELL PLEADED.

### A.    Count I Is Impermissibly Vague.

67.    MBIA's claim for breach of contract in Count I fails to meet the basic pleading requirements set forth by FRCP 8 and should be dismissed on this basis.

68.    "[U]nder Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Swift*, 2013 WL 5486851, at *4 (quoting *Iqbal*, 556 U.S. at 678). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds'" on which the claim rests." *Phillips*, 515 F.3d at 232 (quoting *Twombly*, 550 U.S. at 555). Therefore, "dismissal is appropriate [for failing to comply with Rule 8] in cases where the complaint is so confused, ambiguous, vague, or otherwise unintelligible," *Tillio v. H&R Block, Inc.*, 445 F. App'x 604, 604–05 (3d Cir. 2011) (internal quotation marks omitted), or "excessively long-winded" and "word[y]," *D.J. by Next Friend Megahey v. Cty. of Westchester*, No. 14-CV-7635, 2020 WL 419382, at *4 (S.D.N.Y. Jan. 27, 2020).

69.    In this case, although the Complaint does not want for volume of factual allegations, it does want for clarity, particularly with respect to Count I. More than 186 paragraphs of allegations, spanning more than a decade of alleged conduct, are incorporated by reference into Count I. Yet MBIA completely fails to identify which alleged facts supposedly breached which provision of the CMAs. *See* Compl. ¶ 187. To the contrary, while certain paragraphs purport to specify the alleged breaches, *id.* ¶¶ 190–91, each purported "category" of wrongdoing potentially encompasses dozens of alleged facts, ultimately rendering the claim inscrutably vague.

70.    In paragraph 190, for example, MBIA alleges that the Patriarch Managers breached the CMAs by "failing to exercise their powers under the [CMAs] subject to and in

accordance with the terms of the Indentures, failing to cause the Insured Zohar Funds to exercise rights or remedies and failing to exercise rights and remedies, all in violation of the Indenture." Compl. ¶ 190(a). These broad allegations specify neither what "powers" nor what "rights and remedies" the Patriarch Managers supposedly failed to exercise, when the Patriarch Managers should have acted, or even which Portfolio Companies might be involved.

71.    Similarly, in paragraph 191, MBIA alleges that the Patriarch Managers engaged "in various conflicted, self-dealing transactions knowingly designed to divert to Defendants control over the Insured Zohar Funds' equity interests in the Portfolio Companies . . . including, among other things, obstructing and impeding Zohar II's ability to monetize its equity interests in the Portfolio Companies to avoid its Note payment default." Compl. ¶ 191(d). While there are many words in the description of this category of breach, they fail to explain which various transactions are being referred to, which of the alleged facts constituted the "obstructing and impeding," or which equity interests could or should have been monetized and when.

72.    Additionally, in paragraph 192, MBIA alleges that certain Defendants "divert[ed] to themselves funds that otherwise would have been available to the Insured Zohar Funds to pay amounts owed on the Class A notes and reduce or avoid MBIA's payment under the Financial Guaranties." Compl. ¶ 192(a). Again, this broad language does not identify which of the 73 pages of factual allegations are being referred to, which defendant diverted which specific funds, or explain how exactly such "diversion" breached any particular provision of the CMAs.

73.    The Complaint thus impermissibly forces Defendants "to guess what of the many things discussed" form the basis of MBIA's breach of contract claim. *Binsack v. Lackawanna Cty. Prison*, 438 F. App'x 158, 160 (3d Cir. 2011). In this regard, the Complaint's length and the multitude of allegations hinders clarity rather than creates it. *See In re Westinghouse Sec. Litig.*,

90 F.3d 696, 703 (3d Cir. 1996) (affirming dismissal of 240-page complaint under FRCP 8 for being "unnecessarily complicated and verbose"); *Jackson v. Rohm & Haas Co.,* No. 05-CV-4988, 2009 WL 773936, at *3 (E.D. Pa. Mar. 19, 2009) (dismissing 152-page complaint under FRCP 8).

74.    As MBIA's claim for breach of contract does not meet FRCP 8's basic pleading standards, it should be dismissed.

**B.    In the Alternative, MBIA Should Be Required to Provide a More Definite Statement of Its Breach of Contract Claim.**

75.    In the alternative to dismissal, MBIA should be required to provide a more definite statement explaining which of the factual allegations correspond with each category of breach in paragraphs 190(a)–(f), 191(a)–(f), and 192(a)–(c). *See Thomas v. Independence Twp.*, 463 F.3d 285, 301 (3d Cir. 2006) ("[T]he Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available . . . to obtain the factual basis underlying a plaintiff's claim for relief.").

76.    Here, as discussed below, Arg. III, MBIA alleges fifteen categories of breach of contract, but does not indicate which of the nearly 200 factual allegations apply to each category. Instead, MBIA merely incorporates all 73 pages of allegations into the count, *see* Compl. ¶ 187, placing Defendants "in the unenviable position of attempting to truthfully answer the complaint, while faced with sweeping and broad averments." *Vorobey v. Cleveland Bros. Equip. Co.*, No. 4:18-CV-865, 2018 WL 6436717, at *4 (M.D. Pa. Dec. 7, 2018). Without additional clarity, "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996); *see also Digene Corp. v. Ventana Med. Sys., Inc.*, 476 F. Supp. 2d 444, 448 n.36 (D. Del. 2007) (same); *Carson v. Tucker*, No. 5:20-CV-399, 2020 WL 1953655, at *7 (E.D. Pa. Apr. 23,

2020) ("The vague nature of these subparagraphs highlights the usefulness of a

motion for a more definite statement when a complaint does not disclose the facts underlying a

plaintiff's claim for relief such that the defendant cannot reasonably be expected to frame a

proper, fact-specific defense.") (citation and internal quotation marks omitted).

77.     Therefore, the Court should require MBIA "to link their specific allegat[ions] to

the causes of action pled in their complaint." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d

1273, 1276 (11th Cir. 2006) (dismissing complaint where the "elements of [plaintiff's] claims

[were] insufficiently linked to the large fact section that proceeds the counts"); *see also*

*Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998) (repleading required

where a complaint obscured the material allegations by incorporating all

previous allegations into subsequent counts); *Krushin v. Kosek*, No. 4:16-CV-1540, 2019 WL

1246963, at *8 (M.D. Pa. Feb. 22, 2019) (ordering a more definite statement where "assessing

the legal merits of these alleged claims" required "an extended exegesis analyzing claims whose

legal and factual elements remain uncertain"), *report and recommendation adopted*, No. 4:16-

CV-1540, 2019 WL 1239872 (M.D. Pa. Mar. 18, 2019).

## III.     EVEN IF PLEADED SUFFICIENTLY, THE COMPLAINT STILL DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT.

78.     As best can be gleaned from the Complaint, MBIA has five theories of how the

Patriarch Managers breached the CMAs prior to the Patriarch Managers' replacement as

collateral managers in March 2016:[10] (i) by amending certain credit agreements to defer interest

payments and modify loan terms; (ii) by miscategorizing certain loans; (iii) by funding new loans

---

[10] To the extent Count I is premised on any conduct following the resignation of the Patriarch Managers as Collateral Managers, those claims must be dismissed. Under Section 5.7(b) of the CMAs, the Patriarch Managers may not be held liable for events post-dating their resignation. Trzaskoma Decl. Ex. 2 (Zohar I CMA).

without MBIA's consent; (iv) by refusing to monetize the Portfolio Companies and "siphoning" funds from those companies in the form of fees; and (v) by engaging in "various conflicted, self-dealing transactions." Compl. ¶ 191.

79.    However, these theories all rely on the same faulty premise: that the Patriarch Managers may be held liable under the CMAs for the Insured Zohar Funds' defaults. According to the Complaint, some or all of the Patriarch Managers' alleged actions violated certain provisions of Article II of the CMAs, which govern the general duties of the collateral manager. And those alleged breaches led Zohar I and II to default, triggering MBIA's obligations under the Financial Guaranties. Compl. ¶¶ 194–95. But under the CMAs, the Patriarch Managers expressly did not guarantee the success of the Funds. And further, the CMAs limit the Patriarch Managers' liability such that they cannot be liable for breach of contract.

80.    Therefore, as discussed below, the contract claim is not sustainable for several reasons. First, the CMAs contain a limitation of liability provision that precludes MBIA's claim. Second, none of the complained-about conduct violated any obligation the Patriarch Managers had under the CMAs. Third, even if there had been a violation, the allegations do not support an inference that such violation caused the harm about which MBIA complains – the Zohar Funds' defaults.

### A.    The CMAs Preclude Liability as a Matter of Law.

81.    If for no other reason, MBIA's contract claim fails because the CMAs expressly and broadly limited the Patriarch Managers' liability. *See Roberts v. Weight Watchers Int'l, Inc*., 217 F. Supp. 3d 742, 753–54 (S.D.N.Y. 2016) ("[T]he 'Limitation of Liability Provisions'[] are an independent bar to the plaintiff's breach of contract claim for money damages."), *aff'd*, 712 F. App'x 57 (2d Cir. 2017); *see also Metropolitan Life Ins. Co. v. Nobel Lowndes Int'l Inc*., 84 N.Y.2d 430, 436 (N.Y. Oct. 25, 1994) ("A limitation on liability provision in a contract

30

represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor.").

82.    Article II, upon which MBIA seeks to rely, clearly provides that the Patriarch Managers did not promise to ensure there would not be a default: specifically, MBIA understood that the Patriarch Managers did not "guarantee[] the performance of or economic returns to be realized . . . or whether the economic returns . . . will be sufficient to repay the amounts owed . . . under the Indentures or otherwise." Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 2.2(a) (emphasis added). Moreover, the CMAs provided that neither the Patriarch Managers nor their "members, managers, directors, officers, stockholders, partners, employees, advisors and agents shall not be liable to" MBIA, either as Credit Enhancer or noteholder, for "any loss arising out of any investment." *Id*. Ex. 2 § 4.4.

83.    These provisions of the CMAs make it clear that the Patriarch Defendants cannot be held liable for the harm alleged by MBIA, namely the default of Zohar I and II. The Patriarch Managers did not guarantee the success of the Funds and the sweeping liability limitation provision bars MBIA's claim based on insufficient economic returns. Therefore, MBIA's breach of contract claim must be dismissed. *See TOA Sys., Inc. v. Int'l Bus. Machines Corp*., No. 18-CV-10685, 2019 WL 5693388, at *3 (S.D.N.Y. Nov. 4, 2019) ("[T]he Court finds plaintiff cannot plausibly allege a breach of contract claim . . . given the limitation on liability clause.").

84.    Although there is an exception in the CMAs for "fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance or reckless disregard," Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 4.5(a), MBIA's Complaint fails sufficiently to allege such wrongful conduct because the alleged facts do not suggest that the Patriarch Defendants had a motive to engage in such wrongdoing, much less that they engaged in

Case 20-50776-KBO   Doc 67-1   Filed 04/13/21   Page 51 of 96

"egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts." *Tradex Europe SPRL v. Conair Corp.*, No. 06-CV-1760, 2008 WL 1990464, at *3 (S.D.N.Y. May 7, 2008).[11]

85.     This is because Ms. Tilton's interests and those of her affiliated entities were fully aligned with those of the Zohar Funds and their noteholders. Indeed, the entire structure of the Funds, Ms. Tilton's side-by-side investments, and her role as owner of the Funds completely undermine any allegation that Ms. Tilton would have had a financial interest in breaching her duties to the Zohar Funds. *See Charles Schwab & Co. v. Retrophin, Inc.*, No. 14-CV-4294, 2015 WL 5729498, at *9 (S.D.N.Y. Sept. 30, 2015) (dismissing fraud claim where "allegations fail[ed] to support a plausible inference of motive, let alone a strong inference"); *Waite v. Schoenbach*, No. 10-CV-3439, 2010 WL 4456955, at *6 (S.D.N.Y. Oct. 29, 2010) ("[C]onclusory allegations of scienter are sufficient [only] if supported by facts giving rise to a strong inference of fraudulent intent.") (citation omitted; alterations in original).

