# **EXHIBIT A**

Redacted Public Version of Reply [Adv. D.I. 50]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| MBIA INSURANCE CORPORATION, | |
| Plaintiff, | Adversary No. 20-50776 (KBO) |
| -against- | |
| LYNN TILTON; PATRIARCH PARTNERS, LLC; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC; PATRIARCH PARTNERS AGENCY SERVICES, LLC; PATRIARCH PARTNERS MANAGEMENT GROUP, LLC; OCTALUNA LLC; OCTALUNA II LLC; ARK II CLO 2001-1, LLC; ARK INVESTMENT PARTNERS II, LP; LD INVESTMENTS, LLC; ZOHAR HOLDING, LLC; and ZOHAR HOLDINGS, LLC, | |
| Defendants. | |

## DEFENDANTS' REPLY IN FURTHER SUPPORT
## OF THE PATRIARCH DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

---

[1] The "Debtors," and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited ("Zohar III") (9261), Zohar II 2005-1, Limited ("Zohar II") (8297), and Zohar CDO 2003-1, Limited (together with Zohar II and Zohar III, the "Zohar Funds") (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Dated: January 8, 2021

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117 3
npernick@coleschotz.com
preilley@coleschotz.com
ddean@coleschotz.com

– and –

**SHER TREMONTE LLP**
Theresa Trzaskoma (Admitted Pro Hac Vice)
Michael Tremonte (Admitted Pro Hac Vice)
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com

*Counsel to Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners Management Group, LLC, Octaluna, LLC, Octaluna II, LLC, Ark II CLO 2001-1, LLC, Ark Investment Partners II, L.P., LD Investments, LLC, and Zohar Holding, LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ................................................................................................................................ 3

I.  MBIA'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS
    DUPLICATIVE OF THE ZOHAR FUNDS ADVERSARY PROCEEDING.................. 3

    A.  The Claim Splitting Doctrine Applies Even Where the Plaintiffs Are Not
        Identical................................................................................................................ 4

    B.  The Claim Splitting Doctrine Applies Even Where the Claims Are
        Not Identical........................................................................................................ 5

II.  MBIA'S CLAIM FOR BREACH OF CONTRACT IS NOT WELL PLEADED............. 9

III.  EVEN IF PLEADED SUFFICIENTLY, THE COMPLAINT STILL
      DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT ................................ 11

    A.  The CMAs Preclude Liability as a Matter of Law................................................ 11

    B.  The Complaint Does Not State a Breach of the CMAs ........................................ 15

        1.  No Breach Based on Allegations of Amending Credit Agreements
            with the Portfolio Companies ................................................................... 16

        2.  No Breach Based on Allegations of Funding New Loan
            Commitments Without MBIA's Authorization ......................................... 17

        3.  No Breach Based on Allegations of Refusing to Monetize
            Equity Interests or "Siphoning" Fees or Assets........................................ 17

        4.  No Breach Based on Allegations of Miscategorized Loans or the
            Miscalculation of the OC Ratio ................................................................ 20

    C.  MBIA Concedes that the Complaint's Allegations Do Not Support an
        Inference that the Patriarch Managers' Actions Caused the Zohar Funds'
        Defaults or Any Other Loss MBIA May Have Suffered ....................................... 22

IV.  THE TORTIOUS INTERFERENCE CLAIMS ARE DEFICIENT AS A
     MATTER OF LAW........................................................................................................ 24

V.  THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED ............... 27

i

VI.    THE FAITHLESS SERVANT CLAIM IS NOT VIABLE.................................................28

VII.   THE CLAIM FOR DECLARATORY RELIEF FAILS......................................................29

VIII.  MBIA FAILS TO STATE A CLAIM FOR CONVERSION ............................................30

IX.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED ...........................34

X.     THE MALICIOUS PROSECUTION CLAIM IS UNSUSTAINABLE .........................37

      A.    MBIA Has No Claim Based on the Zohar I Bankruptcy .....................................37

      B.    MBIA Has No Claim Based on the Delaware 225 Action ..................................40

XI.    THE CLAIMS AGAINST DEFENDANTS LDI AND ZOHAR HOLDING MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM ......................................................41

XII.   AMENDMENT OF MBIA'S CLAIMS WOULD BE FUTILE.......................................43

CONCLUSION.................................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abushalieh v. Am. Eagle Exp.*,
716 F. Supp. 2d 361 (D.N.J. 2010) ................................................................. 4

*Acosta v. Gaudin*,
No. 17-CV-336 (MRH), 2017 WL 4685548 (W.D.Pa. Oct. 18, 2017) ............................ 6

*AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*,
No. 04-CV-8832 (KMK), 2007 WL 2962591 (S.D.N.Y. Oct. 10, 2007) .................. 33–34

*Allen v. Cox*,
2011 WL 2436705 (S.D.N.Y. June 16, 2011) .................................................... 31, 33, 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... *passim*

*Beckerley v. Alorica, Inc.*,
2014 WL 4670229 (C.D. Cal. Sept. 17, 2014) ................................................. 4

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... 2, 9

*Charles Schwab & Co. v. Retrophin, Inc.*,
2015 WL 5729498 (S.D.N.Y. Sept. 30, 2015) ................................................ 14

*Chartwell Therapeutics Licensing, LLC v. Citron Pharma LLC*,
2020 WL 7042642 (E.D.N.Y. Nov. 30, 2020) ................................................ 35

*Clean Vehicle Sols. Am. LLC v. Carrollton Exempted Vill. Sch. Dist. Bd. of Educ.*,
2015 WL 5459852 (S.D.N.Y. Sept. 2, 2015) ................................................. 6

*Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
836 F.2d 173 (3d Cir. 1988) ......................................................................... 30

*Corwin v. NYS Bike Share, LLC*,
2017 WL 1318010 (S.D.N.Y. Apr. 7, 2017) ................................................... 13

*Costantino v. Radio Shack*,
No. 85-CV-5358 (AET), 1989 WL 23131 (D.N.J. Mar. 6, 1989) .................... 35

*Davis v. Norwalk Econ. Opportunity Now, Inc.*,
534 F. App'x 47 (2d Cir. 2013) .................................................................... 6

iii

*De La Pena v. Metro. Life Ins. Co.*,
    552 F. App'x 98 (2d Cir. 2014) ..................................................... 17

*De Los Santos v. Just Wood Furniture, Inc.*,
    2007 WL 9817923 (S.D.N.Y. July 12, 2007) ..................................... 4

*Deutsche Lufthansa AG v. Boeing Co.*,
    2007 WL 403301 (S.D.N.Y. Feb. 2, 2007) ....................................... 12

*EBC I, Inc. v. Goldman, Sachs & Co.*,
    5 N.Y.3d 11 (2005) ................................................................ 27–28

*Ellicott Square Court Corp. v. Violet Realty, Inc.*,
    81 A.D.3d 1366, 916 N.Y.S.2d 705 (4th Dep't 2011) ......................... 38

*Engel v. CBS, Inc.*,
    93 N.Y.2d 195 (1999) ................................................................. 39

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995) ......................................................... 43

*Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*,
    2007 WL 2982247 (Del. Ch. Oct. 9, 2007) ...................................... 23

*FS Media Holding Co. (Jersey) v. Harrison*,
    2013 WL 5780771 (S.D.N.Y. Oct. 25, 2013) .................................... 34

*Gottselig v. Energy Corp. of Am.*,
    2015 WL 5820771 (W.D. Pa. Oct. 5, 2015) ..................................... 35

*Gumbs v. Del. Dep't of Labor*,
    2015 WL 3793539 (D. Del. June 17, 2015) ........................................ 4

*Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*,
    2013 WL 1804493,n.5 (S.D.N.Y. Apr. 18, 2013) ............................... 12

*Harris v. Coleman.*,
    863 F. Supp. 2d 336 (S.D.N.Y. 2012) ............................................ 33

*Henriksen v. Henriksen*,
    1987 WL 25466 (Del. Super. Ct. Nov. 18, 1987) .............................. 41

*Hornstein v. Wolf*,
    109 A.D.2d 129, 491 N.Y.S.2d 183 (2d Dep't 1985) ......................... 39

iv

*In re CIL Ltd.*,
　　582 B.R. 46 (Bankr. S.D.N.Y. 2018) ............................................................................ 33

*In re Dow Chem. Co. Derivative Litig.*,
　　2010 WL 66769 (Del. Ch. Jan. 11, 2010) ...................................................................... 22

*In re Draw Another Circle*,
　　602 B.R. 878 (Bankr. D. Del. 2019) ........................................................................ 10, 30

*In re LTC Holdings, Inc.*,
　　597 B.R. 565 (Bankr. D. Del. 2019), *aff'd*, No. AP 15-51889 (CSS), 2020 WL 5576850
　　(D. Del. Sept. 17, 2020) ................................................................................................. 7

*In re Lynn Tilton*,
　　2017 WL 4297256, Exchange Act Release No. 1182 (AU Sept. 27, 2017) ......... 20, 21, 28

*In re Lyondell Chem. Co.*,
　　544 B.R. 75 (Bankr. S.D.N.Y. 2016) ............................................................................ 14

*In re Musicland Holding Corp.*,
　　386 B.R. 428 (S.D.N.Y. 2008) ...................................................................................... 31

*In re Olick*,
　　630 F. App'x 140 (3d Cir. 2016) .................................................................................... 6

*In re Reveley*,
　　148 B.R. 398 (Bankr. S.D.N.Y. 1992) ........................................................................... 39

*In re Vivaro Corp.*,
　　2014 WL 486288 (Bankr. S.D.N.Y. Feb. 6, 2014) ......................................................... 13

*Japhet v. Francis E. Parker Mem'l Home, Inc.*,
　　2014 WL 3809173 (D.N.J. July 31, 2014) ..................................................................... 36

*Khushaim v. Tullow Inc.*,
　　2016 WL 3594752 (Del. Super. Ct. June 27, 2016) ....................................................... 35

*Klein v. H.I.G. Capital, L.L.C.*,
　　2018 WL 6719717,n.135 (Del. Ch. Dec. 19, 2018) ......................................................... 22

*Lentell v. Merrill Lynch & Co.*,
　　396 F.3d 161 (2d Cir. 2005) .......................................................................................... 23

*Leonard v. Stemtech Int'l, Inc.*,
　　2012 WL 3655512 (D. Del. Aug. 24, 2012) ..................................................................... 4

v

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*,
   87 F.3d 44 (2d Cir. 1996) ................................................................. 31

*Loftus v. Arthur*,
   847 N.Y.S.2d 902, 2007 WL 2376883 (Sup. Ct. Madison Cty. 2007) ............................ 40

*McKenna v. City of Philadelphia*,
   304 F. App'x 89 (3d Cir. 2008) ............................................................. 4

*Mian v. Sekerci*,
   2019 WL 4580024 (Del. Super. Ct. Sept. 13, 2019) .......................................... 35

*Montana v. United States*,
   440 U.S. 147 (1979) ...................................................................... 22

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*,
   930 F. Supp. 2d 532 (S.D.N.Y. 2013) ...................................................... 15

*Navajo Nation v. Wells Fargo & Co.*,
   344 F.Supp.3d 1292 (D.N.M. 2018) ........................................................ 21

*Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*,
   273 F. Supp. 2d 436 (S.D.N.Y. 2003) ...................................................... 13

*Peters Griffin Woodward, Inc. v. WCSC, Inc.*,
   88 A.D.2d 883 (1982) ..................................................................... 34

*Peters v. Gould*,
   2012 WL 9518031 (N.Y. Sup. Ct. Jan. 09, 2012) ........................................... 33

*Pierpoint v. Hoyt*,
   260 N.Y. 26 (1932) ...................................................................... 32

*Process Am., Inc. v. Cynergy Holdings, LLC*,
   35 F. Supp. 3d 259 (E.D.N.Y. 2014) ...................................................... 13

*RCM Techs., Inc. v. Constr. Servs. Assocs., Inc.*,
   149 F. Supp. 2d 109 (D.N.J. 2001) ....................................................... 35

*Saleeby v. Remco Maint.*, LLC,
   148 A.D.3d 570, 50 N.Y.S.3d 330 (2017) .................................................. 33

*Sankin v. Abeshouse*,
   545 F. Supp. 2d 324 (S.D.N.Y. 2008) ..................................................... 40

*Schreiber v. Burlington N., Inc.*,
    472 U.S. 1 (1985) .................................................................................. 21

*Senju Pharm. Co. v. Apotex, Inc.*,
    921 F. Supp. 2d 297 (D. Del. 2013) ....................................................... 9

*Silver v. Mendel*,
    894 F.2d 598 (3d Cir. 1990) .......................................................... 38, 39

*Star Direct Telecom, Inc. v. Glob. Crossing Bandwith, Inc.*,
    2012 WL 1067664 (W.D.N.Y. Mar. 22, 2012) .................................... 12

*Sun Gold, Corp. v. Stillman*,
    95 A.D.3d 668 (2012) ........................................................................... 33

