UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 17-12560(JKS) |
| WOODBRIDGE GROUP OF | . |  |
| COMPANIES, LLC, et al, | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . | . | Friday, September 24, 2021 |
| MICHAEL GOLDBERG, as | . |  |
| Liquidating Trustee, | . | Adv. Proc. No. 19-50308(JKS), |
|  | . | et al |
| vs. | . |  |
|  | . |  |
| Various Defendants. | . |  |
| . . . . . . . . . . . . . . | . |  |

TRANSCRIPT OF VIDEO HEARING RE:  ORAL ARGUMENT
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM: (On the Record)

For the Liquidating Trust:    Richard Pachulski, Esq.
                              Colin R. Robinson, Esq.
                              Jason Pomerantz, Esq.
                              Jeffrey Nolan, Esq.
                              PACHULSKI, STANG, ZIEHL
                               & JONES, LLP

                              Michael L. Tuchin, Esq.
                              Jonathan M. Weiss, Esq.
                              KTBS LAW, LLP

(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by Madeline Dungey, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:   (Continued)

For the Woodbridge
Defendants:                    Michael Joyce, Esq.
                               JOYCE, LLC

For the Movants:               Curtis A. Hehn, Esq.
                               LAW OFFICE OF CURTIS A. HEHN

Also Appearing:                Ian Bifferato, Esq.
                               THE BIFFERATO FIRM, PA

                               Uday Gorrepati
                               "ABI PROJECT"

                               Matthew Breen
                               Stephanie Rosner
                               Paula Subda
                               U.S. BANKRUPTCY COURT

INDEX

                                                             Page

ARGUMENT BY MR. HEHN                                           4

ARGUMENT BY MR. PACHULSKI                                     21

FURTHER ARGUMENT BY MR. HEHN                                  43

COURT DECISION                                               55

1    (Proceedings commence at 1:06 p.m.)

2    THE COURT:  Good afternoon, Counsel.  This is Judge

3    Stickles.  We're on the record in Woodbridge Group of

4    Companies, Case Number 17-12560.

5    Before the Court is defendants' motion to

6    temporarily stay the prosecution of complaints pending the

7    determination of distributions to Class 3 note claimants

8    under the confirmed plan.

9    I'll hear from counsel.

10   MR. ROBINSON:  Good afternoon, Your Honor.  Colin

11   Robinson, Pachulski, Stang, Ziehl & Jones, on behalf of the

12   liquidation trust.

13   Your Honor, you named that there's one item on the

14   agenda today, and I -- we're not the movant.  But we'll turn

15   it over to Mr. Hehn.  Mr. Pachulski will be arguing for the

16   trust today when that time comes, Your Honor.  So thank you,

17   thanks for making the time today on your calendar for --

18   THE COURT:  Certainly.  Thank you, Mr. Robinson.

19   Mr. Hehn.

20   MR. HEHN:  Good afternoon, Your Honor.

21   THE COURT:  Good afternoon.

22   MR. HEHN:  It's a pleasure -- it's a pleasure to

23   appear before you.

24   I want to thank you for granting the movants'

25   request for oral argument on the stay motion.  The movants

1    consist of 23 defendants, Your Honor, most of whom are

2    elderly.  This matter is of the utmost importance to them,

3    and they appreciate the opportunity to be heard by the Court.

4         Your Honor, it's not my intention today to merely

5    regurgitate what we stated in the papers.  They already

6    contain our thinking and the bases for why we've sought the

7    relief that we've sought.  And I don't think I could restate

8    the points any better than they were already made in those

9    papers.  But I do want to address what I think are the points

10   that are the crux of the argument for the Court and respond

11   to any questions that the Court might have and respond to any

12   argument that counsel for the liquidating trust might have.

13        So, Your Honor, on a fundamental level, there's

14   really two points to address:

15        Number one is:  Does the Court have the power to

16   grant the motion?

17        Number two is:  Should the Court grant the motion?

18        With respect to point one, Your Honor, you

19   absolutely have the power to grant the relief sought in the

20   motion.  We set forth the legal authorities in the paper, and

21   it's crystal-clear that the Court has inherent control over

22   its docket.  As we had noted in the papers, the Court can

23   absolutely control the disposition of the causes on its

24   docket with economy of time and effort for itself, for

25   counsel, and for litigants.  That proposition is taken

1   directly from the Supreme Court's decision in Landis v. North

2   American Company that was cited on Page 19 of the motion.

3          Moreover, Your Honor, the Court's decision to

4   assert control over its own docket is committed to the

5   Court's sound discretion.  So it's your decision, it's your

6   discretion.  You're going to decide whether to exercise it in

7   these particular cases, and that's crystal clear, Your Honor.

8          So the question becomes:  Should the Court grant

9   the movants' request to stay the prosecution of their

10  adversary proceedings until after the liquidation of the

11  assets?  And I believe that answer is a resounding yes.

12         And the reason for that starts with the purpose of

13  the preference statute itself, Your Honor.  Broadly speaking,

14  it has two overarching goals:

15         Goal number one is the prevention of creditors from

16  dismembering a debtor's estate prior to the bankruptcy

17  filing.

18         And goal number two is the equal treatment, to the

19  greatest extent possible, of similarly situated creditors.

20         So, if a preference claimant, as a result of

21  receiving a preference, gets more than a regular creditor,

22  the statute provides for the debtor's estate to recover the

23  preferential payment, so that the claims of the preference

24  recipient and the debtor's other creditors are ultimately

25  treated the same way.  That's just a fundamental bedrock

1    principle of preference law.

2            The problem in this case, Your Honor, is we have a

3    converse of the usual situation.  And by the "usual

4    situation," I mean all of my cases, where I represent

5    defendants and there are pennies on the dollar or nothing to

6    go to unsecured creditors.

7            Here, in these cases, we have potentially very high

8    recoveries.  They were projected in the plan and the

9    disclosure statement and all of the documentation that was

10   presented to the Court for confirmation to be between 60 to

11   70 percent of the face value of the claims for unsecured

12   creditors.  So the concerns that the movants have in this

13   case, Your Honor, is that they could settle now and actually

14   pay more as a preference defendant than they would if they

15   were just a regular creditor and received their distribution.

16   That's the potential harm.

17           And let's -- let me illustrate that with an

18   example, Your Honor.  If we have a hundred-thousand-dollar

19   preference and the preference creditor paid all of that back

20   into the estate, they would have $100,000 in the hole.

21   However, a creditor with a hundred-thousand-dollar claim

22   would only be in the hole for $30,000 if the returns to

23   creditors are equal to the 70 percent projection under the

24   plan, or some other lower value.  But they would definitely

25   have less harm than the preference recipient who paid all the

1    money back.

2         And it's this net difference that's the nightmare

3    scenario faced by the movants.  Almost all of them are

4    elderly and retired or close to retirement age.  They live

5    off of Social Security and whatever investments they were

6    able to save during their working years.  If they overpay on

7    account of their alleged preference liability, they are going

8    to experience significant economic harm.

9         The entire point of the motion is that we think we

10   can mitigate that economic harm by delaying the prosecution

11   of the complaints until after we know what the actual

12   distribution to creditors will be.  At that point in time,

13   Your Honor, we will know with mathematical certainty what the

14   net preference liability is for each of the movants.  And I

15   think that would greatly facilitate the ability of the

16   parties to consensually resolve these cases.  It would also

17   further the key goal -- one of the key goals of the

18   preference statute, which is the equal treatment of similarly

19   situated creditors.

20        THE COURT:  Mr. Hehn, assuming your proposition

21   here, aren't you asked for a rewrite of Section 502, and

22   specifically the application of 502(h)?

23        MR. HEHN:  No, Your Honor, I am not and the movants

24   are not.  What we are asking for is for the Court to use the

25   inherent power that it has to control its docket, to enable

1     the parties to be in a situation to know exactly who owes

2     what.  We think that that's critical to have a fair and just

3     outcome in these cases.

4          The request for the stay, Your Honor, does not

5     damage substantive law in my opinion.  We're not asking you

6     to change substantive law, to change any of the standards of

7     how it's applied, what's ultimately going to be done.  We're

8     just asking you to delay the prosecution of these cases

9     because that will get us into a position to know exactly what

10    the preference liability is.

11         So the provisions of 502, the provisions in 547,

12    the respective burdens of proof, all of that will remain the

13    same, Your Honor.  It's just it's going to be dealt with

14    later in the case, if the Court grants our motion, and it

15    would be after the assets have finished being liquidated.

16         THE COURT:  But that --

17         MR. HEHN:  So it --

18         THE COURT:  When you do --

19         MR. HEHN:  -- is not --

20         THE COURT:  Excuse me.  But if every defendant in

21    an adversary proceeding waited until they had the

22    mathematical information, wouldn't every action be stayed?

