UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| | . | Case No. 17-12560(JKS) |
| WOODBRIDGE GROUP OF | . | |
| COMPANIES, LLC, et al, | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| Debtors. | . | |
| . . . . . . . . . . . . . . . | . | Tuesday, October 19, 2021 |
| MICHAEL GOLDBERG, as | . | |
| Liquidating Trustee, | . | Adv. Proc. No. 19-51027(JKS) |
| | . | |
| vs. | . | |
| | . | |
| KENNETH HALBERT. | . | |
| . . . . . . . . . . . . . . | | |

TRANSCRIPT OF VIDEO HEARING RE:  ORAL ARGUMENT ON PLAINTIFF'S
MOTION FOR LEAVE TO FILE AMENDED COMPLAINT
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Plaintiff/
Liquidating Trustee:          Richard Pachulski, Esq.
                              Colin R. Robinson, Esq.
                              Jason Pomerantz, Esq.
                              PACHULSKI, STANG, ZIEHL
                               & JONES, LLP

                              Robert Pfister, Esq.
                              Michael L. Tuchin, Esq.
                              Jonathan M. Weiss, Esq.
                              KTBS LAW, LLP


(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by Madeline Dungey, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA ZOOM:   (Continued)

Plaintiff/
Liquidating Trustee:          Michael Goldberg, Esq.
                              AKERMAN, LLP

For the Woodbridge
Defendants:                   Michael Joyce, Esq.
                              JOYCE, LLC

For the Defendant
Kenneth Halbert:              Gregory Hauswirth, Esq.
                              Patrick Carothers, Esq.
                              LEECH, TISHMAN, FUSCALDO
                               & LAMPL, LLC

Also Appearing:               Ian Bifferato, Esq., Mediator
                              THE BIFFERATO FIRM, PA

                              Nicholas Troszak
                              Thomas Jeremiassen
                              "DSI"

                              Uday Gorrepati
                              "ABI PROJECT"

                              Matthew Breen
                              Paula Subda
                              U.S. BANKRUPTCY COURT
```

INDEX

                                                    Page

ARGUMENT BY MR. PFISTER                                6

ARGUMENT BY MR. CAROTHERS                             35

FURTHER ARGUMENT BY MR. PFISTER                       54

COURT DECISION                                 (Reserved)

1       (Proceedings commence at 3:07 p.m.)

2              THE ECRO:  All right.  Very sorry about that.

3    Counsel, you are live in the courtroom and the hearing is

4    about to begin.  Please remember to state your name for the

5    record when you speak and every time you speak.  Please keep

6    your video off and stay muted if you are not speaking to the

7    Judge, so the Judge can concentrate on the parties that are

8    presenting at the time.  Thank you.

9              THE COURT:  Good afternoon, Counsel.  This is Judge

10   Stickles.  We apologize for that delay.

11             We are on the record in the case of Woodbridge

12   Group of Companies, Case Number 17-12560.  This is the oral

13   argument on plaintiff's motion for leave to file an amended

14   complaint in the Goldberg v. Halbert adversary proceeding,

15   Number 19-51027.

16             Before the parties proceed this afternoon with

17   their argument, I would ask that each of you address whether

18   the Cureton standard applies to this contested matter; and,

19   assuming so, which of those factors are at issue from your

20   client's perspective.

21             And with that, I'll let the trustee's counsel

22   begin.

23             MR. ROBINSON:  Good afternoon, Your Honor.  Colin

24   Robinson, Pachulski, Stang, Ziehl & Jones.

25             THE COURT:  Good afternoon.

1          MR. ROBINSON:  I'll be -- good afternoon.  With me

2    today is Mr. Rob Pfister, who will be handling the oral

3    argument today for the liquidating trustee.

4          Your Honor, also, Mr. Thomas Jeremiassen, who

5    submitted a declaration in support of the motion, is here

6    from DSI.

7          And Your Honor, last, but not least is Mr. Michael

8    Goldberg, who is the liquidation trustee.

9          And we just wanted to take this opportunity to

10   introduce you to Mr. Goldberg, we haven't had a chance in the

11   prior hearings.  And since Your Honor took over the cases, we

12   thought this would be a good opportunity.

13         THE COURT:  Okay.  Terrific.  Nice to meet you, Mr.

14   Goldberg.

15         MR. GOLDBERG:  Likewise.  Good afternoon, Your

16   Honor.

17         THE COURT:  Good afternoon.

18         MR. ROBINSON:  Your Honor, just by way, I -- we

19   always like to give you -- even though we have one item on

20   the agenda today, the oral argument, I just wanted to give

21   you one kind of quick update as we proceed with the other

22   adversary proceedings because we did file a stratus report in

23   September.  Mid-October, I think we have hearings set at the

24   end of the month on several summary judgment motions -- I'm

25   sorry, motions for default judgment.

1          So our numbers -- as I said in our last hearing on

2     an unrelated matter, our numbers change weekly and monthly.

3     So the numbers that we have in default, which is around 135,

4     will be down to about 100 by the end of this month.  We will

5     have a couple of the default matters come back open.  I think

6     a good result sometimes of default is actually parties wake

7     up and they get in touch with you, so we expect to actually

8     put a couple of matters back on the mediation track.  So,

9     just general numbers, that's where we are.  That's the real

10    only adjustment.  We'll have about 60 matters open, 100 left

11    that we're pursuing default, either an entry of default or

12    the default judgment stage.  So that's where we are on the

13    adversary proceedings, in general.  I just like to get the

14    court updated.

15         And then I'll turn it over to Mr. Pfister, if

16    that's okay, Your Honor.

17         THE COURT:  Thank you -- certainly.  Thank you, Mr.

18    Robinson.  I appreciate the update.

19         MR. ROBINSON:  You're welcome.

20         THE COURT:  Mr. Pfister --

21         MR. PFISTER:  I think I'm muted.

22         THE COURT:  Good afternoon.  I couldn't hear you.

23         MR. PFISTER:  I apologize, Your Honor.  Rob Pfister

24    from the Klee Tuchin firm on behalf of the trustee.  It's a

25    pleasure to appear before Your Honor today.

1            I want to address the question that you asked at

2    the outset, which is which of the Cureton factors are before

3    the -- or are at issue in the case.  The Cureton factors are

4    whether the plaintiff's delay in seeking the amendment is

5    undue, whether it is motivated by bad faith, or whether it is

6    prejudicial to the opposing party.

7            In our judgment, the only -- in our understanding

8    of the arguments, the only issue that has been raised in

9    opposition is undue delay.  There is in the opposition brief

10   a brief mention of bad faith.  I'm certainly going to address

11   that.  There has, in our judgment and in our view -- and I

12   hope to persuade Your Honor, there has been no bad faith, but

13   they do make a bad faith argument, a brief one.

14           And then prejudicial delay, which is different than

15   undue delay.  They also make a prejudicial delay argument.

16   But as I hope to explain in a few moments, I don't believe

17   prejudicial delay is truly at issue here.  So I think this is

18   entirely an undue delay case -- an undue delay argument by

19   the defendant, in terms of the Cureton factors.  Did that

20   answer Your Honor's question?

21           THE COURT:  Yes, it does.  Thank you.

22           MR. PFISTER:  Thank you.

23           So I'd like to start with a brief overview of Ponzi

24   scheme principles.  These are, I believe, undisputed, at

25   least for purposes of this motion, but I believe they set the

1  framework for understanding what happened here and the time

2  line on which it happened.  And I believe they're very

3  important in assessing the question of undue delay and in

4  assessing the question of bad faith.

5        In Ponzi schemes, there are net winners and there

6  are net losers.  When a Ponzi scheme comes crashing down, as

7  the Woodbridge Ponzi scheme did, there are always more net

8  losers than net winners.  By "net losers," we mean

9  individuals who ultimately took out more from the Ponzi

10 scheme than they put in.  So, if they put in $100 and they

11 received returns of $110, they are a net winner in the sense

12 that they got $10 more than they put in.

13        THE COURT:  That's a net winner, correct?

14        MR. PFISTER:  That's a net winner --

15        THE COURT:  Okay.  I --

16        MR. PFISTER:  -- correct.

17        THE COURT:  I just -- I misheard you.  Okay.  But

18 we're on the same page.

19        MR. PFISTER:  Okay.  I may have -- if I said that's

20 a net loser, I misspoke --

21        THE COURT:  I might --

22        MR. PFISTER:  -- and I --

23        THE COURT:  -- have --

24        MR. PFISTER:  -- apologize.

25        THE COURT:  -- misunderstood you.

1          MR. PFISTER:  Okay.  And a net loser then, by

2     contrast, is somebody who took out less than they put in.

3     So, if they put in $100 and they got back $90, they are a net

4     loser by the amount of $10.

5          Now the vast majority of people who invested in the

6     Woodbridge Ponzi scheme, which raised approximately $1.2

7     billion from nearly 10,000 investors, the vast majority of

8     those people, upwards of 80 percent of them, were net losers;

9     that is, they withdrew less than they had put in.  Those

10     individuals are the beneficiaries of the Woodbridge

11     Liquidation Trust, of which Mr. Goldberg is the trustee, and

12     on whose behalf he brings this action.