**B.     The Complaint's Allegations Are Insufficient to Plead a Breach of the CMAs.**

86.     The CMAs (which are virtually identical for each Fund) are agreements between the Zohar Funds and the Patriarch Managers, pursuant to which the Patriarch Managers agreed to "perform[] certain investment management functions" on behalf of the Funds. Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 2.1. Although MBIA was an "express third-party beneficiary" of each CMA, *id.* Ex. 2 § 7.4, the Patriarch Managers owed duties to the Funds, not to MBIA.

---

[11] To the extent MBIA's allegations of wrongdoing rest on insufficient economic returns this also fails as "willful misconduct does not include the voluntary and intentional failure or refusal to perform a contract for economic reasons." *In re CCT Commc'ns, Inc.*, 464 B.R. 97, 106 (Bankr. S.D.N.Y. 2011).

87.    In claiming the Patriarch Managers breached the CMAs, MBIA relies on the

following provisions:

- Section 2.2, which sets forth the services that the Patriarch Managers were to provide each Fund. In particular, the Complaint points to language in section 2.2(c) authorizing the Patriarch Managers to exercise "any and all" of the Zohar Funds' rights but only so long as the Patriarch Managers do not "cause the [Funds] to exercise any such rights or remedies in a manner prohibited by the Indentures." Compl. ¶ 189(a).

- Section 2.4, which obligated the Patriarch Managers to "use reasonable care" and to manage the Zohar Funds' collateral with "skill and attention." *Id.* ¶ 189(d).

- Section 2.6, which generally required the Patriarch Managers not to take any action that would cause the Funds "to violate the terms of the Indenture" and not to "intentionally take any action that it knows would cause an Event of Default under the Indenture." *Id.* ¶ 189(b).

- Section 4.4, which expressly limits the Patriarch Managers' liability except in the case of "fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard" of their obligations under the CMAs. *Id.* ¶ 189(e).

- Section 6.2(c), which concerned conflicts of interest and required the Patriarch Managers, in the event of a "material conflict of interest" between themselves and the noteholders, to "perform [their] obligations with respect to any such conflict in accordance with the care, skill, prudence and diligence that a prudent Person" would use to resolve that conflict. *Id.* ¶ 189(d).

88.    As discussed below, the Complaint does not state a claim for breach of any of

these provisions.

### 1.    No Breach Based on Allegations of Amending Credit Agreements with the Portfolio Companies

89.    MBIA complains generally that the Patriarch Managers amended the Credit

Agreements between the Portfolio Companies and the Zohar Funds, deferred and/or forgave

interest payments, and extended principal repayment dates on loans, arguing that this conduct

violated the Patriarch Managers' obligations under the CMAs. *See* Compl. ¶¶ 191(a), 191(d).

90.     This position has no merit because the Patriarch Managers' alleged actions were expressly contemplated and permitted by both the Indentures and the CMAs. Specifically, section 7.7(a) of the Indentures acknowledged that the nature of the investments – "stressed and distressed loans" – would be "the subject of extensive amendment, workout, restructuring, and/or other negotiations." Trzaskoma Decl. Ex. 3 (Zohar I Indenture). For this reason, the CMAs explicitly authorized the Patriarch Managers to "enter into any amendment, modification or waiver of, or supplement to, any term or condition of any Collateral, Collateral Debt Obligation, Unrestricted Collateral Debt Obligation or Equity Security (including, without limitation and subject to the terms of the Indenture exchanges thereof for other loans, equity or other securities)." *Id.* Ex. 2 (Zohar I CMA) § 2.2(c). Further, the Patriarch Managers were entitled to restructure the Zohar Funds' loans "without the consent of the holders of any Notes or any other Person." *Id.*; *see also id.* Ex. 4 (Initial SEC Dec.), Ex. 5 ("Final SEC Order").

91.     Under these circumstances, because the Patriarch Managers' alleged actions were expressly authorized by the CMAs, the breach of contract claim based on amendments to credit agreements and other loan workout actions is not viable as a matter of law. *See Stokes v. Lusker*, 425 F. App'x 18, 22 (2d Cir. 2011) (dismissing claim for breach of contract where conduct complained of was expressly permitted by language in contract); *Manchester Equip. Co. v. Panasonic Indus. Co.*, 141 A.D.2d 616, 617 (2d Dep't 1988) (same).

### 2.    No Breach Based on Allegations of Miscategorized Loans or the Miscalculation of the OC Ratio

92.     The Complaint alleges that the Patriarch Defendants miscategorized "non-performing 'Category 1' loans as performing 'Category 4' loans and miscalculate[ed] the Overcollateralization Ratio to ensure the continued wrongful payment of management fees." Compl. ¶ 191(b).

93.     MBIA's position has no merit whatsoever. These are precisely the same

allegations that the SEC already brought against Ms. Tilton and other Patriarch Stakeholders.

And these are precisely the exact same allegations that the ALJ rejected after a fourteen-day

hearing, at which eighteen witnesses testified and hundreds of exhibits were admitted into

evidence. Trzaskoma Decl. Ex. 4 (Initial SEC Dec.) at 51–53. As reflected the Final SEC Order,

Ms. Tilton did not improperly manipulate the OC Ratio and did not fail to disclose financial

information concerning the Portfolio Companies and the loans. *Id.*; *see also id.* Ex. 5 (Final SEC

Order).

94.     MBIA is bound by this prior ruling because (i) the SEC had the same interests as

MBIA with respect to proving liability, and (ii) MBIA was "adequately represented" in that

litigation. *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008); *see also Comm'r of Dep't of Planning &

Nat. Res. v. Century Alumina Co., LLC*, No. 05-CV-62, 2011 WL 6010009, at *5 (D.V.I. Nov.

30, 2011) (Department of Planning and Natural Resources "adequately represented the

Government's interests in the Cost Recovery Action within the meaning of [the adequate

representation] exception"); *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs*., 533

F.3d 634, 640–41 (8th Cir. 2008) (applying adequate representation exception where "interests

asserted by the Yankton Sioux Tribe and its individual members . . . are identical" and the "Tribe

understood itself to be acting in a representative capacity for the benefit of its individual

members"); *Midwest Disability Initiative v. JANS Enterprises, Inc*., 929 F.3d 603, 608 (8th Cir.

2019) (action precluded by disabled plaintiff where the Midwest Disability Initiative brought

prior action and "was acting in a representative capacity for the benefit of its individual

members, including [plaintiff]").

95.     There can be no question that MBIA and the SEC had identical interests in establishing liability based on the OC Ratio claims. In fact, the SEC unsuccessfully pursued the exact same theories of wrongdoing that MBIA is alleging here. There also can be no question that the SEC adequately represented MBIA's interests, particularly considering that MBIA directly participated in the SEC's investigation, coordinating extensively with the SEC prior to and during the hearing. *See* Trzaskoma Decl. Ex. 4 (Initial SEC Dec.) at 47.

96.     Under these circumstances, MBIA is bound by the Final SEC Order and has no claim based on any allegations concerning the OC Ratio or any other theory of liability that the SEC pursued. *See Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 836 (S.D. Iowa 2015) (adequate representation preclusion applied where "the parties have identical interests, a legal relationship, and the evidence shows that [plaintiff in first suit] understood itself to be acting in a representative capacity").

### 3.     No Breach Based on Allegations of Funding New Loan Commitments Without MBIA's Authorization

97.     MBIA asserts that the Patriarch Managers violated the CMAs by funding new loan commitments without MBIA's authorization. Compl. ¶ 191(c). Though not entirely clear, this appears to be based on the allegation that the Insured Funds loaned an additional $6 million to ███ in October 2015. *Id.* ¶ 109.

98.     But MBIA does not point to any provision of the CMAs that required the Patriarch Managers to obtain such consent. This alone is grounds for dismissal. *See Carbonyx License & Lease LLC v. Carbonyx Inc.*, No. 19-CV-1540, 2019 WL 2867022, at *5 (S.D.N.Y. July 1, 2019) (dismissing claim for breach of contract that failed to allege which provision was allegedly breached); *Levy v. Bessemer Tr. Co.*, No. 97-CV-1785, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997) (dismissing breach of contract claim where breached provisions were

not alleged to be part of the contract and where complaint did not identify which provisions of contract were breached); *Trump on Ocean, LLC v. State*, 79 A.D.3d 1325, 1326 (3d Dep't 2010) (affirming dismissal of breach of contract claim where action claimed as breach was failure to approve alternate design, but claimant "failed to allege that there was any such requirement" to do so in the agreement).

99.     Moreover, the CMAs expressly permitted the Patriarch Managers to enter into such loan modifications "<u>without the consent of the holders of any Notes or any other Person</u>." Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 2.2(c) (emphasis added). Thus, the CMAs preclude any claim based on this allegation. Further, the Final SEC Order bars MBIA from making any argument to the contrary as the ALJ concluded that this language in the CMAs permitted the amendments. *See* Arg. III(B)(2), *supra*.

### 4.     No Breach Based on Allegations of Refusing to Monetize Equity Interests or "Siphoning" Fees or Assets

100.     MBIA asserts that the Patriarch Managers refused to "monetize equity interests" and diverted "proceeds from the Portfolio Companies," including "in the form of management consulting fees." Compl. ¶ 191(e). This broad allegation seems to embed three components.

101.     ***First***, as to the Patriarch Managers' failure to monetize assets, MBIA does not tie that grievance to any provision in the CMAs. Again, this is grounds for dismissal. *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (dismissing claim for breach of contract that failed to identify which provision of contract was allegedly breached, holding "a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue"). MBIA also fails to provide any specific facts regarding which Portfolio Companies allegedly should have been sold, when those sales theoretically could have or should have taken place, how much the companies could have sold for, or what Zohar I or Zohar II's allocations

would have been from those sales. *See Harbor Distrib. Corp. v. GTE Operations Support Inc.*, 176 F. Supp. 3d 204, 215 (E.D.N.Y. 2016) (dismissing breach of contract claim for including only conclusory allegations of breach and collecting cases); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (same) (collecting cases).

102.    The theory underlying MBIA's "refusal to monetize" claim seems to be that the Patriarch Managers had some affirmative duty to sell the Portfolio Companies to avoid a default. But nothing in the CMAs (or the Indentures) required the Patriarch Managers to take actions to prevent a triggering of MBIA's insurance obligations, particularly where doing so would have been inconsistent with the Patriarch Managers' duties to manage the Zohar Funds for the benefit of <u>all</u> stakeholders. Further, this argument – that the Patriarch Managers should have sold Portfolio Companies to generate cash for a Fund with an early maturity date regardless of the consequences to other Funds or other stakeholders – is wholly inconsistent with each Fund's express acknowledgement that the Patriarch Managers and their "Related Parties" would have obligations to other parties with interests in the same collateral, *see* Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 6.2(a), and the Funds' and MBIA's express consent to and waiver of those conflicts of interest, *id.* Ex. 2 § 6.2(b).

103.    ***Second***, as to MBIA's conclusory allegation that the Patriarch Defendants "siphon[ed] funds" in alleged violation of the CMAs, Compl. ¶ 191(e), this claim fares no better. Although somewhat murky, it would appear that MBIA is pursuing the same "double dipping" idea the Zohar Funds have alleged: that the Patriarch Defendants were paid fees by the Portfolio Companies for work that was already required under the CMAs. *See*, *e.g.*, Zohar Compl. ¶¶ 120–27, 455. This theory is not plausible, however, because it is contradicted by the relevant underlying agreements.