*TechnoMarine SA v. Jacob Time, Inc.*,
    905 F. Supp. 2d 482 (S.D.N.Y. 2012) .................................................. 31

*Teller v. Galak*,
    162 A.D.3d 959 (2d Dep't 2018) ......................................................... 38

*Thomas v. Independence Twp.*,
    463 F.3d 285 (3d Cir. 2006) ................................................................. 10

*Thyroff v. Nationwide Mut. Ins. Co.*,
    8 N.Y.3d 283 (2007) ............................................................................ 33

*TOA Sys., Inc. v. Int'l Bus. Machines Corp.*,
    2019 WL 5693388 (S.D.N.Y. Nov. 4, 2019) ...................................... 11

*Tolliver v. Christina Sch. Dist.*,
    564 F. Supp. 2d 312 (D. Del. 2008) ............................................... 34–35

*Tradex Europe SPRL v. Conair Corp.*,
    2008 WL 1990464 (S.D.N.Y. May 7, 2008) ...................................... 12

*Transcience Corp. v. Big Time Toys, LLC*,
    50 F. Supp. 3d 441 (S.D.N.Y. 2014) ................................................... 33

*U.S. ex rel. Cestra v. Cephalon, Inc.*,
    2014 WL 1087960 (S.D.N.Y. Mar. 19, 2014) ...................................... 6

*U.S. Sec. & Exch. Comm'n v. Santillo*,
    327 F.R.D. 49 (S.D.N.Y. 2018) .......................................................... 21

*United States v. Wright*,
    160 F.3d 905 (2d Cir. 1998) ............................................................................... 3

*Waite v. Schoenbach*,
    2010 WL 4456955 (S.D.N.Y. Oct. 29, 2010) ................................................... 14

*Walton v. Eaton Corp.*,
    563 F.2d 66 (3d Cir. 1977) ................................................................................. 4

*Wilhelmina Models, Inc. v. Fleisher*,
    19 A.D.3d 267, 797 N.Y.S.2d 83 (1st Dep't 2005) ......................................... 39

*Woodards v. Chipotle Mexican Grill, Inc.*,
    2015 WL 3447438 (D. Minn. May 28, 2015) ................................................... 4

*Zorbas v. U.S. Tr. Co.*,
    48 F. Supp. 3d 464 (E.D.N.Y. 2014) .............................................................. 27

**Rules**

Federal Rule of Civil Procedure 8 ....................................................................... *passim*

Federal Rule of Civil Procedure 12(b) ........................................................................ 34

**Other Authorities**

Juliet M. Moringiello, *False Categories in Commercial Law: The (Ir)relevance of (in)tangibility*,
    35 Fla. St. U. L. Rev. 119 (2007) ...................................................................... 33

The Patriarch Defendants[2] submit this reply in further support of the *Patriarch Defendants' Motion to Dismiss the Complaint* [Adv. D.I. 24] and the *Brief in Support of the Patriarch Defendants' Motion to Dismiss the Complaint* [Adv. D.I. 25] (collectively, the "Motion" or "Mot."), filed on October 23, 2020, and in response to *MBIA Insurance Corporation's Brief in Opposition to Defendants' Motion to Dismiss the Complaint* [Adv. D.I. 46] (the "Opposition" or "Opp."), filed on December 3, 2020.

## PRELIMINARY STATEMENT

1.      As Credit Enhancer for the Insured Zohar Funds, MBIA understood and accepted the risk that those Funds might not succeed and that, in the event of default, it would be required to pay claims on its insurance wrap. MBIA also willingly accepted the risks inherent in the Zohar Funds' structure, including risks associated with the overlapping investments made by the Funds, which all had different maturity dates. Further, MBIA agreed in writing to permit the Patriarch Defendants to enter into business transactions with both the Zohar Funds and the Portfolio Companies. Among other things, MBIA agreed that Ms. Tilton and her affiliated entities would own all the Zohar Funds' preference shares, would serve as the Zohar Funds' Collateral Manager, would serve as the administrative agent under loan agreements between the Funds and the Portfolio Companies, and would invest in the Portfolio Companies alongside the Zohar Funds. Further, MBIA expressly waived any conflicts of interest in connection with those transactions. MBIA has also long been aware of the Management Services Agreements between Defendant PPMG and the Portfolio Companies and such agreements were fully permissible under the Indentures and the CMAs.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Complaint [Adv. D.I. 2] ("Compl.") or the Motion [Adv. D.I. 24, 25]. On December 3, 2020, MBIA voluntarily dismissed Zohar Holdings, LLC from these proceedings [Adv. D.I. 45]; therefore, the Patriarch Defendants are the only defendants remaining in this action.

1

2.      In the wake of the 2008 financial crisis, there was concern that the Insured Zohar Funds could not meet their maturity dates. Should the Insured Funds default, MBIA's insurance wrap would be triggered. Yet for years, MBIA acted in a wholly commercially unreasonable manner by refusing all reasonable restructuring proposals that would have averted defaults on the Insured Zohar Funds and avoided triggering MBIA's obligations under the Financial Guaranties and Insurance Agreements. Rather than seeking consensual paths to repayment, MBIA has instead implemented a litigation strategy infested with personal attacks on Ms. Tilton. MBIA's present position appears to be "it's okay if we suffer and lose money so long as Ms. Tilton suffers and loses more." Having recklessly rolled the dice – causing tremendous damage to the Funds, to many of the Portfolio Companies, and to the Patriarch Defendants – MBIA seeks to hold the Patriarch Defendants liable for the Insured Zohar Funds' defaults. The written agreements make clear, however, that none of the Patriarch Defendants ever agreed to be an insurer to the insurer.

3.      As demonstrated in the Motion, MBIA has no claim against the Patriarch Defendants. Each cause of action must be dismissed because (i) the written agreements between the parties expressly foreclose such a claim, (ii) the legal theory is untenable, or (iii) the allegations are insufficient, as a matter of law. In some instances, a cause of action fails for all three reasons.

4.      MBIA's response to the Motion largely relies on improper inflammatory language in its Complaint and argues that these conclusory allegations of wrongdoing are sufficient to survive dismissal. But the Court should not – and indeed, under *Iqbal* and *Twombly*, cannot – accept these scurrilous accusations at face value. Rather, the Court must look at the nonconclusory allegations to determine whether, in light of the various written agreements governing the parties' relationships and common sense, the Complaint states a viable and plausible cause of action.

2

5.       When stripped of the unsubstantiated and improper allegations, and when viewed in the context of the relevant written agreements, the Complaint fails. What MBIA casts as "embezzlement" is a willful misdescription of the fact that PPAS held loan proceeds on behalf of certain Portfolio Companies, as permitted by the Credit Agreements.[3] What MBIA characterizes as "self-dealing" are simply the related-party transactions that MBIA expressly authorized. And what MBIA describes as "unlawful" is nothing more than commercially reasonable behavior, pursuant to and consistent with various governing agreements, designed to protect the Zohar Funds and the Portfolio Companies, and the Patriarch Defendants' interests in both. At bottom, each of MBIA's claims is premised on the fact that the Patriarch Defendants did not put MBIA's interests above everyone else's – above the Zohar Funds, their noteholders, the Portfolio Companies and their constituencies, and Ms. Tilton's own interests. But the Patriarch Defendants never had an obligation to do so.

## ARGUMENT

## I.      MBIA'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS DUPLICATIVE OF THE ZOHAR FUNDS ADVERSARY PROCEEDING.

6.       As discussed in more detail below, none of MBIA's claims has any merit. But the Court need not even delve into the viability of most of the claims asserted therein for the purposes of this motion because much of the Complaint is impermissibly duplicative of the Complaint in the Zohar Funds Adversary Proceeding, Adv. Proc. No. 20-50534 [Adv. D.I. 2] (the "Zohar Funds' Complaint" or "Zohar Compl."). *See* Mot. ¶¶ 53–66. MBIA concedes that the two cases involve "similar defendants, transactions, [and] underlying conduct," Opp. ¶ 38, but still seeks to justify

---

[3] To be clear, the Patriarch Defendants categorically deny all allegations of wrongdoing. Contrary to MBIA's fictional narrative, it is not a "vulnerable victim[] . . . targeted and deprived of what [it was] entitled to," *United States v. Wright*, 160 F.3d 905, 910 (2d Cir. 1998); rather, it is a sophisticated entity trying to sidestep valid contracts and deprive the Patriarch Defendants of funds to which they are contractually entitled.

3

and distinguish its separate action by pointing out that (i) the plaintiffs are different, and (ii) some of the claims are different. *Id.* MBIA's arguments are unavailing.

### A. The Claim Splitting Doctrine Applies Even Where the Plaintiffs Are Not Identical.

7. As an initial matter, MBIA argues that the claim splitting doctrine does not apply here as a matter of law. In particular, MBIA points out that it and the Zohar Funds are "two different plaintiffs" and argues that the doctrine only "bar[s] a single plaintiff from filing multiple duplicative pleadings for strategic gain." Opp. ¶ 38 (emphasis omitted). None of the cases cited by MBIA stands for such a limited proposition. *See id.*[4] Rather, the "[t]he parties to the two actions *need not be identical*" for the claim splitting doctrine to apply, they just need to "represent the same interests." *De Los Santos v. Just Wood Furniture, Inc.*, No. 05-CV-9369, 2007 WL 9817923, at *3 (S.D.N.Y. July 12, 2007) (emphasis added). Thus, the two cases need only "(1) take place in the same court; (2) with the same defendants; (3) involv[e] the same subject matter." *McKenna v. City of Philadelphia*, 304 F. App'x 89, 92 (3d Cir. 2008). *See also Abushalieh v. Am. Eagle Exp.*, 716 F. Supp. 2d 361, 366 (D.N.J. 2010) (holding cases with "different plaintiffs" duplicative). Because this proceeding meets all three factors, the fact that the plaintiffs are not identical does not provide a basis to distinguish this case from the Zohar Funds Adversary Proceeding.

---

[4] *Walton v. Eaton Corp.*, 563 F.2d 66, 71 (3d Cir. 1977) (stating general proposition that "the court must insure that the plaintiff does not use the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints . . . and demand for trial by jury," but not limiting the application to a single plaintiff); *Leonard v. Stemtech Int'l, Inc.*, No. 12-86-LPS-CJB, 2012 WL 3655512, at *8 (D. Del. Aug. 24, 2012) (same); *Beckerley v. Alorica, Inc.*, No. SACV 14-0836-DOC, 2014 WL 4670229, at *3 (C.D. Cal. Sept. 17, 2014); *Woodards v. Chipotle Mexican Grill, Inc.*, No. 14-cv-4181, 2015 WL 3447438, at *1, 4 (D. Minn. May 28, 2015); *Gumbs v. Del. Dep't of Labor*, No. 15-00190-RGA, 2015 WL 3793539, at *2 (D. Del. June 17, 2015) (same).

**B.      The Claim Splitting Doctrine Applies Even Where the Claims Are Not Identical.**

8.      The purpose of the Zohar Funds Adversary Proceeding, as reflected in their 33-count Complaint, is to collect funds for the benefit of the Funds' creditors, including their largest creditor, MBIA. In this respect, Zohar I and II represent MBIA's interests with respect to claims against Ms. Tilton and her Patriarch affiliates arising out of the Indentures and CMAs. Likewise, much, if not all, of MBIA's lawsuit is an effort to vindicate the Zohar Funds' rights under various agreements. Mot. ¶ 57; *see, e.g.*, Compl. Count I, ¶¶ 187–97 (seeking to enforce the Patriarch Managers' obligations to the Zohar Funds under the CMAs); *id.* Count IV, ¶¶ 215–26 (seeking to enforce the Zohar Funds' equity interests in and rights concerning the Portfolio Companies); *id.* Counts VI and VII, ¶¶ 236–48 (seeking to vindicate certain Patriarch Defendants' alleged fiduciary obligations to the Zohar Funds). MBIA's interests are therefore already being litigated in that proceeding.

9.      In opposition, MBIA relies on certain purported distinctions between the lawsuits to argue that it should be permitted to proceed with its separate action. None of MBIA's arguments has any merit.

10.     *First*, MBIA argues that claim splitting is not applicable because Defendants "completely ignor[e] Counts I-III of MBIA's Complaint" in their "count-by-count comparison." Opp. ¶ 42. This is plainly false, as Defendants' Motion clearly demonstrates that Counts I, II, IV, V, VI, VII, VIII, and IX of MBIA's Complaint are duplicative of the Zohar Funds Adversary Proceeding. Mot. ¶¶ 53-66.

11.     In establishing that litigation is duplicative, "[t]he cases need not be actually identical to involve the same subject matter. When the difference between the two cases is purely semantic and both cases rely on the same operative facts and legal principles, the cases involve the

5

same subject matter." *Acosta v. Gaudin*, No. 17-CV-366 (MRH), 2017 WL 4685548, at *3 (W.D.Pa. Oct. 18, 2017) (internal quotation marks and citation omitted). Thus, "all aspects of the new and prior suits [need not] be identical," *Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 48 (2d Cir. 2013), as the Third Circuit "take[s] a broad view, looking to whether there is an essential similarity of the underlying events giving rise to the various legal claims." *In re Olick*, 630 F. App'x 140, 141 (3d Cir. 2016) (internal citation and quotation marks omitted).