23         MR. HEHN:  Your Honor, I don't think that's the

24    case, as a practical matter.  I do agree with you that,

25    hypothetically, you can make that argument.  But I am not

1   before the Court upon behalf of hypotheticals; I'm before the

2   Court upon behalf of 23 elderly defendants.  Actually, a

3   little bit more because some are married couples.

4           And Your Honor, part of the problem with law, and

5   at times the Bankruptcy Code and the preference statute, is

6   that it is a blunt instrument with which to try to achieve

7   justice.  And it would be unjust for the movants, if they

8   have preference liability, to not pay their fair share.  But

9   I think it's equally unjust for the movants to pay more than

10  their fair share if they ultimately have some type of a limit

11  on their preference liability because distributions in the

12  case are significant.

13          And Your Honor, if these weren't all elderly

14  defendants, our grandmas and grandpas, so to speak, I

15  wouldn't be here before you, seeking this relief.  I hate to

16  admit it, but I'm in year of practice 24.  This is the first

17  time I've ever filed one of these types of motions.  It's

18  probably going to be the last time because I think that the

19  facts and circumstances that you need to have a successful

20  attempt at convincing a judge like yourself to grant the

21  relief are quite limited and unique.

22          THE COURT:  Well, let me --

23          MR. HEHN:  And --

24          THE COURT:  -- stop you right there because you

25  indicate this is the first time that you filed any such

1    motion.  Can you cite to any bankruptcy case with multiple

2    adversary proceedings seeking to avoid or recover

3    preferential or fraudulent transfers, in which courts stayed

4    actions until the amount of the recovery is known?

5           MR. HEHN:  I cannot, Your Honor.  If I could have,

6    I would have put it in the papers.

7           Having said that, though, you know, Your Honor,

8    this is a court of equity, as well as a court of law.  And I

9    know that the equitable powers of a Bankruptcy Court are

10   limited to the provisions of the Code.  But I'm not asking

11   you to change the provisions of the Code, I'm asking you to

12   delay when they're applied.  And you do have absolute

13   authority to do that.  And I don't think that that, although

14   there might not be written opinions on it, is extraordinary

15   relief.

16          And I would also note, Your Honor, in the

17   bankruptcy realm, we ask courts to change the timing of the

18   provisions of substantive law all the time.  Let me give you

19   a for instance.  In first-day motion practice, people almost

20   always come before the Court and say, Your Honor, we need to

21   pay employee wages or maybe some 503(b)(9) claims or some

22   other type of claim that the Bankruptcy Court -- or the Code,

23   rather, does not allow.

24          And the Bankruptcy Court considers that; and,

25   because those are priority claims, it usually grants those

1    requests for relief, in part because the justification is, is

2    it's just a difference in the timing.  Those folks would,

3    ultimately, get paid those amounts, it's just we're going to

4    pay them earlier, to avoid hardship for them, as opposed to

5    paying them later.

6           In my particular case, Your Honor, with respect to

7    the movants, it's one less degree of relief that we're

8    requesting.  We're not seeking anything affirmative from the

9    trust; we're just seeking to have the prosecution of these 23

10   adversary proceedings delayed until we know what the amounts

11   are going to be.  And it's really only an issue, Your Honor,

12   because of the unique facts in this case.  The distributions

13   are going to be significant.

14          But for some of these defendants, Your Honor, they

15   don't have the ability to pay the full amount of the

16   preference complaint.  And the preference complaint wasn't

17   filed seeking a net preference liability, it was filed

18   seeking the full amount.  So it's not feasible for them to

19   say I'm going to pay the full amount of the complaint and

20   then, ultimately, get my money back.  We have to try to

21   resolve this, I think, in the context of litigating these

22   cases, hopefully settling these cases.  The best way to do

23   that, I think, Your Honor, is by staying these matters until

24   we know what's going to happen.

25          You know, some of the defendants, Your Honor, are

1    quite elderly.  They don't have the ability to pass these

2    costs along like a business normally would, to future

3    customers.  It directly impacts them.

4            And the trustee, in a prior status report, I think

5    quite eloquently described the harm that was inflicted upon

6    all of the creditors by Woodbridge.  And we agree with that

7    and we're trying to mitigate that harm that will be inflicted

8    upon the movants when they have to pay back to the estate

9    whatever net preference liability they have, but we don't

10   want them to overpay it.  We don't want to compound that

11   damage.

12           And Your Honor, you do have the inherent authority

13   over your docket and the ability in equity to craft a

14   scalpel, as opposed to a blunt instrument, to achieve justice

15   for the parties, ultimately --

16           THE COURT:  Well --

17           MR. HEHN:  -- which is what we seek in this motion.

18           THE COURT:  Your 23 -- or the 23 defendants that

19   you represent, they are less than 10 percent of the number of

20   adversaries filed in this case.  You speak of equities.  Are

21   there not other defendants -- and can we agree that there are

22   other defendants who are in the same shoes as your clients,

23   defendants who are elderly, defendants who may be retired or

24   on fixed incomes?

25           MR. HEHN:  No, Your Honor, I don't debate that at

1  all.  I'm sure that's the case.  I don't know about those

2  other cases; I only know about the parties that I represent.

3  I also only know that, as an advocate, if I think that

4  there's something unjust in a case or it's going to cause a

5  hardship that's out of the ordinary or unusual, you're the

6  place I have to go to try to seek relief from that.

7          And this, while I don't think it's extraordinary,

8  it is atypical.  I've never done this or tried to do this

9  before.  But I do think, under these facts and circumstances,

10  giving this group of defendants, that have real

11  vulnerability, especially coming off of a COVID-19 pandemic,

12  Your Honor, that the request is appropriate.

13          THE COURT:  Let me clarify one thing with you.  As

14  I understand, net winners are individuals who profited from a

15  Ponzi scheme, they were repaid in full with interest prior to

16  the petition date.  Your clients, were they all net winners?

17          MR. HEHN:  I think they're all net winners, based

18  off of how those terms were defined in the confirmation

19  documents, Your Honor.  From my clients' perspective, they

20  got a check back for their investment.

21          THE COURT:  Okay.

22          MR. HEHN:  Right?  A lot of investors got checks

23  back from their investments.  But if you had the good fortune

24  of getting your check back 91 days or more, you're not in

25  their position.  And there's such a lopsided disparity

1   between the alleged preference liability and the fraudulent

2   transfer liability, and that's what we're really focused on

3   here, Your Honor.  The preference liability for some of these

4   people will be crushing because, for some of them, they got

5   their life savings back.

6            THE COURT:  Okay.  Thank you.

7            MR. HEHN:  Your Honor, if I can just consult my

8   notes for a second --

9            THE COURT:  Certainly.

10           MR. HEHN:  -- and see what we did not cover in our

11  colloquy?  Because I don't want to repeat and --

12           THE COURT:  No --

13           MR. HEHN:  -- waste --

14           THE COURT:  -- take your time.

15           MR. HEHN:  -- people's time.

16           THE COURT:  I interrupted you, so, please, take

17  your time.

18      (Pause in proceedings)

19           MR. HEHN:  Your Honor, this really is a unique

20  case, and it's a great case because returns are going to be

21  so high.  I mean, everybody worked hard to obtain an

22  outstanding set of recoveries here.  And what we're having

23  the dispute over is:  In the context of the preference

24  litigation, where you know there's going to be significant

25  recoveries and defendants don't have the ability to pay the

1    full face value of the complaint or not pay it without a

2    hardship, how do you reach some kind of consensual or

3    litigated resolution that accounts for that?

4         I do think that it's not a controversial

5    proposition to state that the funds available in this case

6    are going to increase.  I would just note for the Court --

7    and I just found out about it myself, for example -- one of

8    the assets is a litigation claim that was being litigated

9    against Comerica Bank.  And I think there was just a notice

10   of class action settlement recently filed at the start of

11   September, advising parties that there is a proposed

12   settlement.  I believe it's been preliminarily approved by

13   the District Court hearing it, and I think it's for $54.2

14   million.  And the lion's share -- not all of it, but the

15   lion's share of that money is going to go to the trust.  It's

16   going to ultimately be distributed to creditors, which is a

17   great thing.

18        There's going to be other assets that come into the

19   trust, Your Honor.  During the status conference back in May,

20   counsel for the trust, in the context of making statements to

21   the Court and providing an update to the Court, noted that

22   the vast majority of the remaining properties are still in

23   construction and are not ready to go to market.  As they are

24   ready to go to market, they will be available for sale and

25   they will be sold.  The trust and the wind-down entity work

1    very closely on that, there's overlap in board memberships,

2    so everyone knows what's going on in the process.

3          And I think that's important because, as I

4    understand things at least, the real estate market has been

5    booming.  And I would think that there's the potential to

6    sell some of these luxury properties after the pandemic for

7    even more than parties anticipated because the driver, as I

8    understand it with the booming real estate market, is wealthy

9    people want to have a sanctuary where they can get away from

10   this pandemic, variants of this pandemic, and do all of the

11   things as close to normal as they would.  So, if you can

12   afford a place with a pool, a tennis court, a below-ground

13   bowling alley, your own movie theater, you know, servants'

14   quarters, high-end properties, they are a hot commodity, they

15   are a limited commodity.