13          The net winners, by contrast, those individuals are

14     defendants in avoidance actions.  And the law is very clear

15     that, for net winners, the amount that they received from the

16     Ponzi scheme in excess of what they put in -- that is, their

17     profits -- those are absolutely always recoverable as actual

18     intent fraudulent transfers; not because the participants

19     themselves -- that is, the investors -- had fraudulent

20     intent, but because the Ponzi scheme itself was an actual

21     intent fraud.  And the law is clear that the relevant intent

22     in that regard is the Ponzi schemer's intent.

23          So -- and so people who have been sued as net

24     winners to return their fictitious profits, the law is very

25     clear that those profits aren't real profits; they are simply

1  funds that were stolen from other investors, the net losers,

2  and those have to come back and those are recoverable.

3       Almost always -- and I'll get to the "almost" --

4  but almost always, the net winners are allowed to keep the

5  principal that they received that was back -- that was

6  received back.  So, going back to our initial example, the

7  net winner who put in $100 and received $110 back, the $10

8  absolutely comes back no matter what, regardless of good

9  faith, regardless of anything else.  The $100 that the person

10  invested almost certainly is not recoverable as a fraudulent

11  transfer in the vast majority of cases.

12       The reason is because of an affirmative defense

13  under Section 548(c) of the Code.  And this tracks in

14  analogous provisions of state law that have adopted the

15  Uniform Fraudulent Transfer Act or the Uniform Voidable

16  Transfer Act.  And it provides that a defendant, to the

17  extent that the transferee gave value to the debtor in

18  exchange for such transfer, then that portion of the transfer

19  is unavoidable.

20       In the vast majority of cases, a person who put

21  $100 into a Ponzi scheme and got back $110 has a 548(c)

22  defense as to the $100 that he or she put in; and, therefore,

23  that amount would not be recoverable as a fraudulent

24  transfer, whether under the Bankruptcy Code or under

25  analogous state law.  It's -- the reason -- but the reason

1  for that is the 548(c) affirmative defense.

2          Now the law is clear, both in the -- in 548(c) and

3  in analogous state law, that it is technically an affirmative

4  defense that the defendant must plead and prove, in order not

5  to have to return the $100 of invested principal.

6          And I think it is very important here, in terms of

7  setting the stage, to understand that, if the trustee had

8  been so inclined, he could have sued every single net winner

9  and demanded both the return of their fictitious profits and

10  the return of the principal that they had invested, and then

11  required each of those net winners to file an answer, plead

12  the 548(c) affirmative defense of value and good faith, and

13  prove that those individuals acted in good faith, and forced

14  everyone to jump through those hoops, in order to get a

15  creditor or not have to return the amount of principal that

16  they invested.

17          Now the reason that the trustee did not do that is

18  because the trustee is a fiduciary, he cares deeply about the

19  victims of the Woodbridge Ponzi scheme, and he has

20  obligations when he is deciding how to commence litigation.

21  His obligation is to take into account the cost and expense

22  that litigation will bring, the burdens that it will put on

23  his own counsel to force everyone to plead and prove these

24  and to really make settlement very difficult, and then the

25  amount of expected, you know, return that that would have an

1    effect on.

2         And it would have a great effect because, if every

3    net winner got a lawsuit that said you have to return every

4    single dollar you put in, including amounts that are -- every

5    single dollar that you got back -- pardon me -- including

6    amounts that are just a return of principal, first of all, it

7    would cause great consternation among defendants and more

8    than the consternation of simply being sued, which is, in and

9    of itself, certainly, not a pleasant experience.  And then it

10    would force them to litigate the case, again, as though it

11    were a hundred-and-ten-dollar case in our example, as opposed

12    to a ten-dollar case, which is a case to get back just the

13    fictitious profits.

14         In addition to stress and strain and legal costs,

15    that is going to reduce, ultimately, the recoveries that the

16    trustee is likely to get because, in these cases, when the

17    trustee files hundreds of actions and attempts to mediate and

18    resolve those actions as consensually as possible and present

19    only those disputes to the Court that require the Court's

20    intervention, that benefits everybody.

21         It certainly benefits the trust, in the form of

22    legal fees.  It benefits the Court, in the sense of not

23    having to hear and decide disputes that don't need to be

24    brought before it.  It benefits the defendants, in terms of

25    not having to defend against an allegation that they have to

1    return every single penny they received from the Ponzi

2    scheme.  And ultimately, it results in much greater

3    settlements because the less that is spent on legal fees, the

4    more that parties can come to the table in mediation,

5    ideally, and reach a resolution.  So that is really an

6    appropriate way of proceeding, the decision not to assume

7    that everybody acted in bad faith, but instead to proceed on

8    the assumption and to seek recovery of the fictitious profits

9    only.

10          This case bears that out.  Of all of the adversary

11    -- well, of all of the demands -- because, importantly, when

12    the trustee -- and we indicate -- these are the numbers in

13    Paragraph 16 of our reply brief that Mr. Robinson averted to.

14    But the trustee initially pursued claims against 675

15    potential defendants, but was able to reach resolution with

16    250 of those defendants without ever initiating litigation.

17    So demand letters go out, parties engage in constructive

18    dialogue, agreements are reached, and the matter was resolved

19    prior to an adversary proceeding ever hitting the docket.

20          Adversary complaints were filed in 425 others.  And

21    of those, 230 have been consensually resolved, aside from the

22    -- a few potential additional ones that Mr. Robinson

23    mentioned -- 136 are in various stages of the default

24    process, and now there's just 55 that are open.  So this

25    strategy of pursuing only what the trustee believed would be

the likely outcome and the likely liability of each defendant

had great dividends in this case, in terms of streamlining

this litigation for the parties and the Courts.

The other thing I will note there is 136 default

judgments.  An individual who has a default judgment, if the

trustee had pled you must return the entirety of the

transfers that you received, individuals, for any number of

reasons, may not be able to mount a defense to a complaint.

And those default judgments, had they been predicated on the

notion that each and every one of those defendants was not

likely to be able to avail himself or herself of the good

faith affirmative defense, those default judgments would be

in amounts greatly more than they are.  And frankly, if we

were to examine the facts of the cases, amounts that are

likely not factually appropriate, assuming that there was no

issue as to the defendant's ability to plead and prove the

bad faith -- or the good faith defense.

So I think that's an important overview because I

think it frames why the trustee proceeded the way he did in

the course of bringing these actions and pursuing these

defendants.

Now, of all those numbers I gave you and of all the

individuals and defendants that the trustee has pursued,

there is precisely one, to date -- and we know of no others -

- there is precisely one -- and this is, again, strictly in

1    the context of the net winner lawsuits; we're not talking

2    about brokers or anything like that -- but there is precisely

3    one net winner for whom the trustee has developed very

4    serious, grounded -- well grounded suspicions that this

5    individual -- and that's Mr. Halbert, whose case we're here

6    today on -- is unlikely to be able to avail himself of the

7    548(c) affirmative defense; one person out of six -- out of

8    hundreds of lawsuits that were filed.

9         I'm going to give a very brief overview of the

10   evidence that we set out in our motion to amend.  But I'm

11   going to preface that by saying, first of all, the other

12   side, in its opposition, didn't contest any of this.  They

13   have the full right to contest the merits of the case, if the

14   Court grants leave to amend and this is the new operative

15   complaint; obviously, they can take issue with these facts.

16   But for purposes of this motion, I believe these facts are

17   undisputed for purposes of whether to assess leave to amend.

18        Now -- so this goes to why does the trustee believe

19   or have good cause to believe that Kenneth Halbert may not be

20   entitled to the 548(c) affirmative defense of good faith,

21   which is his burden to plead and prove.

22        First of all, Mr. Halbert's loan documentation is

23   different than the loan documentation of every other investor

24   of which the trustee is currently aware.  In particular, his

25   loan documentation appears to have granted him liens on the

1    actual underlying properties that were part of the Ponzi

2    scheme, as opposed to liens on LLC interests, which were all

3    determined to be unperfected and avoidable.  Mr. Halbert

4    appears to have negotiated this -- these direct liens on the

5    properties themselves in a way that is different than

6    everyone else did.

7         Mr. Halbert's payments.  He -- when he made

8    transfers to the debtors, those transfers went to the same

9    entities that everyone else's transfers went to; that is, to

10   the fund entities and the like.  But Mr. Halbert's payments

11   came from entities that are different than the entities that

12   he loaned the funds to.  So, if he made a check out, in terms

13   of sending his -- or sent a wire transfer of his initial

14   investment, when he received a check or wire transfer back,

15   it came from a different entity than the one he had allegedly

16   owed the money to.  That situation also appears to be, at

17   least so far as we can tell, unique to Mr. Halbert.