104.    Specifically, as reflected in the CMAs, the Patriarch Managers owed duties to the Zohar Funds, not to the Portfolio Companies. Those collateral management responsibilities included identifying and selecting collateral; exercising the Funds' rights with respect to that collateral; negotiating and transacting on the Funds' behalf with respect to the collateral; interacting on the Funds' behalf with ratings agencies and the Trustee; monitoring the collateral and preparing reports; and supervising the collateral and ensuring compliance with the Indentures. *See* Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 2.2(a)–(r). The contractual services PPMG provided to the Portfolio Companies pursuant to the PPMG Agreements were entirely different. PPMG's services to the Portfolio Companies included, for example, management consulting services (including legal, tax, and accounting services); services in connections with Portfolio Company transactions; assistance with financing efforts; finance and marketing functions; and human resources assistance, including executive recruiting. *See*, *e.g.*, *id*. Ex. 6 (██████ PPMG Agreement).

105.    Given that the CMAs and PPMG Agreements clearly required separate services, this Court should not credit MBIA's conclusory allegations concerning supposed double dipping. *See In re Friedman's Inc*., 452 B.R. 512, 517 n.23 (Bankr. D. Del. 2011) (where "the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint") (citation omitted); *In re Aphton Corp*., 423 B.R. 76, 91 (Bankr. D. Del. 2010) (same); *In re SHC, Inc.*, 329 B.R. 438, 442 (Bankr. D. Del. 2005) (same); *see also Brightwell v. Lehman*, No. 03-CV-205J, 2006 WL 931702, at *3 (W.D. Pa. Apr. 10, 2006) ("the court need not accept allegations in the complaint as true" where the underlying documents contradict those allegations).

106.    *Finally*, as to the allegations in the Complaint that the Patriarch Managers diverted Fund assets, Compl. ¶ 191(e), MBIA cites two transactions: first, MBIA accuses Ms. Tilton of wrongfully taking the proceeds from the sale of HVEASI. *Id.* ¶ 101. But the allegation that Zohar II owned that company is flatly refuted by public bankruptcy court records showing that Ms. Tilton's affiliate Ark II acquired HVEASI in a Section 363 sale in June 2005. *See* Trzaskoma Decl. Ex. 7 (HVEASI Sale Order). Thus, Zohar II was not, as the Complaint alleges, "the rightful owner" of that company, Compl. ¶ 101, and was therefore as a matter of law not entitled to the proceeds from any sale.

107.    Second, MBIA alleges that certain unidentified Defendants "previously represented" that Zohar I and Zohar II owned all the equity in Xpient Solutions, Inc. ("Xpient") and that these Funds did not "receive sales proceeds commensurate with their equity holdings" when that company was sold in 2014. Compl. ¶ 102. This nebulous allegation perfectly exemplifies MBIA's pleading deficiencies and is insufficient to support a claim for breach of the CMAs against the Patriarch Managers. The Xpient sale occurred in 2014 yet MBIA has not alleged that they ever complained of the purported misallocation or sent any demand letter in connection therewith. *See* Trzaskoma Decl. Ex. 8 (███████████████). The Complaint does not allege what percentage of the proceeds were misallocated, or what entity received funds that were otherwise due to Zohar I and Zohar II. The Patriarch Defendants are improperly left to speculate or guess as to what MBIA is claiming with respect to the Xpient transaction.

### 5.    No Breach Based on Allegations of "Conflicted, Self-Dealing Transactions"

108.    MBIA contends generally that the Patriarch Managers' "conflicted, self-dealing transactions" breached the CMAs without specifying which transactions are at issue or identifying which contractual provision was supposedly breached. *See* Compl. ¶ 191(f). In any

event, the claim based on alleged conflicts of interest is precluded by the Zohar Funds' express acknowledgement in the CMAs that various conflicts of interest might arise with respect to the Patriarch Managers and their "Related Parties," *see* Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 6.2(a), and the Funds' express consent to and waiver of those conflicts of interest, *id.* Ex. 2 § 6.2(b).

      **C.**    **Even If There Had Been a Breach, the Complaint's Allegations Fail to Support an Inference that the Patriarch Managers' Actions Were the Cause of the Zohar Funds' Defaults or Any Other Loss MBIA May Have Suffered.**

      109.    Finally, MBIA's breach of contract claim also must be dismissed because it fails to plausibly allege causation. The entire contract claim is premised on the notion that the Patriarch Managers caused the defaults of the two Insured Zohar Funds, and seeks to recover damages as a result of those default. *See*, *e.g.*, Compl. ¶¶ 95, 192–95. But the Complaint does not – and cannot – allege facts that would support a plausible inference that these defaults were proximately caused by any alleged breaches of contract. *See*, *e.g.*, *Fruition, Inc. v. Rhoda Lee, Inc.*, 1 A.D.3d 124, 124–25 (1st Dep't 2003) (a defendant's breach of contract recovery must be "limited to . . . the actual benefit that would have inured to it had the contract been performed. The damages . . . must be proximate and certain."); *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (same); *In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143, 153 (Bankr. S.D.N.Y. 2019) ("A complaint that fails to demonstrate how an alleged breach caused damage to the plaintiff is fatally deficient.") (internal quotation marks omitted).

      110.    ***First***, contrary to MBIA's contention, the defaults followed the global financial crisis that began in 2008[12] and that hit the Portfolio Companies particularly hard. These Portfolio

---

[12] The Court can and should "take[] notice of the events constituting the financial crisis that occurred in fall 2008, for the purpose of providing historical context, . . . and because the Court may take judicial notice of indisputable historical events." *Starr Int'l Co. v. Fed. Reserve Bank of*

Companies were, as the Indentures and CMAs made clear, "stressed and distressed," and the Complaint fails to plead facts from which one could infer that the Portfolio Companies were in any position to weather the extreme difficulties of one of the worst financial crises to hit this country. Instead, the allegations in the Complaint just as plausibly support that this brutal external force, rather than any of the alleged conduct by the Patriarch Managers, was what made it nearly impossible for both Zohar I and Zohar II to repay the notes according to the original investment horizon. *See United States v. Calderon*, 944 F.3d 72, 96 (2d Cir. 2019) (finding no proximate causation where "foreign banks defaulted on their obligations due to their financial inability to fulfill them following a global financial crisis" and holding defendant's alleged misconduct "had no bearing whatsoever on the foreign banks' potential to default in such circumstances").

111.    **Second**, MBIA's Complaint does not support the inference that anything the Patriarch Managers did (or did not do) either hastened or caused the Zohar Funds' defaults.

112.    With respect to Zohar I, MBIA acknowledges that, independent of the Patriarch Managers' actions, "Zohar I would not have sufficient assets to pay outstanding principal and interest on the Insured Notes on the November 2015 Zohar I Maturity Date." Compl. ¶ 108. Similarly, with respect to Zohar II, MBIA does not allege that the Patriarch Managers could have prevented default, only that they "exacerbated the injury" to MBIA of the unavoidable default. *Id.* ¶ 114.

113.    The fact that MBIA's losses "coincide[d] with a marketwide phenomenon causing comparable losses to other investors" means that MBIA has a higher burden to establish the

---

*New York*, 906 F. Supp. 2d 202, 205 n.1 (S.D.N.Y. 2012) (citation and internal quotation marks omitted), *aff'd sub nom. Starr Int'l Co. v. Fed. Reserve Bank of New York*, 742 F.3d 37 (2d Cir. 2014).

plausibility that its alleged injury was caused by the Patriarch Managers. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 n.2 (2d Cir. 2015) (citation omitted); *accord United States v. Calderon*, 944 F.3d at 96. "In a breach of contract action, the plaintiff must demonstrate more than simply that defendant breached its contract and that the plaintiff suffered damage." *Point Prods. A.G. v. Sony Music Entm't, Inc*., 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002), *opinion amended on reconsideration on other grounds*, No. 94-CV-4001, 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002). Because MBIA "would have suffered the harm regardless of" the Patriarch Managers' action, MBIA has no claim. *Id*.

114.    Further, MBIA's argument that the Patriarch Managers could have averted a default on Zohar I if only they had sold some unspecified Portfolio Companies makes no sense given that selling financially distressed companies at fire-sale prices to avoid a default on Zohar I would have caused harm to the other funds and stakeholders, and rendered it impossible for Zohar II to repay its noteholders on time, ensuring a default regardless. This is because the Zohar Funds were, as MBIA knew and expressly consented to in the Indentures, inextricably linked together.

115.    In sum, because of the devastating global financial crisis, MBIA's Complaint does not remotely clear the high bar necessary to plead a strong inference of causation. *See TD Waterhouse Inv'r Servs., Inc. v. Integrated Fund Servs., Inc.*, No. 01-CV-8986, 2003 WL 42013, at *9 (S.D.N.Y. Jan. 6, 2003) (dismissing breach of contract claim where plaintiff's own voluntary actions caused its damages); *34-35th Corp. v. 1-10 Indus. Assocs., LLC*, 103 A.D.3d 709, 711 (2d Dep't 2013) (finding no breach of contract claim where "plaintiff's alleged damages were not proximately caused by the defendant's breach, but rather by the plaintiff's own action").

## IV.    THE TORTIOUS INTERFERENCE CLAIMS ARE DEFICIENT AS A MATTER OF LAW.

116.    MBIA asserts two causes of action for tortious interference with contract against Ms. Tilton, Patriarch Partners, PPAS, and the Patriarch Managers for purportedly inducing the Issuers to cause various undefined breaches of the Indentures (Count II) and the Insurance Agreements (Count III). Each of these claims is deficient as a matter of law.

117.    To establish a claim for tortious interference with contract, MBIA must plead "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc*., 88 N.Y.2d 413, 424 (1996). "The interference must be intentional, not merely negligent or incidental to some other, lawful purpose." *Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 281 (1978). "Procuring the breach of a contract in the exercise of an equal or superior right is acting with just cause or excuse, and is justification for what would otherwise be an actionable wrong." *Felsen v. Sol Café Mfg. Corp*., 24 N.Y.2d 682, 687 (1969) (citation omitted). Under New York law, "[i]t is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." *Koret, Inc. v. Christian Dior, S.A*., 161 A.D.2d 156, 157 (1990) (citing *Greyhound Corp. v. Commercial Cas. Ins. Co*., 259 App. Div. 317, 320–21 (1st Dept. 1940)).

118.    Here, the tortious interference claims fail for three reasons. First, MBIA fails to satisfy Rule 8's notice pleading standards because the Complaint does not differentiate between or among the defendants or even identify any specific acts underlying the claims. Second, Ms. Tilton, the Patriarch Managers, and PPAS cannot be held liable for tortious interference with respect to actions taken in their respective roles as agents of the Zohar Funds. Third, each of the

defendants named in these Counts had undisputed financial interests in the agreements that were allegedly breached and/or in the parties alleged to have breached those agreements.

### A.    The Tortious Interference Claims Do Not Satisfy Rule 8.

119.    MBIA fails to satisfy the notice pleading standards of FRCP 8 because the Complaint's allegations with respect to tortious interference are so vague and general that they fail to place Defendants on notice of the claims against them. Counts II and III each assert tortious interference claims against Ms. Tilton, Patriarch Partners, PPAS, and the Patriarch Managers. Nowhere in these counts does MBIA specify what, if anything, any of these parties did individually. *See* Compl. ¶¶ 198–214. Rather, MBIA simply alleges "Defendants had knowledge" of the relevant agreements and, using identical language in both counts to describe the underlying contractual breaches, that "Defendants through their affirmative acts and domination and control with respect to the Insured Zohar Funds intentionally, improperly and without privilege induced or caused the Issuers to breach their obligations" under the relevant agreements. *Id*. ¶¶ 200, 203, 209, 211.