12.     Further, only three counts in this lawsuit are not virtually identical to claims in the Zohar Funds Adversary Proceeding: (1) tortious interference (Count III); (2) malicious prosecution (Count X); and (3) abuse of process (Count XI). That three of MBIA's claims are new is of no moment, however, because the claim splitting doctrine applies even where two actions "substantially overlap but feature at least one non-overlapping claim." *U.S. ex rel. Cestra v. Cephalon, Inc.*, No. 10-CV-6457, 2014 WL 1087960, at *4 (S.D.N.Y. Mar. 19, 2014); *see also Clean Vehicle Sols. Am. LLC v. Carrollton Exempted Vill. Sch. Dist. Bd. of Educ.*, No. 15-CV-1503, 2015 WL 5459852, at *5 (S.D.N.Y. Sept. 2, 2015) (holding two cases may be duplicative "even if the parties and claims in the two actions are not identical"). And, critically, MBIA does not dispute that the overlapping causes of action "involve overlapping parties, seek 'largely the same or similar relief' and are 'largely premised' on similar facts, agreements, and legal theories." Opp. ¶ 39 (quoting Mot. ¶ 56.).

13.     *Second*, in its Opposition, MBIA repeatedly and in conclusory fashion states that "[t]he relief sought by MBIA here is [] different from the relief the Debtors seek in their adversary proceeding" as "MBIA is enforcing rights and remedies unique to it as Credit Enhancer." Opp. ¶¶ 40–41; *see also id.* ¶ 37, 39, 42–44. However, MBIA is not in fact bringing any claims unique to

6

its position as the financial guarantor and does not cite to a single paragraph of its Complaint to the contrary.

14.     The crux of MBIA's argument appears to be that it is entitled "to reimbursement of the $1 billion it paid as insurer . . . independent of its right to receive principal and interest owed to it as subrogated noteholder." Opp. ¶ 43 (emphasis omitted). This position is contrary both to logic and to the express terms of the Indentures. As MBIA acknowledges, "Section 16.5 of the Indentures . . . provide[s] that . . . upon making payments of interest or principal on the Class A-1 or Class A-2 Zohar Notes, and without having to take any further action, MBIA becomes fully subrogated to the rights of such noteholders." Compl. ¶ 49; *see also* Compl. ¶¶ 70, 147, 169, 232. By its very definition, "[s]ubrogation allows a surety to step into the shoes of its obligee." *In re LTC Holdings, Inc.*, 597 B.R. 565, 567 (Bankr. D. Del. 2019), *aff'd*, No. AP 15-51889 (CSS), 2020 WL 5576850 (D. Del. Sept. 17, 2020). Therefore, MBIA's losses as insurer are identical to its losses as subrogee to the Insured Zohar Funds' noteholders and MBIA's blatant attempt at securing a windfall and double recovery should be rejected. *See* Mot. ¶¶ 25, 63–66, 130.

15.     The only potential additional relief sought is for (i) attorneys' fees MBIA purportedly incurred in litigating the Zohar I 2015 bankruptcy and the Delaware 225 Action, and (ii) "[t]he losses MBIA incurred in the separate capacities of insurer and subrogee . . . paid pursuant to different provisions in the Indentures' priority of payment waterfalls." Opp. ¶¶ 40, 43. With respect to the former, as discussed below, Arg. X, the claims seeking this relief are improper as a matter of law and should, therefore, be discounted in the Court's claim splitting analysis. *See also* Mot. ¶¶ 177–88. With respect to the latter, MBIA's argument is based on the "Indentures' priority of payments" and whether MBIA, as Credit Enhancer, will be paid a distribution before the noteholders. Opp. ¶ 43 & n.4. But there is no meaningful distinction between MBIA's insurance

7

losses and the notes it now holds – they are mirror images of each other. MBIA's claim to priority is simply an argument for paying MBIA first out of any recovery.[5] Further, to the extent MBIA claims it is entitled to certain amounts as "Credit Enhancement Liabilities," that is not part of the Complaint and, in any event, would be a claim MBIA has against the Zohar Funds, not the Patriarch Defendants.

16.    ***Third***, MBIA makes the confusing assertion that the Zohar Funds seek additional relief that "do[es] not apply to MBIA." Opp. ¶ 41 (emphasis omitted). Not only is this factually incorrect with respect to the Insured Zohar Funds,[6] but it is irrelevant to the question of whether MBIA would be harmed if this action were dismissed.

17.    In this case, there is no basis for distinguishing MBIA's claims from those of the Zohar Funds Adversary Proceeding; to the contrary, MBIA's Complaint, filed four months after the Zohar Funds' Complaint in the same bankruptcy proceedings, names the same defendants, is largely premised on the same or similar facts and agreements, asserts largely the same or similar

---

[5] MBIA's argument is particularly nonsensical given that, apart from certain Patriarch Defendants, MBIA is the sole senior noteholder in the Insured Zohar Funds.

[6] In particular, MBIA alleges that the Zohar Funds seek recompense for three losses that do not apply to MBIA: "(a) the decrease in value of the Funds' debt and equity assets caused by Tilton's and her affiliates' breaches of the Management Agreements, (b) the unearned collateral-management fees and preference-share payments paid by the Funds to the Patriarch Manager Defendants and Octaluna Entities, and (c) reasonable expenses incurred by the Debtors in enforcing their rights." Opp. ¶ 41. While MBIA's Complaint may use slightly different verbiage than the complaint in the Zohar Funds Adversary Proceeding, MBIA is still requesting the same (duplicative) relief. *See* Compl. ¶ 190(f) (MBIA requesting relief for from Defendants for "impair[ing] the value and rights in the Collateral" in violation of the Management Agreements); *id.* ¶ 257 (MBIA requesting restitution for "payment of fees to PPMG, PPAS and the Patriarch Manager Defendants to which they were not entitled" and for "taking for the Octaluna Entities, the Patriarch Manager Defendants and Tilton valuable rights in the Portfolio Companies belonging to or that would otherwise inure to MBIA from the Insured Zohar Funds"); *id.* WHEREFORE clause, sub. (d) (requesting "[p]ayment to MBIA of all of its attorneys' fees, costs and expenses in connection with these chapter 11 cases and all related adversary proceedings").

legal theories, and seeks largely the same or similar relief. Therefore, MBIA's action should be dismissed as duplicative.

## II.    MBIA'S CLAIM FOR BREACH OF CONTRACT IS NOT WELL PLEADED.

18.     MBIA's claim for breach of contract in Count I fails to meet the basic pleading requirements set forth by FRCP 8 and should be dismissed on this basis. In opposition, MBIA makes two arguments in support of sustaining its Complaint. Neither of them has any merit.

19.     *First*, citing to several cases that predate *Iqbal* and *Twombly*,[7] MBIA argues for a liberal standard of review with respect to the Complaint's sufficiency, contending generally that "granting a motion to dismiss is a disfavored practice." Opp. ¶ 33. But this is no longer true. Indeed, in the wake of *Iqbal* and *Twombly*, federal courts routinely grant such motions.[8] Nor is MBIA correct in arguing, *id.*, that the Court must accept all of MBIA's allegations at face value. To the contrary, the Third Circuit has specifically disavowed the lower *Conley* standard of notice pleading in favor of "the heightened [fact] pleading standard of *Twombly* and *Iqbal*." *Senju Pharm. Co. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 302 (D. Del. 2013). It is under this standard that the Complaint fails to pass muster.

20.     *Second*, MBIA improperly attempts to cure the pleading deficiencies with respect to Count I through briefing (and a chart) in opposition. Opp. ¶¶ 47–51. This belated effort to connect specific allegations from the 100-page Complaint to the claims in Count I fails as matter of law as, "[w]hen considering a motion to dismiss, it is axiomatic that the complaint may not be

---

[7] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[8] *See*, *e.g.*, Patrick Dorrian, *Workplace Lawsuits Go Further in This New York Court,* Bloomberg Law (Apr. 24, 2018), https://news.bloomberglaw.com/daily-labor-report/workplace-lawsuits-go-further-in-this-new-york-court (noting that the Eastern District of New York granted more than 50% of motions to dismiss in 2018).

amended by the briefs in opposition." *In re Draw Another Circle*, 602 B.R. 878, 893 (Bankr. D. Del. 2019).

21.     In this regard, there is no merit to MBIA's argument that incorporating more than 186 paragraphs of "Common Allegations" into Count I "neither obscures the grounds of MBIA's contract claim or prevents Defendants from responding." Opp. ¶ 50; *see also* Mot. ¶¶ 67–74. If this were so, MBIA would certainly not need several pages of briefing and a chart to try to explain which allegations support Count I. In fact, MBIA's chart perfectly demonstrates the opacity of its Complaint: the chart functions as a kind of cipher. *See* Opp. ¶ 50. The "Common Allegations" connected to each subparagraph are an expansive mishmash of paragraphs or sections in the Complaint, arranged here in a different order than as they appear sequentially in the Complaint, consistent with MBIA having strewed its putative "Common Allegations" underlying Paragraph 191 without discernible rhyme or reason across its voluminous pleading. Further, MBIA's chart addresses only one of the confounding paragraphs at issue. *See* Mot. ¶¶ 70–72. Contrary to MBIA's contention, "Rule 8 does not empower respondent to plead the bare elements of [its] cause of action, affix the label 'general allegation,' and expect [its] complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687.

22.     As MBIA's claim for breach of contract does not meet FRCP 8's basic pleading standards, it should be dismissed.[9]

---

[9] In the alternative to dismissal, MBIA should be required to provide a more definite statement explaining which of the factual allegations correspond with each category of breach in paragraphs 190(a)–(f), 191(a)–(f), and 192(a)–(c). *See Thomas v. Independence Twp.*, 463 F.3d 285, 301 (3d Cir. 2006) ("[T]he Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available . . . to obtain the factual basis underlying a plaintiff's claim for relief.").

III.    **EVEN IF PLEADED SUFFICIENTLY, THE COMPLAINT STILL DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT.**

23.    MBIA's contract claim is not sustainable because (i) the CMAs contain a limitation of liability provision that precludes MBIA's claim; (ii) none of the complained-about conduct violated any obligation the Patriarch Managers had under the CMAs; and (iii) even if there had been a violation of the CMAs, the allegations do not support an inference that such a violation caused the harm about which MBIA complains – the Zohar Funds' defaults. *See* Mot. ¶¶ 78–115. Nothing in MBIA's Opposition explains how the Complaint overcomes these critical defects.

A.    **The CMAs Preclude Liability as a Matter of Law.**

24.    Article II of the CMAs, cited in the Complaint as the basis for the contract claim, Compl. ¶ 189, clearly provides that the Patriarch Managers did not promise to ensure there would not be a default. Specifically, MBIA understood that the Patriarch Managers did not "guarantee[] the performance of or economic returns to be realized . . . <u>or whether the economic returns . . . will be sufficient to repay the amounts owed</u> . . . under the Indentures or otherwise." Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 2.2(a) (emphasis added). MBIA concedes that Section 2.2(a) means "the Patriarch Managers are not guaranteeing investors an economic return on the Collateral." Opp. ¶ 53. Under these circumstances, MBIA's breach of contract claim – which clearly seeks to hold the Patriarch Managers liable for Zohar I's and Zohar II's defaults (in other words, to be an insurer to the insurer) – must be dismissed. *See TOA Sys., Inc. v. Int'l Bus. Machines Corp.*, No. 18-CV-10685, 2019 WL 5693388, at *3 (S.D.N.Y. Nov. 4, 2019) ("[T]he Court finds plaintiff cannot plausibly allege a breach of contract claim . . . given the limitation on liability clause.").

25.    In seeking to circumvent this outcome, MBIA argues that the categorical non-guarantee in Section 2.2 is subject to the narrow non-recourse exception in the CMAs for "fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance or

11

reckless disregard" in Section 4.4. Opp. ¶ 54. Even if this were so, however, MBIA does not meet

the applicable legal standard, which "demand[s] nothing short of . . . a compelling demonstration

of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate

or callous indifference to the rights of others, or an extensive pattern of wanton acts." *Deutsche

Lufthansa AG v. Boeing Co.*, No. 06-CV-7667, 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007)

(citation and internal quotation marks omitted). And, where, as here, "sophisticated parties have

entered into limitation of liability agreements," courts "apply a more exacting standard . . . than in

other contexts." *Star Direct Telecom, Inc. v. Glob. Crossing Bandwith, Inc.*, No. 05-CV-6734T,

2012 WL 1067664, at *10 (W.D.N.Y. Mar. 22, 2012) (internal quotation marks omitted), *report

and recommendation adopted*, No. 05-CV-6734T, 2012 WL 4509877 (W.D.N.Y. Sept. 28, 2012).