16         And we don't, ultimately, know what the net

17   preference liability is going to be until these things are

18   liquidated and they're reduced to money.  But I do believe,

19   Your Honor, in my heart of hearts, that the parties shouldn't

20   have to guess.  And even though this is not the norm, the

21   best way to achieve justice for everybody and fidelity to the

22   statute and equal treatment for similarly situated creditors

23   is to now, with absolute certainty, what those funds are

24   going to be.  And we can do that just through waiting.

25         And while it will impose an administrative burden

on the estate because they're not keeping all of these cases

together, Your Honor, it is not going to be the type of

substantial harm that will be visited to the movants if they

have to finance litigation, if they wind up paying more in a

settlement than they should have paid.

I mean, they're in their twilight years, or at

least a lot of them are, Your Honor.  And just the act of

being sued for many of them, I can't convey how much it

bothered them and how much it upsets them.  And when I talk

with them about it and try to advise them about the case,

that's upsetting because most of these people have never been

sued in their life.  They're regular folks.  It's just a

difficult, difficult situation.

And I think we could potentially assuage a lot of

this angst and grief and not do damage to the trust and its

ability to try to claim, you know, net preference liability

that isn't subject to defenses by using the scalpel of

waiting, using the Court's inherent control over its docket

and these unique circumstances to hopefully enable justice to

be done to the greatest extent possible for everybody.

And the last point that I wanted to make, Your

Honor -- if I can just have a second, I have to find my paper

-- it concerns what would the impact of this be on other

cases that are pending before the Court.  I don't think

there's going to be a parade of terribles or other people

1   trying to glom on to this relief, Your Honor.

2           I know that a status report was recently filed by

3   the trustee with the Court on, I believe it was September

4   3rd.  There are categories, C, service is complete, no answer

5   has been filed, the plaintiffs will seek a default judgment

6   for two cases.  Thirty-six cases are listed as settled or

7   resolved or they can't dismiss the cases yet, they're still

8   finalizing the paperwork.  There's two where service is

9   complete, an answer has been filed, and discovery is ongoing.

10   There's twenty-nine where a mediator has been selected or

11   appointed.  And then there's twenty-five where dispositive

12   motions are pending, which include the twenty-three movants'

13   cases.

14           And I would not say this is a dispositive motion.

15   I think this is a motion for a stay.  It leaves completely

16   open what will ultimately happen with the disposition of the

17   case.

18           But if we write down the total of those 94 pending

19   cases, there's 56 active cases.  When you remove these 23, it

20   leaves a net amount of 33 remaining cases.  So there is not

21   going to be a floodgate opened that the Court or the trust is

22   going to have to deal with if this relief is granted.  I

23   think it will be very narrowly tailored to these 23 people,

24   if the Court is inclined to grant the relief, Your Honor.

25           And that concludes my initial remarks.  If I could

1    have an opportunity to respond to any argument the trust

2    might have, I would appreciate that.  But with that, I would

3    otherwise conclude, Your Honor, unless the Court has

4    questions.

5              THE COURT:  So I just want to clarify the last

6    statement you made, is that you want me to stay the cases as

7    to your 23 defendants, but you don't believe that the other

8    33 defendants that -- and I don't know if that number is

9    accurate, I'm just referencing the number that you stated --

10   that it would have no implication on them.

11             MR. HEHN:  Your Honor, I am without standing to

12   take a position for them.  If they were my clients, I would

13   have to look at their cases and decide whether they should be

14   included in this motion.

15             Part of why I have the views I have, Your Honor, is

16   I had enough clients, as an initial matter, retain me to be

17   able to do a deep dive in the papers.  I was able to look at

18   the pleadings.  I was able to look at the service.  That's

19   why I was able to craft the motion I was able to craft and

20   why I truly do believe that the relief being sought is

21   appropriate under these circumstances, Your Honor.

22             The movants are not abstractions.  They are real

23   people, they are elderly people, some of them are frail.

24   This is a real hardship on them.  And I can't do anything

25   about that.  The litigation is the litigation.  But what I

can potentially do is convince the Court that we should

minimize the economic damage that happens to them as a result

of the preference claims, and that we can fairly do it

without harming the trust simply by waiting until we know

what the assets are going to be and what the net preference

liability actually is.  And that's just a number.  That just

takes the passage of time to reduce the assets to cash.  We

will know it with mathematical certainty.

The trust shouldn't have to guess on this stuff in

negotiations with me.  And the defendants, they shouldn't

have to guess either, especially because of their age and

their limited ability to pay.  Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Pachulski.

MR. PACHULSKI:  Thank you so much, Your Honor.  I

very much appreciate the opportunity to appear before Your

Honor.

And just so you know, Your Honor -- and I'll

explain it through the presentation -- I was lead counsel to

the creditors' committee in the Woodbridge case.  And not

only am I quite familiar with the case, but because of that

and four other cases in which I've taken major roles with

respect to representing -- being involved in Ponzi scheme

cases, nothing -- collectively, I've been involved in cases

that have had over $4 billion of Ponzi scheme losses and with

1    over 20,000 victims.  So I totally understand what's going on

2    in the case and what's gone on in other Ponzi scheme cases.

3    And frankly, Your Honor, I understand it because,

4    approximately 25 years ago, I was a victim of Ponzi scheme,

5    so I understand how this works, and it's beyond unfortunate.

6          But one of the reasons that I wanted to argue this

7    -- and I haven't argued any matter before the Court, even

8    though I still have been heavily involved with the

9    liquidation trust, is because I think this case has some very

10   significant policy issues that I would also like to address

11   because Your Honor has addressed, I think eloquently, the

12   issue with respect to what happens with the other cases.  We

13   do have defense counsel from the other cases listening, so

14   this is relevant to that.

15         But I do want to spend a few moments on the policy

16   itself because Your Honor asked an excellent question, which

17   is -- that you've seen this happen before, to Mr. Hehn.  I

18   actually started practicing the day the Bankruptcy Code went

19   into effect over 40 years ago, on October 1st of 1979 --

20   actually, October 2nd is when I started because of a holiday

21   on October 1st.  So I have never seen this.  And I -- and

22   there's pretty much nothing I have not seen in the bankruptcy

23   process.  So this is highly unusual.

24         And the reason it's highly unusual is because -- I

25   do agree with Mr. Hehn -- the goal of Chapter 11 and of the

1    preference statute is equal treatment.  And I will get into

2    the equal treatment issue.  And what Mr. Hehn is actually

3    asking for is very unequal treatment.  So I agree with his

4    premise; I disagree with his application.

5        I also agree with him, Your Honor, that it is your

6    docket and you get to control your docket.  So I'm not going

7    to -- I'm not arguing that Your Honor does not have the

8    inherent authority.  I'm arguing that it would be -- it would

9    be wrong in this case, for a variety of reasons.  And we

10   wouldn't open the floodgates in this case, we would open the

11   floodgates around the country, and liquidation trustees

12   around the country would have to deal with an insurmountable

13   problem of stays and, if they are granted, the -- what will

14   happen based on those stays, which I will get into.

15       So, as a policy matter, it would be a complete

16   violation of the equal treatment provisions of the preference

17   statute, which actually is why, among other provisions of the

18   Bankruptcy Code, that Your Honor is basically a court of

19   equity.  And this would not be equitable in this case.

20       I'd like to start by dealing with some of the

21   undisputed facts that we have in this particular case.  First

22   of all, Your Honor, as of the filing of the Chapter 11 case

23   in approximately December of 2017, the vast majority -- we're

24   talking over 97, 98 percent, maybe even higher -- had lost

25   their monies.  Nothing -- it had not been returned.  In fact,

1    Your Honor, during the 90 days before the bankruptcy -- and

2    this is just extraordinary, why this had not been shut down -

3    - but victims owed thirty-five -- people put in $35 million

4    of additional monies during that period of time.  Now, at

5    least some of the, give or take, 10,000 victims had received

6    some of it back.  But those people never received a dime

7    back.

8           And so Mr. Hehn has reflected that his clients are

9    victims, but they are victims who, on the date of the

10   petition, had zero claim.  On the day -- since then, almost

11   four years, they have used the money.  We have seen, during

12   that four years, very unfortunately, two of Mr. Hehn's

13   clients have died.  So those claims are now going to have to

14   be dealt with, if at all, in Probate Court, the Estate of

15   Heir Six.  So we have no guarantee that -- even if this

16   granted, that we will even have who the defendants will be,

17   if the 23 become 19, which I hope doesn't happen.  But we

18   have to be realistic, based on what Mr. Hehn has said about

19   the particular victims.