18        More importantly, I think, Mr. Halbert was privy to

19   loan documentation where Mr. Shapiro himself signed as the

20   manager of the Owlwood entity.  And he was also -- his son

21   had a finder's fee agreement to help find a third-party buyer

22   for the Owlwood entity.  Let me explain why that is so

23   problematic.

24        A central lie of this Ponzi scheme, of the

25   Woodbridge Ponzi scheme, was that the debtors were hard money

lenders who lent money to unaffiliated third parties to buy

property, and then took a lien on that property, and the

money was being lent to unaffiliated third parties.  By

seeing, in black and white, the signature of Robert Shapiro

as Manager of the Owlwood entity, for example, the

inescapable conclusion is that he was aware that the Owlwood

entity that owned the property was not a third-party buyer.

By having -- by seeing that his son was entering into a

finder's fee agreement to find a third-party buyer for the

Owlwood Estate, that is irreconcilable with the central

thesis of Woodbridge and the Woodbridge Ponzi scheme, which

is that these properties were owned by third-party buyers.

We have other evidence, as well, that we've

included in the motion -- in the declarations in support of

the motion to amend:

Personal correspondence, where Mr. Halbert would

engage in emails directly with Mr. Shapiro.  He would be

offered special deals.  He would be offered the use of Mr.

Shapiro's properties in Colorado for vacation homes.  He

appeared to have a direct line of communication to Mr.

Shapiro, if he thought anything was amiss, in the form of an

interest payment or the like.  This level of communication is

something, again, we have not seen.  This level is access is

something we have not seen.  But most importantly, this level

of bright, shiny red flags that all was not well, all was not

1    as was being represented with respect to Woodbridge is, in

2    fact, so far as we are aware, unique to Mr. Halbert and to no

3    other investor.

4           And again, in the opposition to the motion to

5    dismiss -- motion to amend, the defendant never says, you

6    know, it's a different Kenneth Halbert whose son signed that

7    finder's fee agreement; or I never saw this paper, where Mr.

8    Shapiro signed as manager; or, you know, any other factual

9    defense to these types of allegations.

10          Now, again, I'm not saying that defense -- I'm not

11   saying he can't defend on those grounds in the course of

12   ordinary -- of litigating this adversary proceeding.  What I

13   am saying is, is that, for purposes of what's before Your

14   Honor today, whether we have -- why we are seeking leave to

15   amend, the evidence stands unrebutted on this motion that

16   Kenneth Halbert is uniquely differently situated than every

17   other net winner defendant who the trustee has sued.  So I

18   think that's the important background, both in terms of the

19   Ponzi scheme as a whole and with respect to Kenneth Halbert

20   and why, among all of the other net winners, he stands out as

21   completely unique.

22          So, turning then to the Rule 15 standard that Your

23   Honor opened the questions with, the first thing I would

24   notge about the standard is, is that (indiscernible) freely

25   given as justice so requires.  This is a matter where the

1  Court has substantial and considerable discretion in

2  considering the factors.  The Third Circuit has set out

3  certain guideposts that the Court should consider, including

4  in the Cureton case.  But ultimately, this is a question that

5  comes down to Your Honor's weighing of the situation and

6  application of what does justice require.

7          Undue delay is what I believe is the primary, if

8  not sole argument that's offered on the other side.  There is

9  no question that there is a temporal delay between the filing

10  of the adversary complaint and the filing of the motion to

11  amend.  That is a calendar fact.  There were -- I believe the

12  emphasis is on 19 months that elapsed from the filing of the

13  original complaint to the filing of the motion to amend.  The

14  -- and that is a delay.  The question, though, is not whether

15  was there delay; the question is, is whether there was undue

16  delay.  And to determine whether there was undue delay, the

17  Court has to look at the entire facts and circumstances

18  before it.

19          The most important of those facts and

20  circumstances, I would submit, Your Honor, is the scheduling

21  order and the parties' agreements with respect to scheduling

22  in these adversaries.  We cited Your Honor to the scheduling

23  order that's at Docket 23 in the adversary proceeding.  This

24  is identical to scheduling orders that were entered across

25  the board in these adversary proceedings, when hundreds of

1  adversary proceedings were filed.

2      The scheduling order gave the parties -- and

3  ultimately, it gave the defendant because both parties had to

4  agree -- so it gave the defendant a choice:

5      Choice number one, which was absolutely available

6  to the defendant, was to proceed immediately down the

7  litigation path.  And if the defendant -- the defendant did

8  not need the plaintiff's consent for this.  It could have

9  unilaterally demanded to litigate the adversary proceeding

10  promptly and at full bore.  So the complaint was filed in

11  twenty nine -- December of 2019; the answer was filed in

12  January of 2020.

13      Under the scheduling order, initial disclosures

14  would have been due in October of 2020, all fact discovery

15  would have been completed in January of 2021, expert reports

16  would have been due in February, all expert discovery would

17  have been done by June, dispositive motions would have been

18  done by July 1 of 2021.  That was an option available to the

19  defendant and it was an option available to every other

20  defendant who was sued by the trustee at the defendant's

21  option.

22      THE COURT:  Did any defendant accept that option?

23      MR. PFISTER:  To my understanding -- and I'll ask

24  Mr. Robinson to correct me if I'm wrong -- but to my

25  understanding, the answer is no.

1    MR. ROBINSON:  That's correct, Your Honor.

2    THE COURT:  Okay.  Thank you.

3    MR. PFISTER:  So, as I believe -- and Mr. Robinson

4    concurs -- as I believe every single defendant decided, the

5    better route here, when a mass of adversary complaints have

6    been filed, the -- an appropriate route would be to, instead,

7    see if the parties could suspend discovery and all progress

8    towards trial and see if they could reach a mediated

9    resolution.

10   As the numbers that I previously discussed with

11   Your Honor indicate, when we went from 600 plus people being

12   approached with demands, hundreds of them settling before

13   suit was even filed; and then, of those hundreds, you know,

14   hundreds more then consensually resolved, this mediation

15   option has proven to be very fruitful and very worthwhile in

16   getting parties to get to a solution that works better than

17   spending a bunch of money on lawyer fees and, you know,

18   thereby decreasing the amount of money that's available and -

19   - to be made available in settlement, and also just the

20   burden of litigation.

21   So, as a result of this scheduling order and as a

22   result of the defendant's decision, conscious decision, to go

23   down the mediation route, all of these deadlines and dates

24   that had been available were suspended.  The parties did not

25   spend time, money, resources on litigating this case to the

1      hilt; and, instead, they went to mediation.

2             Now, in preparation for mediation, as any case that

3      is ever mediated that that is the case, parties prepare.

4      They go through, they assess claims, defenses, and issues in

5      a way that they would have done at the outset of the

6      discovery process as part of the parties' planning meeting.

7      But they do engage in an informal process of figuring out

8      what the issues are between the parties and the like.

9             And as part of that process of preparing, getting

10     ready, and deciding how to proceed with respect to mediation,

11     that is when the trustee became aware, entirely based on

12     documents to which the trustee had access to -- and so I want

13     to be -- I think this is an important point because we'll get

14     to this on bad faith, where the argument on bad faith is, you

15     know, you are penalizing me for participating in mediation,

16     or something.  But the materials that we have relied on and

17     cited to Your Honor with respect to the loans where the

18     payments were made and where the payments came from, with

19     respect to the emails, with respect to the finder's fee

20     agreement for the defendant's son and the like, those are all

21     materials that came from the trustee's possession.

22             And as a result of those materials, it appeared to

23     the trustee that Mr. Halbert is, to date, the one and likely

24     only one of the net winner defendants who has a serious issue

25     on good faith.

1          THE COURT:  I --

2          MR. PFISTER:  And it is for that --

3          THE COURT:  Could I stop you a second?

4          MR. PFISTER:  Sure.

5          THE COURT:  The materials that you're referring to

6    that you became more aware of at the time of mediation, they

7    were materials that were in the trust's possession -- not the

8    "trust" because it wasn't necessarily the trust at the time -

9    - but they were -- you had -- they were available during the

10   bankruptcy.  Is that correct?

11         MR. PFISTER:  That is correct.

12         THE COURT:  Okay.

13         MR. PFISTER:  The -- all of the documents from the

14   debtors are -- became available to the trust when the trust

15   came into existence and the documents were handed over.

16         THE COURT:  Okay.  On the effective date then.

17         MR. PFISTER:  On the --

18         THE COURT:  Okay.

19         MR. PFISTER:  -- effective date, exactly.

20         Now there's an implication, and I want to give a

21   little context to that answer because it is not as though,

22   you know, three -- you know, three boxes of documents came

23   over and said, you know, here's the documents, right?  Go

24   through them.  In fact, this is a mass of information, email

25   -- and much of it is electronic, so archived email accounts

going back to the inception of this Ponzi scheme, you know,

documents and communications, you know, that are effectively

needles in a haystack, to some degree.