120.    FRCP 8(a)(2) requires a complaint to "give the defendant fair notice of what the claim is and the grounds upon which it rests." As pleaded, the tortious interference claims require the Court (and the Patriarch Defendants) to speculate as to which parties might be responsible for what conduct. MBIA does not, for example, attribute a single act to Patriarch Partners anywhere in the Complaint aside from instances where it lumps all defendants together. Similarly, MBIA's failure to link any particular act from the 186 paragraphs of allegations to any agreement or to any defendant prevents any reasonable analysis of whether the Complaint has stated the elements of a tortious interference claim as to any defendant. The lack of clarity improperly requires guesswork to determine whether any of the defendants took actions with the requisite level of intentionality, or whether the acts may have been privileged or justified.

Without more, these claims do not satisfy even the liberal standards of FRCP 8. *See Japhet v. Francis E. Parker Mem'l Home, Inc*., No. 14-CV-1206, 2014 WL 3809173, at *2 (D.N.J. July 31, 2014) (dismissing claims where the complaint "injects an inherently speculative nature into the pleadings, forcing both the Defendants and the Court to guess who did what to whom when"); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (affirming dismissal of claims against individual defendants based on the complaint's group pleading allegations).

> **B.**   **The Tortious Interference Claims Cannot Be Sustained Against Ms. Tilton, PPAS, and the Patriarch Managers Because These Defendants Were Acting as Agents of the Zohar Funds.**

121.   MBIA alleges that Ms. Tilton, the Patriarch Managers, and PPAS tortiously interfered with the Indentures and Insurance Agreements by causing the Issuers to breach those agreements. However, under New York law, an agent cannot be held liable for inducing his principal to breach a contract with a third person. *First Am. Commercial Bancorp, Inc. v. Saatchi & Saatchi Rowland, Inc.*, 55 A.D.3d 1264, 1266 (4th Dep't 2008). In their capacities as collateral managers of the Zohar Funds, the Patriarch Managers, with Ms. Tilton at their helm, were tasked with "carrying out the day-to-day operations and functions of the Insured Zohar Funds" on the Zohar Funds' behalf. Compl. ¶ 34; *see also id.* ¶ 52. Furthermore, as administrative agent under the Credit Agreements, PPAS (also under the direction of Ms. Tilton) acted on behalf of the Zohar Funds, to the extent delineated under the Credit Agreements, with respect to loans made by the Zohar Funds to the Portfolio Companies, and there is no allegation that any of PPAS's actions were taken in anything other than this agent role. *Id*. ¶ 14. Accordingly, Counts II and III fail against the Patriarch Managers, PPAS, and Ms. Tilton because as a matter of law their actions, taken in their capacities as the Zohar Funds' agents, purported to have induced the Funds to breach the Indentures and Insurance Agreements, cannot form the basis of a tortious interference claim.

**C.      Neither Tortious Inference Claim Is Cognizable Under the Economic Interest Doctrine.**

122.     Even if the Court were to conclude that the tortious interference claims are adequately pled notwithstanding the impermissible group pleading, the claims would still be subject to dismissal under the economic interest doctrine.

123.     When a defendant has an economic interest in the subject of the contract or in the alleged breaching party's business, a tortious interference claim cannot survive. *See Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996). This is because when a defendant acts "to protect its own legal or financial stake in the breaching party's business," there can be no tortious interference. *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). As the New York Court of Appeals observed in *White Plains Coat & Apron*, the economic interest doctrine has been applied in a variety of circumstances, including: "where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *Id.* Imposing liability in spite of an economic interest "requires a showing of either malice on the one hand, or fraudulent or illegal means on the other." *Foster*, 87 N.Y.2d at 750.

124.     In this case, the purported breaching parties are the Zohar Funds and the contracts at issue are the Indentures and Insurance Agreements. Compl. ¶¶ 145–47, 167–70. But as the ultimate holder of the preference shares in the Zohar Funds (through the Octaluna Entities), Ms. Tilton had a substantial economic interest in both the Zohar Funds and in the Indentures and Insurance Agreements, which governed and bound the Zohar Funds. The same goes for the Patriarch Managers, which had contractual relationships with the Zohar Funds, and in particular

47

for Patriarch XV, the holder of the Class A-3 notes issued by Zohar I. *Id.* ¶ 11–13. Finally, PPAS had a clear economic interest in the business of the Zohar Funds because PPAS was the Funds' administrative agent under the Credit Agreements with the Portfolio Companies. *Id.* ¶¶ 29, 114.

125.    Absent any allegations that the acts underlying the tortious interference claims were taken with malice, fraud, or illegality, these claims should be dismissed. *See N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*, No. 12-CV-3584, 2013 WL 1500333, at \*6 (S.D.N.Y. Apr. 12, 2013) (dismissing tortious interference claim where plaintiffs had not alleged defendants had any motivation beyond their own legal or economic interest).

## V.    THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED.

126.    In Count V, MBIA asserts that Ms. Tilton, PPAS and the Patriarch Manager Defendants violated their fiduciary duties under the CMAs and Credit Agreements: (i) "by wrongfully consenting on behalf of the Insured Zohar Funds to the transfer of cash, debt and equity interests and other assets owned by the Insured Zohar Funds to themselves or other Defendants," and (ii) "by engaging in acts of self-dealing and exploitation of their control positions at the Portfolio Companies, including, without limitation, Transcare, Dura Automotive, ███████████ and HVEASI." Compl. ¶ 234. And in Count VI, MBIA asserts that Patriarch Partners, the Octaluna Entities, PPMG, Ark, and AIP aided and abetted those same alleged breaches. As discussed further below, these assertions of breach are meritless and fail to state a claim as a matter of law.

### A.    Defendants Owed No Fiduciary Duty to MBIA or to the Noteholders.

127.    A breach of fiduciary duty claim requires the plaintiff to allege "(1) a fiduciary duty exists between the parties; and (2) a fiduciary breached that duty." *Dynamis Therapeutics, Inc. v. Alberto-Culver Int'l Inc.*, No. 09-CV-773, 2010 WL 3834405, at \*3 (D. Del. Sept. 24, 2010). Such a "claim must be based on an actual, existing fiduciary relationship between the

plaintiff and the defendants at the time of the alleged breach." *Omnicare, Inc. v. NCS Healthcare, Inc*., 809 A.2d 1163, 1169 (Del. Ch. 2002).

128.    In this case, there was no fiduciary relationship between MBIA, on the one hand, and Ms. Tilton, PPAS, and the Patriarch Managers, on the other.

129.    In formulating the breach of fiduciary duty claim, the Complaint specifically alleges that the Patriarch Managers owed fiduciary duties to the Zohar Funds by virtue of the CMAs, *see* Compl. ¶ 228; that PPAS owed fiduciary duties to the Zohar Funds under the Credit Agreements, *id*. ¶ 230; and that Ms. Tilton owed fiduciary duties to the Zohar Funds as a "registered investment advisor and principal," *id.* ¶ 231.

130.    Without basis, MBIA then goes on to assert that these defendants "owed fiduciary duties of loyalty, which obligated them to put the interests of the Insured Zohar Funds <u>and their noteholders</u> first." Compl. ¶ 233 (emphasis added). MBIA suggests that its standing is derived from its status as subrogee under the Indentures and Insurance Agreements. *See id*. ¶ 232. But those agreements are clear that as subrogee, MBIA steps into the shoes of the noteholders, not the Zohar Funds. *See*, *e.g.*, Trzaskoma Decl. Ex. 1 (Zohar I Insurance Agreement) § 4.05 (rights of "Insurer is to be fully subrogated . . . to the rights of the Noteholders or Owners, as applicable"); *id.* Ex. 3 (Zohar I Indenture) § 16.5(a) ("Credit Enhancer will be fully subrogated to the rights of [the] Holders").

131.    Even if it were true that fiduciary obligations were owed to the Zohar Funds as alleged above, there is no basis in the agreements for the assertion that any of these defendants owed fiduciary duties to the Funds' <u>noteholders</u>.

132.    The CMAs, for example, are agreements between the Zohar Funds and the Patriarch Managers. The CMAs make clear that the Patriarch Managers owe their duties to the

Zohar Funds themselves, not to any other party. *See* Trzaskoma Decl. Ex. 2 (Zohar I CMA) Article II (setting forth duties and obligations to the Zohar Funds). Further, the CMAs provides that the Patriarch Managers "assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it." *Id*. Ex. 2 § 4.4.

133.    Nor does MBIA's status as a third-party beneficiary under the CMAs somehow mean the Patriarch Managers also owed duties to MBIA in its role as Credit Enhancer. That MBIA could enforce the Zohar Funds' rights under the CMAs does not mean that MBIA could rewrite those agreements so as to require the Patriarch Managers to look out for MBIA's interests rather than or in addition to the Funds' interests. *See De La Cruz v. Caddell Dry Dock & Repair Co*., 56 A.D.3d 365, 366 (2008) ("third-party beneficiaries" are "bound by the terms of" the contract).

134.    Likewise, the Indentures – agreements among the Zohar Funds, MBIA, the applicable class note agents, and U.S. Bank National Association as Trustee – also make clear that to the extent MBIA or noteholders were owed fiduciary duties, those duties were owed by the Trustee not by the collateral managers. *See* Trzaskoma Decl. Ex. 3 (Zohar I Indenture) § 6.17 (stating that the Trustee is "representative of the Noteholders and agent for the other Secured Parties" and is a "[f]iduciary for Noteholders [o]nly").

135.    Similarly, under the Credit Agreements, PPAS was designated as the agent for Zohar Funds as lenders, not as the agent of any noteholders or to MBIA. Trzaskoma Decl. Ex. 9 (Rand Credit Agreement). Moreover, even if that were not the case, the Credit Agreements confirm that the agency relationship between PPAS and the Zohar Funds is not a fiduciary one: as agent, PPAS "shall not have, by reason hereof, or any of the other Credit Documents, a

fiduciary relationship in respect of any Lender, and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose on the Agent any obligations in respect thereof or any of the other Credit Documents except as expressly set forth herein or therein." *Id.* Ex. 9 § 9.2; *see also KnighTek, LLC v. Jive Commc'ns, Inc.*, 197 A.3d 493, 505 (Del. Super. Ct. 2018), *rev'd on other grounds*, 225 A.3d 343 (Del. 2020) (finding agency agreement "establish[ed] an arms-length commercial relationship between sophisticated parties" where agreement contained similar limiting language stating "[e]xcept as expressly set forth in this Agreement, [defendant] shall have no further duties or obligations").

136.    Nor is there any other basis to conclude that the Patriarch Managers owed a fiduciary duty to any noteholders as a result of their position as collateral managers to the Funds. And concluding otherwise would conflict with the important principle that there is generally "no fiduciary obligation in a contractual arm's length relationship between a debtor and a note-holding creditor . . . . A debtor and creditor have no special relationship of confidence and trust . . . and the relationship is generally controlled by contract." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 593–94 (2012) ("While the collateral managers may have owed fiduciary and contractual duties to the [company] there is no factual basis to create fiduciary duties running from the managers to the mezzanine noteholders.").

137.    The same is true for MBIA in its role as Credit Enhancer because that was an "arm's-length contractual relationship." *Coop. Centrale Raiffeisen-Boerenleenbank B.A. v. Atradius Credit Ins. N.V.*, 149 A.D.3d 416, 416 (1st Dep't 2017) (finding "complaint fails to allege facts that would establish a special relationship in support of . . . breach of fiduciary duty, separate from the parties' arm's-length contractual relationship under the insurance policy"); *Freeman v. MBL Life Assur. Corp.,* 60 F. Supp. 2d 259, 266 (S.D.N.Y. 1999) ("the relationship

between an insurance company and a policyholder is a contractual relationship, not a fiduciary one.").