MBIA's allegations falls well short of this "high standard." *Gun Hill Rd. Serv. Station, Inc. v.

ExxonMobil Oil Corp.*, No. 08-CV-7956, 2013 WL 1804493, at *11 n.5 (S.D.N.Y. Apr. 18, 2013).

26.     In its Opposition, MBIA contends that this well-established rigorous pleading

standard is either "beside the point" or incorrect. Opp. ¶¶ 55–57. Both arguments are specious, the

former for obvious reasons. As to the latter, MBIA attempts to distinguish the precedent cited by

Defendants, *see* Mot. ¶ 84, by arguing that those cases "involve[d] attempts to set aside contractual

provisions limiting damages and liability or fraud claims subject to heightened pleading

standards," Opp. ¶ 56 & n.8. There is, however, no basis to apply a lower pleading standard here.

While the precise subject matter of non-recourse cases may differ, there is a single (and very high)

standard that applies to <u>all</u> cases in which "sophisticated parties, represented by counsel, have

voluntarily entered into contracts containing limitation on liability provisions." *Tradex Europe

SPRL v. Conair Corp.*, No. 06-CV-1760, 2008 WL 1990464, at *3 (S.D.N.Y. May 7, 2008)

(articulating "extreme culpability" standard without regard to the type of non-recourse provision

12

at issue); *see, e.g.*, *Corwin v. NYS Bike Share, LLC*, No. 14-CV-1285, 2017 WL 1318010, at *7 (S.D.N.Y. Apr. 7, 2017) (same); *Process Am., Inc. v. Cynergy Holdings, LLC*, 35 F. Supp. 3d 259, 263 (E.D.N.Y. 2014) (same), *aff'd*, 839 F.3d 125 (2d Cir. 2016); *In re Vivaro Corp.*, No. 12-13810, 2014 WL 486288, at *5 (Bankr. S.D.N.Y. Feb. 6, 2014) (same); *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (same).

27.    Under this very high standard, MBIA's Complaint comes up far short.

28.    ***First***, not only does MBIA fail to articulate what its allegations of "egregious intentional misbehavior evincing extreme culpability" are, but it simply lists, without explanation, two dozen paragraphs of the Complaint as "proof" of the sufficiency of its allegations, leaving both the Court and Defendants to divine their significance. Opp. ¶ 56 (citing, without explanation, Compl. ¶¶ 1, 5-6, 74, 76-77, 82, 88–89, 94–95, 99–100, 104, 109, 113, 116, 129, 133–34, 143, 179, 190(e), 191. This alone is a proper basis for dismissal under Rule 8. *Iqbal*, 556 U.S. at 687.

29.    Moreover, MBIA's "allegations" are no more than conclusory, self-serving statements of wrongdoing. *See, e.g.*, Compl. ¶ 1 (stating conclusorily that Defendants committed a "years-long pattern of fraud, self-dealing, and gross mismanagement"); *id.* ¶ 5 (stating conclusorily that Defendants "embarked on an egregious campaign of stunning theft and self-dealing"); *id.* ¶ 74 (alleging conclusorily that Defendants engaged in a "scheme"); *id.* ¶ 82 (alleging conclusorily that Defendants "wrongfully and in bad faith executed various purported 'irrevocable voting proxies' and shareholder agreements"); *id.* ¶ 89 (alleging conclusorily that "Defendants' conflicted, bad-faith and self-dealing transactions [were] usurping control"); *id.* ¶ 94 (alleging Defendants "willfully, unjustifiably, and in bad faith refused to monetize those assets"); *id.* ¶ 190(e) (alleging Defendants "perform[ed] their duties and obligations under the Management Agreements and Indentures in bad faith and with willful misconduct or, at least, gross

negligence"). But these inflammatory assertions are not supported by any actual facts. Instead, the actual allegations demonstrate nothing more than reasonable commercial behavior consistent with and authorized by the written agreements.

30.    ***Second***, MBIA repeatedly alleges that Ms. Tilton and the Patriarch Managers "acted in their own personal self-interest" in violation of the CMAs. Compl. ¶¶ 13, 18, 79. This is fatal to MBIA's claim because to invoke a non-recourse provision, MBIA must "demonstrate that the defendant's conduct in breaching the contract was malicious or motivated <u>by anything other than economic self-interest</u>." *In re Lyondell Chem. Co.*, 544 B.R. 75, 89 (Bankr. S.D.N.Y. 2016) (emphasis added). Further, relying on the self-interested nature of any transaction in this case is especially unwarranted given that MBIA expressly consented to related-party transactions and waived attendant conflicts of interest. Mot. ¶¶ 87, 102, 108.

31.    ***Third***, MBIA's allegations do not support an inference of fraud or "extreme culpability" because Ms. Tilton's interests and those of her affiliated entities were fully aligned with those of the Zohar Funds and their noteholders, a fact that completely undermines any inference of malice. Indeed, the entire structure of the Funds, Ms. Tilton's side-by-side investments, and her role as owner of the Funds completely undermine any allegation that Ms. Tilton would have had a financial interest in siphoning assets away from the Portfolio Companies or the Zohar Funds. *See Charles Schwab & Co. v. Retrophin, Inc.*, No. 14-CV-4294, 2015 WL 5729498, at *9 (S.D.N.Y. Sept. 30, 2015) (dismissing fraud claim where "allegations fail[ed] to support a plausible inference of motive, let alone a strong inference"); *Waite v. Schoenbach*, No. 10-CV-3439, 2010 WL 4456955, at *6 (S.D.N.Y. Oct. 29, 2010) ("[C]onclusory allegations of scienter are sufficient [only] if supported by facts giving rise to a strong inference of fraudulent

14

intent.") (internal citations omitted). MBIA does not dispute Defendants' lack of motive; instead, it simply reiterates that such critical allegations are "beside the point." Opp. ¶ 55.

32.     ***Fourth***, even if MBIA is correct that the Patriarch Managers acted to MBIA's detriment, Opp. ¶ 56, that does not provide a basis for holding the Patriarch Managers liable for the Zohar Funds' defaults. "[A]n allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power." *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013).

33.     Further, an inference of bad faith based solely on the Patriarch Managers allegedly acting to MBIA's detriment is particularly unwarranted under the circumstances given that MBIA was not the only stakeholder in the Zohar Funds. In bringing its breach of contract action, MBIA asks the Court to conclude that the Patriarch Managers had an obligation to look out for MBIA's interests first, above the interests of all other stakeholders. Such a claim is directly contrary to common sense and to the written agreements. Trzaskoma Decl. Ex. 2 § 6.2. As MBIA concedes, the Patriarch Managers were fiduciaries to the Zohar Funds themselves, not to MBIA. Opp. ¶ 97; *see also* Mot. ¶¶ 127–38. MBIA simply had no right to insist that the Patriarch Managers privilege MBIA's interests over everyone else's.

## B.     The Complaint Does Not State a Breach of the CMAs.

34.     MBIA argues that the Complaint states claims for breaches of the CMAs based on (i) amending Credit Agreements between the Portfolio Companies and the Zohar Funds; (ii) making unauthorized loans; (iii) refusing to monetize the Portfolio Companies; and (iv) "siphoning" various fees and sales proceeds. Opp. ¶¶ 69–84. Each of these arguments fails.

15

1. **No Breach Based on Allegations of Amending Credit Agreements with the Portfolio Companies**

35.     MBIA's claim that the Patriarch Managers violated the CMAs by amending the Credit Agreements between the Portfolio Companies and the Zohar Funds, deferring and/or forgiving interest payments, and extending principal repayment dates on loans fails and must be dismissed because the alleged restructurings were expressly contemplated and permitted by both the Indentures and the CMAs as part of the Collateral Manager's broad discretion to modify loan terms. Mot. ¶¶ 90–91.

36.     MBIA contends that the Patriarch Managers' discretion to amend loan terms was limited by terms in the Indentures and CMAs requiring the Patriarch Managers "to not impair the Collateral, to not adversely affect the interests of the Noteholders, and . . . to not take actions that they knew would cause an Event of Default." Opp. ¶ 70. But the Complaint does not plead facts supporting an inference that any modification of any Portfolio Company's loan obligations (much less all such modifications) "impaired" any Collateral, much less that the Patriarch Managers "knew" that such amendments "would cause an Event of Default" for the Zohar Funds. At most, MBIA's allegations establish only that the amendments' overall effect was to prevent the Portfolio Companies from defaulting on their loans. *See* Compl. ¶¶ 104–21.

37.     MBIA's entire theory – that the Patriarch Managers "knew" that not declaring the Portfolio Companies' in default would "impair" the Collateral and cause the Zohar Funds to default – is implausible on its face. Declaring defaults on the Portfolio Companies' loans, rather than engaging in strategic restructurings as the Patriarch Managers did, would have had obvious catastrophic consequences, including interfering with other credit facilities and crippling relationships with vendors. This, in turn, would have thrown the Portfolio Companies into downward financial spirals, resulting in an even worse outcome for the Zohar Funds and their

16

stakeholders. *See De La Pena v. Metro. Life Ins. Co.*, 552 F. App'x 98, 100 (2d Cir. 2014) (holding "implausible" assertions are "insufficient to survive a motion to dismiss").

> **2.    No Breach Based on Allegations of Funding New Loan Commitments Without MBIA's Authorization**

38.    MBIA argues that the Patriarch Managers breached the Indentures by causing unauthorized loans after the January 2010 expiration of the Reinvestment Period. Opp. ¶¶ 73–76. In this regard, MBIA points to allegations in the Complaint that several loans "settled" in 2015 and also points to language in the Indentures permitting the Patriarch Managers to "use [proceeds] during the Reinvestment Period, to fund the purchase of Collateral Debt Obligations. . ." Compl. ¶ 124–25; Trzaskoma Decl. Ex. 3 (Zohar I Indenture) § 9.6(a)(A). MBIA's arguments are misleading, however, because MBIA fails to note that the Indentures also expressly permitted the Patriarch Managers "to fund the purchase of Collateral Debt Obligations for which the commitment to purchase was entered into prior to the end of the Reinvestment Period . . ." Trzaskoma Decl. Ex. 3 (Zohar I Indenture) § 9.6(a)(B).  The mere allegation that a handful of loans "settled" after the Reinvestment Period does not support an inference that any unauthorized transactions occurred after the Reinvestment Period (and in fact they did not). Thus, MBIA has failed to state a claim for breach based on these loans.

> **3.    No Breach Based on Allegations of Refusing to Monetize Equity Interests or "Siphoning" Fees or Assets**

39.    In seeking to hold the Patriarch Managers liable for the Insured Zohar Funds' defaults, MBIA makes several arguments criticizing how the Patriarch Managers ran the Funds.

40.    ***First***, MBIA argues that the Patriarch Managers allegedly breached Sections 2.2 and 2.6 of the CMAs by not equitizing the Portfolio Companies. *See* Opp. ¶ 78. This argument fails because nothing in the CMAs, let alone in these provisions, required the Patriarch Managers to monetize Portfolio Companies or take any other affirmative action to avoid a default.

17

41.    Contrary to MBIA's contention, while these provisions in the CMAs constrained the Patriarch Managers' authority, they did not impose an affirmative duty that could be breached by failing to monetize Collateral. Section 2.2(c), for example, prohibited the Patriarch Managers from causing the Zohar Funds to "exercise any such rights or remedies [regarding the Collateral] in a manner prohibited by the Indenture." Trzaskoma Decl. Ex. 2 (Zohar I CMA). Section 2.2(n) similarly provided that the Patriarch Managers "<u>shall not</u> . . . direct or effect the acquisition or disposition of the Collateral . . . except in accordance with the requirements of the Indenture." *Id.* (emphasis added). And Section 2.6 provided in relevant part:

> [T]he Collateral Managers <u>shall not take any action</u> which it knows or should be reasonably expected to know . . . would (i) cause the Company or the Zohar Subsidiary to violate the terms of the Indenture, [or] (ii) adversely affect the interests of the Holders of the Securities (other than as contemplated hereunder or under the Indenture, <u>it being understood and acknowledged that the Collateral Manager does not guarantee the performance of the Collateral</u> or any payment obligation under the Indenture) . . . . [T]he Collateral Managers <u>shall not intentionally take any action</u> that it knows would cause an Event of Default under the Indenture.

*Id.* (emphasis added). None of these provisions was (or could have been) breached by any purported failure to act.

42.    MBIA's theory of breach by omission is not only inconsistent with the text of the CMAs, it is irreconcilable with the CMAs' express provision that the Patriarch Managers were <u>not</u> acting as guarantors. Trzaskoma Decl. Ex. 2 (Zohar I CMA) § 2.6 ("it being understood and acknowledged that the Collateral Manager does not guarantee the performance of the Collateral or any payment obligation under the Indenture"). Allowing MBIA to sue the Patriarch Managers for any omission that purportedly contributed to a default would create a duty so amorphous and far-reaching as to be indistinguishable from a guaranty of the Zohar Funds' performance.