20          Now, Your Honor, as of the May 19th -- the next

21   undisputed point is that, as of the May 19th, 2021 status

22   conference report, it was disclosed that unit holders had

23   received 19 to 20 percent, and that noteholders had received

24   approximately 26.3 to 27 point -- percent -- 27.68 percent.

25          Now Mr. Hehn says, oh, my God, we may give this

money back, and we will have unequal treatment.  Well, Your

Honor, they won't have unequal treatment; they'd have exactly

equal treatment.  They would return the 100 cents, and they

would get back, depending on the -- whether they were a unit

holder or noteholder, somewhere between, effectively,

approximately 20 cents on the dollar to 27 cents on the

dollar, instead of the 100 cents that his clients are

presently holding.

        Then, Your Honor, just to be clear because we'll go

through some of the other arguments he'll make, the next

undisputed fact is the movants have -- collectively, their

claims for 23 holders is approximately 4.6 million or

approximately $200,000 per claimant.  Even so, Your Honor --

and I find this, I hate say almost amusing, but Mr. Hehn says

let's not use this as a sledgehammer.

        And Mr. Hehn has said very clearly we are going to

demand a jury trial and we are going to fight you on the

Ponzi scheme.  These are -- this is a two-hundred-thousand-

dollar claim, Your Honor.  If you have to do that, you will

spend more than $200,000.  Is he really going to have the

victims, his clients, make these claims?  I would hope not.

But he's a professional, he's a talented lawyer, and he will

make whatever claims he deems appropriate.  But he is using

the Bankruptcy Code and the preference statute as a

sledgehammer.  That is what he has told us, there is no

1    ambiguity in what he said.

2            Now the next thing, Your Honor, is he concedes that

3    the net liquidation value of the assets, which have been

4    disclosed, has gone down dramatically.  Why?  Because the

5    assets have been liquidated from over 500 million at the time

6    of the confirmation of the Woodbridge plan to somewhere now

7    in excess of $200 million.

8            Now the thing I find quite amusing, also, is that

9    Mr. Hehn keeps saying I don't know what it's going to

10   liquidate for.  But there are two points I want to make, and

11   one of them Your Honor hit on, which he is trying to rewrite

12   the Bankruptcy Code.

13           We could go to a mediation, we have every right to

14   do it because of the interrelationship between 502(b) and

15   502(h) and say, very clearly, your clients owe 200,000,

16   please pay it, and then we will round-trip the 20 percent to

17   the 27 percent -- it sounds like he primarily has noteholders

18   -- the 27 percent back to you.

19           He is demanding a credit.  There is no right for

20   any of the victims, any of the creditors, anyone involved in

21   the case to get a credit.  The other 10,000 people did not

22   get credits, they have not gotten their money, and he is

23   demanding it to even go to a mediation.  There's nobody to do

24   it.

25           Now, to be honest, Your Honor -- and we do this and

1    we have been -- our firm has been involved in literally

2    thousands of preference actions.  When we go to mediation, we

3    have a policy, if we can, to give the creditors, to give the

4    victims -- because one of the other things, Your Honor, you

5    don't have to be a victim to just be in a Ponzi scheme; you

6    actually don't even have to be a victim to be in a fraud

7    case.  You are a victim because you weren't paid because a

8    company told you, you would be paid.  And now you, as a

9    creditor, may go into bankruptcy because you are not being

10   paid.

11              So we understand that.  We are sensitive to it, we

12   are empathetic to it.  And we will typically give in a

13   mediation, if we can, two options:

14              You can either just pay it back and get your

15   distribution -- and you can get your distribution, which we

16   basically have had in this case.  We've had parties who have

17   said I'd rather just wait it out, I don't want to take a

18   discount, I know you're going to be conservative.  And we've

19   had others, in this case and others, who have said we'll take

20   the credit.

21              So I will tell you, without getting into mediation

22   issues, that the credit that has been offered to Mr. Hehn's

23   clients is greater than the distribution that has been paid

24   to date.  They would do better than the other victims in this

25   particular case.  People have not gotten the opportunity.

1          Now, Your Honor, the trustee, to date, has pursued,

2     either prior to filing the complaints or after, 675

3     preference actions.  We're down to 69.  And I believe that

4     was -- as of the time the pleadings were filed, I'm told by

5     my colleagues, that we're down below 69.  We've been working

6     as best we can to do this, to get it resolved.  But Mr.

7     Hehn's 23, Mr. Hehn doesn't want to negotiate.  His view is

8     I'm demanding that you give us the 60 to 70 percent you said

9     in the disclosure statement.

10         Mr. Hehn has given a very eloquent presentation as

11    to how L.A. real estate has gone -- is going to go up in

12    value.  Well, Your Honor, when those -- when the estimates

13    were made in 2018, L.A. real estate was doing just fine.

14    After confirmation, it went down.  That's just the reality.

15    We have sold assets during the pandemic because we can't hold

16    them forever.  So we're not going to get the 60 or 70

17    percent, necessarily.  And on September of 2019, a letter

18    went out saying, effectively, we're sorry, that's not going

19    to happen, we now think it's 40 to 63 percent.  It is going

20    to go down.  And while we hope it will go up in value, it is

21    not.

22         And you know something?  It -- because this is more

23    -- this case is way more transparent than most other cases

24    because we have a publicly traded trust, which is almost

25    unheard of -- the SEC required it in this case -- Mr. Hehn

1    has the information.  Mr. Hehn even knows which assets are

2    going to have to be liquidated.  It would take him two hours

3    of due diligence to go out and find out what those assets are

4    likely to sell for.  His clients don't want to do that.  They

5    want a 70 percent credit, come hell or high water.  And that

6    is not required under the Bankruptcy Code.

7            But Your Honor has also touched on something else

8    or alluded to in your questions, which were excellent because

9    it's very clear that we're trying to get a rewriting of the

10   Code.  But let's go to another issue.

11           All we know is that there are 23 parties who would

12   like to delay this process.  We don't know what's happened to

13   the money over the last 4 years.  We don't know if they

14   fraudulently conveyed that money.  We don't know the

15   collectability.  Mr. Hehn raises that.  He can show us a

16   financial statement.  We're not stupid, we're not crazy.  If

17   the clients can't pay or they can only pay a fragment, then

18   that's what we're going to have to settle for.  We've done

19   that with others.  So he doesn't even have to trust that

20   we're going to do the right thing.  That's what we've been

21   doing throughout the case.

22           But for all I know, the money is gone, or that

23   he'll tell us right before he did one mediation that one of

24   his clients died, so he's not going to go to the mediation,

25   which is somewhat -- which is obvious, when a party is going

1     to die in the middle of a preference action.

2          So the one thing that has also been put in looking

3     at the reports and through the publicly disclosed documents

4     is that, right now, the estimate for noteholders is

5     approximately 34 percent -- I'm sorry -- for unit holders is

6     34 percent recovery, and for noteholders it's about 47

7     percent.  Mr. Hehn --

8          THE COURT:  Do you --

9          MR. PACHULSKI:  -- can try to --

10         THE COURT:  -- actually mean --

11         MR. PACHULSKI:  -- get that --

12         THE COURT:  You said 47 percent?

13         MR. PACHULSKI:  Forty-seven percent for noteholders

14    and thirty-four percent for unit holders.  That's the

15    present, publicly disclosed.  It was in one of our recent

16    reports, Your Honor.

17         And where Your Honor clearly hit the nail on the

18    head is Mr. Hehn is trying to change the Bankruptcy Code

19    because he would like 502(h) to be a credit, a required

20    credit in any preference action.  It's just the opposite.

21    You have to pay to get the benefit of 502(h), but that is not

22    what Mr. Hehn wants to do.

23         So I would like to spend a moment, Your Honor, to

24    project what will happen in two years, if Your Honor grants

25    this motion because, in essence, Your Honor, what Mr. Hehn is

1    really doing is not filing a motion for a stay.  He's really

2    filing a motion to dismiss, effectively, and here's why.

3              We will attend the mediation.  Here's what will

4    happen.  Mr. Hehn will threaten us to seek another stay.

5    Why?  Because he realizes he can't just stay this forever, so

6    he's asked for a two-year stay until the real estate has been

7    liquidated.  We have provided, again, publicly, that we have

8    -- are pursuing significant litigation against -- it was

9    Comerica, which he has disclosed, Your Honor, is a

10   settlement, and against multiple professional service firms

11   who we believe are liable for acts related to Woodbridge.  A

12   lot of that has been unsuccessful and on appeal.

13             And we will go to a mediation.  Mr. Hehn will say I

14   think, even though you are valuing it at zero because it's so

15   speculative, you can get hundreds of millions of dollars, and

16   this is not fair.  That will be one of his arguments, we

17   should stay it again.

18             THE COURT:  Mr. Pachulski --

19             MR. PACHULSKI:  And he will --

20             THE COURT:  -- I'm sorry.  But how much litigation

21   outside of Delaware is going on?  You mentioned appeals.  Is

22   there significant litigation?