So I know the defendant says, well, you had all

this stuff when you filed the complaint, so, gracious, you

know, why didn't you include it in the complaint.  And the

answer is:  It's not, you know, three banker's boxes of

documents that just decided not to go through.  Instead, we

undertook -- the trustee undertook a detailed forensic

examination and is in possession of a large amount of

material.  The materials that we have found are -- as I

would, I think, correctly characterize them, are effectively

needles in a very giant haystack.

So, in any event, we -- that is the genesis of the

motion to amend.  It is not any kind of penalization --

penalty or "retaliation," I believe is the word that's used

in the defendant's opposition brief, in terms of an

allegation of bad faith, for the defendant having mediated.

Indeed, mediation is what we want.  We have been able, in

mediation, to successfully resolve the vast majority of these

claims.  So the trustee has neither the motivation, nor the

incentive, in any sense, to penalize individuals who

participate in the mediation process, by any means.

THE COURT:  Well, was the mediation in this case --

and are my notes correct, was it October 2020?

1          MR. PFISTER:  There were two mediations scheduled

2     in this case:  One was -- there were two mediations

3     scheduled; only one took place.  So there was a first

4     session, I don't have the date off the top of my head.  Oh,

5     I'm sorry.  It was March 17th of 2021.  That was the first

6     mediation, March of 2021.  And then there was a June 14th of

7     2021 mediation that was scheduled, but it was ultimately

8     canceled.

9          THE COURT:  Okay.

10          MR. PFISTER:  So it was March 17 of 2021, and our

11     motion to amend was filed on July 12th of 2021, after the

12     failed -- after the June 14th, 2021 mediation session did not

13     take place.

14          THE COURT:  Okay.

15          MR. PFISTER:  So that is the time line by which we

16     go from 19 months to -- from the inception -- or the filing

17     of the original complaint to the filing of the motion to

18     amend in July of 2021.  It is not a time line where the

19     parties engaged in any discovery.  It did not engage in any

20     briefing, they did not engage in any experts, they did not

21     engage in any trial preparation activities at all.  All they

22     did was gear up to a mediation that occurred once, and only

23     once, in March of 2021.  Then, when the -- it appeared that

24     there would be no likelihood of any success in a June 2021

25     mediation, the trustee then filed the motion to amend.

1        So, going back then to the Cureton factors, we

2   would submit, Your Honor, that, although there is delay --

3   that is, there is a temporal difference between the filing of

4   the original complaint and the filing of the motion to amend

5   -- there is -- on the facts of this case, the temporal delay

6   is not an undue delay when you look at the entirety of the

7   situation, as I think the Court is required to do when

8   assessing whether a delay is an undue delay.

9        The remaining factors, prejudicial delay.  This one

10  is important because I think there's a fundamental disconnect

11  between the parties here.  The case law makes clear -- and

12  this is what we pointed out in our reply brief, emphasized it

13  strongly because I think it's an important point -- that it

14  is prejudice that must result from the delay itself, not

15  prejudice from facing new allegations that you could have

16  faced when the lawsuit was filed.

17       Obviously, no one likes to be subjected to a

18  lawsuit.  Obviously, no one likes to be subjected to a motion

19  to amend that potentially increases the scope of the

20  defendant's liability.  That said, the prejudice, there is no

21  prejudice that is alleged here.

22       THE COURT:  So --

23       MR. PFISTER:  There is no --

24       THE COURT:  Let me make sure I understand your

25  argument.  So --

1          MR. PFISTER:  Sure.

2          THE COURT:  -- an amended complaint that goes from

3     a million-dollar -- and I'm just rounding off numbers --

4          MR. PFISTER:  Uh-huh.

5          THE COURT:  -- a million-dollar allegation to a

6     thirty-five-million-dollar allegation is not prejudice.

7          MR. PFISTER:  It is not prejudice under Rule 15's

8     and Cureton's standard of what is a prejudicial delay because

9     the delay did not -- if the delay, for example, had caused --

10    let's say Mr. Halbert had a start witness that he was going

11    to introduce, and that witness died between the filing of the

12    initial complaint and the filing of the motion to amend.

13    That would be an argument for prejudicial delay, right?

14         But the fact is he could have been sued on these

15    counts, on these allegations.  And I want to caveat the 37

16    million because I don't think it's necessarily -- we're not

17    saying this gone from a one-million- to a thirty-seven-

18    million-dollar case.  We're saying that the amount -- that

19    the principal repayments are subject to avoidance and

20    recovery to the extent that Mr. Halbert cannot show good

21    faith as to each one.  He very well may have a good faith

22    defense as to -- he may have a good faith defense as to all

23    of them, it's possible.  But he very well may have a good

24    faith defense as to certain of the earlier ones, but not the

25    later ones.  Those are fact-intensive issues.  But I don't

want to accept the construct from the defendant this is a million to a 37 million case.

But in terms of what is a prejudicial delay, no. There is nothing that has happened where his ability to defend against the allegations that are set forth in the amended complaint has been prejudiced by the lapse of time. No witnesses have died, no documents have been destroyed, no funds have been expended.  So it is not a prejudicial delay, which is precisely how Cureton reads.  It is -- I'm quoting from the Third Circuit's opinion, "Leave to deny" -- pardon me.

"The Court may deny leave to amend a complaint if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party."

The key word there is "if the plaintiff's delay is prejudicial."  And here, there is no prejudice from the delay.  He's in precisely the same circumstance that he would have been in had these allegations been made on December 1 of 2019.

The defendant next makes a bad faith argument. Again, I think that there is no substance to the bad faith alleged in the opposition, other than there is this significant delay; ergo, there must be bad faith.  The reason I went through the sequence, Your Honor, of the scheduling

1  order and all these other adversary proceeding is, first of

2  all, the trustee takes very seriously any allegation that he

3  has acted in bad faith and is -- those allegations are strong

4  allegations.

5  Here, they are not backed up by anything.  The

6  defendant's opposition brief says it must be in bad faith

7  because 19 months is a long time or because it was after we

8  mediated and we didn't reach a resolution that you then

9  sought to amend the complaint.  That is not bad faith.

10 Handling this lawsuit as every other lawsuit -- adversary

11 proceeding has been handled, in terms of the timing and the

12 scheduling order and mediating first and the like, that's not

13 bad faith.

14 And after the parties failed to reach a result in

15 mediation, when it became clear that there would not be a

16 result in mediation, proceeding with a motion to amend,

17 where, again, there's been no allegation that the factual

18 showing we have set forth as to why there's a serious issue

19 of bad faith here, no allegation that that's incorrect, there

20 is simply no bad faith that has been adequately or clearly or

21 persuasively alleged here.

22 And then the final argument -- and I don't know if

23 it's phrased in Cureton precisely, but I know the defendant

24 makes significant argument about it -- is the so-called

25 "futility" issue.  Futility, traditionally in the Third

1    Circuit case law, is (indiscernible) the complaint state a

2    claim for -- upon which relief can be granted.

3            I don't think there's any dispute here -- in fact,

4    I'm certain there's no dispute here because it wasn't raised

5    in the opposition brief -- that the amended complaint, had it

6    been filed on December 1 of 2019, adequately states a claim

7    against Mr. Halbert upon which relief can be granted; that

8    is, a claim to avoid and recover payments that he received

9    from the Woodbridge Ponzi scheme.  What the defendant has

10   done is said, well, the reason that it would be futile to

11   allow this amendment is because it wouldn't relate back.

12           So, first of all, I'll preface this by saying I

13   don't know -- I don't think the Court has to decide the

14   relation back issue today.  It's not identified in the -- as

15   one of the Cureton factors.  But I think the Court has

16   certainly before it a sufficient record to resolve that

17   issue.  And to say that amendment would not be futile because

18   the new claims -- pardon me -- the amended complaint does

19   relate back.

20           The standard here is in Rule 15(c).  And I think

21   I'll just talk about the standard for a second and then talk

22   about the two circuit cases that I think are the key ones for

23   Your Honor.

24           The standard is:  Does the claim or defense -- did

25   it arise out of the conduct, transaction, or occurrence that

1    was set out in -- or attempted to be set out in the original

2    pleading?  And here, I don't think there can be any dispute

3    that, when we -- the original pleading sets out a claim for

4    avoidance and recovery of fraudulent transfers and lists the

5    precise amounts of interest that are being avoided, and then

6    an amended complaint challenges precisely those same

7    transfers; indeed, some of them that were made, you know, in

8    the same wire transfer.  We pointed this out in Paragraph 25

9    of our reply.  But you know, the same 75 -- seven-hundred-

10   and-fifty-five-dollar interest payment that's reflected on

11   the Halbert ledger of the original complaint, you know, was

12   transferred in the same wire transfer as the one-hundred-

13   thousand-dollar principal repayment that accompanied it on

14   the same day.