138.    In sum, MBIA has no claims for a breach of fiduciary duty, whether purportedly owed to itself (as insurer or Credit Enhancer), the Zohar Funds, or the Noteholders.

**B.    The Fiduciary Duty Claim Is Not Cognizable as It Fails to Meet Basic Pleading Requirements.**

139.    Even if MBIA could establish a fiduciary relationship it had standing to sue for, Plaintiff's allegations that Defendants breached fiduciary duties by "wrongfully consenting on behalf of the Insured Zohar Funds to the transfer of cash, debt and equity interests and other assets," Compl. ¶ 234, fail to meet the notice pleading requirements of Rule 8(a).

140.    Among other deficiencies, MBIA fails to specify what transfers of "cash, debt and equity interests and other assets" purportedly support the breach of fiduciary duty claim and thus the Complaint does "not articulate the alleged actions which form the basis of Plaintiff's claims."[13] *Swift*, 2013 WL 5486851, at *4. Although MBIA incorporates 186 paragraphs of allegations into its breach of fiduciary claim, the Complaint still fails to "connect . . . factual allegations previously set forth in the . . . Complaint to [a] specific cause of action." *Freshpair.com, Inc. v. Butlein*, No. 17-CV-905, 2017 WL 2968395, at *3 (D.N.J. July 11, 2017); *see also Falat v. Cty. of Hunterdon*, No. 12-CV-6804, 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013) ("It is not the Court's job to laboriously search the Complaint for factual assertions that could, in theory, be used to support one legal claim or another.").

---

[13] For example, to the extent MBIA's claim rests on the sale of Xpient, which occurred in 2014, Compl. ¶ 102, it is time-barred. *In re AMC Inv'rs, LLC*, 551 B.R. 148, 152 (D. Del. 2016) (noting "three-year statute of limitations for breach of fiduciary duty claims").

141.    In addition, the Complaint fails to particularize which Defendants purportedly

engaged in which conduct allegedly supporting the breach of fiduciary duty claims, stating only

generally that "*Defendants* violated their fiduciary duties." Compl. ¶¶ 234, 243 (emphasis

added). *See Falat*, 2013 WL 1163751, at *3 (dismissing claims where "Complaint does include

specific allegations against particular Defendants"); *Spence v. Schafer*, No. 2:13-CV-16, 2013

WL 1364025, at *3 (W.D. Pa. Mar. 7, 2013) (dismissing case where complaint failed "to align

each claim against a particular Defendant with the allegations supporting such claims."), *report

and recommendation adopted*, No. 2:13-CV-16, 2013 WL 1352079 (W.D. Pa. Apr. 3, 2013).

> **C.    The Breach of Fiduciary Duty Claims Must be Dismissed Because They Are
> Duplicative of the Contract Claim.**

142.    Even if the Court were to find that MBIA could establish that it was owed some

fiduciary duty by the Patriarch Managers, and that the Complaint's allegations satisfy Rule 8, the

breach of fiduciary duty claim should still be dismissed because it is duplicative of the contract

cause of action and grounded in the same vaguely stated underlying harm. *Compare* Compl. ¶

191(f) (alleging that Defendants "engag[ed] in various conflicted, self-dealing transactions

knowingly designed to divert to Defendants control over the Insured Zohar Funds' equity

interests"), *with id.* ¶ 234 (complaining about transfers of "cash, debt and equity interests and

other assets owned by the Insured Zohar Funds" to the Defendants and "acts of self-dealing and

exploitation of their control positions at the Portfolio Companies").

143.    Delaware law "respects the primacy of contract law over fiduciary law in matters

involving . . . contractual rights and obligations and does not allow fiduciary duty claims to

proceed in parallel with breach of contract claims unless there is an independent basis for the

fiduciary duty claims apart from the contractual claims." *IMO Ronald J. Mount 2012 Irrevocable

Dynasty Tr. U/A/D Dec. 5, 2012*, No. CV 12892-VCS, 2017 WL 4082886, at *8 (Del. Ch. Sept.

7, 2017) (citation omitted). Where a "breach of fiduciary duty claim is duplicative of its breach of contract claim" it "must be dismissed." *MHS Capital LLC v. Goggin*, No. CV 2017-0449-SG, 2018 WL 2149718, at *8 (Del. Ch. May 10, 2018).

> **D.    The Aiding and Abetting Claim Must Also Be Dismissed.**

144.    Count VI, for purportedly aiding and abetting breaches of fiduciary duty, fails for the same reasons that Count V, the primary violation, fails. Where "no cognizable breach of fiduciary duty claim is stated," the "aiding and abetting claim also fails." *Related Westpac LLC v. JER Snowmass LLC*, No. CIV.A. 5001-VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) (citation omitted); *Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *18 (Del. Ch. Jan. 29, 2016) ("[A]n aiding and abetting claim is predicated on an underlying breach of fiduciary duties."); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 215 (Del. Ch. 2006) ("because the complaint fails to state a claim for breach of fiduciary duty against the Trenwick or Trenwick America directors, the claims that the defendant advisors aided and abetted any underlying breach of fiduciary duty fails"), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007); *Stone & Paper Inv'rs, LLC v. Blanch*, No. CV 2018-0394-PAF, 2020 WL 3496694, at *14 (Del. Ch. June 29, 2020) ("Because the Counterclaims fail to allege a fiduciary duty that could serve as the grounds for an underlying breach of fiduciary duty, the aiding and abetting claim fails as a matter of law.").

## VI.    THE FAITHLESS SERVANT CLAIM IS NOT VIABLE.

145.    In Count VII, MBIA asserts a "faithless servant" claim against Ms. Tilton, the Patriarch Managers, and PPAS. *See* Compl. ¶¶ 246–48. Although not clearly articulated, the theory of this claim appears to be premised on the same allegations underlying the breach of fiduciary duty claim and seeks to claw back all compensation the Zohar Funds (not MBIA) ever paid to Ms. Tilton, the Patriarch Managers, and PPAS. *See id.* ¶ 248. And it appears that MBIA

is relying, as it does in arguing breach of fiduciary duty, on the CMAs and Credit Agreements.
*See id*. This claim is patently defective.

146.     ***First***, MBIA has no standing to bring a faithless servant claim because Ms. Tilton,
the Patriarch Managers, and PPAS were never employees or agents of MBIA. *See CARCO
GROUP, Inc. v. Maconachy*, 718 F.3d 72, 84 (2d Cir. 2013) (the faithless servant doctrine
"arises out of an agency or employment relationship"); *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597,
2015 WL 5769945, at *3 (S.D.N.Y. Sept. 29, 2015) (holding that faithless servant doctrine only
applies to employees or agents). While MBIA claims to be "subrogated to the rights and claims
of the Class A Noteholders," Compl. ¶ 232, MBIA does not (and cannot) allege that these
noteholders had any employment or principal-agent relationship with Defendants either. Indeed,
even by MBIA's own allegations, any duties were "owed to the Zohar Funds," not to any other
party. *Id*. ¶ 248.

147.     ***Second***, even if MBIA did have standing to bring a faithless servant claim against
these defendants (which it does not), it has still failed to plead a viable cause of action.
Determining whether an employee or agent's conduct warrants forfeiture under the faithless
servant doctrine depends on whether the alleged misconduct either (i) "substantially violates the
contract of service such that it permeates the employee's service in its most material and
substantial part," or (ii) "rises to the level of a breach of a duty of loyalty or good faith." *Babbitt
v. Koeppel Nissan, Inc.*, No. 18-CV-5242, 2020 WL 3183895, at *6 (E.D.N.Y. June 15, 2020)
(citation and internal quotation marks omitted). Under either standard, however, courts apply the
faithless servant doctrine "relatively narrowly." *Linder v. Innovative Commercial Sys. LLC*, 41
Misc. 3d 1214(A), 981 N.Y.S.2d 636 (Sup. Ct. 2013).

148.    In this case, the Complaint's allegations are insufficient to meet the very high bar for pleading a claim for faithless servant. As discussed above, there is no colorable claim for breach of fiduciary duty, *see* Arg. V, *supra*, and, accordingly the faithless servant claim must also be dismissed. *See Babbitt*, 2020 WL 3183895, at *6; *In re Gupta*, 38 A.D.3d 445 (2007) (affirming judgment, holding faithless servant doctrine was unavailing where no breach of fiduciary duty was found); *Pozner v. Fox Broad. Co.*, 59 Misc. 3d 897, 74 N.Y.S.3d 711 (Sup. Ct. 2018) (dismissing breach of fiduciary duty claim that also included allegations invoking faithless servant doctrine).

## VII.    THE CLAIM FOR DECLARATORY RELIEF FAILS.

149.    In Count IV, MBIA brings a claim for declaratory judgment against all defendants, seeking a declaration that it is the "legal, beneficial and equitable owner of the equity interests at the Portfolio Companies that were issued or otherwise created in the name of Zohar I (with the relevant equity interests in the Portfolio Companies to be established at trial)," and asks the Court to declare the Governance Conveyances, the November 2017 Written Consents, and "any other restrictions and limitations imposed on the equity interests by Defendants' execution of conflicted, self-dealing transactions" to be invalid. Compl. ¶ 226. For the reasons stated below, this claim should be dismissed.

150.    ***First***, Count IV is partially moot because there is no dispute (a) that Zohar I is currently the legal and beneficial owner of the equity interests created in its name, or (b) that the Governance Conveyances are no longer valid or enforceable. That is because on March 30, 2020, the Court issued an *Order Granting in Part Debtors' and Independent Director's Joint Emergency Motion for an Order Declaring that the Debtors Control the Portfolio Companies and Granting Related Relief*, Bankr. Proc. No. 18-10512, D.I. 1542 (the "Equity Order"). Because the existence of an actual claim or controversy is "a prerequisite to all federal actions,

56

including those for declaratory or injunctive relief," this Court does not have subject matter jurisdiction over this claim. *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994).

151.     **Second**, MBIA's claim that the November 2017 Written Consents executed at ███████████████████ are invalid is also unsustainable because there is simply no theory that would entitle MBIA to such relief. With respect to all the actions MBIA seeks to invalidate in Count IV, the Complaint asserts that the transfer of "valuable benefits of equity ownership and voting or control rights . . . violated the terms of the Indenture and applicable law because they interfered with and impaired the value and rights in the Trustee's lien under the Indenture," namely the Insured Zohar Funds' enjoyment of the "full rights, title and equity assets belonging to them." Compl. ¶¶ 221–22. But MBIA does not identify which specific Patriarch Defendants allegedly violated the Indentures; does not explain how any of the Patriarch Defendants could be held liable under those agreements given that none of the Patriarch Defendants were party to the Indentures; and does not specify what provisions of "applicable law" were violated by execution of the November 2017 Written Consents. Perhaps most confusingly, MBIA's vague theory of injury cannot even explain how it was harmed by the November 2017 Written Consent at ███ when neither of the Insured Zohar Funds own any equity interests in ███ to begin with. *See id.* ¶¶ 76–77.

152.     **Finally**, to the extent MBIA seeks to invalidate the November 2017 Written Consent at ███ by virtue of its own purported ownership interest in the company,[14] such a claim, which ultimately alleges harm against the company and not any individual member, must be brought derivatively rather than directly. *See Stone & Paper Inv'rs, LLC v. Blanch*, No. CV

---

[14] MBIA holds no equity interests in either ███████████. *See* Compl. ¶¶ 76–77.

2018-0394-TMR, 2019 WL 2374005, at *3 (Del. Ch. May 31, 2019); *see also Jayapaul v. Balamurugan*, No. CV 2006-11-505, 2009 WL 10674911, at *1–2 (Del. Com. Pl. July 9, 2009) (dismissing contract claim as derivative where "corporation suffered the alleged harm . . . and would receive the benefit of any recovery"). Therefore, MBIA's claim for declaratory judgment seeking invalidation of the November 2017 Written Consents should also be dismissed.