18

43.    *Second*, in arguing that it has alleged a breach of the CMAs, MBIA points to allegations in the Complaint describing the Governance Conveyances and November 2017 Written Consents,[10] through which the Defendants purportedly asserted certain voting and management rights in the Portfolio Companies. *See* Opp. ¶ 82 (citing Compl. ¶¶ 81, 86–89). But the November 2017 Written Consents, which were executed long after the Patriarch Managers had resigned as collateral managers and the CMAs terminated in March 2016, cannot provide the basis for any claim of breach. Further, MBIA does not dispute that the Zohar Funds expressly consented to and waived any conflict of interest. *See* Mot. ¶ 108 (citing CMA § 6.2). Thus, MBIA has failed to explain how these supposedly conflicted transactions violated the CMAs or how the transactions were inconsistent with the Patriarch Managers' broad authority to manage the Zohar Funds and the Collateral.

44.    *Third*, MBIA points to vague allegations about "siphoned" fees, but this claim is fundamentally flawed. Indeed, MBIA confirms that the claim is premised on the same double-dipping theory the Zohar Funds have asserted in their adversary proceeding: that the Portfolio Companies paid fees to PPMG for work that the Patriarch Managers were already obligated to provide under the CMAs. *See* Opp. ¶ 83 (citing Compl. ¶¶ 90–93). These allegations do not, as MBIA argues, "raise issues of fact that cannot be resolved on a motion to dismiss," *id.*, because the CMAs and PPMG Agreements clearly required separate and non-overlapping services. The Court need not and should not credit conclusory allegations that are contradicted by the operative agreements, particularly where the Complaint does not contain any allegations supporting an inference that there were in fact any overlapping services. *See* Mot. ¶¶ 103–05.

---

[10] The November 2017 Written Consents include transactions related to ▮▮, but neither of the Insured Zohar Funds has an interest in that company and thus, even if MBIA could bring a claim as to any of the November 2017 Written Consents, it has no claim concerning ▮▮.

45.    *Finally*, MBIA's claims concerning proceeds from the sales of the Portfolio Companies HVEASI and Xpient do not raise issues of fact preventing dismissal. MBIA does not dispute that public bankruptcy court records prove that Ark II acquired HVEASI in a Section 363 sale in June 2005. *See* Mot. ¶ 106. Nor does the Complaint allege that Zohar II owned Xpient equity, only that the Defendants made some unspecified representation that it did. Compl. ¶ 102. Because of this lack of any concrete allegation of ownership, especially in light of the fact that MBIA has never contested (or made claims or demands regarding) the 2014 Xpient sale, MBIA has not stated a plausible claim that it has been deprived of Xpient sale proceeds. *See* Mot. ¶ 107.

### 4.    No Breach Based on Allegations of Miscategorized Loans or the Miscalculation of the OC Ratio

46.    The Final SEC Order in *In re Lynn Tilton* resoundingly rejected the theory that Ms. Tilton improperly manipulated the OC Test, and this judgment precludes MBIA's claims to the extent based in whole or in part on the very same theory.

47.    In opposition, MBIA argues that the SEC "never determined whether or not Tilton or any of her affiliates miscategorized loans or miscalculated the Overcollateralization Ratio." Opp. ¶ 64. MBIA seems to contend that while the ALJ concluded that the information related to the OC Test was fully disclosed to investors, the ALJ did not rule out the possibility that Ms. Tilton "manipulated" the test. This argument is nonsensical.

48.    The SEC pursued only two theories of wrongdoing, and one of them was that Ms. Tilton "improperly categorized and overvalued loans, such that Zohar II and III never failed their OC Ratio Tests, enabling [Patriarch] to collect Subordinated Collateral Management Fees and other payments." *See In re Lynn Tilton*, Exchange Act Release No. 1182, 2017 WL 4297256, at *40 (AU Sept. 27, 2017). Thus, the issue of Ms. Tilton's supposed "wrongful manipulation" of the OC Test was at the heart of the SEC's allegations and was the subject of lengthy testimony by fact

and expert witnesses. *See id.* at \*1, 34–37. Therefore, when the SEC found that Ms. Tilton never failed to disclose any material facts related to the OC Test, that decision necessarily rejected alleged "manipulation" of the OC Test for the purpose of collecting fees.[11] *See* Mot. ¶¶ 92–95; *In re Lynn Tilton*, 2017 WL 4297256, at \*45–46. Indeed, "failure[] to disclose" is "the core" of manipulation. *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985).

49.     MBIA also disputes that the SEC represented its interests for purposes of preclusion, arguing that it is a "private party" and could never have asserted the claims brought by the SEC. Opp. ¶¶ 62–63. But the lack of a private right of action only further demonstrates that the SEC was representing all potentially injured parties – including MBIA – especially where, as here, MBIA encouraged and provoked the SEC to investigate Ms. Tilton and Patriarch. *See Navajo Nation v. Wells Fargo & Co.*, 344 F.Supp.3d 1292, 1307–08 (D.N.M. 2018) ("[T]he Court finds that the statutory division of enforcement authority and lack of a private right of action demonstrate that action by the CFPB is intended to represent the interests of all consumers nationwide."); *see also U.S. Sec. & Exch. Comm'n v. Santillo*, 327 F.R.D. 49, 51 (S.D.N.Y. 2018) ("The SEC seeks to obtain a judgment on behalf of all injured investors, and to maximize that judgment. Thus, the movant's legitimate interests are adequately protected."). Further, MBIA does not (and cannot) identify any way in which the SEC's legal theories diverge from the theories alleged in the Complaint. Regardless of the underlying statute or cause of action, the SEC pursued the exact same theories of wrongdoing that MBIA alleges here. Mot. ¶¶ 92–96.

50.     Nor is there any merit to MBIA's argument that its constitutional rights would be denied if *res judicata* applies. Opp. ¶ 60. MBIA participated extensively in the SEC's investigation

---

[11] In other words, since the Patriarch Managers disclosed all material facts, decisions regarding categorizations under the OC Test were not hidden from investors, as would be required for a finding of manipulation.

and enforcement action, including coordinating extensively with the SEC prior to and during the hearing, Mot. ¶ 95, making it clear that MBIA ha[d] a "sufficient laboring oar" in the original litigation so as to be bound by nonparty preclusion. *Montana v. United States*, 440 U.S. 147, 155 (1979).

51.     Therefore, because MBIA is precluded from asserting claims in this bankruptcy that were already thoroughly litigated on its behalf, Count I must be dismissed to the extent based on claims related to the OC Test.

C.     **MBIA Concedes that the Complaint's Allegations Do Not Support an Inference that the Patriarch Managers' Actions Caused the Zohar Funds' Defaults or Any Other Loss MBIA May Have Suffered.**

52.     Finally, MBIA's breach of contract claim also must be dismissed because it fails to plausibly allege causation. The entire contract claim is premised on the notion that the Patriarch Managers caused the defaults of the two Insured Zohar Funds, and seeks to recover damages as a result of those defaults. *See*, *e.g.*, Compl. ¶¶ 95, 192–95. But the Complaint does not – and cannot – allege facts that would support a plausible inference that these defaults were proximately caused by any alleged breaches of contract.

53.     *First*, MBIA's Complaint does not support the inference that anything the Patriarch Managers did (or did not do) either hastened or caused the Zohar Funds' defaults. In fact, MBIA concedes this point as it failed to respond to Defendants' argument for dismissal of Count I on these grounds. *See* Mot. ¶¶ 111–14. As a result, MBIA has "waived this theory of relief" and Count I must be dismissed for failure to plausibly allege causation. *Klein v. H.I.G. Capital, L.L.C.*, No. CV 2017-0862-AGB, 2018 WL 6719717, at *16 n.135 (Del. Ch. Dec. 19, 2018) (dismissing claim where plaintiff "fail[ed] to respond in his opposition brief to [defendant's] argument in favor of dismissal"); *see also In re Dow Chem. Co. Derivative Litig.*, No. CIV.A. 4349-CC, 2010 WL 66769, at *14 (Del. Ch. Jan. 11, 2010) (holding plaintiffs "abandoned" certain  arguments "when

they failed to respond to defendants' arguments"); *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007) ("The plaintiffs have waived these claims by failing to brief them in their opposition to the motion to dismiss.").

54.    ***Second***, contrary to MBIA's contention, the defaults followed the global financial crisis that began in 2008 and that hit the Portfolio Companies particularly hard. Mot. ¶¶ 110, 115. In its Opposition, MBIA argues that "Defendants' attempt to pin causation on the 2008 recession ignores reality." Opp. ¶ 89. But MBIA's own allegations undermine any plausible inference that the Zohar Funds' defaults were caused by anything other than the collapse of the financial markets. Indeed, according to the Complaint, the value of the equity interests dropped dramatically between February 2007, when it was valued "in excess of $1.5 billion," and July 2009, when it was valued at "hundreds of millions." Compl. ¶ 78.[12] Such an alleged drastic loss of value in the wake of an obvious precipitating event cannot plausibly be attributed to the Patriarch Defendants. Further, according to MBIA's own allegations, the Patriarch Defendants' purported "pattern of misconduct" did not even begin until 2013. Compl. ¶ 73. Thus, the obvious culprit is the only plausible one – a marketwide phenomenon causing comparable losses to other investors – and, therefore, Count I should be dismissed as MBIA has not "adequately ple[]d facts which, if proven, would show that its loss was caused by [the Patriarch Managers' actions] as opposed to intervening events." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).

---

[12] Ms. Tilton's First Day Declaration does not, as MBIA argues, demonstrate that the financial crisis had no negative impact on the Portfolio Companies' turnaround timelines. Opp. ¶ 89 & n.14. The value of the equity interests in 2018 is irrelevant to the precipitous valuation decline between 2007 and 2009. Rather, the First Day Declaration is (i) consistent with a conclusion that the financial crisis was a major setback for the Portfolio Companies, requiring longer turnaround timelines and directly impacting the Zohar Funds' abilities to avoid default; and (ii) inconsistent with MBIA's claims that the Patriarch Defendants caused any default.

23

## IV.    THE TORTIOUS INTERFERENCE CLAIMS ARE DEFICIENT AS A MATTER OF LAW.

55.    MBIA's tortious interference claims – alleging several Defendants induced the Zohar Funds to breach the Indentures (Count II) and the Insurance Agreements (Count III) – are untenable because (i) MBIA improperly relies on group pleading, Mot. ¶¶ 119–20; (ii) acts allegedly taken by Ms. Tilton, PPAS, or the Patriarch Manager Defendants as agents of the Zohar Funds do not give rise to tortious interference claims against them, *id.* ¶ 121; and (iii) the economic interest doctrine bars the tortious interference claims against all defendants, *id.* ¶¶ 122–25. MBIA's arguments in opposition are unavailing.

56.    *First*, MBIA contends that its tortious interference claims satisfy FRCP 8 because the Complaint attributes "individual tortious acts to particular Defendants," and, in light of the purportedly concerted nature of the Patriarch Defendants' breaches, group pleading "makes sense and is perfectly appropriate." Opp. ¶ 91. MBIA does not cite to any case law supporting the notion that a plaintiff can avoid the obligation to plead clear theories of liability as to each and every defendant simply by alleging conclusorily that a group of defendants acted in concert.

57.    Further, instead of explaining how the Complaint articulates tortious interference claims as to each individual defendant named in these counts, MBIA simply offers a laundry list of over thirty Complaint paragraphs seemingly to argue that all the Patriarch Defendants took intentional acts. Opp. ¶ 91. On review, however, these allegations only raise more questions regarding MBIA's theories of liability, especially as to whether a breach occurred, whether any particular defendant was allegedly involved in or procured that breach, and whether any particular act by any particular defendant proximately caused such a breach.

58.    MBIA cites, for example, to allegations detailing Ms. Tilton's execution of the November 2017 Written Consents. Opp. ¶ 91; *see also* Compl. ¶ 87. But MBIA does not explain,

24

nor could it, how actions taken by Ms. Tilton in 2017 in her capacity as the manager for certain Portfolio Companies caused the Insured Zohar Funds to breach their obligations not to impair Collateral or to fail to pay the noteholders (the two purported breaches identified in Count II). Compl. ¶¶ 201–02. Similarly, MBIA points to the Portfolio Companies' acts of entering into agreements with PPMG to provide management services, *id.* ¶¶ 91–94, but the Insured Zohar Funds were not parties to these agreements, and these events do not constitute a breach of the Indentures or Insurance Agreements by the Zohar Funds, or a but for cause of specific breaches. In short, these are simply not tortious interference claims because there is not even an underlying breach.[13]

59.    Further, MBIA's excessive reliance on group pleading is particularly improper in the context of claims where the analysis critically turns on understanding the relationships between the contracting and interfering parties and on determining whether certain acts were taken in a representative capacity. In light of Ms. Tilton's roles at the Patriarch Manager Defendants, PPAS, and Patriarch Partners, and the contractual relationships between these Defendants and the Insured Zohar Funds, MBIA's reliance on group pleading is not remotely permissible or "appropriate."