23             MR. PACHULSKI:  There is significant litigation,

24   per se, against certain law firms.

25             THE COURT:  Okay.

1      MR. PACHULSKI:  And if that -- and if we lose those

2  appeals, there will be very insignificant litigation, Your

3  Honor, because we lost at the lower court.  And those appeals

4  will likely be dealt with in the next year --

5      THE COURT:  Okay.

6      MR. PACHULSKI:  -- so we will know more about it in

7  the next year.  But there is that litigation, Your Honor.

8      Mr. Hehn will raise that he -- and he's basically

9  said, you know, you should stay it because I have asked for

10  23 jury trials.  He will tell me that that is going to be

11  very expensive for my colleagues.  He will raise the Ponzi

12  scheme issue that we are not -- that he is not bound by

13  Paragraph (nn) in the confirmation order.

14      He will raise that his clients will appeal if they

15  lose, and they will delay us more.  He will raise the fact

16  that we, right now, are trying to get this case closed, and

17  we've stated it publicly, by February of 2024.  And he's

18  basically asking for a stay to almost that time.  He will

19  tell us --

20      THE COURT:  And --

21      MR. PACHULSKI:  -- keeping the --

22      THE COURT:  -- before --

23      MR. PACHULSKI:  -- case open --

24      THE COURT:  -- you go on with that, can I just ask

25  you a procedural question --

1        MR. PACHULSKI:  Sure.

2        THE COURT:  -- having inherited this case?  Is

3    there -- can the trust terminate and the bankruptcy close and

4    the wind-down entity remain open, or is -- does the trust

5    need to remain open to make distributions?

6        MR. PACHULSKI:  The trust is what makes the

7    distributions, Your Honor.  The trust own -- is -- the wind-

8    down entity is, effectively, a hundred percent subsidiary and

9    the money is upstreamed.

10        THE COURT:  So, when you mentioned February 2024,

11    then the goal would be that both the wind-down entity is

12    complete and the trust is complete at that time.

13        MR. PACHULSKI:  Yes, the goal is to shut down all

14    of this.

15        Now, again, Your Honor, either because of the

16    litigation or because sales are slower, we have the ability

17    to seek extensions of the trust.  But at this point, we are

18    working very hard to meet that date --

19        THE COURT:  So, if --

20        MR. PACHULSKI:  -- but --

21        THE COURT:  If -- that is the date that your trust

22    terminates, without further approval from the IRS or the

23    Court.

24        MR. PACHULSKI:  Correct, Your Honor.

25        THE COURT:  Okay.

1          MR. PACHULSKI:  Basically -- I believe we -- our

2     date is the February 2024 date.

3          THE COURT:  Okay.

4          MR. PACHULSKI:  That is correct, Your Honor,

5     because --

6          THE COURT:  And my apologies for interrupting, but

7     I just want to kind of make sure that I have the procedure

8     down with respect to the case and the trust.

9          MR. PACHULSKI:  Yes, Your Honor.  And in fact, the

10    reason for that, just to put it in perspective, is the

11    confirmation -- the -- I'm sorry.  The effective date of the

12    plan was February 15th of 2019.

13         THE COURT:  '19.

14         MR. PACHULSKI:  The trust was supposed to be in

15    effect for five years.

16         THE COURT:  Right.

17         MR. PACHULSKI:  We would have to seek an extension

18    or it would terminate on its own terms --

19         THE COURT:  Right.

20         MR. PACHULSKI:  -- if we did not get it extended.

21         So the point of the mediation, Your Honor, is the

22    bottom line, Mr. Hehn at a mediation will show up and he will

23    say, based on the litigation that I'm going to cause and the

24    potential appeal, and based on the fact that you have a

25    publicly traded company which is expensive to keep open

1    because, obviously, the costs -- the SEC and related

2    regulatory costs and accounting and related costs, that it

3    will cost you more and, frankly, because we are entitled to a

4    recovery.

5         Let's just use the math.  Even though we think it's

6    47 cents, let's pretend it's 50 cents, that, when you deduce

7    what we would get back and you cost -- deal with the costs in

8    keeping this open for three years, if you recovered 100 cents

9    against us, that will, in and of itself, cost you more than

10   what you will ever recover from us, so you need to dismiss.

11        And that will be the motion to dismiss, which is,

12   getting back to the policy issue, the problem in this -- in

13   not just this case, but in every single case, preference

14   case, because you will have a flood of stay motions

15   throughout the country that Mr. Hehn does not want to deal

16   with and, frankly, Your Honor should not have to deal with.

17        Now, without getting -- Your Honor, I know, has

18   reviewed the pleadings, and I don't want to bore you with

19   going through that and being repetitive.  But I think there's

20   only one real issue, and that is the question that is put out

21   for the standards and Your Honor making the determination of

22   granting a stay is whether the stay would cause a non-movant

23   to suffer unique prejudice from any delay or allow the movant

24   to gain a clear tactical advantage.  It's both.

25        The tactical advantage is he will use, as a sword,

1  as a sledgehammer, all of his right -- defense rights and

2  will seek to get us to dismiss his complaints to the

3  detriment of the victims who, other than receiving the 27

4  percent to date, will not receive the benefit of what his

5  clients received during the 90 days; and, instead, his

6  clients will retain 100 percent.

7  And I would like to say, Your Honor, in conclusion,

8  a few things:

9  Number one -- and Your Honor had asked this

10 question, but it was already in my presentation, so you got

11 ahead of me -- is there is not a single case that can be

12 cited by Mr. Hehn or me or anyone I know of that a stay has

13 been granted with respect to this type of avoidance action,

14 either pre- or post-confirmation.  We could have filed these

15 actions pre-confirmation, and we waited to see where the case

16 was going, and then we decided to file it.

17 And in fact, Your Honor, we made every effort to

18 settle these matters before those complaints were filed, and

19 the complaints were filed when we had no choice.  So we

20 basically waited almost two years to file the first complaint

21 from the time the bankruptcy was filed, so that we could not

22 -- even though confirmation took place just over a year, to

23 try to settle these in the first instance.

24 There is also, Your Honor, not a single case Mr.

25 Hehn has cited that, in determining how to even settle

1   matters, we should take into account the 502(h) credit.

2   That's what he wants, he wants a 502(h) credit.  And there's

3   no requirement.  We could go to the mediation and say, Mr.

4   Hehn, I'm going to shut you down right now, we just want to

5   discuss the amount of the preference.  We have done better

6   than that because we want to treat people fairly, but we're

7   not -- we're certainly not required to do that.

8         Mr. Hehn has also not cited a single case and there

9   actually -- I cannot imagine there is one, that projected

10  recoveries in a disclosure statement are somehow relevant in

11  a preference action.  I've had cases where the numbers go up

12  and I've had cases where the numbers go down.  It is a static

13  number.  Mr. Hehn wants to rely on that static number, but he

14  doesn't want to rely on any other static number, and that's

15  fundamentally wrong.

16        We've already discussed, Your Honor, that, of the

17  675 actions, 69 of those -- all but 69 have been resolved,

18  and even some of those I think have been resolved.  So the

19  movants are asking to be treated better than the 10,000

20  investors who received no preference and the hundreds of

21  preference defendants who have resolved their disputes with

22  the trust.

23        So, right now, Your Honor, we have 23 parties who

24  have received 100 percent of their money back.  We have no

25  idea of the collectability.  They've held onto that money for

1    4 years.  They have -- may be fraudulent conveyance risks,

2    which we have no evidence of, and we may have statute of

3    limitations problems at this point.  And so, basically, we

4    have no information at all relating to the 23 parties because

5    we had hoped we would have gotten that in mediation, but Mr.

6    Hehn is really not interested in that mediation.

7         So, Your Honor, if we want to talk about equity and

8    inequity, to not allow these matters to go forward and allow,

9    finally, for the victims to all be treated equally, would be

10   inequitable and unjust.  And for all of those reasons, Your

11   Honor, I believe that the movants' request should absolutely

12   be denied.  And I very much appreciate Your Honor's time that

13   you've given me today, and I would certainly be happy to

14   answer any questions.

15        THE COURT:  Bear with me one second because I think

16   you answered --

17        MR. PACHULSKI:  Sure, no problem.  Thank you, Your

18   Honor.

19        THE COURT:  I am a little confused about -- and

20   this is just a -- for my reference -- point of reference.  I

21   understood that there were 287 adversaries filed in the

22   Bankruptcy Court here.  Is that accurate or am I miss --

23        MR. PACHULSKI:  There were 600 -- I thought there

24   were more, Your Honor, to be honest.  I'd have to ask my

25   colleagues.  There were 675, and I believe that all but -- I

1   believe about two-thirds were -- I'm sorry.  I think -- I

2   thought about just over one-third were resolved pre-filing.

3   Mr. Robinson would actually have a better answer or Mr.

4   Nolan, as to the exact.  I thought it was 400, but Your Honor

5   may have a lower number.