15           So, again, I don't know how you could get closer to

16   having the same conduct, transaction, or occurrence than

17   having the same -- literally the same wire transfer payments,

18   the interest portion, and the principal portion.  Interest

19   and principal is inextricably intertwined.  Interest arises

20   out of principal.  And there is -- I don't see an argument

21   that we don't fall within the exact standards of Rule 15.

22           The two circuit cases I'd emphasize for Your Honor

23   are the Bensel case, Third Circuit 2004, where the Third

24   Circuit says:

25               "The Court should look to whether the opposing

1    party has had fair notice of the general fact

2    situation and legal theory upon which the amending

3    party proceeds."

4    General fact situation and legal theory.  General

5    fact situation, this is to avoid and recover transfers made

6    from the Woodbridge Ponzi scheme, specific transfers made

7    from the Woodbridge Ponzi scheme to the Defendant Kenneth

8    Halbert.  The legal theory is avoidance and recovery.  The

9    general factual situation is the specific payments that Mr.

10   Halbert received, except, instead of just the interest

11   portion, it is the principal portion.

12   And then, finally, the second -- and this is where

13   I'll close, unless Your Honor has questions -- the second

14   circuit case I would point the Court to is the Ninth

15   Circuit's Martell case that we cite in our opening brief.

16   And again, I think this -- the analysis here is so concise

17   that I'll quote it, where the Court explains that:

18   "When a suit is filed in a Federal Court under the

19   rules, the defendant knows that the whole

20   transaction described in it will be fully sifted by

21   amendment, if need be, and that the form of the

22   action or the relief prayed or the law relied upon

23   will not be confined to their first statement."

24   And the point there is, is that, when we litigate

25   in the environment we litigate in, which is under the Federal

1    Rule of Civil Procedure, which have amendment provisions in

2    them that allow leave to amend when justice so requires and

3    that allow for relation back when something arose out of the

4    same conduct, transaction, or occurrence, those provisions

5    and the backdrop provide the defendant with ample notice.

6    And there are no notice issues or concerns with respect to

7    potential amendments.  And I think we -- if this case doesn't

8    qualify as falling within the same conduct, transaction, or

9    occurrence under Rule 15(c), I find it hard to imagine a case

10   that would.

11           So I'll close with that, unless has any questions,

12   and reserve, if I may, time to respond to anything

13   defendant's counsel says.

14           THE COURT:  I do have a question before we move on

15   to the defendant's counsel.  I've reviewed the cart of the

16   transfers that attach to exhibit -- attached as Exhibit 1 to

17   the original and the amended complaints, which sets forth the

18   multiple transfers --

19           MR. PFISTER:  Uh-huh.

20           THE COURT:  -- and totals and subtotals.  And I

21   want to make sure that we're on the same page with respect to

22   the value of the transfers.  And I think I understand your

23   comment earlier that, look, this could perhaps be -- have a

24   complete defense to it.  But what is the trustee's allegation

25   with respect to the total dollar value of the alleged

1　　fraudulent transfers in the original and amended complaint?

2　　　　　　MR. PFISTER:  The total dollar value of transfers

3　　that are at issue in -- as those terms are broadly defined,

4　　and without the caveat that I gave, which I think is an

5　　important one, is on the order of 1 million in the original

6　　to on the order of 37 million in the amended complaint.

7　　Those are accurate numbers.  I just think they need a little

8　　context.

9　　　　　　THE COURT:  Oh, I understand.  Okay.  So, I mean,

10　　this was addressed, I believe, in Paragraph 17 of your draft

11　　amended complaint.  I just wanted to make sure that I was

12　　looking at the same numbers.

13　　　　　　MR. PFISTER:  Yes, the numbers are correct, Your

14　　Honor.  My point is just, for the reasons I stated, it is not

15　　necessarily the case that it is a one-million- to thirty-

16　　seven-million-dollar exposure, not by any means.

17　　　　　　THE COURT:  Okay.  Terrific.

18　　　　　　Okay.  We'll hear from the defendant's counsel.

19　　I'm sorry, sir --

20　　　　　　MR. HAUSWIRTH:  Good afternoon --

21　　　　　　THE COURT:  -- I can't --

22　　　　　　MR. HAUSWIRTH:  -- Gregory --

23　　　　　　THE COURT:  Sorry.  Go ahead.  I couldn't hear you

24　　was all I was going to say.

25　　　　　　MR. HAUSWIRTH:  Not a problem, Your Honor.  Good

1    afternoon.  Gregory Hauswirth of Leech, Tishman, Fuscaldo &

2    Lampl.  Here with me today is my colleague Patrick Carothers,

3    that will go into the argument for the Defendant Kenneth

4    Halbert.

5            THE COURT:  Good afternoon, Mr. Carothers.

6        (No verbal response)

7            THE COURT:  I cannot hear.  Can anyone else not

8    hear, or is it just us?

9            MR. CAROTHERS:  I apologize, Your Honor.  Maybe I

10   had it on mute.

11           THE COURT:  Oh, okay.

12           MR. CAROTHERS:  Can you hear me now?

13           THE COURT:  Terrific.  That -- yes, I can hear you

14   now.

15           MR. CAROTHERS:  I apologize, Your Honor.

16           THE COURT:  No problem.

17           MR. CAROTHERS:  (Indiscernible) my name is Patrick

18   Carothers and I'm here today on behalf of the Defendant

19   Kenneth Halbert.

20           Your Honor, to summarize my argument in a nutshell,

21   I think there's something that has to be said at the outset

22   that's very important, and I'll continue to come back to that

23   point.  The causes of action that are being set forth in the

24   amended complaint, these new causes of action, these are

25   time-barred causes of action.  These actions were not pled in

1    the initial complaint.  Subsequent, we went down a road.  And

2    during that time period, the time period to bring these

3    allegations were barred by the statute of limitations.

4         So, yes, there is, of course, our civil rule of

5    procedure, Rule 15, and we're going to talk about it during

6    the case law and those types of things.  But one of the

7    things that could not be any more prejudicial to Mr. Halbert

8    would be to allow -- for this complaint to come forward and

9    allow for causes of action that have already been time-barred

10   by applicable time limitations to be advanced against him.

11   So, at its core, that Mr. Halbert's argument here today.

12        Now the first thing I think that has to be set

13   forth is that we believe these are two truly completely

14   different cases.  And as I listened to what Mr. Pfister was

15   saying about, you know, if this isn't a case where it's --

16   causes of action arise out of a same transaction and

17   occurrence, where would one be.  Well, it's not this case,

18   Your Honor, because let's look at these two different,

19   distinct cases that were made.

20        And I think, in his opening, in the first ten

21   minutes Mr. Pfister was talking, he really laid out the true

22   distinctions very well, actually, between these two types of

23   cases, which I would describe as, one a very simplistic case;

24   and, to, a rather fact-intensive, complex case.  Let's call

25   them "Case A" and "Case B."

1    Case A is what was pled in the original complaint

2    in which the trustee, the plaintiff, explained is a kind of

3    garden variety Ponzi scheme case, where the cashed-out

4    investors in the Ponzi scheme are sued just for the interest

5    they received from the ill-gotten gains of the fraudulent

6    company.  And that's where the plaintiff has said they

7    pursued some 600 cases against defendants or this kind of

8    garden variety cause of action.  And I agree, it's an action

9    that sometimes is pretty difficult to defend against when

10    you're the defendant in one of those situations.

11    If you invested in the company by a debt investment

12    or other type of investment, and you receive an interest

13    return on your investment, and then it turns out that company

14    that paid you was later deemed to be a Ponzi scheme, absent

15    some other defenses that could be present -- that, actually,

16    Mr. Halbert has articulated that he has to those interest

17    components -- it's a rather simple accounting exercise where

18    you look at the ledger, you see where interest was paid.

19    Usually long before the adversary proceeding is pursued,

20    there's usually a conditional determination in the underlying

21    Chapter 11 that the case was a Ponzi scheme, pretty simple

22    cause of action.

23    Case B, which we would be looking at here, as to

24    what the plaintiff wants to amend this case to be, it's a

25    much difference and advanced cause of action where the

allegations have to turn to the fact that the investor now

was basically a material participant in the overall Ponzi

scheme; that this investor acted in bad faith.  Essentially,

when you read the case law, it talks about, you know, who

qualifies for these things.  As the plaintiff pointed out,

these things don't happen a lot because you're talking about

true and actual fraud, basically.  You're saying that this

person had enough knowledge that basically they are a true

wrongdoer in the overall scheme, they're a co-conspirator of

fraud, maybe even potentially -- because we know what

eventually happened to Mr. Shapiro -- or possibly a criminal.

These are night and day now, when you look at what

needs to be proven.  This is a case where, basically, you're

going to have a true fraud complaint, a true fraud lawsuit,

where before you just had a situation where there was some

accounting entries on a piece of paper.  This now delves into

light years of a difference between Case A and Case B.

And in fact, that's where a lot of these factors

under Rule 15 come in.  All four of them, I think, are

applicable because of the fact that this case was pursued as

a basic Case A type of an action throughout this proceeding,

until the mediation abruptly ended.  And I want to talk about

that abrupt ending a little bit.