## VIII.   THE CONVERSION CLAIM IS UNTENABLE.

153.     In Count VIII, MBIA brings a catchall conversion claim, asserting generally that all defendants "intentionally interfered with MBIA's and the Zohar Funds' property rights with respect to the Collateral." Compl. ¶ 251. This claim has no merit and must be dismissed.

154.     To establish a claim for conversion, MBIA "must allege: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)). MBIA's conversion claim fails in several respects.

155.     ***First***, the conversion claim must be dismissed to the extent it fails to identify which "valuable rights" were supposedly converted or interfered with, and also fails to specify what "rights to payments and other equity rights" are at issue. In this regard, it is not at all clear what property was allegedly converted, who owned that property, which defendant converted it, and when. This lack of clarity dooms the claim. *See Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (dismissing conversion where "vague reference to 'funds' [does not] satisfy Rule 8"); *Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at *4 (S.D.N.Y. May 27, 2020) (dismissing claim for conversion where complaint

failed to specify "the ground[s] upon which the claim for conversion rests" and noting

"guesswork is antithetical to the fair notice that Rule 8 requires") (citation omitted); *Calcutti v.*

*SBU, Inc.*, 224 F. Supp. 2d 691, 703 (S.D.N.Y. 2002) (dismissing conversion claim pursuant to

Rule 8 where allegations were "devoid of facts that would put [defendant on notice]"). The

Complaint's generic reference to "payments" also cannot form the basis of a conversion claim,

which must set forth "specifically identifiable [and] segregated" funds. *Mazzola v. Roomster*

*Corp.*, 849 F. Supp. 2d 395, 409 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also*

*Interior by Mussa, Ltd. v. Town of Huntington*, 664 N.Y.S.2d 970, 972 (2d Dep't 1997) (holding

that the plaintiff failed to allege adequately a claim for conversion of money when "[the]

complaint only [sought] the return of a sum paid to defendant"); *Steinberg v. Sherman*, No. 07-

CV-1001, 2008 WL 2156726, at *6 (S.D.N.Y. May 8, 2008) (conversion claim dismissed where

third-party plaintiff failed to claim a "specifically identifiable and segregated or definite sum of

money").

156.    ***Second***, to the extent the conversion claim is based on "selling certain Portfolio

Companies" without paying "due compensation," Compl. ¶ 253, this claim fails because, as

alleged in the Complaint, those proceeds belonged to the Zohar Funds, not to MBIA. *See In re*

*Musicland Holding Corp.*, 386 B.R. 428, 440 (S.D.N.Y. 2008) (action for conversion is

"insufficient as a matter of law" unless the "claimant was the owner and entitled to immediate

possession.") (citation omitted), *aff'd*, 318 F. App'x 36 (2d Cir. 2009). The same is true to the

extent the claim is based on fees paid to PPMG because not only were those fees paid by the

Portfolio Companies pursuant to written agreements in exchange for valuable services, the

monies at issue were "the property of, or obligations incurred by, the Portfolio Companies," not

the property of the Zohar Funds, its noteholders, or MBIA. Zohar Compl. ¶ 456.

157. ***Third***, any supposed diversion of sales proceeds was alleged to have been done by the Patriarch Managers in their capacity as collateral managers under the CMAs. Thus, the alleged acts underlying the conversion claim cannot be "distinguished from acts that are a mere violation of contractual rights," and the claim must be dismissed on this basis. *Allen v. Cox*, No. 10-CV-7118, 2011 WL 2436705, at *3 (S.D.N.Y. June 16, 2011) (citation omitted).

158. ***Finally***, "equity rights and interests," Compl. ¶ 253, are simply not amenable to a conversion claim. "[A]n action for conversion will not normally lie, when it involves intangible property because there is no physical item that can be misappropriated." *Thyroff v. Nationwide Mut. Ins. Co*., 8 N.Y.3d 283, 289 (2007) (internal quotations omitted); *see also Saleeby v. Remco Maint., LLC*, 148 A.D.3d 570–71 (2d Dep't 2017) ("ownership share in a limited liability company was a type of intangible property that could not be the subject of a conversion claim"); *Sun Gold, Corp. v. Stillman*, 95 A.D.3d 668, 670 (1st Dep't 2012) (dismissal of conversion claim for alleged conversion of "future business interests" as "conversion of intangible property is not actionable"); *Pilliard v. Sotheby's, Inc.*, No. 95-CV-7775, 1997 WL 381795, at *7 (S.D.N.Y. July 10, 1997) ("action cannot be predicated upon an equitable interest or a mere breach of contract obligation") (quoting *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883 (1st Dep't 1982).; *accord In re CIL Ltd*., 582 B.R. 46, 114 (Bankr. S.D.N.Y. 2018) (issuance and transfer of a new class of equity in a company, which only diluted the value Debtor's shares, could not be the basis of a conversion claim).

159. For these reasons, the Conversion claim fails to state a claim and must be dismissed.

## IX.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

160. The unjust enrichment claim in Count IX should be dismissed because it is precluded by the existence of contracts governing the subject matter of the claim. *See Ellington*

60

*Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 203 (S.D.N.Y. 2011) ("[T]he existence of a valid and binding contract governing the subject matter at issue in a particular case does act to preclude a claim for unjust enrichment.") (citation omitted).[15] Courts have consistently held that a "valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Landesbank Baden Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (citation omitted); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) (affirming dismissal of unjust enrichment claim where transaction was governed by written engagement letter for services finding where "parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded"). This remains true even where the unjust enrichment claim is asserted against entities who are not parties to the contract. *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 532 & n.123 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

161.    In this case, the Complaint makes clear that the unjust enrichment claim is ultimately based on various written agreements. The allegations in Count IX either explicitly or implicitly reference, among other contracts, the Credit Agreements, the Insurance Agreements and Financial Guaranties, the Indentures, LLC Agreements. *See* Compl. ¶¶ 256–58. Therefore, on this basis alone, the unjust enrichment claim should be dismissed.[16] *See MF Glob. Holdings*

---

[15] To the extent Count IX is premised on the execution of the original PPMG Agreements, the claim is time barred. *See Underground Utilities, Inc. v. Comptroller of City of New York*, 170 A.D.3d 481, 481 (1st Dep't 2019) (finding three-year statute of limitations applicable to unjust enrichment claim).

[16] Count IX includes a passing reference to Ms. Tilton's 2016 "check the box" election. *See* Compl. ¶ 257. It is wholly unclear how MBIA could conceivably have standing to bring any

*Ltd. v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014) ("A plaintiff can plead unjust enrichment . . . only if there is a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue.") (citations and internal quotation marks omitted).

## X.   THE MALICIOUS PROSECUTION CLAIM IS UNSUSTAINABLE.

162.   MBIA's malicious prosecution claim in Count X is based on two actions: the 2015 Zohar I Bankruptcy in the Southern District of New York and the Delaware 225 Action. Compl. ¶¶ 261–67.

163.   Regarding the Zohar I bankruptcy, MBIA alleges that Ms. Tilton caused defendant Patriarch XV to commence the Zohar I bankruptcy maliciously and in bad faith, in breach of the Indentures and with the purpose and effect of delaying MBIA's exercise of its rights to change Zohar I's management. Compl. ¶¶ 148–53, 262. MBIA alleges that, as a creditor, it was a party in interest in the litigation, and that the litigation was resolved in MBIA's favor when Ms. Tilton and Patriarch XV withdrew their objections to the Zohar Funds' Motion to Dismiss. *Id*.

164.   As for the Delaware 225 Action, MBIA alleges that defendant Ms. Tilton "maliciously asserted multiple baseless defenses, counterclaims and third-party claims against MBIA, Zohar II and Zohar III" disputing their ownership and equity in three Portfolio Companies. Compl. ¶ 262. MBIA alleges that Ms. Tilton prosecuted those claims to trial despite knowing they were baseless. *Id*.[17]

---

claim based on the Zohar Funds' tax status, but in any event, this action was not improper in the least. *See* Zohar Funds Adversary Proceeding, D.I. 44 ¶¶ 190–204.

[17] Not all of Ms. Tilton's counterclaims in this action were adjudicated. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc*., No. CV 12946-VCS, 2017 WL 5956877 (Del. Ch. Nov. 30, 2017).

165.     Regarding abuse of process, MBIA alleges that defendants abused the automatic

stay and discovery processes in bankruptcy by wrongfully filing the Zohar I bankruptcy. Compl.

¶¶ 265–67. MBIA alleges that process was abused by invoking the automatic stay to prevent

MBIA from removing Zohar I's management, to submit a re-organization plan that was not

favorable to MBIA, and to engage in costly discovery before the argument of a contested motion.

*Id*.

166.     Both the malicious prosecution and abuse of process claims fail as a matter of

law.[18]

### A.     MBIA Has No Claim Based on the Zohar I Bankruptcy.

167.     As an initial matter, MBIA's claim for malicious prosecution is time-barred to the

extent it is based on the Zohar I Bankruptcy. Under New York law, "[a] malicious prosecution

cause of action is governed by a one-year statute of limitations" accruing from the time the

underlying action is resolved. *Teller v. Galak*, 162 A.D.3d 959, 959 (2d Dep't 2018) (citing

CPLR § 215(3)). As the Complaint acknowledges, the Zohar I Bankruptcy was completely

resolved, at least to the extent it related to MBIA, on February 5, 2016 "when Tilton and

Patriarch XV withdrew their objections to the Zohar Funds' and MBIA's motions to dismiss that

case following a contested evidentiary hearing." Compl. ¶ 262. Therefore, this claim, is plainly

---

[18] In Delaware, courts generally hold that malicious prosecution and abuse of process torts are
governed by the law of the state where the underlying proceeding took place. *See In re
Washington Mut., Inc.*, No. 08-12229, 2010 WL 3238903, at *3–*7 (Bankr. D. Del. Aug. 13,
2010) (applying Delaware choice of law rules, finding New York law applied to abuse of process
claim where underlying suit was filed in New York); Restatement (Second) Conflicts of Laws §
155 (stating that malicious prosecution and abuse of process claims are generally determined "by
the local law of the state where the proceeding complained of occurred"). New York is in accord.
*Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, 701 F. Supp. 2d 340, 355 (E.D.N.Y.
2010) ("malicious prosecution claims are governed by the law of the state where the underlying
proceeding took place"). Therefore, claims concerning the Delaware 225 Action are governed by
Delaware law, and claims concerning the Zohar I Bankruptcy are governed by New York law.

untimely because the limitations period had long expired by May 2018, when the parties entered into the Settlement Agreement in this case. *See* Trzaskoma Decl. Ex. 10 (Settlement Agreement).

168.     Further, even if it were not time barred, the malicious prosecution claim would be subject to dismissal on substantive grounds as well.

169.     Under New York law, pleading malicious prosecution requires  "(1) prosecution of a civil action against the plaintiff, (2) by or at the instance of the defendant, (3) without probable cause, (4) with malice, (5) which terminated in favor of the plaintiff, and (6) causing special injury." *Teller*, 162 A.D.3d at 960 (citation omitted). MBIA's pleadings do not properly allege any of these factors.