---

[13] The deficiencies in MBIA's tortious interference claims extend beyond these examples. For instance, MBIA points to allegations that Ms. Tilton made public statements to investors that equity in the Portfolio Companies would be available to avoid defaults to noteholders, Opp. ¶ 91 (citing Compl. ¶ 78); Ms. Tilton, through the Octaluna Entities, sent notice to the IRS that the Zohar Funds would be taxable entities, *id.* (citing Compl. ¶ 160); the Patriarch Managers failed to accurately report the value and performance of the collateral, *id.* (citing Compl. ¶¶ 80, 135, 142–43); the Patriarch Managers refused to turn over certain information requested by the successor collateral manager, *id.* (citing Compl. ¶ 156); PPAS failed to distribute unspecified loan amounts to unspecified Portfolio Companies, *id.* (citing Compl. ¶¶ 131–32); and PPAS did not resign as administrative agent upon the Patriarch Managers Defendants' resignation as collateral manager, *id.* (citing Compl. ¶ 154). None of these acts could possibly represent breaches by the Insured Zohar Funds of the Indentures or Insurance Agreements, as specified in Counts II and III, and MBIA does not allege or explain how these acts were but for causes of any specific breaches.

60.     ***Second***, MBIA argues that Defendants may be liable for acts taken on behalf of the Zohar Funds in an agency capacity because MBIA has alleged those actions were taken in bad faith and amount to independently tortious conduct. Opp. ¶¶ 92–93. Specifically, MBIA points to allegations concerning (i) purported "conversion" of the Zohar Funds' voting and equity control rights and Portfolio Company distributions and proceeds, (ii) entry into the PPMG Agreements, (iii) modification of the Credit Agreements, (iv) the issuance of new loans to the Portfolio Companies, and (v) the miscalculation of the OC Ratio. *Id.* ¶ 93. Yet these allegations at most describe breaches of the contractual agreements between the Insured Zohar Funds and Defendants, not independent tortious acts,[14] and do not overcome the heightened bar applicable to the tortious interference liability of agents acting on behalf of a principal.

61.     ***Third***, MBIA does not dispute that the Defendants had an economic interest in the Insured Zohar Funds but argues that the economic interest doctrine does not apply because Defendants acted purportedly in their own economic interests and "not to protect or advance the Funds' interests." Opp. ¶ 95 (emphasis omitted). Even assuming the economic interest doctrine is limited in this way, MBIA has not alleged facts strongly supporting an inference that Defendants were not, at all times, acting to protect their substantial interests in the Insured Zohar Funds. Although MBIA has alleged that Defendants' actions were taken to <u>MBIA</u>'s detriment as insurer, MBIA has not alleged facts giving rise to a strong inference that anything Defendants did was to the ultimate detriment of the Insured Zohar Funds. Indeed, the nonconclusory allegations MBIA points to, such as retaining control of the Portfolio Companies and providing the Portfolio Companies with additional liquidity, are entirely consistent with the protection and maximization

---

[14] MBIA's claim for conversion in Count VIII fails for the reasons described below in Arg. VIII. Further, MBIA's liberal use of inflammatory labels like "embezzlement" and "fraud" do not, on their own, give rise to any inference that Defendants actually engaged in tortious conduct.

of Portfolio Company value for the ultimate benefit of the Insured Zohar Funds and all their stakeholders.

## V.    THE BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED.

62.    MBIA has no claim for breach of fiduciary duty or aiding and abetting breach of fiduciary duty because the governing written agreements clearly make clear there was no fiduciary relationship between MBIA (as either Credit Enhancer or subrogated noteholder), on the one hand, and Ms. Tilton, PPAS, and the Patriarch Managers, on the other. Mot. ¶¶ 128–38. MBIA contends that its claims should survive the Motion because the Complaint raises issues of fact on this point. Opp. ¶ 99. MBIA is not correct. Where, as here, the governing written agreements confirm an arm's length commercial relationship and foreclose the existence of fiduciary obligations to the plaintiff, dismissal is appropriate.

63.    In opposition, MBIA tries to distinguish *Oddo*, a New York Court of Appeals decision affirming that the relationship between a debtor and creditor is generally controlled by contract, arguing that because the Patriarch Defendants "regularly interacted and communicated with MBIA and the other Zohar noteholders regarding the Zohar Collateral" they created a special relationship. Opp. ¶ 98. But nothing in *Oddo* suggests that communications, even regular ones, supplant the parties' contracts, which in this case confirm that the Trustee was the only fiduciary to MBIA and the noteholders. Rather, the law is clear that "[t]he relationship between a borrower and lender is normally conducted at an arm's length and governed solely by the contract between them." *Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 479–82 (E.D.N.Y. 2014) (collecting cases). To overcome the contracts, MBIA must plead facts giving rise to a strong inference that the Patriarch Defendants "enjoyed an <u>unusual</u> advantage resulting from the confidence that [MBIA] placed in them, or showing that [the Patriarch Defendants] 'assum[ed] control and responsibility' <u>outside the terms provided for in the contract</u>." *Id.* at 481 (emphasis in original); *see also EBC I, Inc. v.*

27

*Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005) (noting that to survive dismissal, plaintiff must allege facts showing "a relationship of higher trust" that would otherwise arise out of the written agreements). The Complaint does not come close to pleading such facts, nor would such allegations be credible given the sophistication of MBIA and the noteholders, the detailed and voluminous written agreements, the structure of the Zohar Funds, and the Trustee's role as fiduciary.

64.     Moreover, the alleged communications MBIA points to are inconsistent with any inference that a fiduciary relationship existed. To the contrary, the allegations reflect nothing but investor calls and presentations, statements to ratings agencies, and <u>statements in public filings</u>.[15] *See* Compl. ¶ 78. Such routine communications between the Collateral Manager and the noteholders cannot and do not reflect (much less create) a special relationship. Because MBIA's flimsy allegations plainly do not give rise to a strong inference of any fiduciary relationship, the fiduciary duty claim must therefore be dismissed.

## VI.    THE FAITHLESS SERVANT CLAIM IS NOT VIABLE.

65.     MBIA's faithless servant claim fails for the same reasons as its fiduciary duty claims – none of the Patriarch Defendants was ever MBIA's agent or employee. Mot. ¶¶ 145–48. In opposition, MBIA does not provide any plausible basis as to how it has standing to bring such

---

[15] MBIA also cites to the SEC Initial Decision. Opp. ¶ 98. Even if properly considered here, the investor communications described therein do not support an inference that MBIA or the noteholders placed any unusual trust in the Patriarch Defendants. Instead, the emails and investor calls reflect that these highly sophisticated investors (Barclays, Natixis, MBIA) asked detailed questions about the Zohar Funds to which the Patriarch Defendants responded. *In re Lynn Tilton*, 2017 WL 4297256, at *18–*22. This is nothing more than an arm's length relationship between the Collateral Manager and the noteholders. MBIA's reliance on allegations in the Equitable Subordination Complaint, Opp. ¶ 98, is even more bizarre and inappropriate. Those allegations relate to <u>negotiations</u> between the Patriarch Defendants, on the one hand, and MBIA and the noteholders, on the other hand, regarding efforts to <u>restructure</u> the Zohar Funds. *See, e.g., Tilton v. MBIA Inc.*, Case No. 19-50390-KBO (Bankr. D. Del.) [Adv. D.I. 7] ¶¶ 95–97, 102–03, 119, 136–37.

a claim. While MBIA states that it brings the faithless servant claim "in its capacity as subrogated noteholder of the Zohar Funds," MBIA leans on the same flawed fiduciary duty theory – that "communications" between Defendants, on the one hand, and the noteholders on the other hand, converted Defendants into servants of the noteholders. Opp. ¶ 98. This argument is completely untenable. None of the Patriarch Defendants was ever an employee or an agent of the noteholders, and "communications" about the Zohar Funds did not, under any conceivable theory, create such a relationship.

## VII.    THE CLAIM FOR DECLARATORY RELIEF FAILS.

66.    MBIA's claim for declaratory relief (Count IV) fails because (i) it is moot, as of March 30, 2020, to the extent it seeks to declare Zohar I the legal and beneficial owner of the equity interests created in its name and to the extent it seeks to invalidate the Governance Conveyances, Mot. ¶ 150;[16] (ii) MBIA has no basis to invalidate the November 2017 Written Consents, *id.* ¶ 151; and (iii) with respect to the November 2017 Written Consent issued at ██, any claim seeking to invalidate that action by virtue of MBIA's purported ownership interest in the company must be brought derivatively, not directly, *id.* ¶ 152.

67.    MBIA concedes that the request for a declaration of Zohar I's legal and beneficial ownership of equity interests in its name is moot to the extent it seeks such a declaration as of and after March 30, 2020. *See* Opp. ¶ 105. And MBIA does not dispute that, to the extent it seeks to invalidate the November 2017 Written Consent at ██ by virtue of MBIA's purported ownership interests in ██, such a claim must be brought derivatively under Delaware law. *See id.* ¶¶ 103–07.

---

[16] MBIA incorrectly argues that "Defendants do not challenge MBIA's claim for a declaratory judgment with respect to the Governance Conveyances," Opp. ¶ 107, but Defendants explicitly argued in the Motion that the request for declaratory relief with respect to the Governance Conveyances is moot. Mot. ¶ 150. MBIA does not address this argument.

57772/0001-21992263v1

68.     MBIA argues it has stated a claim to invalidate the November 2017 Written Consents because certain allegations – that Defendants purportedly concealed the nature of the Insured Zohar Funds' equity holdings and engaged in self-dealing that restricted the Insured Funds' control over the Portfolio Companies – are sufficient "to adduce evidence of which Defendants executed the 2017 Written Consents in violation of applicable law." Opp. ¶ 106. But MBIA does not even attempt to explain how Defendants violated the Indentures when none of the Defendants were parties to those agreements, how Defendants may have been otherwise bound by the Indentures' terms, or what other "applicable law" may have been violated. And MBIA offers no response as to why the November 2017 Written Consent at ▮▮▮ is even at issue here, where neither of the Insured Zohar Funds held an equity stake in that company.

## VIII.    MBIA FAILS TO STATE A CLAIM FOR CONVERSION.

69.     MBIA's claim for conversion, Count VIII, fails because MBIA has not identified any tangible property that it (as opposed to the Zohar Funds) owned that could serve as the basis for a conversion claim. The Complaint fails to specify any allegedly converted property and merely makes vague references to "rights to payments and other equity rights and interests." Compl. ¶ 253. MBIA attempts to remedy this pleading deficiency in its Opposition, which is impermissible. *In re Draw Another Circle.*, 602 B.R. at 893 ("When considering a motion to dismiss, 'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (citing *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)). Even if considered by the Court, the purportedly converted property identified in the Opposition was either not owned by MBIA or is intangible property that cannot support a conversion claim.

70.     *First*, in its Opposition, MBIA argues that the Patriarch Defendants converted the following property: (i) loan funds allegedly embezzled by PPAS; (ii) PPMG management fees;

30

and (iii) proceeds from sales of certain Portfolio Companies. Opp. ¶¶ 109–10. But MBIA does not allege that any of this property was owned by MBIA at the time of its alleged conversion (nor was it). *See* Compl. ¶ 127 (PPAS allegedly withheld loan funds from Zohar Funds in 2016); *id*. ¶ 92 (Portfolio Companies allegedly paid improper management fees to PPMG over an extended period of time); *id*. ¶¶ 101–02 (proceeds from sales of two Portfolio Companies, HVEASI and Xpient, allegedly withheld from Zohar Funds). MBIA's theory seems to be that because it had a contractual right to payment from Zohar Funds, it had an interest in these funds. This is a preposterous notion with respect to the PPMG fees, which were paid by the Portfolio Companies in connection with the Management Services Agreement pursuant to which PPMG provided services to the Portfolio Companies (and to which MBIA is not a party). But even as to the loan funds and sales proceeds, these funds belonged to the Zohar Funds, not MBIA, so the allegations are plainly insufficient to satisfy the element of ownership required for a conversion claim. *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 50 (2d Cir. 1996) ("An action for conversion can be maintained only by the true owner of the property."); *see also In re Musicland Holding Corp*., 386 B.R. 428, 440 (S.D.N.Y. 2008) (action for conversion is "insufficient as a matter of law" unless the "claimant was the owner and entitled to immediate possession.") (citation omitted), *aff'd*, 318 F. App'x 36 (2d Cir. 2009); *TechnoMarine SA v. Jacob Time, Inc*., 905 F. Supp. 2d 482, 496 (S.D.N.Y. 2012) (watch manufacturer failed to state conversion claim for theft of watch then owned by its distributor).