6                 Mr. Robinson?

7                 MR. ROBINSON:  Hi.

8                 THE COURT:  Hi.

9                 MR. ROBINSON:  Good afternoon, Your Honor.

10                Your Honor, we filed approximately 400 adversaries,

11  I want to say, in the fall of 2019, November, December, a few

12  before, starting earlier.  And we're down to the numbers Mr.

13  Pachulski --

14                THE COURT:  Okay.

15                MR. ROBINSON:  -- referenced, in terms of matters

16  in mediation, matters in default.  But it was approximately

17  400.  I'm --

18                THE COURT:  I think --

19                MR. ROBINSON:  I'm not sure we're --

20                THE COURT:  It must have been 280 when I got on

21  board.

22                MR. ROBINSON:  Yeah --

23                THE COURT:  And that's --

24                MR. ROBINSON:  -- I think that's --

25                THE COURT:  -- probably where --

1    MR. ROBINSON:  -- what -- I --

2    THE COURT:  -- I got that number from.

3    MR. ROBINSON:  Your Honor, right.  I was about to

4    say, when you were -- when you -- when the case was assigned

5    to you, I think we were around that number.  But we -- to Mr.

6    Pachulski's point, we started around 400, and we're down to a

7    much lesser number, in terms of those in mediation.  I think

8    it's around 60.  That number, frankly, it changes daily, as

9    the mediators provide updates.

10   And also, the default numbers change daily, as we -

11   - as your team in chambers can tell you, as we get default

12   judgments entered.  So that number changes, those numbers go

13   down and fluctuate.  But that's where we are, in terms of the

14   numbers, Your Honor.

15   THE COURT:  Okay.

16   MR. ROBINSON:  I hope that answers your question.

17   THE COURT:  No, that does.  Thank you.

18   Mr. Pachulski, was there anything further?

19   MR. PACHULSKI:  No, Your Honor.  I wanted to just

20   answer Your Honor's questions.  And I did think -- I thought

21   it was 400 because I had been falling it, so the 289 was a

22   number I had no familiarity with.

23   THE COURT:  Okay.  Let me just ask one question.

24   The reply discusses the delay in getting properties to market

25   by the wind-down entity.  Does this change the trust's

1    argument at all?

2         MR. PACHULSKI:  No, Your Honor, because we always

3    knew that the -- if I could -- and I hate to do this, Your

4    Honor, but I'm going to give you a little more history than

5    you probably want.

6         The oddity of this -- this is what I refer to --

7    and this is just my reference -- as a "hybrid Ponzi scheme."

8    Most Ponzi schemes is, you know, I will -- you give me $100,

9    I'll give you 15 percent.  Obviously, I can't generate 15

10   percent.  I go to Mr. Hehn and say, give me $100, I'm with

11   you, and then that's a traditional Ponzi.  This was a hybrid

12   because there actually was a business.

13        And to be frank, Your Honor, Mr. Shapiro and

14   Woodbridge actually bought some of the finest properties in

15   Los Angeles.  And when the Chapter 11 was filed, a decision

16   had to be made and a lot of time was spent because we sell in

17   bulk.  And we determined that the estate -- it would cost the

18   estate well over $200 million to just sell in bulk, or should

19   we build it out.  And so we have been building it out.  And

20   we hope soon that all of the properties will be completed.

21        And it would take, depending on the -- and these

22   are unique properties -- between 30 days and maybe 180 days

23   to sell some of them.  All of that has been taken into

24   account in terms of coming up with the dates, as far back as

25   2018.  But some of these properties were in -- were ground-

1    up, many of them were ground-up and would take about 3 years

2    to build.  So none of that has changed, and we've stuck with

3    our February 2024 date with the goal, knowing that many of

4    the properties had to be built.

5          So -- and we have -- and today, our determination

6    is that, by selling the -- by building and then ultimately

7    selling -- because some of these have been built during the

8    process.  There were a number of properties, we're down to

9    about four or five that, by going through the process, that

10   we have done much better for the trust because we had -- Your

11   Honor, the number of hedge funds who showed up and said, oh,

12   I'll buy it in bulk, we knew that, if they were buying it in

13   bulk, it was a mistake to sell them in bulk.  It was an easy

14   decision to make.  So the construction does not change any of

15   that.  We've taken all of that into account.

16          THE COURT:  Okay.  I think that's all the questions

17   I had.

18          Mr. Hehn.

19          MR. PACHULSKI:  Thank you so much again, Your

20   Honor.

21          THE COURT:  Thank you.

22          MR. HEHN:  Your Honor, if I can just respond to a

23   few of the arguments that were made by Mr. Pachulski for the

24   record?

25          THE COURT:  Uh-huh.

1          MR. HEHN:  Number one, I have to start by

2     acknowledging that Mr. Pachulski is a brilliant lawyer.  And

3     on a personal level, I'm grateful for his involvement in the

4     Woodbridge cases because it's part of why -- a very important

5     part of why the creditor returns and outcomes are going to be

6     so high.  And my clients, who I'm very worried about, would

7     be in a worse position, but for his efforts and the efforts

8     of all of the professionals that crafted the plan.  So, in a

9     way, it's his fault we're here because, if we had terrible

10    outcomes, I wouldn't have filed the motion.

11          Having said all of that, I still think,

12    respectively, that he's wrong in this particular case, and

13    that's what I want to try to explain to the Court with

14    respect to rebutting a few of the arguments, if I can.

15          Mr. Pachulski is a brilliant lawyer, and that's why

16    he did not argue back to me and the Court the motion that I

17    filed.  He drafted a new motion for me that I did not file

18    that creates a much stronger case for him, which is, namely,

19    that I am seeking, in essence, to file a motion to dismiss

20    these cases.  That's simply not the case, Your Honor.

21          All we're asking for, all the movants are seeking

22    to do is to delay the ultimate resolution that's going to

23    happen.  Nothing is going to change the legal standards,

24    nothing is going to change the substantive law.  It will put

25    us in a position, though, where we know, we actually know

1    what net preference liability is going to be.  And I think

2    that will enable settlements to happen that could have life-

3    altering impacts on my clients because it would minimize the

4    amount of money they have to pay.  I'm not saying that they

5    get off the hook, they don't have to pay anything.  I'm just

6    saying they're not paying more than what their preference

7    actually as, number one.

8         Number two, Your Honor, I am not trying to rewrite

9    the Bankruptcy Code.  Part and parcel of the Bankruptcy Code

10   is the Bankruptcy Court.  And part and parcel of the

11   Bankruptcy Court is the inherent power that you have over

12   your docket.  And this goes back, before our time, back to

13   England.  I mean, we're, in essence, having a debate on the

14   place of law and equity.  Equity evolved over time because

15   law was inadequate, it created hardships.  And that's what

16   I'm basically premising the motion off here, Your Honor,

17   again, the Bankruptcy Code and law sometimes being a blunt

18   instrument.

19        I think we can use equity like a scalpel and have

20   surgical precision to eliminate the trauma that will be

21   harmed by this blunt instrument, while still preserving

22   fidelity to one of the primary principles of the preference

23   statute, which is the equal treatment for similarly situated

24   creditors.

25             THE COURT:  But aren't you -- at bottom, aren't you

1    having 502(h) serve as an offset?  Isn't that really what you

2    want?  You can call it, you know, an equity that the Court

3    can impose.  But to do that, aren't -- isn't what I'm really

4    doing here is being asked to modify Section 502(h)?

5            MR. HEHN:  No, you're not being asked to modify it.

6    You're not being asked to take any kind of action like that.

7    You're just being asked to stay the matter.  If, in

8    negotiations, I can, with the liquidating trustee's

9    professionals, reach settlements where -- that account for

10   that, that actually look at the net preference liability,

11   that's one thing.  But that has nothing to do, Your Honor,

12   with respect to the relief that we're asking for the Court.

13   And if we aren't able to reach a settlement, that argument

14   still exists for the liquidating trust.  You know, if they

15   don't want to settle for what the parties believe is a net

16   preference liability, they can proceed with litigation.

17           But the problem is --

18           THE COURT:  But then --

19           MR. HEHN:  -- Your Honor --

20           THE COURT:  why should I stay?  Because if you're

21   already at an impasse -- and I'm not suggesting that you are.

22   But if the parties were to discuss it and are at an impasse

23   where they're going to go and issue -- litigate issues such

24   as what you deem the net preference or Section (nn) of the

25   confirmation order, why wouldn't we just proceed forward?

1          MR. HEHN:  Your Honor, respectfully, my opinion, to

2     be able to settle a preference action before you proceed with

3     litigation, you have to be able to value it.  You have to be

4     able to know what you think the real preference liability is.

5     There's two sides to that coin:  One is the defense side

6     because that reduces the preference liability; the other is

7     what's the actual amount of the preference.