But going back again, we now have -- so we have

Case A and Case B.  We have Case B that is otherwise barred

1    by the statute of limitations, and we have Case B, in our

2    opinion, completely different from Case A.

3              THE COURT:  Well, let me --

4              MR. CAROTHERS:  So let's --

5              THE COURT:  -- ask you --

6              MR. CAROTHERS:  -- look at -- yeah, go ahead.

7              THE COURT:  One question.  Do you disagree that the

8    amendments -- the amended claims involve the same

9    transactions and investments as the original complaint?

10             MR. CAROTHERS:  There's sort of overlap in the

11   dollar amounts that we have there.  But Mr. Halbert, in many

12   ways -- although the way this documentation was set up looks

13   as if, though, he loaned $37 million overtime, in a nutshell,

14   what he did was he basically established a credit line, a

15   credit facility of a certain amount of money.  He kind of was

16   re-loaning in the same money over the course of time.

17             There's different times -- you know, this went on -

18   - this went on for years.  I think it was, you know, a five-

19   or-six-year period, where these different transactions were

20   made.  And I think that, while maybe, you know, you're

21   looking at the same dollars, you know, that are coming in and

22   out, it's more of a case, when you go to Case B, about what

23   Mr. Halbert knew, what type of relationships he had and the

24   like during those time periods.  So, while maybe it's, you

25   know, the same transactions from a dollar perspective that

1    support both Case B or Case A, there would be evidence in

2    those cases.

3            We're not really looking at it in Case B, in terms,

4    really, of, well, you know, was this money paid and, you

5    know, as a result, you know, did Mr. Halbert owe it back.

6    We're looking at a much more intense factual inquest into

7    fraud, intent, involvement, and those things.  And again, I

8    just think that the dollar amounts there, there were

9    underlying evidences, as opposed to a same or similar case.

10           THE COURT:  Thank you.

11           MR. CAROTHERS:  So, with that as the -- my -- the

12   general backdrop, let's look at these factors --

13           THE COURT:  Yeah.

14           MR. CAROTHERS:  -- that have been brought up.  And

15   again, it was stated in some ways by the plaintiff as though

16   we limited our argument, and I don't think we limited our

17   argument in any ways.  I think our papers show that we had

18   issues under all four of these factors.  I'll at least

19   address them to day to try to clarify that.

20           But the first would be the amendment being undue.

21   And the plaintiff tried to come back and say, well, we were

22   suing 600 people, so we engaged in this strategy that kind of

23   excuses the fact that, you know, we didn't sue Mr. Halbert

24   for the allegations that now we want to sue him for because,

25   you know, that would have been kind of hard, that may have

1    burdened some other defendants, that may have, you know,

2    required us to do, you know, a lot of diligence, looking for

3    needles in a haystack.  Well, I'm not real moved by that.

4    This is -- we're not litigating this as a class action, we're

5    not 1 of 600 people that invested in some sort of a group.

6    It just so happened that the trustee had potentially 600

7    targets to pursue.

8         And the trustee (indiscernible) even though I think

9    he had some hyperbole in his papers, certainly clarified the

10   record today that the trustee is not claiming that they newly

11   discovered this evidence during the course of the litigation.

12   And this is -- and albeit this evidence that they point to I

13   think is week, and we'll talk about it.  But this evidence

14   was at their disposal for a long period of time before they

15   filed these cases, and the Bankruptcy Code has the statutory

16   deadline that it has.

17        And with this type of evidence that's there, yeah,

18   it probably was a bit of a needle in a haystack and was

19   included inside of voluminous documents.  But that's not a

20   surprise to any of us that are involved in these types of

21   large cases.  We have the amount of time that we have to

22   pursue the actions.  And that's why you see, typically,

23   trustees will include these types of, you know, additional

24   pleadings when they bring fraudulent transfers or when you

25   see -- typically, when you'll see a preference action is

pursued, you'll see it pursued under 547 and 548, just so the trustee can cover their bases.  There's lots of ways to do that, and including the fact that they had at least enough information in front of them that they could have put down the principal and dropped that other count in.

The plaintiff will say, well, that would have really, you know, maybe affected the other 600 cases.  Well, I don't think Mr. Halbert is too concerned about the other 599 cases; he's worried about this case, where he's now being sued for $37 million.  So the fact that it may have been burdensome to have reviewed that information, that, you know, there was a needle in a haystack that had to be found, well, that, frankly, is just not an exception to the statute of limitations defense, so that happens in all types of cases; nor did anyone approach Mr. Halbert and ask, you know, to get a tolling agreement or bring this issue in the forefront.

Essentially, what the trustee did was say I'm going to file these 600 cases, I'm not going to pay any attention to what I have over here in my boxes, and if it might help me out 20 months into some litigation to pull some of these things out of the box, then I'll bring them to the forefront at that time, and then I'll try to freely amend the complaint.  And I don't think that is proper under these facts.

So I think the delay, you know, that is spoken to

is undue because the trustee possessed all of the information

at the time, and he could have reviewed this and pled it at

the outset.  And I'm, frankly, just not moved by the fact

that it might have injured their ability to bring other

cases.

And you know, if they would have reviewed this

information -- they said Mr. Halbert was in a class of one --

they would have had to just file against one person those

additional allegations.  They chose to wait.  And I don't

think there's a reason now to allow them to benefit by

amending that complaint late, past a deadline that if, for

example, Mr. Halbert was the only defendant in this case,

they wouldn't be able to come and produce that same evidence

as a reason to get past the limitation period.  I don't think

Mr. Halbert should be prejudiced himself because it just

happened to have been some other work that the trustee had to

do during the same period of time.

Number two, as far as the prejudicial delay, I

couldn't think of a more prejudicial situation than the

attempt to amend this complaint over the top of the statute

of limitations period being expired.  So I think that one is

one of the easier ones to see where Mr. Halbert would be

prejudiced by allowing the case to now go forward with his

legal rights being essentially ignored as to a defense that

he would have to the case.

1          THE COURT:  So let me stop you there.  Your

2     prejudice argument is that he's prejudiced because of the

3     statute of limitations.

4          MR. CAROTHERS:  So, number one, of course, where it

5     says if the delay is seeking an amendment is undue, the undue

6     delay was caused by the trustee in not reviewing the

7     documents and bringing it at that time.

8          THE COURT:  Right.

9          MR. CAROTHERS:  (Indiscernible)

10          THE COURT:  Would --

11          MR. CAROTHERS:  Number two, as far as the amendment

12     being prejudicial to us at this point, I have a couple of

13     arguments there.  A is the statute of limitations has expired

14     in the interim time period.

15          B -- and this kind of goes into the bad faith

16     motivations that I want to discuss.  Mr. Halbert had to spend

17     a fair amount of money pursuing his defense rights in Case A.

18     He had some defenses that were applicable in that case that

19     related to the fact that he released liens on certain

20     properties when he was paid the interest.  So we spent a lot

21     of time going back into countless amounts of real property

22     records to figure out where Mr. Halbert's liens were and then

23     charting out liens that were released against properties when

24     he received these interest payments because it wouldn't be a

25     defense to this case, we believe, even to the interest, if

1    Mr. Halbert was releasing good faith, valid liens that he had

2    on property of the debtor at the time he received the

3    interest payments.

4         So we spent a lot of time on that and a fair amount

5    of legal fees, only to go to the mediation and, at the

6    mediation, no one wanted to talk about Case A.  Instead, the

7    whole discussion at the mediation was, well, we can bring

8    Case B against Mr. Halbert if you don't want to pay the full

9    amount that we're suing you for in Case A.  Well, we thought

10   we had defenses for that.

11        And then we looked at the evidence that we can talk

12   about, that's being advanced against Mr. Halbert for this

13   Case B, which we'll take a look.  And again, I think it's

14   extremely weak to (indiscernible) be able to meet that

15   standard.  So we spent a lot of money looking at Case A.  Now

16   it didn't work out for the plaintiff in Case A, so they said,

17   well, we want to bring Case B, notwithstanding the fact that

18   it's time barred and it's not going to have any prejudicial

19   effect to you.  Well, it does because we didn't realize this

20   case was out there, and we probably wouldn't have spent a ton

21   of time, effort, and money defending Case A, had we known

22   that, really, this was all about Case B anyway.  So there is

23   an effect to that.

24        I hate to use, to be honest, you know, especially

25   amongst my colleagues, the trustee (indiscernible) a lot of

1    respect for (indiscernible) but I don't think it was good

2    faith to proceed down this mediation course when the only

3    thing that was ever discussed substantively about Case A was

4    the fact that Case B was out there, and there was a thirty-

5    seven-million-dollar ball hanging over Mr. Halbert's head if

6    he didn't resolve Case A, we were put in a -- really, in my

7    mind, a very tough situation.