170.     ***First,*** MBIA has not alleged an action was prosecuted against it. "Only a party to the proceeding complained of as a malicious prosecution is entitled to maintain an action for malicious prosecution." *Crown Wisteria, Inc. v. F.G.F. Enterprises Corp.*, 168 A.D.2d 238, 241 (1st Dep't 1990) (dismissing malicious prosecution claim where plaintiff was not party to underlying suit). MBIA's claim is based on allegations that Ms. Tilton and Patriarch XV initiated involuntary bankruptcy proceedings against Zohar I – meaning that Zohar I, not MBIA, was the debtor made subject to bankruptcy. Compl. ¶¶ 149, 262. Thus, MBIA was only a potential party in interest to that proceeding. *Id.* ¶ 263. MBIA, as a creditor, has no standing to bring a malicious prosecution claim based on the filing of a bankruptcy petition. *See Silver v. Mendel*, 894 F.2d 598, 604 (3d Cir. 1990) (upholding dismissal of malicious prosecution claim brought by involuntary debtor's sole shareholder on ground that only the involuntary debtor could state a claim).

171.     ***Second,*** MBIA has not adequately alleged that the Zohar I Bankruptcy petition was filed without probable cause. The bar for finding that civil complaints were instituted

without probable cause for the purpose of maintaining a malicious prosecution claim is a high one. *See Perryman v. Vill. of Saranac Lake*, 41 A.D.3d 1080, 1081–82 (3d Dep't 2007) ("[W]hen the underlying action is civil in nature the want of probable cause must be patent . . . inasmuch as the defendants had probable cause to assert *some* of their causes of action, the plaintiffs could not maintain a malicious prosecution claim.") (internal citations and quotation marks omitted); *see also Wilhelmina Models, Inc. v. Fleisher,* 19 A.D.3d 267, 270 (1st Dep't 2005) ("An action brought with actual malice is one brought with 'conscious falsity'") (citation omitted).

172.    In this case, the Complaint does not come close to establishing a lack of probable cause because it does not (and cannot) plausibly allege that the filing lacked any valid purpose. There is a presumption of good faith in involuntary bankruptcy filings, and the burden or rebutting this presumption "is a heavy one." *In re Reveley*, 148 B.R. 398, 406 (Bankr. S.D.N.Y. 1992). The burden is not satisfied where the "bankruptcy filings were utilized, on counsel's advice, to prevent the further dissipation of assets and provide for court-supervised administration of those assets." *Id.* at 412. It does not suffice to allege, as MBIA does, that Zohar I was put into bankruptcy to protect the Fund and other stakeholders, not MBIA. Compl. ¶¶ 148–53, 262. Indeed, it is highly ironic that MBIA would make an argument that the decision to file a petition for bankruptcy for Zohar I was so meritless as to constitute malicious prosecution when Zohar I is once again in bankruptcy.

173.    ***Third***, the Complaint fails to allege facts to support the inference that the Zohar I bankruptcy terminated in MBIA's favor. It could not have, because the bankruptcy petition was not filed against MBIA. *See Silver*, 894 F.2d at 604. Moreover, MBIA contends that Patriarch XV's decision to withdraw its objection to dismissal after "a contested evidentiary hearing"

constitutes a resolution in MBIA's favor, but that position fails because there was no order

finding in MBIA's favor. Compl. ¶ 262.

174.    **Fourth,** none of the allegations in the Complaint support the notion that the Zohar

I Bankruptcy was filed with "with actual malice, *i.e.,* that the defendant brought the prior action

due to a wrong or improper motive, something other than a desire to see the ends of justice

served." *In re Eerie World Entm't, L.L.C.*, No. 00-13708, 2006 WL 1288578, at *6 (Bankr.

S.D.N.Y. Apr. 28, 2006) (internal citations and quotation marks omitted). Indeed, rather than

support an inference of malice, the Complaint's allegations undermine any such theory. MBIA

alleges, for example, that defendants brought the Zohar I Bankruptcy to stay MBIA from

replacing the Patriarch Managers as Zohar I's collateral manager and to prevent MBIA from

exercising contractual rights, including the right to auction Zohar I's assets. Compl. ¶¶ 149–51,

262. But this is exactly the purpose of the automatic stay – to prevent the dissipation of assets

and propose a judicial re-organization of an entity experiencing financial distress. MBIA's

disagreement with defendants' bona fide litigation positions does not render them malicious

under the law.

175.    **Fifth,** MBIA has not adequately alleged that it suffered special injury, absent

which there can be no malicious prosecution claim. In New York, "what is 'special'

about special injury is that the defendant must abide some concrete harm that is considerably

more cumbersome than the physical, psychological or financial demands of defending a lawsuit."

*Engel v. CBS, Inc.*, 93 N.Y.2d 195, 205 (1999). Here, MBIA's assertion of damages rests largely

on an allegation that it suffered expenses related to its attempts to participate in the Zohar I

Bankruptcy as a litigant. Compl. ¶ 263. This is plainly insufficient to qualify as special damages.

176.    Read generously, MBIA's sole assertion of damages not relating to the costs of participating in suits was a delay in the exercise of its contractual rights and remedies by reason of the brief stay in the Zohar I Bankruptcy. However, MBIA was not the debtor and cannot piggyback on the automatic stay to claim special damages. *See*, *e.g.*, *In re Nicholas*, 457 B.R. 202, 216 (Bankr. E.D.N.Y. 2011) (holding creditor did not suffer special damages when creditor was subject to an adversary proceeding in underlying bankruptcy); *Wilhelmina Models, Inc. v. Fleisher*, 19 A.D.3d 267, 269 (1st Dep't 2005) (dismissing malicious prosecution claim because loss of financing for affiliate did not constitute special damages: "As separate entities from the potential borrower, plaintiffs could not directly profit from the loan proceeds and therefore damages were insufficiently pleaded.").[19]

### B.    MBIA Has No Claim Based on the Delaware 225 Action.

177.    MBIA's malicious prosecution claim regarding the Delaware 225 Action fails for similar reasons.

178.    A malicious prosecution claim is "viewed with disfavor by the Delaware courts, and, therefore, assessed with careful scrutiny." *Spence v. Spence*, No. CIV.A. K11C-06035JTV, 2012 WL 1495324, at *2 (Del. Super. Ct. Apr. 20, 2012) (citation omitted). There are five elements necessary to sustain a cause of action for malicious prosecution: "1) the institution of regular judicial proceedings; 2) without probable cause; 3) with malice; 4) termination of the proceedings in the aggrieved party's favor; and 5) damages which were inflicted upon the aggrieved party by seizure of property or other special injury." *Id.* Once again, MBIA's pleadings do not properly allege the required factors.

---

[19] MBIA's damages claim is further undermined by the fact that it waited until June 27, 2016 to direct the Trustee to liquidate the Zohar I assets through public action. *See* Compl. ¶ 161.

179.     ***First,*** and most basically, MBIA does not (and could not) allege that Patriarch XV was a party to the Delaware 225 Action. *See* Compl. ¶ 262. Therefore, at a minimum, the claim for malicious prosecution based on the Delaware 225 Action should be dismissed as to Patriarch XV.

180.     ***Second,*** MBIA does not plead that claims were terminated in its favor. One of Ms. Tilton's two claims against MBIA in this action – for breach of fiduciary duty – was never tried or adjudicated. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. CV 12946-VCS, 2017 WL 5956877 (Del. Ch. Nov. 30, 2017).  Even with respect to the declaratory judgment counterclaim that was adjudicated, MBIA did not answer or participate in the defense of that claim, arguing that the court had no personal jurisdiction over it. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. CV 12946-VCS (Del. Ch. 2016). Accordingly, MBIA cannot argue that any claim was prosecuted against it.

181.     ***Third,*** MBIA has not adequately pleaded that Ms. Tilton's third-party claims were brought without probable cause.[20] "Malicious prosecution does not involve litigating a case about which reasonable minds might differ." *Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Tr.*, 117 A.3d 549, 561 (Del. 2015). In particular, suits brought to "preserve . . . rights" have been found to be brought with probable cause, even if ultimately unsuccessful. *See*, *e.g.*, *Winshall v. Viacom Int'l, Inc.*, No. 15-CV-6137, 2019 WL 960213, at *15 (Del. Super. Ct. Feb.

---

[20] Although MBIA alleges conclusorily that Ms. Tilton "filed meritless and bad faith counterclaims and third-party claims," Compl. ¶ 172, these claims sought a counter-declaration and were thus inseparable from Ms. Tilton's defenses. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, 2017 WL 5956877, at *18 (describing the counterclaims). Accordingly, the counterclaims cannot conceivably support a malicious prosecution claim. *See Rowlands v. Phico Ins. Co.*, No. 00-CV-477, 2000 WL 1092134, at *2 (D. Del. July 27, 2000) ("[t]he Delaware courts and those of other jurisdictions have expressly rejected a cause of action for malicious defense for sound policy reasons.").

25, 2019), *aff'd*, No. 520, 2019, 2020 WL 3722401 (Del. July 6, 2020). Further, MBIA's own complaint acknowledges that the overall action was only resolved after extensive discovery, a six-day trial, and a 96-page opinion, which makes no reference to bad faith. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc*., 2017 WL 5956877; Compl. ¶¶ 172–73. MBIA's unsupported assertion that Ms. Tilton lacked probable cause to bring her claims is belied by the court's careful findings of fact and law after extensive proceedings in the Delaware 225 Action. *See Winshall*, 2019 WL 960213, at *16 n.134 (denying claim for malicious prosecution and finding probable cause where "the Court of Chancery did not find that [defendant's action] was a frivolous lawsuit"). The fact that the Chancery Court stayed its judgment pending appeal upon finding that, among other things, "[the] Defendants have presented serious legal questions that present fair grounds for appeal" further evidences the fact that the claims raised were not frivolous. *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. 12946-VCS, D.I. 475 at 2.

182. ***Fourth***, since MBIA has not adequately pleaded that Ms. Tilton's third-party claims were brought without probable cause, it cannot demonstrate the existence of malice. "Malice in a malicious prosecution claim is only considered when there is lack of probable cause, but it is not even considered when there was probable cause." *Pfeiffer v. State Farm Mut. Auto. Ins. Co*., No. 09-CV-8380, 2010 WL 11506689, at *3 (Del. Com. Pl. Nov. 30, 2010); *see also Winshall,* 2019 WL 960213, at *16 ("A claim is brought with malice if it is done with a wrongful or improper motive or with a wanton disregard of the rights of that person against who the act is directed.") (citation and internal quotation marks omitted). Here, MBIA's claims of "malice" are, read generously, mere assertions that Ms. Tilton lacked probable cause. Compl. ¶ 262. MBIA has not alleged that Ms. Tilton's third-party claims were intended to do anything other than clarify and settle the issues raised in the Delaware 225 Action, much as MBIA is

aggrieved that Ms. Tilton sought to press her claims in court. The mere conclusory addition of the words "malice" and "malicious" are inadequate to allege the element of malice under Delaware law.

183.     *Fifth*, MBIA's claim fails for the additional reason that it does not allege special injury relating to the Delaware 225 Action. Like in New York, in Delaware, special injury "must be something more than expenses and attorney's fees incurred in connection with defending the original suit and alleged damage to the claimant's reputation." *BRP Hold Ox, LLC v. Chilian*, No. CV N18C-04-116 CLS, 2018 WL 5734648, at *6 (Del. Super. Ct. Oct. 31, 2018) (citation and internal quotation marks omitted); *see also Nevins v. Bryan*, No. CIV.A. 05C-07-041ESB, 2005 WL 2249520, at *6 (Del. Super. Ct. Sept. 8, 2005) (dismissing claim of malicious prosecution and holding 'special injury' has to be something more than expenses and attorney's fees incurred in connection with defending the counterclaims); *Cuccia v. Edinburg*, No. CIV.A. 83C-MY-6, 1984 WL 548380, *2 (Del. Super. Ct. Jan. 10, 1984) (dismissing malicious prosecution claim for failure to plead special damages). Here, MBIA alleges only that it "incurred substantial costs and expenses as a litigant and third-party respondent."[21] Compl. ¶ 263. This is plainly insufficient to support a cause of action for malicious prosecution under Delaware law.