71.    ***Second***, even with respect to the Zohar Funds and/or Portfolio Companies, none of these categories of property would support a conversion claim because the alleged transactions are governed by contract. *See* Mot. ¶ 157; *Allen v. Cox*, No. 10-CV-7118, 2011 WL 2436705, at *3 (S.D.N.Y. June 16, 2011) (conversion claim fails if it cannot be "distinguished from acts that are

a mere violation of contractual rights"). The allocation of loan funds, for example, was governed by the Credit Agreements.[17] Compl. ¶ 127. Likewise, the management fees paid to PPMG were governed by the PPMG Agreements. *Id.* ¶ 91. The distribution of Portfolio Company sales proceeds were governed by the CMAs and Indentures. *Id.* ¶¶ 41, 52.

72.   **Third**, MBIA argues that its intangible interests in equity of the Portfolio Companies can support a conversion claim. That is not correct. *See* Mot. ¶ 158. MBIA tries to shoehorn its claim into a limited exception under the "merger doctrine," arguing that it can bring a conversion claim because its intangible interests are "embodied in limited liability company agreements, amendments thereto, stock certificates, purported proxy agreements, and other electronic and paper records." Opp. ¶ 111. But that exception is not applicable here, where there is no allegation that any of the underlying <u>documents</u> was stolen.

73.   The "merger doctrine" exception "recognizes that some intangible rights are embodied in paper documents in such a way that transfer of the document effects transfer of the right." Juliet M. Moringiello, *False Categories in Commercial Law: The (Ir)relevance of (in)tangibility*, 35 Fla. St. U. L. Rev. 119, 143 (2007) (emphasis added). The reason a conversion claim may exist with respect to a document like a stock certificate is that "[w]rongful acts affecting property rights in corporate stock can ordinarily be committed only through the medium of the certificates which evidence those rights." *Pierpoint v. Hoyt*, 260 N.Y. 26, 29 (1932). Thus, when the stock certificate is stolen, the plaintiff is "deprived [plaintiff] of his property." *Id.*

---

[17] MBIA well knows that PPAS did not misappropriate a single penny of loan proceeds. Instead, as PPAS previously explained in detail and at length, these funds had been committed and belonged to certain Portfolio Companies. *See Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., et al.*, No. 16-cv-4488-VM-KHP (S.D.N.Y.), ECF No. 164 at 4–7. In any event, to the extent MBIA has a complaint regarding how PPAS handled any funds, such a claim would be governed by the Credit Agreements, pursuant to which PPAS acted.

74.     In this case, however, MBIA does not allege that the Patriarch Defendants pilfered or took possession of any documents reflecting intangible rights.[18] Instead, they are alleging that Defendants took actions that nullified MBIA's intangible equity interests and control rights, precisely the sort of allegation that cannot constitute conversion as a matter of law.[19] *See* Mot. ¶ 158; *see also Peters v. Gould*, No. 6515052010, 2012 WL 9518031, at *7 (N.Y. Sup. Ct. Jan. 09, 2012) ("25% equity stake" in property "cannot be the subject of a cause of action in conversion"); *Sun Gold, Corp. v. Stillman,* 95 A.D.3d 668, 669–70 (2012) (dismissing conversion claim of "future business interests" as "not actionable").

75.     Nor is there any merit to MBIA's effort to analogize "limited liability company agreements" and "proxy agreements" to stock certificates. Opp. ¶ 111. Instead, the law is clear that claims based on contractual rights must be pleaded as contract claims, not conversion claims.[20]

---

[18] MBIA misconstrues both *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292 (2007), and *Harris v. Coleman*. 863 F. Supp. 2d 336, 344 (S.D.N.Y. 2012). *See* Opp. ¶ 111. *Thyroff* simply acknowledged the modern reality that electronic records, though intangible, can be stolen just like paper records. 8 N.Y.3d at 293. And *Harris* held that a patent could be converted where the defendant had fraudulently assigned the underlying patent record. *See* 863 F. Supp. 2d at 345.

[19] MBIA attempts to distinguish *In re CIL Ltd.*, 582 B.R. 46, 114 (Bankr. S.D.N.Y. 2018), *amended on other grounds upon reconsideration*, No.13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018), but the court in that case held unequivocally that the value of shares "bears no resemblance to tangible property. Instead, it is an 'indefinite, intangible, and incorporeal species of property,' that cannot be the subject of a conversion action." 582 B.R. 46, 114–15. Similarly, their contention that *Saleeby v. Remco Maint.*, LLC, 148 A.D.3d 570, 50 N.Y.S.3d 330 (2017) "did not even consider whether the interests at issue in that case were represented by a tangible manifestation" is beside the point where the *Saleeby* court clearly held a "7.5% 'common interest' ownership share in a limited liability company was a type of intangible property that could not be the subject of a conversion claim" – this is precisely the same "type of intangible property" that MBIA contends was converted here.

[20] It bears mentioning that the diversion of sales proceeds was alleged to have been done by the Patriarch Managers in their capacity as collateral managers under the CMAs. Thus, the alleged acts underlying the conversion claim cannot be "distinguished from acts that are a mere violation of contractual rights," and the claim must be dismissed on this basis as well. *Allen*, 2011 WL 2436705, at *3; *see also Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 456 (S.D.N.Y. 2014) ("conversion claims are routinely dismissed on [FRCP] 12(b)(6) motions"); *AD*

33

*See FS Media Holding Co. (Jersey) v. Harrison*, No. 13 CIV. 3144 SAS, 2013 WL 5780771, at \*4

(S.D.N.Y. Oct. 25, 2013) ("A conversion claim may only succeed if the party alleges a wrong that

is distinct from any contractual obligations"); *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88

A.D.2d 883, 884 (1982) ("an action for conversion cannot be validly maintained where damages

are merely being sought for breach of contract (10 N.Y. Jur. Conversion, § 27)"); *Allen*, 2011 WL

2436705, at \*3 ("an action for conversion of money may not lie where damages are merely being

sought for breach of contract").

## IX.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

76.    The unjust enrichment claim in Count IX should be dismissed because it is

precluded by the existence of contracts governing the subject matter of the claim. In this case, the

Complaint makes clear that the unjust enrichment claim is ultimately based on various written

agreements. The allegations in Count IX either explicitly or implicitly reference, among other

contracts, the Credit Agreements, the Insurance Agreements and Financial Guaranties, the

Indentures, and the LLC Agreements. *See* Compl. ¶¶ 256–58.

77.    MBIA's first rejoinder to Defendants' argument is "Defendants have not

established whether New York or Delaware law applies." Opp. ¶ 114. Yet, regardless of whether

Delaware or New York law applies, *see id.* & n.19, MBIA's unjust enrichment claims must be

dismissed because it is black-letter law in both jurisdictions that "the existence of an express,

enforceable contract that controls the parties' relationship will defeat an unjust enrichment claims"

unless "the validity of the contract is in doubt or uncertain." *Tolliver v. Christina Sch. Dist.*, 564

---

*Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04-CV-8832 (KMK), 2007 WL 2962591, at \*4 (S.D.N.Y. Oct. 10, 2007) ("[E]ven if a plaintiff meets all of the elements of a conversion claim, the claim will still be dismissed if it is duplicative of a breach of contract claim.").

F. Supp. 2d 312, 315 (D. Del. 2008); *see also Chartwell Therapeutics Licensing, LLC v. Citron Pharma LLC*, No. 16-CV-3181, 2020 WL 7042642, at *12 (E.D.N.Y. Nov. 30, 2020) (same).

78.     As MBIA concedes, there is no dispute as to the validity of the Portfolio Company Credit Agreements, the Insurance Agreements and Financial Guaranties, the Indentures, and the LLC Agreements, all of which govern the subject matter of the unjust enrichment claim. Opp. ¶ 114; *see also* Mot. ¶ 161. Instead, in its Opposition, MBIA confuses a dispute over validity (which there is not) with a dispute over interpretation (which there is). The latter does not permit a tort or quasi-contract claim under these circumstances, even if pleaded in the alternative. *Mian v. Sekerci*, No. CV N17C-05-585 JRJ, 2019 WL 4580024, at *5 (Del. Super. Ct. Sept. 13, 2019) (dismissing unjust enrichment claim where "[t]he issue in dispute is not the contract's validity, but rather the parties' interpretations of the provisions and terms"); *Khushaim v. Tullow Inc.*, No. CV N15C-11-212-PRW, 2016 WL 3594752, at *8 (Del. Super. Ct. June 27, 2016) (holding alternative pleading of unjust enrichment claim "is generally only allowed when there is doubt surrounding the enforceability or the existence of the contract").[21]

79.     Finally, MBIA attempts to use its own muddled pleading to bypass this clear precedent. Within its single unjust enrichment claim, MBIA alleges six distinct acts of unjust enrichment. Compl. ¶ 257. The Complaint fails to specify which defendant committed each

---

[21] *See also Gottselig v. Energy Corp. of Am.*, No. 15-CV-971, 2015 WL 5820771, at *8 (W.D. Pa. Oct. 5, 2015) (dismissing unjust enrichment claim because "[e]ven assuming that Plaintiffs properly pleaded this ground for unjust enrichment, this claim is properly within the realm of contract law and not equity, as it necessitates a discussion of contract interpretation and what the leases permitted and not a discussion of equitable principles"); *RCM Techs., Inc. v. Constr. Servs. Assocs., Inc.*, 149 F. Supp. 2d 109, 114 (D.N.J. 2001) ("[A]n unjust enrichment claim inherently does not involve contract 'interpretation.'"); *Costantino v. Radio Shack*, No. 85-CV-5358 (AET), 1989 WL 23131, at *4 (D.N.J. Mar. 6, 1989) (dismissing unjust enrichment claim where "[i]t is the interpretation of this agreement which will determine whether he should have received his annual bonus when he was terminated").

respective act; instead, it conclusorily pleads that, taking all six acts together, "All Defendants" were unjustly enriched. *Id.* ¶¶ 256–58. In its Opposition, MBIA recombines this nebulousness to suggest that: (i) some unknown portion of the defendants, (ii) who are allegedly not a party to some of the contracts at issue, (iii) committed unspecified acts of unjust enrichment and, therefore, (iv) MBIA's unjust enrichment claim against these supposed non-parties should survive as a matter of law. Opp. ¶¶ 115–17. Not only is this impermissible group pleading an independent basis for dismissal, *see Japhet v. Francis E. Parker Mem'l Home, Inc.*, No. 14-CV-1206, 2014 WL 3809173, at *2 (D.N.J. July 31, 2014) (dismissing claims where the complaint "injects an inherently speculative nature into the pleadings, forcing both the Defendants and the Court to guess who did what to whom when"), but as MBIA cannot articulate a plausible theory that any of these defendants, much less all of them, were unjustly enriched, this claim must be dismissed. Rule 8, which requires a "<u>short</u> and <u>plain</u> statement of the claim," simply does not allow such a scavenger-hunt pleading. Fed. R. Civ. P. 8(a).

80.     Moreover, as described below, each of the Defendants – with the exception of LDI and Zohar Holding, who are not proper parties to this proceeding, *infra* Arg. XI – is a party to at least one of the valid, enforceable contracts which govern the subject matter of the six unjust enrichment allegations. Therefore, MBIA's absurd argument, and its concomitant efforts to transform black-letter law into a novel question, must be rejected.

| ACT | CLAIM | CONTRACTUAL BASIS | DEFENDANT(S) PARTY TO THE CONTRACT |
|---|---|---|---|
| A | The granting to ARK and AIP of priority over the Insured Zohar Funds' liens on the Portfolio Companies. | Credit Agreements | PPAS<br>Ark II Investment Partners II, L.P. |
| B | Payment of fees to PPMG, PPAS and the Patriarch Manager Defendants to which they were not entitled. | CMAs | Patriarch VIII<br>Patriarch XIV<br>Patriarch XV<br>PPMG |
| C | Misappropriating dividends, distributions, and sales proceeds on equity interests owned by the Zohar Funds. | Indentures<br>Credit Agreements | PPAS<br>Ark II Investment Partners II, L.P. |
| D | Tilton's wrongful assertion of ownership over equity interests owned by MBIA and the Insured Zohar Funds. | LLC Agreements | Ms. Tilton<br>Ark II CLO 2001-1, LLC<br>Patriarch XV |
| E | Claiming favorable tax attributes associated with the Zohar Funds' status as pass-through entities for years prior to improperly and with no consideration to the Funds shifting tax liabilities to the Zohar Funds. | Subscription Agreements | Octaluna Entities<br>Ark II CLO 2001-1, LLC<br>Patriarch XV |

## X.    THE MALICIOUS PROSECUTION CLAIM IS UNSUSTAINABLE.

81.    MBIA purports to state a claim for malicious prosecution stemming from the Zohar I Bankruptcy and the Delaware 225 Action. The claim fails on both fronts and MBIA's efforts to resuscitate it in the Opposition are unsuccessful.