8          And with respect to tactical advantage, we're --

9     that was one of the arguments raised by Mr. Pachulski that I

10    think relates to this point, Your Honor.  We aren't seeking

11    to gain a tactical advantage.  The tactical advantage right

12    now exists from the perspective of the trust because we do

13    have complaints that have been filed.  They're seeking to

14    avoid and recover the full face amount of those complaints

15    when we all know the underlying reality is that not all of

16    the transfer would be preferential.  There would be some type

17    of credit, ultimately, for it.

18          And the problem I have with my clients, Your Honor,

19    is they are real people.  They're not companies, they can't

20    absorb these costs, this isn't an abstraction for them.  Let

21    me give you a for instance.

22          I have a married couple, Floyd and Lavonne Davis,

23    Floyd is 89, Lavonne is 87.  They live in Colorado.  Their

24    preference claim is $300,000.  They can't pay $300,000 in

25    order to preserve their 502 claim rights.  But what are they

1    supposed to do?  Are they supposed to sell their house?  Now

2    I have to try to help these people.

3        You know, in terms of the economics, Your Honor,

4    I'm not doing this litigation to make a whole bunch of people

5    for these people.  This is -- a lot of my clients are like my

6    grandma and my grandpa, if they were still alive.  They will

7    either get my services at a reduced rate or free because I

8    think they're facing a terrible situation here, and

9    potentially an injustice, if they have to pay more than what

10   the actual true economic preference liability is.  And I

11   think we can avoid it.  And that's why we beseech the Court

12   for the relief sought in the motion.  We can avoid that

13   without doing damage to the Bankruptcy Code or to the trust

14   by delaying this.

15       And if, in fact, the trust -- all of the properties

16   are going to be sold and we're going to have a number by

17   February 24th, I don't think that is such a material delay

18   that it would harm the trust.

19       THE COURT:  But it --

20       MR. HEHN:  And --

21       THE COURT:  Okay.

22       MR. HEHN:  And Your Honor --

23       THE COURT:  Excuse me just one second because I

24   want to talk this through with you.

25       So, if, come February 24th, the wind-down entity

1    has sold properties and the trust has paid off or made

2    distributions to creditors, at that point, the trust is to be

3    terminated, right?  Under the plan, this is a five-year

4    trust.  At that point, doesn't the trustee then have to keep

5    the trust open to address the 23 adversary proceedings?

6            MR. HEHN:  If that was all that remained to be

7    done, I would agree with that point, Your Honor, and I think

8    that would be prejudicial.  But Mr. Pachulski just mentioned

9    that there is other significant litigation that's going to

10   keep the trust open because, if they're successful with that,

11   they're going to have to have distributions.  If that's

12   already going to be there, we are not causing harm by

13   delaying until February 24th.

14           THE COURT:  Let me ask you one other thing.  I want

15   you to address the floodgates argument.  No one has cited a

16   case where a court has stayed adversaries to allow parties to

17   settle once they know the value.  Does this have --

18           MR. HEHN:  Your Honor --

19           THE COURT:  -- ramifications beyond your 23

20   defendants?

21           MR. HEHN:  Your Honor, nobody has cited a case yet

22   because you have not yet ruled.  I'm hoping that you will

23   rule in favor of the movants and then there might be

24   precedent out there.

25           However, having said that, I think the reason that

1  you don't see any decisions on this is because it's such a

2  unique set of circumstances.  These are very significant

3  creditor returns.  This is very atypical in a bankruptcy

4  case.  This is not my experience, as a person who defends

5  preference defendants, that you have these types of

6  significant returns, where this becomes a problem.

7          In addition, Your Honor, if a company is the target

8  of a preference defense or a business or an individual

9  working as a business, I think it's a completely separate

10  thing because part of the policy is to deter those types of

11  folks from taking aggressive action that would denude a

12  debtor of assets before the bankruptcy filing, and also to

13  have equal treatment of similarly situated creditors.

14          These folks are almost all retirees.  They didn't

15  take any action to put themselves in the position that

16  they're in, other than having the misfortune of investing

17  with the debtor.  With respect equal treatment of similarly

18  situated creditors, there's no ability for them, like a trade

19  creditor or somebody else in that capacity, to take the hit

20  on the preference and pass it along to others.  It has to

21  come out of their Social Security and their savings, and it's

22  going to have a significant impact on them.  So I would say

23  you are not going to have floodgates across the country

24  because there are so few cases where you have this

25  constellation of circumstances arising.

1          Also --

2          THE COURT:  But it would --

3          MR. HEHN:  -- equity is --

4          THE COURT:  It would --

5          MR. HEHN:  -- always --

6          THE COURT:  -- apply in all Ponzi scheme cases,

7    wouldn't it?

8          MR. HEHN:  No.  It would only apply if a court

9    says, under the unique facts and circumstances of the matter

10   before it, where you had significant returns, you had

11   retirees, you had people like Floyd and Lavonne Davis, 89 and

12   87.  Under those circumstances, somebody might convince a

13   court to change or stay the timing of the prosecution of an

14   adversary proceeding.  But I think that's pretty limited and

15   pretty narrow.

16         And I think a testament to that, Your Honor, is the

17   fact that you don't have anybody else here seeking this

18   relief before you.  The pleadings have been on the docket.

19   Everybody knows everybody in these cases.  They know what

20   other people are doing.  You haven't had a ton of folks show

21   up saying me too, me too.  I don't think you've had any folks

22   showing up saying me too, me too.  So I do think it's

23   specific, it's unique.  It's not the type of thing that's

24   going to be repeatable in every -- repeatable in every case

25   or that should worry Chapter 7 Trustees or liquidating

1    trustees.  It's very limited.

2         And really, the breaking principle is every court

3    has discretion to make this decision.  I don't see how this

4    decision could really be binding on any other court.  You

5    have to convince the Court, under the specific facts and

6    circumstances of those cases, that it's appropriate.  And I

7    don't think that's easy to do.  You can see I'm having a

8    challenging time with you and with Mr. Pachulski, so I think

9    it's inherently hard to do.  And that might -- and it takes

10   very unique facts and circumstances, and that might very well

11   be why there are no other cases, at least published opinions,

12   that we can cite to as precedent.

13        I had just a few additional points, Your Honor, if

14   I may.  If I could just have one second to check my notes.

15        (Pause in proceedings)

16        MR. HEHN:  Your Honor, if the estate is really

17   going to be resolved by February 24th -- and that's a matter

18   that's completely in control of the trust and the entity -- I

19   don't think that would be a significant delay for waiting to

20   see what the actual economic outcomes are.

21        And I don't think that we're just relying on a

22   disclosure statement when we make these arguments, Your

23   Honor.  And we put this in our papers.  Judge Carey, in the

24   confirmation order, specifically cited to the analysis that

25   was done by Brad Sharpe, Mr. Chin, all of the lawyers agreed

1   with that.  He said this is part of the evidence upon which

2   I'm basing my confirmation ruling.  So it's not a stray

3   passage in a pleading that we're basing this off of.  It was

4   one of the principal requirements that had to be established

5   before the Court, the best interests of the creditors test,

6   that the Court actually relied on.  The Court said this is

7   the evidence that I'm relying upon. So we think we have a

8   basis for the position.

9        And the last thing I would say to the Court, Your

10  Honor, in addition to all of the foregoing, is these 23

11  people need help.  And the Court isn't just there for debtors

12  and liquidating trusts, it's there for all of the parties.

13  And I think we've made a sufficient enough case, or at least

14  I hope we have, that the Court will use its inherent power to

15  grant these folks the limited relief they need.  And we're

16  not asking that you change anything in the Bankruptcy Code or

17  deviate from any of the standards.  All of that is going to

18  be applicable.  They need the help.

19        And Your Honor, it can't be the case that the

20  relief should be denied because I'm trying to assert all of

21  the potential defenses that they might have.  That's just a

22  fundamental bedrock right that a defendant has to try to

23  limit their liability and there's nothing wrong with that.

24  And I would be remiss if I didn't do these things.

25        You know, the liquidating trust has excellent

1    counsel.  They're very hard to try to pull the wool over

2    their eyes, and I have to try to be equally sharp just to

3    keep up with them.

4           For all of these reasons, Your Honor, the movants

5    respectfully request that you grant the relief sought in the

6    motion, and that you stay the prosecution of the adversary

7    proceedings, I guess until February 24th, since it looks like

8    that's when all of this would be done, and we would know,

9    with mathematical precision, what the number is and nobody

10   would have to guess.  And you might make a real impact, and I

11   do mean a real impact, Your Honor, in the life of an awful

12   lot of senior citizens and retired people that need your

13   help.  Thank you.

14          THE COURT:  Thank you.

15          Is there anything further?

16      (No verbal response)

17          THE COURT:  We are going to recess until 4:30, and

18   I'll make my ruling at 4:30 today, unless that time is not

19   good for the parties.