8         And the reason the mediation -- the second

9    mediation was canceled was because we told the mediator that

10   we weren't going to come to the mediation and pay the full

11   amount of money on Case A.  And at that time, he came back to

12   me and said, well, then we shouldn't come forward because

13   that's the only way the other side will mediate.  So this has

14   always been an attempt to get Case B in the middle of Case A.

15   I don't think that's proper, I think we've been prejudiced by

16   it, and I don't think it's been, you know, good faith to see

17   this progress the way it has.

18        My final comments are to go to -- I'd like to just

19   point out the evidence that we have here, that we keep

20   hearing about.  And we keep hearing that Mr. Halbert is in

21   this class of one of the net winners that, upon review,

22   raised everybody's eyebrows so much.  One, I don't know what

23   happened in those other 400 cases that settled.  Many of

24   those cases may have settled because the trustee went to --

25   into those cases and said, hey, I got some Case B against you

and then settled Case A.  I think that could be certainly an

issue for evidentiary discovery that might need to be done,

you know, in connection with the motion.

But let's look at the evidence that they cite to,

in terms of support for this case.  This comes from their

papers.  They said that:

> "During the course of litigating this adversary
>
> proceeding, the trustee has recently learned that,
>
> unlike typical Woodbridge investors, Halbert had a
>
> close personal business relationship with Shapiro.
>
> The trustee has uncovered emails in which Shapiro
>
> refers to Halbert as "his good friend," and in
>
> which Shapiro offers his vacation home rent-free to
>
> Halbert's son.  In addition, numerous other email
>
> evidence that Halbert had an open line of
>
> communication with Shapiro regarding business
>
> matters."

Well, when you go to these exhibits that they

produced of these emails, there was an email December 31st of

2014 that stated -- this is Exhibit D.  It said:

> "Ken, hope all is well.  Just to let you know, Ivan
>
> has left the co to pursue his own deal.  Feel free
>
> to speak to my stepson Scott or Dane for any of
>
> your structured settlement needs.  Scott or Dane" -
>
> -

1          And they were copied on this email.

2          "-- take care of my good friend Ken Halbert.  Hope

3          you have a nice trip and a happy new year."

4          In response to that, Ken Halbert says:

5          "If you need anything, my direct line is 818-530-

6          0287."

7          Now that is supposed to tell us that Mr. Halbert

8    was somehow a bad faith material participant in a Ponzi

9    scheme that, on New Year's Eve, in a friendly email, someone

10   says take care of my good friend Ken Halbert.  Well, Ken

11   Halbert loaned $37 million to the company.  He probably was

12   his -- you know, he probably was a good friend, or at least

13   Bob Shapiro wanted to act like he was a good friend.  And

14   then Ken Halbert saying, if you need anything, here's my

15   direct line to call me is far from somebody saying, well,

16   there's open lines of communication for anything you need

17   ever.  I think that's just a -- you know, a friendly

18   exchange.

19          Then, in exhibit -- also in Exhibit D, we have the

20   -- an email about that condo, where the trustee, in his

21   pleadings, said that this condo was being offered free of

22   charge.  It says, on February 14th, 2016:

23          "Hi, Bob.  I'm sure you're having a great time in

24          Bora Bora.  A few times in the past, you offered

25          your condo to me in Aspen.  My son Jeff will be in

1          the area.  I was wondering if it's available,

2          either from February 20th through the 23rd or

3          February 25th through the 28th.  Thanks, Kenny."

4          To which it looks like Bob Shapiro responded:

5          "In Australia.  Bora Bora was great.  We have a

6          condo in Aspen he can use.  Copied Laura on this

7          email, and she can make arrangements for a key.

8          Laura will take care of you, my good friend Ken's

9          son."

10          Well, one, it looks like he uses the term "good

11    friend" when he describes anybody.  Two, there's nothing in

12    this that suggests that this condo was leased free of charge.

13    It just looks like that it was available in Aspen, and they

14    agreed to have his son use it.  If we would get into more

15    testimony, we would learn that, you know, that wasn't a

16    gratis situation.

17          And I only bring that -- those up because that's

18    the extent of this evidence that they're using to support

19    Case B.  Well, it's not very strong evidence.  And again, we

20    were put in a position to have to litigate Case A against

21    this Case B ball hanging over our head that contained these

22    kind of flimsy allegations of evidence.

23          So, look, I don't think that the amendment

24    necessarily would be futile because they're probably pleading

25    a cause of action that could possibly, if you take the

1    complaint on its face, sustain a motion to dismiss maybe.

2    And I'm not saying I wouldn't file one if leave is granted.

3    But I certainly don't think that, when you combine that all

4    together with all the other facts that we're looking at, that

5    we can't see a pattern of what's going on here:  The trustee

6    blew a statute of limitations and is trying to get it back

7    and hold it over our head to settle Case A, with the threat

8    that Case B may be looming.

9          So, for all those record -- reasons I stated, I

10   would ask that this --

11         THE COURT:  Well --

12         MR. CAROTHERS:  -- motion to amend be dismissed.

13   And I'll take any questions.

14         THE COURT:  I -- yeah, please.  So why can't -- why

15   shouldn't this be related back to the statute?

16         MR. CAROTHERS:  Well, I think it goes to, you know,

17   the same point I made earlier.  Case A, pretty simple, you

18   were shown some interest payments that you received.  And it

19   was asked that those payments be returned because this case

20   was a Ponzi scheme.  That case did say, okay, these interest

21   payments came from certain payments that were made, but it

22   never had any reference to the fact that they were going to

23   try to recover those principal payments, and it certainly did

24   not have anything in those pleadings that discussed that

25   there was going to be an attack on Mr. Halbert that would

basically put him almost in the same category as Mr. Shapiro,

that he was going to, you know, be accused of being a bad

faith participant in his investments, that he was, you know,

a glorified fraud, co-conspirator, maybe a criminal.  The

transactions are the evidence of maybe what the loss would

be.  But these are completely different types of allegations

that are used -- trying to utilize the same transactions to

hang on together.

But it's certainly one thing to come to me and say

you got some interest back from a Ponzi scheme and you were

an investor, you know, and by dumb luck you're going to have

to pay this back because the company, unbeknownst to you, was

a Ponzi scheme and there's a million dollars on the line.

And then go down to Case B and say you're a fraud, you

conspired, now you have all these damages.  I don't think

those are the spirit of same transactions or occurrences.  I

think this certainly would come as a surprise to anybody, if

they received one complaint that related to Case A, only to

find that, absent -- with the statute of limitations running,

they now would be guilty of the allegations in Case B, or be

subjected to those types of allegations.

THE COURT:  At this juncture, there's been no

discovery, there's been no motion practice, et cetera, right?

It's a -- we're at a clean slate, more or less.  Doesn't the

defendant still have the right, the opportunity to fully

1    defend the case and argue good faith as an affirmative

2    defense?

3              MR. CAROTHERS:  Sure.  And if the trustee sued Mr.

4    Halbert for something that he did in 1983, and it was allowed

5    to go forward, he would have the ability to come forward with

6    his defenses.  The distinction is that the case is now time-

7    barred, so it's a much different situation.  And Mr. Halbert

8    shouldn't be made to have to come forward and dispute this;

9    he should be able to raise the statute of limitations defense

10   to it.

11             THE COURT:  Do you think, under the law, that a

12   trustee is entitled to leeway?

13             MR. CAROTHERS:  I don't, Your Honor.

14             THE COURT:  Are you --

15             MR. CAROTHERS:  I mean, the trustee -- there's

16   nothing in the Bankruptcy Code that says -- and look, I

17   appreciate -- I represent trustees.  I appreciate the types

18   of burdens that you face when 19,000 boxes of documents are

19   delivered to you and you have to send 7 to Iron Mountain, and

20   you're looking at a two-year statute of limitations, and it's

21   driving you crazy that you're going to make it.  And you

22   don't want to file anything that's in bad faith, but at some

23   point, you have to make a call and a decision.

24             And the Bankruptcy Code nowhere says where a

25   trustee gets an extra period.  The trustee gets a two-year

1    period.  Whether that's right or wrong, I guess is a decision

2    for Congress to make, and they've made (indiscernible) case,

3    right?  So to try to expand that duty to (indiscernible)

4    trustee, it definitely faces, you know, some significant

5    burdens in these cases.  We've actually advanced the powers

6    of a trustee far beyond, you know, what any other litigant

7    would have.  And you know, that's not the law, and it

8    certainly wouldn't be fair to Mr. Halbert.

9             THE COURT:  Thank you.

10            And just, Mr. Carothers, I want to just clarify one

11   thing because I think the standard really has -- you referred

12   to four factors, and there are really five.  But I think the

13   fifth -- you're saying the factor, if the movant doesn't

14   provide a draft of the amended complaint, you're --

15            MR. CAROTHERS:  The movant --

16            THE COURT:  -- you just --

17            MR. CAROTHERS:  -- provided a very well drafted

18   complaint.

19            THE COURT:  Okay.  I just want to make sure that

20   the four factors that you had referred to were the first

21   four, and that you were just skipping over the fifth one.