### C.     The Abuse of Process Claim Must Be Dismissed.

184.     MBIA's claim for abuse of process, Compl. ¶¶ 264–67 (Count XI), based solely on the Zohar I Bankruptcy, fails as a matter of law.

---

[21] MBIA's assertion that it suffered additional damages caused by "interference with and resulting delay in MBIA's exercise of its contractual rights and remedies under the Zohar I Transaction Documents," Compl. ¶ 263, recites damages related only to the Zohar I Bankruptcy, which is deficient as discussed above. *See* Arg. X(A), *supra*.

185.    ***First***, MBIA's claim is time-barred. The statute of limitations for abuse of process

claims brought pursuant to New York State law is one year. *See* N.Y. C.P.L.R. § 215(3); *Lewis v.*

*Snow*, 01-CV-7785, 2003 WL 22077457, at *12 (S.D.N.Y. Sept. 8, 2003). Further, "since accrual

of a cause of action for abuse of process need not await the termination of an action in claimant's

favor, the statute of limitations expires one year from institution of the process, that is, from the .

. . complaint." *Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC*, No. 11-CV-3327,

2013 WL 417406, at *15 (S.D.N.Y. Feb. 4, 2013) (alteration in original) (citation omitted). Here,

the Complaint alleges (and it is a matter of public record) that the Zohar I Bankruptcy was

brought "[o]n or about November 22, 2015" and resolved in February of 2016. Compl. ¶ 265.

Nearly five years have elapsed since the complained-of action was filed – indeed, more than four

years have elapsed since the case was resolved. Accordingly, the claim must be dismissed as

time-barred.

186.    ***Second***, even if the claim were not time-barred, MBIA has failed to properly

plead abuse of process. In New York, the elements of an abuse of process cause of action are

"(1) the regular issuance of civil or criminal process, (2) with an intent to do harm without any

excuse or justification, and (3) misuse of the process in a perverted manner to obtain a collateral

objective." *Schilt v. Matherson*, 104 A.D.3d 668, 669 (2d Dep't 2013). The burden of pleading

the second and third elements is high. "No action for abuse of process will lie premised merely

upon the commencement of a civil action, even if such action is commenced with malicious

intent," *I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D.3d 206, 207 (1st Dep't

2005), or has "occasioned a party trouble, inconvenience and the expense of defending," *Curiano*

*v. Suozzi*, 102 A.D.2d 759, 759 (1st Dep't 1984), *aff'd*, 63 N.Y.2d 113 (1984); *see also La*

*Torella v Hallissey*, 131 A.D.2d 818, 819 (2d Dep't 1987) (even where underlying action is

alleged to be "frivolous" mere "commencement of an action . . . does not constitute an abuse of process"). The Complaint does not contain allegations sufficient to meet the high standard for either an intent to "do harm without excuse or justification," or "misuse of the process in a perverted manner."

187.     MBIA has failed to allege the existence of actionable harm because it has not adequately pled that the Zohar I bankruptcy filing was without probable cause or solely motivated by an intent to do harm without "economic or social excuse or justification." *Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Local 1889 AFT AFL-CIO*, 38 N.Y.2d 397, 403 (1975). Moreover, a claim for abuse of process must be dismissed where a complaint alleges only that the process was used for the purpose the law intended it for, even if the motive was malicious. *See Stroock & Stroock & Lavan v. Beltramini*, 157 A.D.2d 590, 591 (1st Dep't 1990) ("[A]s a matter of law, service of a summons and complaint, even if made with malicious intent, is insufficient to state a cause of action for abuse of process."); *see also Panish v. Steinberg*, 32 A.D.3d 383 (2d Dep't 2006) (dismissing claim for abuse of process where no facts were pled to suggest process was used beyond its proper scope). Here, the Complaint does not allege that Zohar I was ineligible for bankruptcy at the time of the filing or that the filing lacked any ordinary business purpose.

188.     In fact, MBIA acknowledges that Ms. Tilton and Patriarch XV used the bankruptcy process to accomplish normal facets of bankruptcy litigation. Specifically, MBIA's Complaint alleges that these defendants: "knowingly and intentionally filed the Involuntary Petitions to gain the protections of the automatic bankruptcy stay"; proposed a plan for reorganizing Zohar I; took discovery; and negotiated for settlement. Compl. ¶¶ 265–66. The Complaint's allegations amount to nothing more than assertions that Ms. Tilton and Patriarch

XV used the bankruptcy process in an attempt to establish the legal protections and benefits of bankruptcy. *See*, *e.g.*, *Matter of Cohoes Indus. Terminal, Inc*., 931 F.2d 222, 228 (2d Cir. 1991) ("[B]ecause a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense, be frustrated when their debtor files a bankruptcy petition. In reality, there is a considerable gap between delaying creditors . . . on the eve of foreclosure and the concept of abuse of judicial purpose.") (internal citation omitted); *see also In re Northshore Mainland Servs., Inc*., 537 B.R. 192, 203 (Bankr. D. Del. 2015) (filing made in good faith where debtor was on verge of financial precipice, concerned about the exercise of remedies after default on a credit agreement, and "[t]he Debtors admit that they filed chapter 11 cases in an effort to maintain control of the Project and to reorganize, rather than liquidate. Without more, this is not the type of 'tactical advantage' that constitutes bad faith."). Such allegations simply cannot sustain a claim for abuse of process.

## XI.    THE CLAIMS AGAINST DEFENDANTS LDI AND ZOHAR HOLDING MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

189.    LDI and Zohar Holding are identified in a single allegation in a single paragraph of MBIA's 95-page complaint, in Count IX for unjust enrichment. Compl. ¶ 258. MBIA alleges, in conclusory fashion and without any supporting factual allegations, that these Defendants "knew of and played an active role in the Defendants' manipulation of the Overcollateralization Ratio." *Id.* This paltry pleading, as explained below, is woefully insufficient under Rule 8.[22]

---

[22] And to the extent these Patriarch Defendants are named as part of "all Defendants," this constitutes, for the reasons stated *supra*, impermissible group pleading. *See Japhet*, 2014 WL 3809173, at *2 (dismissing claims where the complaint "injects an inherently speculative nature into the pleadings, forcing both the Defendants and the Court to guess who did what to whom when").

190.    And to the extent MBIA is attempting to bring LDI and Zohar Holding into this action by virtue of their roles as sole members of PPAS, Patriarch Partners, Patriarch VIII, Patriarch XIV, Patriarch XV, and PPMG, Compl. ¶¶ 10–15, 20–21, MBIA fails to state a claim under (what appears to be) a failed attempt at pleading an alter ego theory of liability.

191.    Under both New York and Delaware law, two elements must be established to pierce the corporate veil on an alter-ego theory: "(1) the entities must 'operate[] as a single economic entity,' and (2) there must be an 'overall element of injustice or unfairness.'" *Varbero v. Belesis*, No. 20-CV-2538, 2020 WL 5849516, at *3 (S.D.N.Y. Oct. 1, 2020) (alteration in original) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008)); *see also VariBlend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, No. 18-CV-758, 2019 WL 4805771, at *17 n.9 (S.D.N.Y. Sept. 30, 2019) ("[U]s[ing] New York or Delaware law . . . the test for alter ego liability is substantially the same in each jurisdiction.").

192.    MBIA fails at the first step of the inquiry as the Complaint does not offer even bare allegations of control. "It says virtually nothing about the management of the defendants, explains only minimally their relationships with each other," and "does not detail what role, if any," LDI or Zohar Holding played in the operations of PPAS, Patriarch Partners, Patriarch VIII, Patriarch XIV, Patriarch XV, and PPMG. *City of Long Beach v. Total Gas & Power N. Am., Inc.*, No. 19-CV-8725, 2020 WL 3057796, at *11 (S.D.N.Y. June 8, 2020). Nor, as explained above, does the complaint allege in any meaningful way that either LDI or Zohar Holding was involved in the conduct at issue in this case. *See id.* ("The few paragraphs that mention [the parent company] do not permit an inference that any defendant exercised . . . complete control [over another defendant] . . . that leads to a wrong against third parties.").

193.    Therefore, the claims against LDI and Zohar Holding must be dismissed.

## XII.    AMENDMENT OF MBIA'S CLAIMS WOULD BE FUTILE.

194.    "Amendment of the complaint is futile if the amendment will not cure the

deficiency in the original [pleading] or if the amended [pleading] cannot withstand a renewed

motion to dismiss." *Jablonski v. Pan Am. World Airways, Inc*., 863 F.2d 289, 292 (3d Cir. 1988).

Here, the duplicative and defective claims asserted by Plaintiff cannot be cured through

amendment, and therefore should be dismissed with prejudice.

### <u>CONCLUSION</u>

195.    For all of the foregoing reasons, the Patriarch Defendants respectfully request that

the Court enter an order granting their Motion and dismissing MBIA's Complaint in its entirety

and with prejudice.


Dated: October 23, 2020                **COLE SCHOTZ P.C.**

By: *<u>/s/Patrick J. Reilley</u>*
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
preilley@coleschotz.com
ddean@coleschotz.com

– and –

**SHER TREMONTE LLP**
Theresa Trzaskoma (Admitted Pro Hac Vice)
Michael Tremonte (Admitted Pro Hac Vice)
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com

75

*Counsel to Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners Management Group, LLC, Octaluna, LLC, Octaluna II, LLC, Ark II CLO 2001-1, LLC, Ark Investment Partners II, L.P., LD Investments, LLC, and Zohar Holding, LLC*

**File a Court document:**

20-50776-KBO MBIA Insurance Corporation v. Tilton et al

| | | |
|---|---|---|
| Type: ap | Office: 1 (Delaware) | Judge: KBO |
| Lead Case: 1-18-bk-10512 | Case Flag: MultiDFT, SealedDoc(s) | |

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Patrick J. Reilley entered on 10/23/2020 at 8:48 PM EDT and filed on 10/23/2020
**Case Name:**     MBIA Insurance Corporation v. Tilton et al
**Case Number:**    20-50776-KBO
**Document Number:** 25

**Docket Text:**
[SEALED] Brief *in Support of the Patriarch Defendants' Motion to Dismiss the Complaint* (related document(s)[24]) Filed by ARK II CLO 2001-1, LLC, Ark Investment Partners II, L.P., LD Investments, LLC, Octaluna II, LLC, Octaluna, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners Management Group, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Patriarch Partners, LLC, Lynn Tilton, Zohar Holding, LLC. (Reilley, Patrick)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** Brief ISO Defendants' Motion to Dismiss MBIA Adversary Complaint - FINAL.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/23/2020] [FileNumber=16695301-0] [306b62f91a0bfc94dd4f74b3ac6cd4d421b9aed82614b4c5b365ab5604ba8c6b94 252ce9b9dc0ce9f5655adc4d7f9d99066e0cae472ccd7c8c2b69934188a045]]

**20-50776-KBO Notice will be electronically mailed to:**

Ryan M. Bartley on behalf of Interested Party Zohar III, Corp.
bankfilings@ycst.com

Timothy P. Cairns on behalf of Plaintiff MBIA Insurance Corporation
tcairns@pszjlaw.com

Michael R. Nestor on behalf of Interested Party Zohar III, Corp.
bankfilings@ycst.com

Norman L. Pernick on behalf of Defendant ARK II CLO 2001-1, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Ark Investment Partners II, L.P.
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant LD Investments, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Octaluna II, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Octaluna, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Patriarch Partners Agency Services, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Patriarch Partners Management Group, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Patriarch Partners VIII, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Patriarch Partners XIV, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Patriarch Partners XV, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Patriarch Partners, LLC
npernick@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;jwhitworth@coleschotz.com;jford@coleschotz.com;lmorton@coleschotz.com

Norman L. Pernick on behalf of Defendant Zohar Holding, LLC