### A.    MBIA Has No Claim Based on the Zohar I Bankruptcy.

82.    MBIA's claim for malicious prosecution with respect to the Zohar I Bankruptcy is time-barred. Under New York law, the statute of limitations is one year from the resolution of the underlying action. Mot. ¶ 167. At the very latest, the Zohar I Bankruptcy was resolved on March 28, 2016, when Judge Drain signed the order of dismissal and the clerk made a "Case Closed" entry on the docket. *See In re Zohar CDO 2003-1 Limited*, Case No. 15-23680-RDD (Bankr. S.D.N.Y.), ECF No. 53. Indeed, the electronic docket for this case reads at the top of the page:

*Date filed:* 11/22/2015
*Date terminated:* 03/28/2016
*Debtor dismissed:* 03/28/2016

*Id.* This was well over a year before MBIA's claims in this action were tolled by the Settlement Agreement in March 2018.

83.     MBIA argues in vain that despite dismissal and termination nearly five years ago, the Zohar I Bankruptcy is ongoing to this day because there have been post-termination filings regarding public access to documents previously filed under seal. *See* Opp. ¶ 123. Post-dismissal filings do not extend the statute of limitations. *See Teller v. Galak*, 162 A.D.3d 959, 959 (2d Dep't 2018) (case resolved for malicious prosecution purposes upon order of dismissal); *Ellicott Square Court Corp. v. Violet Realty, Inc.*, 81 A.D.3d 1366, 916 N.Y.S.2d 705 (4th Dep't 2011) (affirming dismissal of malicious prosecution action, rejecting arguments that post-dismissal filings in case including seeking leave to appeal extended date of favorable termination). MBIA's contention that the Zohar I Bankruptcy remains ongoing is especially absurd given that Zohar I is a debtor again in the bankruptcy before this Court.

84.     Even if it were not time barred, the malicious prosecution claim regarding the Zohar I Bankruptcy should be dismissed for failure to plead any of these required elements: (1) prosecution of a prior civil action against MBIA that terminated in MBIA's favor; (2) without probable cause and with malice; and (3) causing special injury. *See* Mot. ¶¶ 168–69.

85.     *First*, the Zohar I Bankruptcy was not an action prosecuted against MBIA. *See* Mot. ¶ 170. MBIA argues that it has standing as a "senior creditor." Opp. ¶ 121. However, the Third Circuit has rejected this argument, holding that only the debtor, and not a creditor, has standing to bring a malicious prosecution claim for filing an involuntary bankruptcy. *See Silver v. Mendel*,

38

894 F.2d 598, 604 (3d Cir. 1990).[22] MBIA cites no contrary legal authority in support of its position. And because MBIA was not a party, the Zohar I Bankruptcy necessarily could not have been resolved in its favor.

86.     *Second*, MBIA has not adequately alleged that the Zohar I Bankruptcy petition was filed without probable cause and with malice. *See* Mot. ¶¶ 171, 174. MBIA's allegations do not refute the presumption of good faith in an involuntary bankruptcy filing, nor do they indicate that the bankruptcy was not legitimately filed "to prevent the further dissipation of assets and provide for court-supervised administration of those assets." *In re Reveley*, 148 B.R. 398, 412 (Bankr. S.D.N.Y. 1992). MBIA's self-serving assertion that the filing was in bad faith because the proposed reorganization plan did not sufficiently benefit MBIA does not establish malice. *See* Opp. ¶ 122; Compl. ¶ 152 (complaining that the proposed reorganization plan did not "ensure that MBIA was compensated for the nearly $150 million it had paid under the Zohar I Financial Guaranty"); *Wilhelmina Models, Inc. v. Fleisher*, 19 A.D.3d 267, 270, 797 N.Y.S.2d 83, 85 (1st Dep't 2005) ("An action brought with actual malice is one brought with 'conscious falsity'") (quoting *Hornstein v. Wolf*, 109 A.D.2d 129, 133, 491 N.Y.S.2d 183 (2d Dep't 1985)).

87.     *Third*, MBIA still has not identified any alleged special damages. This deficiency is fatal to its claim. *See* Mot. ¶ 175. MBIA weakly argues that the Zohar I Bankruptcy caused some unspecified and unquantified harm by delaying MBIA's "ability to enforce its contract and legal rights." Opp. ¶ 125. Vague allegations of "delay" do not satisfy the requirement to plead "concrete" special damages and MBIA cites no authority to the contrary. *Engel v. CBS, Inc.*, 93 N.Y.2d 195,

---

[22] MBIA seeks to distinguish *Silver v. Mendel* on the ground that the malicious prosecution claim there was brought pursuant to Pennsylvania statute. The "Pennsylvania statute" that MBIA leaves unnamed is Pennsylvania's malicious prosecution statute, which the Third Circuit explicitly notes is a codification of the common law tort of malicious prosecution. *Silver*, 894 F.2d at 604. *Silver*'s analysis is analogous to and instructive in this case.

205 (1999) (special injury requires showing of "concrete harm"); *see also Loftus v. Arthur*, 847 N.Y.S.2d 902, 2007 WL 2376883 (Sup. Ct. Madison Cty. 2007) (holding that delay in use of property caused by litigation was insufficient to constitute special damages); *Sankin v. Abeshouse,* 545 F. Supp. 2d 324, 328 (S.D.N.Y. 2008) (legal fees and vague claims of loss of business, without specifics, do not constitute special damages).

### B.    MBIA Has No Claim Based on the Delaware 225 Action.

88.    The malicious prosecution claim regarding the Delaware 225 Action similarly fails to plead any of these required elements: (i) that a claim was terminated in MBIA's favor; (ii) lack of probable cause or malice; and (iii) special damages.[23]

89.    *First*, MBIA does not address the meritorious argument that the Court did not deny any original claim brought by Ms. Tilton against MBIA. Rather, the declaratory counterclaim that the Court denied was simply the mirror-image of the declaratory relief that the Zohar Funds sought when they initiated the suit. Moreover, MBIA did not answer or participate in the defense of that claim, arguing that the court had no personal jurisdiction over it. Mot. ¶ 180. As such, it was a defensive maneuver that cannot support a claim for malicious prosecution. *See* Mot. ¶ 181 n.20.

90.    *Second*, MBIA has not adequately alleged that the Delaware 225 Action was filed without probable cause and with malice. *See* Mot. ¶¶ 181–82. In the Opposition, MBIA argues that "Tilton's malice may be inferred from allegations" that Tilton 1) "reversed her positions with respect to ownership of Portfolio Company equity;" 2) took "steps in advance of the litigation to entrench her control over the Portfolio Companies;" and 3) "intentionally appealed the court's trial opinion" in order to effect a stay. Opp. ¶ 124. None of these allegations support an inference of malice. As alleged in the Complaint, Ms. Tilton did not "reverse[] her position[]" regarding

---

[23] In addition, MBIA does not dispute that Patriarch XV was not a party to the Delaware 225 Action, invalidating any claim against it with respect to that action. *See* Mot. ¶ 179.

ownership of equity, *see id.*; she merely decided to stop litigating the issue, which comes nowhere near suggesting bad faith. *See* Compl. ¶ 183. MBIA does not and cannot explain how Ms. Tilton's alleged efforts to "entrench her control over the Portfolio Companies," which MBIA and all other stakeholders had agreed she would have an integral role in managing, is evidence of malice. Nor is "intentionally appealing" a court decision a wrongful act, especially when the Court of Chancery has stated that "Defendants have presented serious legal questions that present fair grounds for appeal." *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. 12946-VCS (Del. Ch.), D.I. 475 at 2.

91.     ***Third***, MBIA has not pleaded special damages. As with the Zohar I Bankruptcy, MBIA argues that the Delaware 225 Action caused harm by delaying MBIA's ability to monetize the Portfolio Companies. Opp. ¶ 125. This allegation similarly fails to plead special damages. *See*, *e.g.*, *Henriksen v. Henriksen*, No. CIV.A. 87C-MR-2, 1987 WL 25466, at *2 (Del. Super. Ct. Nov. 18, 1987) (holding that "broad, vague and conclusory" allegations fail to plead special damages, which require specific allegation of "interference with the person or property of the plaintiff."). Moreover, because MBIA did not answer or otherwise participate in the Delaware 225 Action, it has no basis to claim that it was harmed by the prosecution of that case. *See* Motion ¶ 180.

## XI.    THE CLAIMS AGAINST DEFENDANTS LDI AND ZOHAR HOLDING MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

92.     To the extent MBIA is attempting to bring LDI and Zohar Holding into this action by virtue of their roles as sole members of PPAS, Patriarch Partners, Patriarch VIII, Patriarch XIV, Patriarch XV, and PPMG, Compl. ¶¶ 10–15, 20–21, MBIA fails to state a claim for alter ego liability, *see* Mot. ¶¶ 189–93.

93.     In fact, in its Opposition, MBIA effectively concedes that it has failed to meet the two elements of establishing alter ego liability as to LDI and Zohar Holding; instead, MBIA

appears to argue it does not have to meet Rule 8's basic pleading standards. Opp. ¶¶ 126–28. Such

an argument is contrary to law and logic.

94.     The totality of the Complaint's "allegations" against LDI are as follows:

- LDI, a holding company for certain affiliates and subsidiaries of Patriarch Partners, is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is Lynn Tilton. Compl. ¶ 10.

- Defendant PPAS is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is LDI. As set forth above, LDI's sole member is Lynn Tilton. Compl. ¶ 14.

- Defendant PPMG is a Delaware limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and whose sole member is LDI. As set forth above, LDI's sole member is Lynn Tilton. Compl. ¶ 15.

- Defendant LDI is a Delaware limited liability company with its principal place of business in New York, New York. LDI's sole member is Lynn Tilton. As set forth above, LDI is the sole member of and holding company for certain of Tilton's affiliates and subsidiaries. Compl. ¶ 20.

- Patriarch Partners, the Patriarch Manager Defendants, the Octaluna Entities, ARK, AIP, LDI, Zohar Holdings and Zohar Holdings, through Tilton, knew of and played an active role in the Defendants' manipulation of the Overcollateralization Ratio, their scheme to transfer valuable rights in the Portfolio Companies, including voting and control rights, and valuable equity distributions and other benefits away from the Zohar Funds.  Compl. ¶ 258.

95.     Similarly, the totality of the Complaint's "allegations" against Zohar Holding are

as follows:

- Defendant Zohar Holding is a Delaware limited liability company with its principal place of business in New York, New York. Zohar Holding's members are Tilton and the Tilton Trust. Tilton holds 99% of the membership interests in Zohar Holding, and the Tilton Trust holds the remaining 1% of the membership interests in Zohar Holding. As set forth above, Zohar Holding is the sole member of Patriarch VIII, Patriarch XIV and Patriarch XV. Compl. ¶ 21.

- Patriarch Partners, the Patriarch Manager Defendants, the Octaluna Entities, ARK, AIP, LDI, Zohar Holdings and Zohar Holding[], through Tilton, knew of and

57772/0001-21992263v1

played an active role in the Defendants' manipulation of the Overcollateralization Ratio, their scheme to transfer valuable rights in the Portfolio Companies, including voting and control rights, and valuable equity distributions and other benefits away from the Zohar Funds. Compl. ¶ 258.

96.    In its Opposition, MBIA argues that this handful of basic facts and a single conclusory allegation leads one to the conclusion that "LDI and Zohar Holding were not operated as distinct entities independent from Tilton and served only as vehicles for the movement of Tilton's and Defendants' assets and ill-gotten gains." Opp. ¶ 128. But these paltry allegations, which describe LDI and Zohar Holding in only conclusory fashion, are plainly insufficient to state a plausible claim for alter ego liability. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) ("To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness . . . is present.") (alterations, citations, and internal quotation marks omitted).

97.    Therefore, the claims against LDI and Zohar Holding must be dismissed.

## XII.    AMENDMENT OF MBIA'S CLAIMS WOULD BE FUTILE.

98.    MBIA should not be granted leave to replead because its Complaint is duplicative of the Zohar Funds Adversary Proceeding. No amount of repleading will cure the duplicative nature of this action.

99.    Even if that were not the case, leave to replead should be denied because MBIA's Complaint is fundamentally vague, and fails as a matter of law and fact. As such, these claims should be dismissed with prejudice.

43

## **CONCLUSION**

100.    For the foregoing reasons, Defendants respectfully request that the Court grant their

Motion to Dismiss the Complaint.

Dated: January 8, 2021

**COLE SCHOTZ P.C.**

By: */s/ Patrick J. Reilley*
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
preilley@coleschotz.com
ddean@coleschotz.com

– and –

**SHER TREMONTE LLP**
Theresa Trzaskoma (Admitted Pro Hac Vice)
Michael Tremonte (Admitted Pro Hac Vice)
90 Broad Street, 23rd Floor
New York, NY 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com

*Counsel to Lynn Tilton, Patriarch Partners, LLC,*
*Patriarch Partners VIII, LLC, Patriarch Partners*
*XIV, LLC, Patriarch Partners XV, LLC, Patriarch*
*Partners Agency Services, LLC, Patriarch Partners*
*Management Group, LLC, Octaluna, LLC,*
*Octaluna II, LLC, Ark II CLO 2001-1, LLC, Ark*
*Investment Partners II, L.P., LD Investments, LLC,*
*and Zohar Holding, LLC*

57772/0001-21992263v1