20          MR. PACHULSKI:  And just to be clear, Your Honor,

21   so we -- are you going to submit it or are we going to get

22   back on the --

23          THE COURT:  No, I'm going to get back online at

24   4:30 today.

25          MR. PACHULSKI:  That will be fine, Your Honor.

1    Thank you.  I just wanted to understand.

2              MR. HEHN:  That is fine, Your Honor.  Thank you.

3              MR. ROBINSON:  And --

4              THE COURT:  Thank you.

5              MR. ROBINSON:  And Your Honor, hi, it's Colin

6    Robinson --

7              THE COURT:  Hi.

8              MR. ROBINSON:  -- for the record.  Your Honor, same

9    Zoom login is okay?

10             THE COURT:  Yeah, I believe so.  I didn't consult -

11   -

12             MR. ROBINSON:  I'll check.

13             THE COURT:  -- the court staff.

14             MR. ROBINSON:  I'll check.

15             THE COURT:  Let me just -- bear with me one second.

16        (Court and court personnel confer)

17             THE COURT:  The same Zoom at 4:30.

18             MR. ROBINSON:  Okay, Your Honor.  Thanks a lot.

19   And we'll file a short notice of hearing that notices that --

20             THE COURT:  Okay.

21             MR. ROBINSON:  -- so it's --

22             THE COURT:  I will take the matter under advisement

23   until 4:30 and I will rule today.  Okay?

24             MR. ROBINSON:  Thank you.

25             THE COURT:  Thank you.

1          MR. PACHULSKI:  Thank you so much, Your Honor.

2          THE COURT:  We stand adjourned.

3          MR. HEHN:  Thank you, Your Honor.

4     (Recess taken at 2:18 p.m.)

5     (Proceedings resume at 4:31 p.m.)

6          THE COURT:  Good afternoon.  We're back on the

7    record in Woodbridge Group of Companies, Case Number 17-

8    12560.

9          Before ruling, I want to thank the parties for

10   their very thoughtful briefs and their engaging and helpful

11   argument this afternoon.

12         Before the Court is defendants' motion to

13   temporarily stay the prosecution of their complaints pending

14   the determination of distribution to Class 3 note claimants

15   under the confirmed plan.  The Court, having reviewed the

16   stay motion and related pleadings and having considered the

17   arguments of the parties, denies the stay motion.

18         The Court has discretion in determining whether to

19   stay a matter.  As Justice Cardozo stated in Landis v. North

20   American Company:

21              "The power to stay proceedings is incidental to the

22              power inherent in every court to control the

23              disposition of the causes on its docket with

24              economy of time and effort for itself, for counsel,

25              and for litigants."

1    In addition, Section 105 of the Bankruptcy Code

2    permits the Court to issue any order, process, or judgment

3    that is necessary or appropriate to carry out the provisions

4    of the Bankruptcy Code.

5    Here, the parties offer competing balancing tests

6    to determine if a stay of an adversary proceeding is

7    appropriate.  The defendants cite the five factors set forth

8    in South Side House, LLC, and the trust advances the three

9    factors set forth in Ever Win International Corp v.

10   RadioShack.

11   Having applied both balancing tests, the Court

12   finds the movant fails to meet the burden to obtain a stay

13   for the following reasons:

14   First, the Court considers the trust's interests in

15   proceeding expeditiously with the adversary proceeding as

16   against the prejudice to harm to the trust from any delay.

17   The trust was established to pursue litigation

18   trust actions and make distributions to the liquidating

19   trust's beneficiaries.  The trustee filed over 400 adversary

20   proceedings and has worked diligently to resolve the

21   litigation, bringing the number of unresolved adversary

22   proceedings to less than 69.  Further, the trustee has

23   represented that he has obtained judgments and entered

24   settlements aggregating $14.6 million and approximately 9.6

25   million in reduction of claims.

If the Court were to grant the stay, progress on
the 23 adversary proceedings would cease and not begin again
for an infinite period of months or years.  The trust would
undoubtedly be prejudiced by additional case management
activities, increased costs, and delay if these defendants'
adversary proceedings are stayed, while the remaining
adversary proceedings proceed in accordance with this Court's
September 4, 2020 scheduling order.  In sum, the prejudice to
the trustee in his global efforts to resolve the adversary
proceedings weighs against granting the stay motion.

The Court next analyzes the interests of and
burdens on the 23 defendants, including whether the
defendants would gain a tactical advantage.

Defendants argue prosecution of their complaints
should be stayed until after the wind-down entity has sold
all of the debtors' assets and distributed the net proceeds
to the trustee.  Defendants argue, at that point, the parties
will know with mathematical certainty the exact net
preference liability for each defendant, which should
significantly assist the parties in settling the complaints.
They argue that, absent a stay, they will either potentially
pay too much to settle their respective complaints or incur
counsel fees resulting from litigation.

The Court finds that it would be fundamentally
unfair to carve 23 defendants out of the litigation process.

1    Staying the adversary proceeding provides those 23 defendants

2    the benefits of mathematical certainty and a tactical

3    advantage that no other defendant, including individual

4    defendants, has had in these cases.  To stay these

5    proceedings would treat similarly situated defendants

6    differently.

7         The Court observes that the trust is publicly

8    traded.  All the defendants have access to the same financial

9    information with which they can assess their settlement

10   options.  Moreover, if requests for stays such as this

11   request were routinely granted, it would be unduly difficult

12   for trustees to administer a post-confirmation trust and

13   carry out their fiduciary duties.

14        Finally, defendants argue that the stay is

15   necessary to minimize potentially catastrophic economic

16   consequences that they will face for any liability, including

17   overpaying.

18        The Court is sympathetic to the economic

19   circumstances that paying the avoided transfers will bring

20   upon the defendants, especially given that they are elderly

21   and retired individuals.  The Court appreciates that the

22   amount in controversy for the 23 defendants is approximately

23   4.6 million, averaging $200,000 per defendant.  Such are the

24   devastating consequences of a Ponzi scheme.

25        And the trust is attempting to put people on an

equal playing field and maximize recovery for all victims.

The defendants here are net winners who profited from the

Ponzi scheme and were repaid in full with interest prior to

the bankruptcy filing.  Without diminishing the defendants'

economic hardship, the Court cannot prioritize defendants

over the beneficiaries, some of whom are also elderly and

retired individuals and who find themselves in the same

economic circumstances as the defendants or the other

defendants in this case.  For these reasons, the interests of

and burden on the movants weigh against granting the stay.

The Court is motivated to keep all litigation

moving as expeditiously as possible and has the inherent

power -- excuse me -- to control its docket.  Defendants' 23

adversary proceedings are only a fraction of the avoidance

litigation pursued by the trust.  Judicial economy is better

served by having all the adversary proceeding proceed in

concert, consistent with the scheduling order previously

entered by the Court.

If every victim defendant in these adversary

proceedings sought a stay, the adversary proceedings and the

administration of this trust would come to a halt.  In

addition, granting a stay will not simplify the issues for

trial because certain of the underlying issues that

defendants have raised and the applicable law will remain

unchanged.  Moreover, settlement is not guaranteed, even if

1  this Court grants a stay.  Therefore, the interests of the

2  Court favor denying the stay.

3         The interests of persons not parties to this

4  litigation also do not weigh in favor of granting a stay.

5  Nearly 8,000 Ponzi scheme victims who are trust beneficiaries

6  rely on the distributions from the trust.  They also rely on

7  the trustee to pursue causes of action and to recover funds

8  for distribution to the beneficiaries diligently and

9  promptly.  These victims will be harmed by staying the

10  adversary proceedings.  Finally, public interest weighs in

11  favor of the swift administration of bankruptcy cases.

12         Taking all of these factors into consideration, the

13  Court denies the motion to stay.  The parties should confer

14  and submit an order under certification of counsel.

15         Is there anything further today, Mr. Robinson or

16  Mr. Hehn --

17             MR. ROBINSON:  I --

18             THE COURT:  -- or Mr. Pachulski?

19             MR. ROBINSON:  Sorry, Your Honor.  There's nothing

20  further for the trust, Your Honor.  Thank you.

21             MR. HEHN:  Your Honor, I would like to thank you

22  for your time and for your diligence and thoughtful decision.

23  Thank you.

24             THE COURT:  Thank you.  And again, I thank you all

25  for your very helpful presentation.  I hope you all have a

1    good weekend.  And we stand adjourned.  Thank you.

2              MR. PACHULSKI:  Thank you, Your Honor.

3              MR. HEHN:  Thank you, Your Honor.

4              MR. ROBINSON:  Thanks, Your Honor.

5         (Proceedings concluded at 4:40 p.m.)

6                         *****

1  <u>CERTIFICATION</u>

2  I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of my

5  knowledge and ability.

6

7

8

9

10

11  _____    October 4, 2021

12  Coleen Rand, AAERT Cert. No. 341

13  Certified Court Transcriptionist

14  For Reliable