22            MR. CAROTHERS:  I was.  Thank you, Your Honor.

23            THE COURT:  Okay.  No, no.  No problem.  I just

24   want to make sure the record is clear.  Thank you.

25            MR. PFISTER:  Thank you, Your Honor.  If I can

1   reply briefly?

2          THE COURT:  Yes.

3          MR. PFISTER:  Okay.  Let me give two -- make two

4   opening points and then hit a couple of key points that I

5   think Mr. Carothers -- that I need to address.

6          My first opening point is I think we're hearing a

7   slightly different argument than we heard in the opposition

8   brief, especially with respect to prejudice.  I just went

9   back and looked at the opposition brief.  I didn't see

10  anything about legal fees and releasing liens and the like.

11  I mean, the prejudice that is alleged in the opposition brief

12  is about the prejudice of litigating, you know, what they say

13  is a thirty-seven-million-dollar case.

14         I think one of Mr. Carothers' statements about, you

15  know, this isn't 37 million, this is the same money, you

16  know, he'd lend it, he'd get it back, he'd lend it, he'd get

17  it back, he'd lend it, he'd get it back, that's certainly a

18  fine argument for him to make when we're talking about which

19  transactions are shielded by good faith.  If he lent a

20  million, got back a million, and was in complete good faith,

21  that one is shielded.  If you lend a million, got back a

22  million, and was in complete good faith, that one is

23  shielded.  Maybe the last few are the ones where, you know,

24  he -- there's a potential issue there.  So, again, I think

25  that statement by Mr. Carothers, that characterization of the

1   transfers as not being $37 million lent, but rather being the

2   same money, you know, lent and returned, lent and returned,

3   lent and returned, I think that raises interesting issues as

4   to how exactly the 548(c) affirmative defense will come into

5   play.  But I think it highlights that this is not a question

6   of 1 million to 37 million.

7          The second opening point I'd like to make is the

8   mediation privilege.  Mr. Carothers made a number of

9   statements about what happened at mediation.  I don't think

10  that's appropriate, given the very strong shield of

11  mediation.  I was not present at any of the mediations, I

12  can't -- I wouldn't and I can't comment on anything that was

13  or was not said at a mediation.  But I don't think it's

14  appropriate to argue with respect to what happened at a

15  mediation and the like.

16         I think what is before the Court is that there was

17  an initial complaint filed.  There was a scheduling order

18  that deferred everything, in terms of actual litigation,

19  pending the parties' efforts at mediation.  The parties

20  attempted to mediate.  The mediation was not successful.  And

21  the trustee, thereafter, immediately filed a motion for

22  leave.  I think that's what's properly before the Court.

23         I don't think any questions about what was said or

24  was not said during the mediation process are really

25  appropriate for the core discussion.  And I am certain that,

1    if we were going to get into that, that the trustee's other

2    counsel who was present at the mediation would strongly

3    disagree with Mr. Carothers as to what was said.  But again,

4    I just don't think that's germane or relevant.

5            On the prejudice point, I did want to point Your

6    Honor specifically to the Dole case, Third Circuit 1990.

7    It's cited in Paragraph 14 of our reply.  It very clearly

8    says that the type of prejudice required to defeat an

9    amendment under Rule 15 is, quote:

10               "A showing that the defendant was unfairly

11               disadvantaged or deprived of the opportunity to

12               present facts or evidence which it would have

13               offered had the amendments been timely."

14           I left out some ellipses there.  But the point

15   being that the prejudice inquiry under Rule 15 -- and this

16   follows from the text of the original Cureton case that I

17   quoted about the delay must be prejudicial.  It's not the new

18   allegations must be prejudicial.

19           I think Mr. Carothers has a nice rhetorical point

20   on what he calls a "Case A" versus a "Case B."  It certainly

21   sounds nice.  But I think, when you look at the text of Rule

22   15, you'll see that that's not the standard.  And this goes

23   back to what I think is ultimately going to be the critical

24   factor here, which is the case that the trustee pled in his

25   initial complaint and the case the trustee pled in his

proposed amended complaint is the same case, in the sense of it is an action to avoid and recover fraudulent transfers.

The -- what Mr. Carothers is talking about, in terms of Case A versus Case B, is the answer that he is going to proffer to that complaint and the defenses that he is going to mount to that complaint.  But Rule 15, if you look at its text, it refers to a pleading.  So Rule 15(a), "A party may amend its pleading, and then it gets to, you know, "as justice so requires."

Our pleading here is our affirmative request that the -- affirmative attempt to avoid and recover transfers that were made.  The only substantive change is, is that the universe of those same transfers that were -- transfers of both principal and interest have been included now, have been expanded to include the principal components and not just the interest components.

Mr. Carothers pointed out, you know, the trustee sitting on, you know, boxes of documents and the like.  This is not a case where we are proffering an amended complaint that charges -- alleges that Mr. Halbert engaged in fraud by any means.  That's not a complaint we are bringing, it's not a complaint we're attempting to bring.  We're bringing the same complaint for avoidance and recovery of fraudulent transfers.  Mr. Carothers intends, as is his right, to vigorously oppose the -- on the merits, using his 548(c)

1    affirmative defense -- and it's his burden to plead and prove

2    -- he plans to mount a different affirmative defense -- or a

3    different defense to that pleading.

4            But what is before the Court is not, in the

5    abstract, Case A versus Case B.  It is the trustee's original

6    complaint and the trustee's proposed amended complaint,

7    neither of which, either do, or obligated to alleged,

8    affirmatively a lack of good faith on Mr. Halbert's part

9    because that is his burden to plead and prove that.  So,

10   again, I think it's a nice rhetorical point, but I don't

11   think it actually takes you anywhere.

12           And then, finally, in terms of this -- in terms of

13   attempting to parse through the evidence that the trustee

14   proffered with the motion to amend as to why we now believe

15   that Mr. Halbert may not take advantage of the good faith

16   defense.  First of all, it wasn't done in the opposition

17   brief.  Mr. Halbert point -- picked out the good friend

18   emails and the lending -- you know, the son -- or lending the

19   house to him in Aspen emails.

20           It's actually far more damning than that.  Again,

21   the business about he understood or he knew or should have

22   known -- which, by the way, should have known is sufficient

23   to defeat affirmative -- a good faith affirmative defense --

24   you know, that the signatory on the Owlwood property entity

25   was, in fact, Robert Shapiro and was not a bonafide third-

party buyer; and then that his son entered into a finder's

fee agreement to find a bonafide third-party buyer for

Owlwood.  Those are far, far more damning than, you know, my

good friend and the house.

All of that, however -- and I'll close with where I

started.  All of that is not before the Court.  The Court is

not holding a mini-trial right now on did Ken Halbert act in

good faith.  That is not what is before the Court.  The Court

is -- has before it a motion to amend.  Under Rule 15(a), the

standard is leave shall be freely amend [sic] as justice

requires.  There are the four factors from Cureton, we've

gone through them at great length.

I think Mr. Carothers' primary argument about

statute of limitations, that's a Rule 15(c) issue, that's not

a Rule 15(a) issue.  And that argument would be precisely the

same as if the trustee had filed this initial amended

complaint on December 8th of 2019, right?  He filed the

initial complaint on December 1, within the statute of

limitations, of 2019.  Had he then filed the amended

complaint on December 8th of 2019, seven days later, just

past the statute of limitations, it's the same test under

Rule 15(c).  Does it arise out of the same transaction --

conduct, transaction, or occurrence set out in the initial

pleading or attempted to be set out in the initial pleading.

So, again, I understand the desire to conflate the Rule 15(c)

1    issue and the Rule 15(a) issue, but they are not the same.

2    What's before the Court is the request to amend.  I believe

3    that request is well taken.

4         And the issue of relation back, I don't think the

5    Court has to address it now, I think the Court can address it

6    now.  I maintain that it -- that we -- it's difficult to see

7    a clearer instance of something arising out of the same

8    conduct, transaction, or occurrence when you're talking about

9    principal payments and interest payments, but that's the

10   change.  The change is not Mr. Halbert is a fraudster.  The

11   change is we are seeking to recover funds that were

12   transferred to Mr. Halbert.  He is entitled to mount defenses

13   to those claims, and we are entitled, under the rules, to

14   seek leave to amend those claims.

15        So, with that, Your Honor, I think, if -- unless

16   the Court has any questions, I'll conclude.

17        THE COURT:  Thank you.  No, I -- is there anything

18   further?

19      (No verbal response)

20        THE COURT:  Okay.  I am going to take this matter

21   under advisement.  We'll be in contact with the parties.

22   Thank you very much for your helpful arguments today.  Have a

23   great day.  We stand adjourned.

24        MR. PFISTER:  Thank you.

25      (Proceedings concluded at 4:36 p.m.)

1                          <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9

10

11     _____          October 27, 2021

12     Coleen Rand, AAERT Cert. No. 341

13     Certified Court Transcriptionist

14     For Reliable